**EXHIBIT 2**

# PRISON Legal News

VOL. 17 No. 11
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

November 2006

## PHS Redux: Sued In A Dozen States, Contract Losses, Stock Plummets, Business Continues

*by John E. Dannenberg*

Prison Health Services (PHS), a subsidiary of America Service Group, Inc. (ASG), continues to face lawsuits and lose contracts for its deplorable record of prisoner health care gaffes in a dozen states. The old maxim "Physician, heal thyself" might be good advice for ASG, whose stock has tanked by over 55% from March 2005 to October 2006, based largely on negative publicity from PHS. Even more disturbing is that PHS is the nation's largest for-profit provider of prisoner health care, with 110 contracts in 37 states, meaning that its low-budget "solution" to prisoners' health needs has become bad medicine for an increasing number of our nation's prisoners. This report is an update to *PLN*'s six earlier reports since 2002 on PHS's sordid performance (see, e.g., *PLN*, May 2005, p.34 and Aug. 2005, p.1).

### Alabama

Alabama's Department of Corrections (ADOC) has been the target of major federal-court ordered health care reform at the Tutwiler, Limestone and Donaldson prisons, and continues to be troubled turf for PHS. On March 6, 2005, 53-year-old insulin-dependent diabetic Teresa Morris died of what PHS called "natural causes" at the Tutwiler Prison for Women. Visibly unnatural, however, was Morris' condition at the time of her death: her legs were so badly swollen that her shackles dug into them. Morris' family filed suit, claiming that PHS inexplicably took Morris off her insulin shots, a predictably fatal move. "I can't say whether or not she was given insulin," said PHS Vice-President Ben Purser, adding, "it was an expected death." Although Morris's death certificate listed diabetes, cirrhosis and Hepatitis-C as causes of death, she was not being treated by PHS for the latter two diseases. Morris was reportedly seen by PHS staff every three months, but not by a doctor. She was last visited by her mother just after Morris died. Her mother kissed Morris' swollen, shackled, still-warm body in the hospital, and held her hand.

PHS replaced prior medical care contractor Naphcare in November 2003, whose health care services had been a disaster. ADOC officials characterize PHS's services as "better," but court monitor Dr. Joseph Bick reported that ADOC was far from compliant and suffered from severe shortages of doctors and nurses. PHS's own Montgomery-based medical director was pressed into service at Limestone, where he was reportedly their sole HIV doctor.

There have been six deaths at Tutwiler since PHS took over. Renowned prison health care expert and court monitor Dr. Michael Puisis audited Tutwiler and found mistakes in 19 of 22 prisoner charts he reviewed. Dr. Puisis recommended to the court that based on the chart reviews, PHS employee Dr. Samuel Englehardt, a retired obstetrician and the primary care physician at Tutwiler "should not be providing general internal medicine care to the patients." Dr. Puisis's comments came on the heels of his investigation into three prisoner deaths, at least two of which were laid to "no effective physician monitoring of patients." The state and PHS tried to keep Dr. Puisis' reports confidential, but the prisoners' class attorney, the Southern Center for Human Rights, fought for disclosure and accountability.

In May 2005, ADOC put its foot down. It annulled $1.2 million in payments on PHS's $143 million, three-year contract because the company had not provided enough doctors and nurses from May 2004 to February 2005. Whether PHS still made a profit from short staffing its facilities is not known. ADOC is also conducting an audit of PHS's staffing

## Inside

| | |
|---|---|
| Utah Work Release Hell | 10 |
| From the Editor | 12 |
| Florida Civil Commitment | 13 |
| California Mayhem Continues | 18 |
| Chicago Jail Scandals | 21 |
| BOP Medical Suit Award | 24 |
| Geo Prison Problems | 27 |
| Arizona Jail Corruption | 30 |
| Georgia Guards Plead Guilty | 32 |
| Vienna Convention Ruling | 34 |
| California Strip Searches | 36 |
| Idaho Population Cap Upheld | 38 |
| News in Brief | 43 |

# www.prisonlegalnews.org

## *Prison Legal News Online!*



➤ *PLN's website offers all issues of PLN in both a searchable database and PDF format. Issues are indexed and posted as soon as they go to press!*

➤ *Full text decisions of thousands of court cases, published and unpublished!*

➤ *Most complete collection of prison and jail related verdicts and settlements anywhere!*

➤ *Brief bank with a wide assortment of winning motions, briefs, complaints and settlements!*

➤ *Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search. Visitors can search the site's content for free, pay only if we have what you are looking for!*

➤ *Our Publications section has downloadable versions of numerous government reports, audits and investigations from around the country!*

➤ *All content is easy to print for downloading and mailing to prisoners!*

➤ *Order books, print subscriptions and make donations on line!*

➤ *Website chat room and forum allow for discussion and questions and answers by those interested in prison and jail issues!*

➤ *Links to thousands of other prison, jail, criminal justice and legal websites around the world!*

➤ *This is the highest quality and most comprehensive prison litigation news and research site in the world!*

## *New content added almost daily!*

If you need to know about prisons and jails or are litigating a detention facility case you can't afford not to subscribe to our website!

Online subscribers get unlimited, 24 hour a day access to the website and its content!

Low, affordable subscription rates to meet your needs and budget:

➤ $9.95 per month
➤ $69.95 per year

*You can't afford not to subscribe!*

**www.prisonlegalnews.org**

*Sign up for PLN's FREE listserve to receive prison and jail news and court rulings by e-mail.*

**PUBLISHER**
Rollin Wright

**EDITOR**
Paul Wright

**ASSOCIATE EDITOR**
Alex Friedmann

**EXECUTIVE DIRECTOR**
Donald W. Miniken Jr.

**COLUMNISTS**
Mumia Abu Jamal, Denise Johnston, Daniel E. Manville, Kent Russell

**CONTRIBUTING WRITERS**
Matthew Clarke, John Dannenberg, Gary Hunter, David Reutter, Mike Rigby, Sam Rutherford, Roger Smith, Silja J.A. Talvi, Bob Williams & Mark Wilson

**LAYOUT**
Lance Scott/Catalytic Communications

*PLN* is a Monthly Publication

A one year subscription is $18 for prisoners, $25 for individuals, and $60 for lawyers and institutions. Prisoner donations of less than $18 will be pro-rated at $1.50/issue. Do not send less than $9.00 at a time. All foreign subscriptions are $60 sent via airmail. *PLN* accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. *PLN* is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

Prison Legal News
2400 NW 80th Street #148
Seattle WA 98117
(206) 246-1022
Fax (206) 248-6846
info@prisonlegalnews.org
www.prisonlegalnews.org

Please do not mail *PLN* paperwork for an ongoing case or request legal advice. *PLN* is not a legal service provider and cannot give legal advice. *PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without a SASE. Check our website or send a SASE for writers guidelines.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index*.

**PHS Redux (cont.)**

records to determine how much money ADOC should be reimbursed for billed vacant medical positions. But PHS is only losing money; prisoners are losing their right to adequate health care and their lives.

Accusations flew alleging interference with prisoners' access to attorneys during a federal suit against PHS's non-performance at ADOC's Hamilton Aged and Infirm Correctional Facility. There, 33-year-old prisoner Terry Miller, a habitual drunk driver who was severely injured in a car wreck, suffered from a hole in his stomach (a fistula, caused by bile eating through skin grafts) that exposed his intestines. For over a year at Hamilton, his only medical treatment was gauze to sop up the caustic drainage that was consuming his surrounding skin. Later treatment, ADOC spokesman Brian Corbett said, cost the state $500,000. Miller was reportedly seen by PHS 28 times and a chronic care clinic six times. But in his four years in ADOC, Miller never received the admittedly risky and complex surgery needed to correct the fistula. He wheeled himself out of the prison gates on June 2, 2005 with, by then, three fistulas, a ten-day supply of gauze pads and $10 from the state. Miller is a plaintiff in a class action lawsuit filed by the Southern Center for Human Rights alleging inadequate care at the Hamilton prison. The suit, which did not name PHS as a defendant, resulted in a partial consent agreement in March 2006. See: *Aris v. Campbell*, USDC ND AL, Case No. 1:05-cv-00396-PWG.

A fresh brouhaha arose in February 2006 when Nurse Brandon Kinard resigned from PHS to become a state employee (ADOC regional clinic manager) charged with monitoring PHS's performance under its contract with the state. Attorney Rhonda Brownstein of the Southern Poverty Law Center opined that this smacked of a conflict of interest. Kinard had worked for PHS at the Hamilton facility as director of nursing and in administration, making patient health care decisions. After several weeks of employment with the state Kinard stated he would resign and go back to work for PHS, but then rescinded his resignation. Under Alabama law, state employees cannot immediately accept employment at companies they audited or regulated.

Kinard's supervisor, Associate Commissioner Ruth Naglich, was also formerly employed with PHS; she was vice president of sales and marketing for the company. "I don't know if it violates any state laws. But effective monitoring of a private company by the state Department of Corrections needs to be done by people who are independent of the medical company and independent of the DOC..." stated Southern Center for Human Rights attorney Joshua Lipman. And given PHS's record, such independent monitoring is necessary. In addition to withholding $1.2 million in payments to PHS due to contract violations in 2005, Alabama also withheld $580,000 as a performance penalty.

**Florida**

PHS, which contracts with a large number of Florida counties, has experienced an above-average amount of bad publicity and adverse incidents in the Sunshine State.

On March 4, 2004, Kimberly Ann Grey, after complaining to PHS medical staff and jail workers that she was in pain, gave birth to a son over a toilet at the Hillsborough County Jail. Although the mother and her newborn were belatedly taken by ambulance to a hospital after nurses initially refused to call 911, the infant died enroute. Suit was filed in December 2004 against PHS and jail personnel, alleging grossly inadequate medical care. The umbilical cord had been wrapped around the baby's neck and PHS nurses were untrained with resuscitation and newborn care; they also initially refused to believe that Grey was in labor and dismissed her complaints of pain as "mood swings." PHS fired one nurse practitioner and reprimanded two nurses over the incident. Grey's family's lawyer asked the federal court for "nationwide discovery" of PHS's records, but the court denied the motion as overbroad, notwithstanding a similar event reported in PHS's past. However, the court said it would entertain such a motion later if warranted. The case is ongoing. See: *Lister v. Prison Health Services, Inc.*, USDC MD FL, Case No. 8:04-cv-02663-RAL-TGW.

Two former Hillsborough County Jail prisoners have also accused PHS of shoddy medical care. Sean Norbury was 19 years old and had a fractured hand when he was incarcerated in Oct. 2003. According to a lawsuit filed in Circuit Court on Oct. 26, 2005, he requested treatment but instead was ridiculed by

**PHS Redux (cont.)**

PHS nurses. Despite swelling, bruising and complaints of pain, Norbury received no medical care and never saw a doctor; an X-ray was ordered but never taken. In a separate lawsuit filed one day earlier, Aretha Jackson claimed that PHS failed to provide treatment resulting in her going blind. Jackson, who was HIV-positive and suffered from deteriorating vision, was held at the jail from August 16, 2004 until June 1, 2005. She accused PHS employees of ignoring a doctor's follow-up order and alleged they were untrained, unfamiliar or indifferent to her medical needs and did not have proper treatment procedures or policies for HIV-positive prisoners. See: *Jackson v. Prison Health Services, Inc.*, USDC MD FL, Case No. 8:05-cv-02157-SDM-TBM.

PHS is also being sued by the widow of 47-year-old Patrick Bilello, who suffered his third and fatal heart attack at the Palm Beach County jail on October 24, 2003. Dr. Edgar Escobar, PHS's jail doctor at the time, admitted that he had overlooked critical lab results showing low blood oxygen that required Bilello's immediate hospitalization four days earlier. Instead, he ordered that Bilello, who was also HIV-positive, receive Tums for indigestion and gave him an extra blanket. Escobar's malpractice history included two deaths and five lawsuits; he was later fired by PHS. A Circuit Court judge ruled in September 2005 that Bilello's widow, Roseanne Scarola-Bilello, could seek punitive damages against the doctor and PHS. Since the death, and after numerous other complaints, the sheriff, also a defendant in the lawsuit, dumped PHS as the jail's medical provider.

Attorney Gary Susser, who represents Roseanne Scarola-Bilello, said, "A jury … will want to send a message to the corporate parent of PHS that profits should not rule over the sanctity of human life." After being terminated by PHS, Dr. Escobar was employed as a practicing physician at Johnson Medical Center in Hollywood. It was not until October 6, 2006 that he was finally disciplined by the Florida Board of Medicine in connection with Bilello's death, and only then after a personal plea from Bilello's widow. Escobar was fined $10,000 (the maximum allowable under state law), ordered to complete 200 hours of community service, and required to pay $5,000 for the cost of the investigation. His medical license was suspended until he passes a competency exam. Board member Dr. Elisabeth Tucker termed Escobar's actions in the Bilello case "terribly egregious."

Mrs. Bilello's lawsuit against PHS and Dr. Escobar settled on August 15, 2006 under confidential terms. However, according to closed medical malpractice claim records maintained by the Florida Office of Insurance Regulation, the suit settled for $475,000 against Escobar. The settlement with PHS was undisclosed. See: *Roseanne Scarola-Bilello v. Prison Health Services* Palm Beach Co. Circuit Court, Case No. 50-2004-CA-009140.

One year previously, Dr. Escobar had settled an unrelated malpractice suit involving another prisoner at the Palm Beach County jail when he was employed with EMSA Correctional Care, Inc., a sister subsidiary of America Service Group. Stafford Wilder, who was serving a one-year jail sentence, complained of blurred vision in April 2002. Dr. Escobar and other medical staff took no action; eight months later Wilder had lost 90% of his vision due to untreated glaucoma. The malpractice suit against Escobar and EMSA reportedly settled in October 2005 for over $500,000, with $287,500 being paid by Escobar's malpractice insurer. See: *Wilder v. EMSA Correctional Care* Palm Beach Co. Circuit Court, Case No. 50-2003-CA-011473xxmmaa.

On February 22, 2005, Milton Oakes committed suicide at the Marion County Jail, one month after PHS staffers stopped giving him antidepressant medication. He was ignored when he began banging his head on the wall of his jail cell. Sheriff Ed Dean admitted that PHS did not provide the medical care he expected at the facility

Orestes Rendon began his 90-day jail sentence at the Sarasota County Jail in good health but finished it on November 14, 2005 in intensive care, unable to eat, speak or walk. Rendon had been on a work crew and a falling branch containing a hornet's nest resulted in his receiving more than a dozen stings. He filed forms for immediate health care as he went into shock, but it took six days for PHS to get him to a doctor, who put Rendon in the hospital. PHS nurses had only given him Tylenol, even though he complained of losing his eyesight.

Also in 2005, PHS contracted to provide health care at the Volusia County Jail; the company promised to save the county $2.2 million over a four-year period. However, in the first year of the contract the county was asked to pay an additional $1 million to cover PHS's medical services. More disturbing, according to County Chairman Frank Bruno, were allegations regarding the company's health care. "My main concern is doctors taking away prescriptions, especially for non-convicted people going through court cases," said Bruno. While medical expenses at the jail have increased, the cost for psychotropic drugs declined sharply after PHS took over, dropping over 70% from the expenses charged by the previous health care provider.

According to *The News-Journal*, a local newspaper, defense attorneys have noted that their clients are being deprived of medication, which hampers their ability to assist in their criminal cases; the county's Public Defender and Chief Circuit Judge were concerned enough to call for a meeting with PHS officials to discuss the issue. Dr. David Hager, PHS's director of mental health services for Volusia County, has stated his approach to mental health treatment is often to discontinue all medication so he can observe the prisoner's symptoms, stating that less is more in terms of psychotropic drugs. PHS spokesperson Martha Harbin, however, said the company would never "withhold care to hold down costs."

On June 5, 2003, former Sarasota Jail prisoner Gerrese Daniels was paralyzed after being thrown head-first into a concrete wall by a guard. Two PHS nurses accused him of "faking it," and he was dragged to a bus and transported to the Central Florida Reception Center without receiving any medical care. When he arrived and his injuries were discovered, he was airlifted to a hospital. Daniels subsequently sued PHS for two severed vertebrae and near-complete paralysis. The guard, Matthew O'Kon, was acquitted on a charge of intentionally slamming Daniels into the wall and then stepping on his neck. The case is pending. See: *Daniels v. America Service Group, Inc.*, USDC MD FL, Case No. 8:05-cv-01392-JSM-TBM.

Manatee County prisoner Tony Myrick, 41, died in 2004 in the jail's infirmary after having four epileptic seizures over two days. PHS nurses allegedly did not provide adequate treatment. The company fired two nurses and its medical director as a result.

Two other PHS nurses were fired following a bizarre incident at the Charlotte

County Jail in March 2006. Prisoner William Parbus, a diabetic serving a 15-day sentence, required an insulin shot. PHS nurse Karen Helmick, upon learning the infirmary was out of insulin, said "she just did not feel like driving and getting it." Instead she broke open a sharps container used to dispose of medical and biohazard waste, and retrieved a vial of expired insulin. Sheryl Staples, another PHS nurse, then injected Parbus with the outdated drug. "Unfortunately, it happened," admitted PHS health service administrator Linda Antuono.

In an unusual claim against the company, on August 21, 2006, Kevin Coleman filed suit against PHS claiming that grossly inadequate medical care at the Palm Beach County Jail caused him to admit to a crime he didn't commit. In July and August 2004, PHS staff reportedly misdiagnosed Coleman's abdominal pain, telling him it was gas when it was in fact diverticulitis, an inflammation of small pouches in the colon. Coleman lost 30 lbs. and eventually required emergency surgery. Convicted of first-degree murder in 1992, Coleman was being held at the jail pending a new trial after it was learned a detective had suppressed evidence in his case. He reluctantly pled no contest to a lesser charge in September 2004 in exchange for his freedom so he could obtain competent medical treatment. According to Coleman's lawsuit, he took "a plea agreement whereby he admitted to a crime he did not commit in order to be immediately released from [PHS's inadequate] care."

On September 15, 2006, the estate of Herman B. Tucker, 24, who committed suicide at the Marion County Jail, filed suit against the sheriff, jail officials and PHS employees. Tucker, who was on suicide watch at the time he killed himself in September 2002, was allegedly drugged by PHS medical staff in order to subdue him; he was injected seven times with "cocktails" that included Ativan, Haldol and Benadryl. He received no mental health treatment. Tucker's estate is seeking compensatory damages for his funeral and burial expenses, and for the pain and suffering of his parents. See: *McGough v. Marion County*, USDC MD FL, Case No. 5:06-cv-00364-WTH-GRJ.

Despite PHS's dubious track record at county facilities, in January 2006 the Florida Department of Corrections (FDOC) hired PHS under a ten-year contract to care for 14,000 prisoners in 13 southeast Florida prisons. PHS's almost $800 million bid for the contract was $80 million less than that of its nearest rival, Wexford Health Sources, FDOC's prior health care contractor since 2001. Although FDOC had wanted to select the winner on factors other than cost, the state legislature ordered the department to reopen the contract and hire the lowest bidder. Governor Jeb Bush touted the deal, but state Senator Frederica Wilson said, "It all seems very suspect," adding, "I fear we can only expect greater disappointment." Competitor Wexford Health Sources was "really surprised [PHS]... bid as low as they did," calling the FDOC contract "one of the most risky contracts that any prison health company could enter into" because of the disproportionately high rate of Hepatitis-C, HIV, diabetes and hypertension in the FDOC prison population.

Such concerns proved correct when less then nine months into the contract, on August 21, 2006, PHS announced it was abruptly calling it quits, stating it had underestimated the cost of treating prisoners who required off-site hospitalization. "This is what I was warning about," remarked state Senator Dave Aronberg, who had expressed misgivings about the PHS contract before it was finalized. Sen. Aronberg and Sen. Walter Campbell demanded to know why the company had not been fined or assessed liquidated damages for the contract cancellation. PHS acknowledged that it may be subject to fines, but said that was the "cost of doing business"; the company also complained that state officials had provided incorrect information during the bidding process. An audit of PHS's performance during the short-lived contract is on-going, and the company may submit another (presumably more realistic) bid when the FDOC's health care contract is re-bid in October 2006. Unless it wins the re-bid contract, PHS will stop providing services at FDOC facilities as of November 20, 2006.

Prior to canceling its contract with the state, PHS officials had approached FDOC Secretary James McDonough and tried to renegotiate for better terms, including moving some medically-needy prisoners to other facilities not serviced by the company. This is apparently standard operating procedure for PHS, which has renegotiated contracts after claiming it was losing money in Philadelphia and Maine in June 2002, in Kansas in October 2003 (unsuccessfully), in Wyoming in 2005, and in Vermont in mid-2006. McDonough declined to cut PHS any slack, however, saying, "The answer was a polite no – there was nothing I would be doing for them."

### Georgia

The October 17, 2005 death of 43-year-old Harriett Washington in the Gwinnett County Jail continues to dog PHS. Washington, who suffered from leukemia, died on the floor as her two cellmates watched. The cellmates, parole violators Kim Holmes and Carla Dotson,



**INMATE CONNECTIONS**
www.inmate-connections.com

**PEN PAL HOOKUPS for PRISONERS**
✓ 24/7 Internet Exposure
✓ Free Email Forwarding
✓ Free Photo Cropping & Enhancement
✓ Front Page Exposure Available
✓ Multiple Page Exposure Available
✓ Helpful How-To Brochure Available
✓ High Response Rate
✓ Fast Publication
✓ Referral Program & Incentives
✓ Stamps Accepted

"INMATE CONNECTIONS is great! I've recommended your service to several inmates and they've all reached the same conclusion. It's unanimous! Personally, I've had the pleasure of meeting dozens of interesting women from all over the United States. There has even been a few from over seas. Your response rate is remarkable. I've received mail through your service on a regular basis. By the way, thanks for providing e-mail forwarding for us fellas! INMATE CONNECTIONS has certainly brought a great deal of joy to my life over the past year and I'm confident that 2006 will be just as rewarding. Please, continue the good work. Thank you!"
- Patrick Streater, California inmate

Write for a free brochure/application:
**Inmate Connections**
**465 NE 181st, #308 - Dept. PLN**
**Portland, Oregon 97230-6660**
(Please include a business-sized self-addressed stamped envelope or .39-cent stamp if possible)

In business since 2001

## PHS Redux (cont.)

can't get the images of Harriet's death out of their minds, saying, "She screamed in pain and was convulsing before dying." Their repeated pleas to PHS medical staff to get help for Washington were allegedly ignored for two days. When a nurse came in on the last day, she refused to look at the list of symptoms Holmes and Dotson had kept. At 2:10 a.m. the next morning Washington began vomiting continuously, but despite the cellmates' repeated screams for help, none came for 34 minutes. By then it was too late – Washington had "exhaled a loud breath and her eyes were open and fixated."

On November 8, 2005, Holmes and Dotson wrote a detailed exposé to the medical unit supervisor and the Sheriff's Department internal affairs unit. "We fulfilled all of our legal responsibilities to ensure she received the proper medical care," replied Department spokesperson Stacey Kelley. PHS declined to comment. Sheriff Conway's report was released in January 2006, clearing his deputies of any culpability. The report concluded that although Washington would have died even if she had been taken to an outside hospital, the appropriateness of her treatment would not have been in question. Nurses alleged that they responded within three minutes of Washington's screams for help (there are no doctors present on weekends at the Gwinnett jail). The emergency oxygen cart they brought was missing its tubing. One of the nurses, Brian Woodward, had also been accused of taking narcotics from the jail's medical unit. He resigned after admitting he "messed up by failing to document Washington's treatment." It was learned that the PHS nurses had violated protocol by not keeping notes of care that was provided. They did, however, hastily jot some down after Washington died on their watch.

Sheriff Conway, beset by Washington's death, was considering firing the company. Two other lawsuits naming PHS were filed in Gwinnett County in 2005, including a federal suit involving the September 2003 death of prisoner Ray Charles Austin, who was forcibly injected with an anti-psychotic drug by PHS medical staff despite a doctor's order in Austin's file directing that he not be given injections. Austin became combative, was Tasered and then strapped in a restraint chair, where he received no medical treatment and later died. The lawsuit is pending. See: *Lewis v. Prison Health Services, Inc.*, USDC ND GA, Case No. 1:05-cv-02434-TWT.

Regardless, on October 5, 2006, Gwinnett County renewed its contract with PHS to the tune of $6.1 million. According to Sheriff's Dept. Major Jim Hogan, a member of the committee that considered bids for the health care contract, the lawsuits against PHS were taken into consideration but "it seemed that most of the companies we considered had similar situations somewhere around the country in some site that they provided service." Which simply seems to indicate that PHS is just as bad as many of its competitors. Seven companies bid on the contract; PHS was not the lowest bidder, but according to Hogan was selected – ironically – because of its experience, references and financial stability. The Gwinnett County chapter of the NAACP objected to the contract renewal due to three deaths at the jail under the company's watch.

### Maryland

In May 2005, PHS learned that it had lost its bid to continue providing medical services at most Maryland prisons and Baltimore's jails, a total population of 20,000 prisoners. The winning bidder for the estimated $100 million annual contract was St. Louis-based Correctional Medical Services (CMS), whose track record is reminiscent of PHS's. PHS had signed a $270 million five-year contract with Maryland in 2000. But because the contract was based on a flat-fee model, it became a loss-leader for PHS over time, resulting in $13 million in red ink on $55 million in billings in the last year alone. Sally Dworak-Fisher, an attorney for Baltimore's prisoner-advocate Public Justice Center, criticized Maryland for pitting a contractor's loss against prisoners' health needs.

The Baltimore grand jury routinely reviewed jail health care performance and determined that there had been a "poor job" at medical care in the past five years (i.e., under PHS's reign) because of a flawed and under-funded contract. The result, the grand jury found, was that pressure on PHS's management to economize on operations "made it more and more difficult for offenders to receive prescription medications, hospital procedures or laboratory tests." PHS President Trey Hartman called this charge "blatantly false."

Under the new contracts, Maryland expects its annual prisoner health care costs to rise from $68 million to $110 million. The Public Justice Center and the ACLU have a long-standing lawsuit to improve medical services in Baltimore jails, and are skeptical that the new CMS contract will remedy their complaints.

### New York

In May 2005, New York's state Department of Education, which regulate the practice of medicine, began an investigation into the terms of the five-month-old $300 million prisoner health care contract the state had signed with PHS. New York law requires that for-profit medical care companies be owned and controlled by doctors in order to prevent business considerations from influencing medical decisions. PHS insisted that doctors are in charge of medical decisions through its doctor-run subsidiary, PHS Medical Services P.C., which directs health care at the Rikers Island jail. However, the corporation is run by Dr. Trevor Parr who is a regional medical director f PHS. Education Department investigato called this arrangement a sham.

Illegal contract concerns notwit standing, a scant one month later the N York Department of Health and Men Hygiene reported that in the first quar of 2005, PHS failed 12 of 39 performa standards for treating prisoners at Rik Island and Lower Manhattan jails. A result, New York City withheld $55, in payments, its largest penalty aga PHS for poor performance since 20 Health Department official Paul Vall criticized the department's decision let PHS develop its own plan to rem deficiencies. "It's like a judge allowi criminal to determine his sentence,

---

**CALIFORNIA HABEAS HANDBOOK**
5th Edition Now Shipping!

By Kent Russell, PLN Columnist ("Habeas Hints")
- Completely Revised Sept. 2006
- All-New Habeas Grounds Table
- Appx. w/ Actual Russell Documents

A PRACTICAL GUIDE TO STATE AND FEDERAL HABEAS UNDER AEDPA

Cost = $39.99 for prisoners (others add $10)

Send check or money order to:
Kent Russell (Cal. Habeas Handbook)
2299 Sutter Street
San Francisco, CA 94115

stated.

In 2003, York County prisoner Michael Herman, 19, who had a history of mental illness, was court-ordered not to be placed in general population because of his vulnerability. In January 2004, Herman was assaulted and put in a solitary-confinement cell pending a hearing. He was not watched for an "extended period of time," during which he tried twice to commit suicide, once unsuccessfully with his shoelaces and once successfully with his bed sheets. Herman's family filed a wrongful death suit against prison officials and PHS for not providing Herman with appropriate medical care and treatment for his mental illness.

In December 2005, the very process by which New York health officials evaluate PHS's performance came under attack as "slapdash, subjective and lenient." The state comptroller audited the Health Department's reviews of PHS's performance. One complaint was that PHS was allowed to preview audit-selected files to "fix" them just before the auditors gave them the once-over. When a mentally ill prisoner died in the prison ward at NYU Downtown Hospital, a PHS doctor and mental health workers went through the prisoners' medical files, "doctoring" the records where they had failed to doctor the patient. In another incident, a PHS doctor used correction fluid (which is unlawful) to change the date he had reviewed a prisoner's abnormal lab test result, to make it appear the review was done within the requisite 24 hours. At Rikers Island the rule that intake prisoners are to be given a physical examination within four hours of admission is repeatedly violated but dismissively overlooked by auditors, thus nullifying the important public health purpose of timely initial exams. One auditor said the only way she could keep a physician's assistant from altering selected prisoner medical charts was to get to work first, at 5:30 a.m. Since the tightening up of such "previews," PHS has received 22 failing grades, for which the company was penalized $107,000, a drop in the proverbial bucket.

In an ominous sign of the audit tension, Dr. Bruce David, assistant commissioner with the Department of Health and Mental Hygiene, who monitored PHS as part of his $165,514 per year job, quit and took a position as mental health director for Nassau County. Dr. David's "too-lenient" grading of PHS was one criticism of the comptroller's audit of the Department's review process.

In January 2006, New York City health officials withheld $71,000 in payments to PHS for failure to meet standards in 10 of 39 audit areas in the final quarter of 2005. Six of the areas, including untimely administration of medication to mental health and HIV+ prisoners, had been failed for three consecutive quarters. Also in January 2006, the Deputy Commissioner for New York City's jail health care program quit after only seven months on the job. Dr. Arthur Gualtieri left for "undisclosed personal reasons," but it was alleged that his resignation was due to his perception that prisoner health services (under PHS) suffered from a lack of leadership.

### Tennessee

PHS isn't getting any breaks in its home state of Tennessee. The company is being sued by Memphis lawyer Archie Sanders III for the January 19, 2005 death of Davidson County Metro Jail prisoner Ricky Douglas, who was diabetic. Douglas died in his cell, on his stomach, with his tongue sticking out between his teeth, after PHS personnel allegedly made "critical errors" in his treatment (e.g., failing to respond to his requests for medication). Because of slipshod medical records, PHS nurses allegedly "failed Ricky Douglas and did not provide him with anything close to medical care," according to the lawsuit. Sheriff Daron Hall said he had reviewed PHS's report and said, "No, it's not a concern." Yet he did order PHS to give their nurses additional training, which company officials said they were too busy to do.

Apparently it was also "not a concern" eight days before Douglas' death, when Metro Jail prisoner Paul Burton, 40, died after lapsing into a diabetic coma. PHS allegedly had failed to give him enough diabetic medicine, according to Nashville attorney David Raybin. In January 2005, PHS official Phil Burser told the *Tennessean*, "The personnel at the Davidson County Jail provided timely, effective and appropriate care."

Yet when prisoner Glen Lee checked into Nashville's Metro Jail in November 2005, he walked in unassisted. Three months later, after PHS allegedly denied him needed treatment, he was in a diabetic coma in the hospital for three weeks. Lee claimed that PHS not only didn't give him his insulin, they gave him an inappropri-

**Attention inmates: You need mail when you're in jail!!**

Here is all the information you need to place your ad on

**www.inmate-connection.com**

First name, last name, inmate ID#, facility name,
COMPLETE Mailing Address, your sex, D.O.B., race.
Interested in men, women, friends or legal help (choose 1).
Convicted of, release date. All ads run for 1 year.

Send 200 word ad, photo and $25.00 check or money order to:

Inmate-Connection.com
P.O. Box 83897
Los Angeles, CA 90083

We will return your photo along with a copy of your web page.
Inmate-Connection.com is a legitimate service registered in
the State of California. Price doubled for all extras.
Send self-addressed stamped envelope for all inquiries.

**PHS Redux (cont.)**

ate diet. When his blood sugar hit 520 he went into shock. The American Diabetes Association is in touch with attorneys representing Burton and Douglas' families, in furthering the association's mission to ensure that diabetics receive proper care. Attorney Raybin may take Lee's case as well. One can only ask Sheriff Hall if three diabetic treatment failures in three months, two fatal, out of a jail population of 690, are "not a concern."

PHS was also named in a federal suit involving the August 14, 2005 death of James Patrick McCullar at the Metro Jail. McCullar, who committed suicide using his boot laces, was allegedly not adequately screened by a PHS nurse at intake; the nurse requested a mental health referral that McCullar never received. The suit is pending. See: *McCullar v. Prison Health Services, Inc.*, USDC MD TN, Case No. 3:06-cv-00786.

PHS's five-year contract with Metro went up for rebidding on June 30, 2005. Apparently medical care was now a concern to someone, because the Metro Jail dumped PHS and hired Correct Care Solutions of Nashville to replace the problem-plagued company.

### South Carolina

PHS drove prisoner Antonio Richburg to suicide in May 2005 at the Richland County Jail. After going seven days without his medication, he wrote to his wife, "I need you to call down here and get on them for me." He hanged himself the next day.

Richburg's attorney said he had been mentally ill, and that "physician and court orders were not being followed." PHS spokesperson Stephany Snowden stated that PHS staff "are not professionally trained in the area of mental health." PHS has been named in six lawsuits in Richland County since 2003, three of which involved "questionable" prisoner deaths.

A rare coroner's inquest was convened, and Richland County Coroner Gary Watts looked into having criminal charges brought against PHS as a result of Richburg's death. A coroner's jury found that Richburg died "due to a lack of standard care by providers." Testimony revealed there were no jail records of diagnosed paranoid-schizophrenic Richburg receiving anti-psychotic or anti-depressant medications in the seven days prior to his suicide, even though a probate court had ordered jail staff to follow a treatment plan developed by Just Care, Inc., a private company that provided mental health care to prisoners. Attorney Richard Harpootlian, who handled two earlier jail suicide cases that settled for over $600,000, reportedly had arranged a partial settlement of $500,000 for Richburg's widow, Tiffany. No criminal charges were filed in Richburg's death.

In September 2005, based upon the coroner's jury ruling, the Richland County Council unanimously terminated PHS due to the three prisoner deaths. Council Member Val Hutchinson called PHS's performance "unacceptable and inhumane." In March 2006, Richland County was negotiating a $2.7 million annual contract with Correct Care Solutions, Inc. to replace PHS's $1.9 million contract. PHS was given six months to pull out and its last day was March 17, 2006. Correct Care will provide 28 full-time medical staff, almost double the 15 staff members under PHS, to service the jail's 1,000 prisoners. In addition, the county will maintain its own nurse and an administrator at the jail. During PHS's tenure starting July 2001, the county paid $7.5 million for medical and mental health care services.

### Wyoming

The Wyoming Department of Corrections (WDOC) apparently wasn't convinced by Mike Rigby's report panning PHS in the May 2005 issue of *PLN*. Citing *PLN*'s article for PHS having received "some bad press", WDOC spokesperson Anne Cybulski-Sandlian said, "so have all of the private medical providers." In addition to hiring PHS for a $10.5 million annual contract in May 2005 (effective July 1, 2005), WDOC employs Consultants in Correctional Care to visit WDOC every quarter and audit prison facilities based on health care and contractual standards. PHS replaced Correctional Medical Services, Inc., which in turn had replaced Wexford. Linda Burt of the Wyoming ACLU reported that the number of health care complaints remained unchanged under all three providers, and noted that both Wexford and PHS had been sued.

In October 2005, auditors reported that WDOC prisoners were continuing to receive "constitutionally adequate health care," notwithstanding complaints of delayed treatment due to the transition to PHS and the integration of its record-keeping system with that of its predecessor. The report found, however, that 36% of incoming prisoners were not screened within the required 24-hour period. Also, in a sampling of seven hypertensive patients, a majority did not have adequate control of their high blood pressure. Subsequent quarterly audits in Feb. and July 2006 found that PHS's services had improved significantly. The company entered into a renegotiated $14.2 million contract with WDOC in July 2006, a 35% increase over the initial contract amount. PHS claimed that it had lost $600,000 in a single quarter under the first contract.

Parenthetically, two former PHS nurses alleged they were fired or forced to quit because they complained about inadequate staffing and training by the company. Karran Bedwell and Debra Long said standards of care declined after PHS took over. According to Long, an LPN, prisoners who signed up for sick call were seen within 48 hours only 20% of the time and medications were not dispensed in a timely manner. Bedwell raised concerns about training for new medical staff, stating, "One of the poorest things about [PHS] is when they hire someone they don't even orient them but put them right on the floor," adding, "That is really scary for someone who's never been in a prison before."

### Lawsuits, Settlements and Jury Awards

PHS has been named in 788 federal lawsuits over the past five years, in addition to an unknown number of complaints filed in state courts. The company, however, considers such litigation a cost of doing business. "Inmates are one of the most litigious groups in society, and the vast majority of the suits that are filed against PHS are dismissed as baseless, said PHS spokesperson Martha Harbin. In cases where claims of gross medical neglect, malpractice and deliberate indifference filed by injured prisoners or their survivors are not "baseless," the company often settles under confidential terms. In addition to the lawsuits mentioned above, other recent cases involving PHS and other ASG subsidiaries include the following:

In December 2005, PHS settled a federal lawsuit in Ohio in which the company was accused of negligence. Booker Mitchell, 72, was pepper-sprayed and suffered a head injury during his arrest. Despite complaining about a seve

headache, fatigue and vision problems, PHS nurses at the Mahoning County Jail told him to rinse his eyes with water and did not contact a doctor. Mitchell, who had a history of high blood pressure, got progressively worse, was diagnosed with a cerebral hemorrhage after his family took him to a hospital, lapsed into a coma and died six months later. The case against the Youngstown police department, the sheriff's office and PHS settled for $450,000. See: *Pennington v. City of Youngstown*, USDC ND OH, Case No. 4:02-cv-01343-PCE.

In New Jersey, Michael DiFelice, formerly incarcerated at the Gloucester County Jail, filed a Superior Court lawsuit in August 2006 against the county and PHS, the jail's medical provider. DiFelice claims he contracted a drug-resistant staph infection (MRSA) while held at the jail, and upon release infected his domestic partner. Similar lawsuits have been filed by over a dozen other former prisoners and jail guards.

On July 15, 2005 a federal jury in Albany, New York awarded $782,988 to former prisoner Byron Lake, which included $632,988 in punitive damages against EMSA Correctional Care, a subsidiary of ASG. The jury found that an EMSA employee had failed to properly treat Lake's undiagnosed heart attack when he was held at the Schenectady County Jail. Following the verdict the district court vacated the punitive damages and awarded $138,336 in attorney fees and $5,438.55 in costs to Lake. The case has been appealed to the Second Circuit. See: *Lake v. Schoharie County*, USDC ND NY, Case No. 9:01-cv-01284-DEW-DEP.

Patricia Ann Farrell, serving a five-month sentence at the Collier County Jail in Florida, filed a lawsuit on September 5, 2006 asking a federal judge to force the sheriff's office to let her leave the facility so she could undergo hip-replacement surgery for osteoarthritis, a painful degenerative disease. PHS, which provides medical care at the jail, gave her Tylenol instead of her prescription pain medication, and a PHS nurse reportedly told Farrell that her hip condition was not "life threatening." See: *Farrell v. Hunter*, USDC MD FL, Case No. 2:06-cv-00454-UA-SPC.

In August 2005, PHS agreed to pay $350,000 to settle a lawsuit filed by the family of Ruth Hubbs, a 39-year-old prisoner who died at the Leon County Jail in Florida on May 16, 2003. An autopsy indicated she had an excessive amount of Doxepin (an antidepressant) in her system, but was unable to determine if PHS staff had given her an overdose. According to the suit, PHS had a policy of rarely using a different medication that was safer but more expensive. Guards at the jail reported that PHS medical workers seemed to be unconcerned about Hubbs' condition prior to her death. Under the terms of the settlement PHS did not admit liability. Following another death at the jail in June 2003, PHS replaced some staff members at the facility and made other changes, including implementing a medical-grievance committee and a medical hotline for family members and friends of prisoners. See: *Travison v. Prison Health Services, Inc.*, USDC ND FL, Case No. 4:04-cv-00409-RH-WCS.

Most recently, in October 2006, the family of Robert Nichols, who died at the Chittenden Regional Correctional Facility in South Burlington, Vermont on February 5, 2005, filed suit in Rutland Superior Court, naming the state and PHS as defendants. The lawsuit claims that Nichols, who notified the jail staff he was suffering from heroin withdrawal, did not receive needed treatment. He was not seen by a PHS nurse for almost 16 hours. PHS had entered into a contract to provide medical care in Vermont's prisons shortly before Nichols died; in June 2005, a statewide advocacy group reported that Nichols' death could have been prevented had he received adequate medical care.

### Internal Investigation, Stock Slide, Shareholder Suits

In March 2005, within one month of a damning three-part investigative series on PHS published in the *New York Times*, (which was reprinted with permission in the August, 2005 issue of *PLN*) parent company ASG's stock began a long, fairly steady decline with sudden, precipitous drops along the way [the *Times* also did a follow-up article on PHS's care at the Rikers Island Jail on June 10, 2005]. The series documented horrific cases of prisoner suicides, shoddy care to children in custody and prisoners dying after being denied treatment. Michael Catalano, ASG's CEO, called the story "unfair," asserting that it gave "no context, no perspective and completely failed to tell the real story of what it is like to provide health care in a correctional setting." Catalano also said the story had no effect on ASG's business. But with the loss of six contracts in 2005,



OUTSIDE CONNECTION

INMATE COLLECT CALLING 4 LESS!!

WE WILL HELP YOU

CALL US TODAY AND FIND OUT THE WAYS YOU CAN SAVE !!

1-800-270-8810
Friendly Staff
Just One
Call Away
1-800-270-8810

## PHS Redux (cont.)

earnings forecasts were lowered and the company's stock dropped accordingly.

In mid-March 2006, ASG shareholders headed for the exits again, taking the stock down 33% after the company announced lower-than-expected revenues. Concurrently, ASG disclosed that following an internal investigation into accounting irregularities at its prison pharmacy subsidiary, Secure Pharmacy Plus, the company would have to restate $2.1 million in earnings from 2001-2004 and the first six months of 2005, and would refund $3.6 million in overcharges to clients who weren't properly credited with discounts and rebates for returned pharmaceuticals. As a result of the Secure Pharmacy Plus investigation, Grant Bryson, head of Secure Pharmacy Plus, and PHS president Trey Hartman were fired on December 7 and 9, 2005, respectively.

ASG's stock has fallen from a high of almost $30 a share in February 2005 to under $12 in August 2006; it has since rebounded to $13.62 a share as of October 12, 2006. Stock price does not necessarily correlate with a company's financial or operational health – private prison juggernaut CCA, for example, once traded as a penny stock after a series of management blunders. However, ASG's revenue continues to suffer as well; in August 2006 it was reported that the company's second quarter earnings plunged by 81% compared to the same period the previous year. ASG's net income fell to $4.37 million for 2005, less than half of its profit in 2004.

Investors have taken notice of the company's less-than-stellar performance. At least four shareholder suits were filed against ASG between April and May, 2006. The lawsuits allege that company officials violated federal securities laws by making false or misleading statements that inflated the value of ASG's stock. Specifically, ASG was accused of failing to disclose that it was not charging its customers pursuant to the company's contracts, failing to properly credit customers with discounts and rebates, and inappropriately using reserve capital – claims primarily related to the company's internal investigation of subsidiary Secure Pharmacy Plus.

Nasdaq, the stock exchange where ASG is traded, has also taken notice. After two of the company's directors quit in May 2006 following unsuccessful efforts to oust ASG chairman Michael Catalano, the Nasdaq National Market threatened to delist the company due to non-compliance with rules requiring a majority of independent directors. One of the ASG directors who left, Michael Gallagher, stated, "I no longer have confidence or faith in the leadership of the company." New directors were retained in June.

In the for-profit correctional health care industry, ASG (largely through PHS) holds 21% of the market while competitor CMS has 22%. As a result, competition has become intense and the lowest bid often wins the contract. For example, CMS underbid PHS by 10% in Maryland, by 14% in Idaho and by 21% in Indiana. Such contract losses for PHS have a direct impact on its profitability and stock performance.

While there are obviously huge difficulties in the execution of for-profit prison health care services, this writer believes that the underlying problem lies with the "low bidder wins" concept. As medical contractors, sheriffs and state DOCs are learning through lawsuits and court orders, pitting prisoners' health care against corporate profit margins is inherently incompatible with the Eighth Amendment. Indeed, the health and wellbeing of prisoners are reduced to mere chattel in a bidding process that is based solely or primarily on the financial bottom line. ASG's shareholders may be bleeding due to a decline in the company's stock price, but prisoners are suffering far heavier losses, including their lives in some cases – and such losses are not tax deductible. However, it is not as if government provided medical care in prisons or jails is much better. However, when a prisoner dies of medical neglect due to government action, shareholders are not personally enriching themselves at the cost of human misery.

Sources: *Birmingham News, Tuscaloosa News, Mobile Register, Decatur Daily, Montgomery Advertiser, Tampa Tribune Palm Beach Tribune, Palm Beach Post WSEH Channel 2, Miami Herald Tribune St. Petersburg Times, Orlando Sentinel* www.gainesville.com, *Atlanta-Journal Constitution, Baltimore Sun, Baltimore Daily Record, New York Times, Daily Record Tennessean, WVLT-TV, The State,* www. myrtlebeachonline.com, *Casper Star-Tribune, Business Week,* www.bizjournal. com, www.gwinnettdailypost.com, *Napl News.*

## Utah House of Refuge a House of Horrors

### by Gary Hunter

A Utah "faith based" halfway house for probationers, jail releasees and homeless men, called the House of Refuge, turned out to be a house of horrors for those who lived there.

On February 2, 2006, state licensing officials shut down the church-operated shelter citing it for 13 different state violations. Robert Ferris and Steve Sandlin are pastors of the Central Christian Church in Salt Lake City. They also owned and operated Transmetron, an unlicensed telemarketing company which they ran out of the church basement. Transmetron phone lines were manned by House of Refuge residents, some of whom were paid as little as 28 cents per hour for their labor.

Some of the men living in the House of Refuge were homeless. Others were ordered there by judges or state agencies, including the Department of Corrections.

Joe Rupp was ordered into the program by the court. "For the first three a a half weeks I was there, I believe I v making 58-cents an hour," he said.

Resident James Auston said, " pay? I'm making $1.28 an hour," work up to 50 hours per week.

House of Refuge residents w forced to sign contracts which stated all their pay would be donated back tc program. Residents surviving the prog for six months would get a "love o ing," a partial refund on their "dona wages. At least one resident, Leo Di was kicked out of the program just before his six months were up.

"When he threw me out, I had back on the streets, live with my fr and start over," said Duran.

Auston said Pastor Steve would sistently "...stand up and threaten, just put you back in jail, contact probation officer.' He threatens us jail all the time."

Prison Legal 1

Case 3:07-cv-00367-P  Document 2-3  Filed 02/27/07  Page 12 of 15  PageID 81

"What they've done is exploit these clients," said Ken Stettler of the Department of Human Resources. "They've been working them in a private company that's owned by the pastors and basically paying them nothing."

KSL-TV originally launched the investigation which culminated in separate investigations by the Labor Commission, the Division of Consumer Protection, the Department of Human Services and the Department of Commerce.

The Labor Commission ordered the pastors to begin paying its workers minimum wage. The Consumer Protection Agency discovered that Transmetron was not a registered business.

Health concerns surfaced when it was discovered that at least one kitchen worker had Hepatitis C and more than one kitchen worker had no "Food Handler's Permit" required by the state.

Licensing investigators found milk containers well beyond their expiration dates.

The House of Refuge was served a revocation notice on February 2, 2006. Citations included not relinquishing reports requested by Licensing Investigators. Reports indicate that pastor Sandlin verbally abused and, in at least one instance, physically assaulted a resident. The assault was originally filed with local police but was later withdrawn by the resident, under pressure from Sandlin.

House of Refuge operators are charged in the Revocation Notice with "Emotional maltreatment, bullying, teasing, provoking or otherwise verbally or physically intimidating or agitating a client." Specifically, residents who did not adhere to the "Born Again" philosophy were teased, bullied and verbally abused for having different views.

Also cited were substandard intake evaluation policies for incoming residents, inadequate training for staff, inconsistent rules and administrative policies, insufficient fire drills and emergency procedures.

"As being someone who has employed the men from the House of Refuge, I am finding all of this very concerning," said Christian business owner Royal O. Fackrell. "...my father, the business I work for, and myself have paid at least a couple of thousand dollars to the House of Refuge for the men's work.(sic)...I cannot express enough the betrayal and anguish that is in my heart for those men."

Apparently, the local Food Bank felt betrayed too because it cut off donations after it found out the pastors were charging residents for their meals.

In another part of the state, Beaver County Sheriff Kenneth Yardley is being investigated for claims that he used prisoners, from the jail, to renovate his house.

Chett Pearson and Clayton Myers said that in 2000, Yardley, who had recently divorced, would take them out of the jail in the morning, drop them off at his home, then pick them up later in the day and return them to jail.

Pearson said he didn't mind the work at first. "He just came in and got us and hauled us up there and said, 'This is what we're gonna' do.' We didn't care it got us out of the jail cell."

But later Pearson would tell investigators "Kenny Yardley is a good friend of mine. I hate to incriminate him but this bulls____ is wrong."

Yardley would occasionally buy the two tobacco and then order them not to smoke in plain view. Sometimes he would pick the prisoners up and bring them back to the jail for lunch; other times he would bring them burgers. On at least one occasion the sheriff gave the two the keys to a county-owned pickup truck and let them drive themselves to and from work.

Utah has a work-release program for prisoners but it requires a judge's approval. Neither Pearson nor Myers was approved.

Pearson and Myers said that their activities did not go unnoticed by jail employees who voiced concern over their lack of supervision. Others would make comments like, "Where's my free labor?"

Gary DeLand, executive director of Utah's Sheriff's Association said that Yardley's actions are so obviously inappropriate that most county jails never bothered to address the issue.

"We also don't have a regulation that says you can't paint inmates orange and hang Christmas decorations on them," said DeLand. DeLand is among the US prison officials who set up the Iraqi prison system after the US attack and invasion of that country, including the Abu Ghraib prison.

Sheriff Yardley declined comment.

Sources: *Salt Lake Tribune, Deseret Morning News, KSL-TV*

**Choose from 1000's of Great Gifts**
Buy quality gifts for friends & loved ones. Electronics, toys, magazines, fragrances, gourmet foods, handbags, flowers & more. Reliable delivery. Fast, fair, friendly gift service. Orders confirmed by request. Send name, address and $5.00 (or 13 - 39¢ stamps) for gift catalog and brochures along with complete ordering details. Quixtar affiliated independent business owner. Try us once and you'll be back.
**The Gift Wizard**
**PO Box 567**
**Florence, AZ 85232**



volume 1 • issue 1

**prison living**
MAGAZINE

prisoner profiles
sports
life after prison
crossword
dr. gary
jailhouse lawyer
prisoner art

10645 N Tatum Blvd
Phoenix, Az 85028
1.800.419.2891

The vision of the *Prison Living Magazine* (PLM) is to bring hope, help and maybe small delight via the printed page from the magazine's creator, Michele Millikan. Her confinement energizes her vision that other inmates would not only enjoy this magazine but they would also become active contributors to its content. After compiling lists of the needs and desires of prisoners, PLM was born to help address those needs

subscribe online at
www.prisonlivingmagazine.org

1 year $12.00
2 years $24.00

# From the Editor

## by Paul Wright

By now subscribers should have received the annual PLN matching grant fundraiser. I hope that those who can afford to make a donation do so. While there are many worthy causes out there I think that PLN is one of the few where your activist dollar will get the biggest bang for the buck.

We will receive up to $15,000 in a matching grant from a PLN supporter, dollar for dollar, for all donations made between now and January 31, 2007. Please help us receive the entire amount. We will report our progress in the next few issues of PLN. Your support, above and beyond the amount PLN receives from subscriptions and advertising is what helps us continue publishing and supports our advocacy on behalf of prisoners around the country.

That advocacy includes events like my attending the National Lawyers Guild convention in Austin, Texas in late October where I gave a presentation on the rights of disabled prisoners and moderated a workshop on the issue of sexual assault of prisoners. I am also the national jailhouse lawyer co-vice president of the NLG. PLN columnist Mumia Abu Jamal is the other. One of our goals is not just to inform people about the plight of prisoners in the United States but to get them to do something about it.

You can flip through the pages of this issue of PLN or any other and see that we are covering issues and reporting news no one else. If PLN stopped publishing tomorrow, where would you get this high quality and quantity of prison and jail related news, regardless of the price. We have not raised PLN's subscription rate in a number of years, despite rising printing and postage costs, while expanding the size of the magazine. If you think an independent penal press is worth supporting, please send a donation to PLN to support our work.

On October 16, 1006, New York criminal defense attorney Lynne Stewart was sentenced to 28 months in federal prison for violating federal prison rules by issuing a press release that her client, a political prisoner from Egypt, did not support a ceasefire in that country. While much attention has been given to the fact that the government blithely violates the attorney client privilege of prisoners it dislikes, the larger issue of why any prisoner shouldn't be able to speak directly to the press is ignored. Her prosection is obviously an attack on the attorneys and advocates who represent political prisoners. The government had sought a sentence of 30 years against Stewart, 67. She is free on bail while appealing her sentence.

A few days before this president Bush signed legislation allowing the torture of military prisoners and giving total immunity from suit to the military and CIA torturers who commit these crimes against humanity. Abuse and torture a[re] something with which American prisone[rs] are all too familiar. As well as the relati[ve] impunity with which these acts are carrie[d] out. PLN has consistently made the co[n]nection between the abuse of prisoners [at] Guantanamo and Abu Ghraib and wh[at] happens in American prisons and jails.

As the holidays approach, I hope y[ou] will consider a gift subscription of PL[N] or some of the books we distribute as gi[fts] for your friends and family. Enjoy this [is]sue.

# Wisconsin Halfway House Overbills BOP; Fired Whistle blower Settles For $435,000

## by John E. Dannenberg

Federal jurors found that Rock Valley Community Programs (RVCP) in Janesville, Wisconsin and its chief executive officer, Irwin McHugh, had submitted false claims for reimbursement to the Federal Bureau of Prisons (BOP). The jury also found that the whistleblower reporting the fraud had been wrongfully terminated thereafter. A settlement was reached totaling $500,000 for both the fraud and the wrongful termination.

RVCP is a 75-bed halfway house providing drug abuse treatment programs to state and federal offenders and has been paid over $300,000 annually by BOP. The story broke when RVCP employee Nancy Gilligan-O'Brien refused to sign bogus claims paying for alleged work supervision that she had never performed. Gilligan-O'Brien had been employed by RVCP since 1990, and was their director of outpatient and clinical services. In addition to the billing fraud, Gilligan-O'Brien charged that RVCP didn't have adequate staff to meet Wisconsin certification for residential treatment services, a deficiency validated in June 2006 by U.S.D.C. Judge John Shabaz. In April 2004, she asked for official investigations. One month after Gilligan-O'Brien's whistle blowing, McHugh fired her for being publicly critical of RVCP's programs.

Gilligan-O'Brien sued in a qui tam action accusing RVCP and McHugh of knowingly making false claims in violation of 31 U.S.C. § 3729(a)(1) and (2). She also claimed her firing was in retaliation for whistle blowing, protected under both U.S.C. § 3730(h) and Wisconsin law. Def[en]dants' motion for summary judgment w[as] denied and the case went to trial to reso[lve] disputed facts. In April 2006, a jury fo[und] that RVCP did knowingly present fa[lse] fraudulent claims to the BOP; that McH[ugh] also did so; that RVCP used false record[s to] gain fraudulent payment; that McHugh [also] did so; but that Gilligan O'Brien's cond[uct] was not a "motivating factor" in her ter[mi]nation. Nonetheless, the jury found that [she] was wrongfully discharged "in violatio[n of] an important Wisconsin public polic[y]" judicial exception to the state's employ[ment] at-will doctrine that was carved out by [the] Wisconsin Supreme Court in Brockm[eyer] v. Dun & Bradstreet, 335 N.W. 2d 834 ([Wis.] 1983).

It was this last finding that led [to a] damages settlement for Gilligan-O'B[rien.] RVCP's insurer, West Bend Mutual I[nsur]ance, agreed to pay her $407,000 to s[ettle] her wrongful discharge claim. In addi[tion,] West Bend paid $92,500 to settle the [false] claims act violation. Of this, 70% we[nt to] the U.S. Government and 30% to Gill[igan-] O'Brien. Gilligan-O'Brien was repres[ented] by Janesville attorney Julie Lewis of No[wlan] & Mouat, LLP. See: United States e[x rel.] Nancy Gilligan-O'Brien v. Rock Valley [Com]munity Programs, Inc. and Irwin Mc[Hugh,] U.S.D.C. (W.D. Wis.), Case No. 04-C-[?,] Memorandum and Order (March 200[6),] Special Verdict (April 2006).

Other source: Madison Gazette.

# Florida's Civil Commitment Center Under Funded and Out-of-Control

*by David M. Reutter*

When first created in 1999, Florida's Civil Commitment Center (FCCC) was hyped as a place to house "sexually violent predators" for protection of the public while providing sex offender treatment after completion of criminal sanctions.

Instead, FCCC has turned into a facility that treats less than one-third of its residents while releasing those who receive no treatment. To date, not one resident has completed the treatment regimen, but over 200 formerly-incarcerated sex offenders have been released from FCCC. A state audit found that FCCC failed to provide a therapeutic atmosphere; drug and alcohol use was routine, sex between staff and residents was not uncommon, pornography was available, and a racially-charged tension existed.

FCCC was created due to a 1998 law commonly referred to as the Jimmy Ryce Act, in memory of a 9-year-old Miami-Dade County boy who was kidnapped at gunpoint, sexually assaulted, murdered and buried inside several large planters by a handyman. The law allows for persons deemed "sexually violent predators" to be confined indefinitely beyond the expiration of their criminal sentence.

Initially, FCCC was located within a former drug treatment center adjacent to Martin Correctional Institution. In June 2000, FCCC resident Steve Whitsett escaped from FCCC when a friend picked him up in the recreation yard with a helicopter. They crashed the helicopter in a nearby orange grove and were captured in a canal the next day with handguns and over $10,000 in cash (See: *PLN*, Nov. 2000, p.7). Ironically, a jury subsequently found Whitsett not to meet the criteria for a sexually violent predator.

In 2000, FCCC was moved to a former prison adjacent to DeSoto Correctional Institution in Arcadia. Following its plan to privatize some of its prison operations, the state, effective January 1, 2003, granted a three-year, $45 million contract to Liberty Behavioral Health Corporation (Liberty) to run FCCC. Liberty was the only bidder for the contract, and from 1998 to mid-2006 Florida taxpayers have spent $150 million to operate FCCC. Liberty lost the contract in June 2006 and the 545-bed facility is now being operated by the GEO Group (formerly Wackenhut).

### Anatomy of Commitment

In 1998 the Florida legislature found "that a small but extremely dangerous number of sexually violent predators exist who do not have a mental disease or defect," and enacted the Jimmy Ryce Act "to provide short-term treatment to individuals with serious mental disorders and then return them to the community."

To accomplish this task, six people review the case files of 2,000 or more prisoners per year to determine if they should be held under the Ryce Act. Using a prisoner's criminal record, court cases, medical and mental health files, victim statements, police reports and other available information, the reviewers make a subjective decision about which prisoners are "likely" to commit new sex crimes.

"We don't have some magic formula where we plug in information" to reach the decision, said Greg Venz, former FCCC director and now special counsel for Florida's Department of Children & Families (DCF). The qualifications of psychologists who conduct face-to-face interviews with prisoners subject to civil commitment have been questioned. There are no licensing or accreditation requirements.

"My view is that there must be some type of licensing requirement and more specialized training. What Florida has right now is well below the threshold for this highly specialized field," said Natalie Brown, a former Florida evaluator who now screens offenders for programs in Washington and Missouri.

Once an offender is deemed "likely" to re-offend, they are transported to FCCC to await a jury trial to determine if they are a sexually violent predator. The trial to make this determination is legally required to commence within 30 days, but the average wait is now 2½ years. Some offenders have reportedly been awaiting trial for up to seven years. While 825 men

## MARILEE MARSHALL* & ASSOCIATES, INC.
### ATTORNEYS AT LAW
### CERTIFIED CRIMINAL LAW SPECIALIST
### 523 WEST SIXTH STREET, SUITE 1109
### LOS ANGELES, CA 90014

### APPEALS, HABEAS CORPUS,
### LIFER PAROLE HEARINGS AND RELATED WRITS
### CALL OR WRITE FOR FREE CONSULTATION
### 213-489-7715

### FCCC (cont.)

have been held at FCCC, another 600 who were reviewed were found unqualified for the Ryce Act but later re-offended.

### A Therapeutic Atmosphere?

For the most part, transfers of state prisoners to FCCC after they complete their sentences are like any other inter-prison transfer. Upon arrival, the "resident" is confronted with a compound surrounded by razor wire-draped fences and patrolled by armed Department of Corrections guards. The typical dormitory lay-out with central chow-hall and laundry facilities are present, and everyone uses the same recreation yard. FCCC is, after all, a "converted" state prison. The only true conversion, however, is in the legal classification of the person being involuntarily held there.

The atmosphere at FCCC is a stark difference from Florida's tightly controlled, punitive prison system. Residents wear their own clothes, wear their hair and facial grooming as they please, are allowed to possess cash, and can have packages with TV's, radios and food sent in.

Drug and alcohol abuse is rampant. Like most prisons, the alcohol is homemade while most drugs are brought in by staff. That picture was clearly spelled out by interviews conducted by DCF Inspector General Auditors of FCCC residents. Of seven residents interviewed, only one refused to inform.

Other residents said that homemade wine, or "buck", was regularly made in the kitchen using five-gallon oil barrels. One auditor was surprised that FCCC staffers made no effort to conceal the activity despite knowing that an inspection was scheduled.

When DCF officials visited FCCC on June 23, 2005, a drunken fight ensued. The auditors interviewed one of the combatants. "His eyes were bloodshot, he smelled of alcohol, and admitted he was still drunk and could not talk at that time," the auditor's report says. "He was badly beaten and sustained a broken nose." A staff member who witnessed the fight said the two men "had been drinking all night."

That came as no surprise to investigators. "All residents and staff interviewed admitted 'everyone' knows the residents drink and consume homemade alcohol, called 'buck'", reads a February 2005 DCF report. "Two residents during the investigative interview admitted being intoxicated at the time."

Residents also said you could smell marijuana on the compound all the time. One stated that there was "more weed in this place than I have ever seen in my life." That resident named Coach Wayne Bythewood as the drug "kingpin" of the staff, saying he brought in drugs and small bottles of liquor to sell to the residents.

Several other residents named staff members who trafficked drugs at FCCC, and said they also smuggled in cell phones. Allegedly, these employees worked with a few select residents to sell drugs – one for the whites, one for the blacks and one for the Hispanics.

The drug trafficking was easily accomplished due to the large amounts of cash on the compound. A resident claimed "there is probably $10,000 in cash right now" at the facility. Much of it came through the mail by tricking the "mail lady" with a slight of hand, dropping the cash where she could not see it while holding the letter high once opened. Another resident then scoops up the cash. More cash and contraband enters FCCC during family visits.

The greatest mail smuggling job came over the weekend leading up to December 4-5, 2004. That was the weekend when the residents had a cook-in. They smuggled in uncooked chicken, hamburger meat, hot dogs, buns and French fries. After cooking the food in the dorm they sold or gave it away to residents and staff in exchange for cash, tobacco and volunteer labor.

Upon reporting the cook-in to Facility Safety Manager James Staunton, FCCC's investigator, Ken Dudding, was told to "let it go" in order to avoid a confrontation with residents. That statement coincided with the overall philosophy at FCCC. A staffer told investigators that "as long as the residents were not causing problems," staff would ignore any inappropriate behavior or rule violations. "We'd rather have them happy than their bad attitude."

Child pornography has been sent into FCCC through the mail, which has resulted in two residents being indicted on federal charges. Sex between residents and staff is widespread. "Most of the turnover of staff is due to female staff having sex with residents," says a Liberty memo. That must keep residents happy, indeed.

### Same-Old Same-Old

The willingness of staff to overlook or even cover-up rule violations and crimes worried Dudding, who predicted, "the danger ... will eventually cause the death or serious injury of a staff or resident." That forecast, made in April 2005, would come true twice in the next eight months. But considering that Dudding had investigated over 100 violent episodes during his two-month stint as FCCC's investigator, his prediction was hardly prescient.

In October 2004, FCCC resident Daniel E. Donnelly, 38, was in his dorm watching TV while eating a bag of chips. Alfredo Roebuck, 48, then questioned Donnelly about the bag of chips he was owed. When Donnelly refused to "pay up", Roebuck assaulted him while the lone FCCC staff member present stood by telling Roebuck to stop. Donnelly, who was described as a "frail resident or a lot of medication," died the next day of head injuries. Donnelly was a rare case he had committed himself to FCCC after completing his probationary criminal sentence.

Then in December 2004, a basketball rolled into resident George Williams' flower garden outside his dorm. When Jorg Delgado, 38, went to get the ball, he deliberately "trampled [Williams'] flowers". A argument and fight ensued. On his way t get a rock to defend himself, Delgado sa "an ice pick ... on the ground." He the stabbed Williams seven times.

That incident was not the first stabbin Delgado had been involved in at FCCC. I June 2004 he had stabbed another reside 12 times. He avoided criminal charg because staff ordered him to clean up t blood and crime scene.

"It's the same-old same-old, nothin changed. In fact, it's getting worse," sa Dudding. "My point is, this [Delgado] a guy that goes around stabbing peop – and he can find a knife lying arou anyplace."

### Sit-In Protest

By November 2004, a small group FCCC's residents was disgusted with lack of sex offender treatment and me cal care, as well as the poor food in chow hall. They reported worms in t food. They also complained that sew backed up in the toilets and drains arou the facility. Rather than admit FC was an old, deteriorating prison in n