of repairs, administrators used the old swan song of prison officials, claiming the residents were flushing blankets and sheets down the commodes.

Resident Jody Colzin experienced poor medical care after he received a broken jaw in a fight. His jaw was wired into place. "The wires broke and popped into his lip," said Nancy Morois, president of Family and Friends of Committed Victims, an advocacy group for FCCC residents. "He asked to be taken to the emergency room." Instead, a Liberty staff supervisor told him, "'You're not going nowhere.' He took old, rusty pliers and cut the wires himself," said Morois.

Other complaints include one resident being given heart medication that would have conflicted with his prescription for his high blood pressure. Despite arguing it was the wrong medication, an FCCC nurse ordered him to take it anyway. Another resident complained of shortness of breath, but nothing was done until he passed out in the kitchen. A subsequent examination at DeSoto Memorial Hospital discovered a loose electrode on the resident's pacemaker.

The culmination of these problems caused 30 residents to begin a sit-in. They moved all of their property and bedding into the recreation yard and refused to go into the dorms. The peaceful protest came to a crashing halt 89 days later.

On February 9, 2005, FCCC was raided by over 300 guards from the Florida Department of Corrections (FDOC). The raid was hyped by officials as necessary to enforce orders from the state Fire Marshall, who required FCCC to comply with the same regulations as state prisons because of the lockdown atmosphere. That could change if FCCC removed the locks on doors inside the dorms, which FCCC officials refused to do.

The Fire Marshall ordered all plugs in resident cells to be covered and the extension cords that were strung throughout the dorms removed. Some residents confronted the guards with broom sticks; the guards then used chemical agents and physical force to regain control.

Residents claim the guards took educational and religious materials, clothes, family pictures and TV's without providing property inventory slips. Some residents were simply told to throw their property in the trash. "My personal possessions are the only difference between making this a clinical setting and a punitive setting and a prison," said resident Mark Ritchie, chairman of FCCC's residents' commission. The raid also netted eight gallons of buck. It further gained FDOC a $2 million payment from DCF to bring in the guards to conduct the raid.

### Cover Up

After two months on the job as FCCC's investigator, Dudding resigned and filed a whistleblower complaint, which spurred an audit of FCCC. Nearly all of Dudding's allegations were found to be true.

One of his claims was that staff would cover up critical incidents to make it appear they never happened. The primary perpetrators were FCCC Facility Safety Director Tiffany Lane and Facility Safety Manager James Staunton.

The audit "demonstrated how Ms. Lane either failed to document, or destroyed, documents she felt were unfavorable toward her or certain staff members, including her own mother, whom she supervised," wrote investigator Kelly Summers. In fact, Lane hired and supervised not only her mother, but a sister, two cousins, another relative and two high school friends.

In June 2003, a resident climbed on top of the roof of the mailroom. Lane had several opportunities to stop him but made no effort, according to staff witnesses. Lane and her best friend from high school, Michelle Allen, viewed the security tapes of the incident. Afterwards, the tapes could not be located by administrative staff.

In April 2004, another resident climbed onto the roof of a building. This time, Lane's mother made no attempt to stop the resident, who was supposed to be on 1:1 status, which is constant supervision in the resident's cell. Staunton had failed to promptly enforce a doctor's 1:1 status order, providing the resident – who had threatened to burn a female staff member – time to climb onto the roof. Once on the roof, Lane, Staunton and other "security" staff confronted the resident, who warned them to back off or he would jump.

Staff members rushed the resident anyway, and he jumped. When Dudding went to retrieve the videotape of the incident, Lane told him to "get with her later." Five days later he was given the tapes, which had been erased. Staunton justified the decision to rush the resident because he was supposedly trying to eat a nail and set himself on fire. Somehow, a video from a handheld camcorder survived. It showed the resident doing nothing other than attempting to light a cigarette. Auditors also uncovered Staunton's alteration of times on incident reports. Lane failed to even write a report for 49 days, and only did so because investigators ordered her to.

Finally, the audit revealed how staffers who complained of misconduct or mismanagement by Lane or members of her clique were given demotions and suspensions, or were terminated. Lane's conduct finally caught up to her on August 20, 2004, when she was fired after she tried to move residents "without sufficient resources to accomplish the move." Her





When you can't be there ...





touch your loved ones in a special way!

Catering to Incarcerated People
Affordable Gifts for Family & Friends
Exclusive Glass & Spa Items • Balloon Gifts
Unique Plush Animals • Specialty Candles
Fresh Cut Roses & Flowers
Discount Greeting Cards & More!
Send 3 loose stamps in strips only (or equivalent funds) for Full-Color Catalog featuring 45+ gifts to:
Jaden Moore of New York
Attn: Color Catalog-PLN • 600 Violet Ave • Suite 168
Hyde Park, NY 12538-1880

**FCCC (cont.)**

termination letter said the move resulted in "a hostile and rebellious environment ... which took over 20 hours to diffuse."

### They've Thrown Away the Key

Since its inception, not one resident has completed the treatment protocol at FCCC. In February 2006, FCCC held about 520 residents. From its inception in 1999, 825 men have been placed at FCCC to await civil commitment jury trials. Of the 300 men released during that time, only five were set free through plea agreements with prosecutors while the remainder were found to not be a danger to the public.

What about the current 520 residents? Most have no realistic hope for release. The blame lies in the lack of "short-term treatment" envisioned in the Ryce Act's preamble. The fault lies with legislators. What must not be forgotten is that the Florida legislature intended for FCCC "to provide short-term treatment" of "sexually violent predators" and then "return them to the community." While that certainly sounds like a worthy goal, in reality the legislature has failed to provide the financial backing needed to accomplish the goals of the Jimmy Ryce Act. But it also ignores why, if that is the stated goal, sex offender treatment is not being provided within the Department of Corrections before sex offenders are released.

In its first year, DCF estimated it would cost $27 million annually to operate FCCC. The legislature provided $17 million. Each subsequent year DCF requested more funding, seeking an additional $8.6 million in 2002 to "meet the public safety goal of the Jimmy Ryce Act." Legislators responded with silence. In 2003, DCF sought a $1 million increase because "the need for new funding to operate the facility in a safe manner has become quite critical." Once again, the legislature ignored the request.

It was only after the February 2005 raid of FCCC that the legislature responded with a $2.6 million allotment. That was only $600,000 more than the cost of the raid, however, so funding to improve operations at FCCC was minimally affected. Florida spends less than half as much at FCCC as it does at other state mental health facilities.

Further, the "short-term treatment" at FCCC is so short that few even receive it. In its contract with Liberty, DCF stipulated that funds were provided to treat only 150 residents. Hence, the other 370 have nothing to do but wait for additional funding. And wait, and wait.

The minimal treatment that is provided is inadequate. "It's common for group sessions not to be held because of staff training, staff turnover, or because it's too hot in the classroom," said Dean Cauley, a former FCCC Mental Health Counselor.

The treatment regimen is supposed to consist of four stages: (1) reception and custody; (2) introduction to treatment-assessment and evaluation; (3) intermediate phases one through four; and (4) community treatment. These are no alternatives to the program. The fourth phase does not exist, which spawned a class-action lawsuit challenging the failure to provide treatment. See: *PLN*, Nov. 2004, p.35. Other Florida mental health facilities are required to provide "adequate care," but in February 2001, DCF exempted FCCC from complying with that rule.

Many FCCC residents are opting to not participate in treatment on the advice of their attorneys or of their own accord. "A lot of guys that stay in treatment have been there for four or five years. For what? There ain't no guarantee they're going to get out," said resident Johnny Frazier.

Resident Doug Carlin, 50, learned just that in August 2005. Carlin is the first "graduate" of FCCC. Three psychologists testified he had gone as far as possible in his treatment and was ready to be released to continue with outpatient sex offender care. Duval County Chief Judge Donald Moran disagreed, stating, "while ... Douglas W. Carlin has indeed made commendable progress, the evidence is clear that secure confinement continues to be necessary as he continues with his treatment program." The judge's order means Carlin will continue to be indefinitely civilly committed for the 1983 rape of a Jacksonville woman.

### Medical and Mental Health Care Lacking, Too

Beyond the lack of meaningful sex offender treatment, medical and mental health care at FCCC has continued to be substandard. Resident Ernest Contrillo, 52, had to have his left arm amputated in 2005 due to a gangrene infection that resulted after he repeatedly mutilated himself. He then spent ten days in an outside hospital because FCCC staff failed to keep him on antibiotics. According to a June 19, 2006 article in the *Miami Herald*, a four-month review of internal records, reports and court cases revealed a startling level of medical incompetence. Drugs were reportedly dispensed without doctors' approval. One resident languished in the infirmary for days; mold grew in the urine in his unemptied bedpan. Nurses were threatened and intimidated by residents who demanded medications. "The medical care is a mess because they don't want to spend the money on proper care," said Beverly Babb, a former FCCC nurse who quit in 2004.

The *Herald* found that healthcare at FCCC was compromised by inadequate record keeping, failure to provide basic checkups, delays in treatment, improper use of solitary confinement for mentally ill residents, and misuse (or no use) of certain medications. Only three of 23 residents' medical records that were examined met state standards. Lacking additional money from the state, Liberty diverted funds from its already under-funded sex offender treatment program – its core mission – to pay for mental health care. Residents with serious mental illnesses, including Joseph Myers, 32, who has a history of suicide attempts and hearing voices, have received minimal treatment consisting of monthly visits from a contract psychiatrist. "This is an asylum-era institution that has no place in this century," said Douglas Shadle, a psychiatrist who quit his position at FCCC because of conditions at the facility.

### The Future of Civil Commitment in Florida

The landscape for FCCC has no real hope of changing anytime soon. "But, like, I mean, this is a group of people that are the sickest of the sick," said Florida Governor Jeb Bush. "They are truly perverted and not curable. These are grotesque crimes. They should just be put away ... imprisoned forever. That would solve this problem." As Bush proposed only a paltry $58,000 increase in FCCC's 2006-07 budget, he's doing his part to ensure that residents are confined indefinitely without needed treatment. Which has been the pattern nationally since Washington started its civil commitment program in 1990.

The U.S. Supreme Court, in *Kansas*

*v. Hendricks* (1997), upheld civil commitment of sex offenders provided the intent is to provide treatment – not impose punishment. Treatment and eventual release, however, is not what the state, or politicians, want.

"It is political suicide for a legislator to suggest that some of those laws don't work and they're a waste of public money," said John Q. Lafond, editor of the book *Protecting Society from Sexually Dangerous Offenders: Law, Justice, and Therapy.*

Critics have pointed out that FCCC residents may choose to avoid treatment without punitive repercussions due to a loophole in the Ryce Act. The whole act is cited as being ineffectual. "It's, in effect, the legislature practicing medicine or practicing psychology without a license," said Dr. Fred Berlin, a psychologist and psychiatrist who founded the sexual disorders clinic at John Hopkins University in Baltimore.

Those same critics question why treatment for sex offenders is not available in prison, a place where treatment can be required in the face of disciplinary action. For two decades, Florida pioneered treating sexual offenders in prison with what was known as the Mentally Disordered Sex Offender Program. When the program was running, prisoners received 20 to 30 hours a week of intensive therapy. The program was cut to save taxpayers $7.3 million a year after adjusting for inflation – or less than a third of what it now costs to treat offenders beyond their prison sentences at FCCC.

Even FCCC doctors see legal problems with civil commitment. "I think it's a constitutional issue," said Dr. Douglas Shandle, a Punta Gorda psychiatrist familiar with FCCC. "You have people in a civil facility without the full range of psychiatric services, and without them, they can't get out."

With the political strength of today's prison industrial complex, one can not help but wonder when the government will start extending civil commitment to other "violent offenders" who have completed their sentences.

"They have essentially locked them up and thrown away the key," said Alice Nelson, an attorney in the Gainesville office of Southern Legal Counsel. Which is apparently the whole point behind civil commitment; just ask Gov. Bush and the Florida legislature.

## Civil Commitment Update

During the 2006 spring session, state lawmakers proposed to speed up civil commitment trials by limiting continuances to one lasting 120 days. They also hope to earmark more money to provide additional prosecutors and public defenders to handle such trials. The state, further, plans to create a database of mental-health doctors specializing in sexual offenders to testify at trials. No money, however, was allotted to improve the sex offender treatment program at FCCC. DCF's secretary, Lucy Hadi, said the program is properly funded. "In terms of priorities, this would not be one that would ask for additional funding," she testified at a Florida House hearing.

A major change took place at FCCC in June 2006 when it was announced that Liberty was being booted by the state in favor of another private operator. Boca Raton-based GEO Group, formerly Wackenhut, and its subsidiary GEO Care, Inc., will run the facility from July 2, 2006 to January 2007 for $7.7 million. DCF later entered into a long-term contract with the company to operate FCCC until 2012. That contract includes the construction by GEO of a $60 million, 660-bed civil commitment treatment facility within the next two years (Liberty filed suit after the state initially requested bids to build and operate a new facility, alleging bid-rigging; the suit has since been resolved). GEO says it will design a new treatment program that is "outcome-based" rather than time-based; the company has agreed to retain 182 former Liberty employees on an interim basis. Upon losing its contract to run FCCC, Liberty lashed out, claiming it was made into a scapegoat due to failures by the state. Liberty Vice president Sue Nayda stated that DCF had "abdicated its responsibilities to establish formal, fundamental administrative rules, regulations or standards to govern the program" at FCCC, and said the problems at the facility were due to "a legacy of [DCF's] own poor decisions."

Regardless of whether Liberty or the state is more at fault for the deplorable situation at FCCC, the fact remains that hundreds of offenders are languishing at the civil commitment facility for sex crimes they might commit in the future, without even minimal sex offender, medical or mental health treatment, under substandard conditions. "Anytime offenders are put in the position where they can pretend to have the moral high ground, then we have done something very stupid," said Don Ryce, the father of Jimmy Ryce, whose 1995 abduction and murder led to the Jimmy Ryce Act and, by extension, the establishment of FCCC. ■

*Sources: Florida Department of Children & Families, Inspector General Investigation 2004-0043, available at: http://www.dcf.state.fl.us/admin/ig/publications/investigations/2004-0043.pdf. Miami Herald, News Press, Sun Herald, St. Petersburg Times, Florida Times-Union, Associated Press, News Journal, Talkleft.com.*


**LEARN TO PROTECT YOUR RIGHTS**

**YOU HAVE A RIGHT TO**

- Adequate medical care
- Protection from assault
- Humane living conditions
- Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, ***Protecting Your Health and Safety***, written specifically for inmates who are unable to receive help from a lawyer.

WRITTEN BY
ROBERT E. TOONE
A PROJECT OF THE
SOUTHERN POVERTY LAW CENTER

**COST** $10 (includes shipping/handling)

**ORDER A COPY**
Send a check or money order to
**Protecting Your Heath and Safety**
**Prison Legal News**
**2400 NW 80th Street #148**
**Seattle, WA 98117**
**(206) 246-1022**

*Be sure to include your name, identification number (if any), and mailing address. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date. Upon request, prison law libraries will be sent a copy at no cost.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2002.

# California Guard Murdered By Prisoner; Investigative Reports Blame Gross Staff Incompetence

*by Marvin Mentor*

A prison guard at the California Institution for Men (CIM) at Chino was stabbed to death in the Sycamore Hall housing unit on January 10, 2005 by an East Coast Crips gang-affiliated prisoner who had just begun a 75-year-to-life "three-strikes" enhanced sentence for the attempted murder of a Los Angeles peace officer. This was the first murder of a guard by a state prisoner in California in twenty years. All 33 California prisons (and many county jails) were locked down for one day; Governor Schwarzenegger ordered Capitol flags lowered to half mast.

Guard Manuel A. Gonzalez, Jr., 43, died from three stab wounds to his chest and abdomen that were allegedly inflicted by Jon Blaylock, 35. Using a prison-made weapon, Blaylock was allegedly assisted by fellow prisoners Keith White and Henry Riley when he attacked Gonzalez from behind. Gonzalez was not wearing a protective vest because CIM had received only 352 of its order for 900 of the $500 vests; none were issued pending receipt of the balance. However, it is uncertain whether a vest would have saved Gonzalez's life. Blaylock is now fighting for his own life: San Bernardino Co. District Attorney Michael Ramos is seeking the death penalty for Gonzalez's murder.

## Four Inquiry Boards Convened

Four formal inquiry boards were convened to investigate the killing. Separate reports were issued by the San Bernardino County Sheriff, the California Office of Inspector General [a legislative watchdog agency for prisons], the California Department of Corrections and Rehabilitation (CDCR), and by a national panel of experts appointed by former Corrections Secretary Roderick Hickman. The latter panel was chaired by New York DOC Commissioner Glenn S. Goord.

One area of inquiry raised by officials with California's prison guards union (CCPOA) was why none of the protective vests were issued until the entire purchase order had been filled. CIM Warden Lori DiCarlo indicated it was a fairness issue raised by the union itself, i.e., who should be favored if only some staff could be outfitted with vests?

A second concern lay with the fact that Blaylock was a maximum-security (Level IV) prisoner who was being held at a Level III Reception Center until his custody placement was resolved. Blaylock claimed to have enemies at Corcoran State Prison where he was initially slated to go, and begged off his earlier transfer. He reportedly had medical and mental conditions (including suicide attempts) that required special placement. Blaylock was hoping to go to the California Medical Facility, a Level III prison. Meanwhile he remained at CIM for seven months, where his security restrictions were lower than the maximum security level expected for someone with his criminal history and known assaultive behavior.

## Guards Are Safe – Prisoners Are Not

CCPOA President Mike Jiminez blamed Gonzalez's slaying on a "prisoner-coddling" culture allegedly instilled by former CDCR Secretary Hickman that compromised the workplace safety of guards. Indeed, on May 6, 2006, Michael Watson, a mentally unstable prisoner at New Folsom (Sacramento) facility who was unhappy over losing his job in the kitchen, took guard Sheila Mitchell hostage for 10 hours using a prison-made knife (the incident ended peacefully through negotiations). But statistically, California guards have suffered far fewer workplace homicides than have other classes of workers. With one murder in 20 years, the CDCR's average annual workplace homicide rate computes to about 0.25 deaths per year per 100,000 guards. This compares favorably with taxicab drivers (26.9 homicides per 100,000 drivers/yr.]), detectives (5.0) and justice/public-order workers (3.4). The average rate for CDCR guards is 1/3 that for workers in all professions (0.7), according to the National Institute for Occupational Safety and Health's 1995 report, No. 93-109.

To be sure, prisoners have a much greater "on the job" homicide risk. For example, 50 prisoners were shot to death by CDCR guards from 1986 to 2004, some of which were reported as staged "bloodsport" fights. Only one of those shootings involved an escape. Other prisoners have died after altercations with guards, including being pepper sprayed. And according to findings of fact in *Plata v. Schwarzenegger*, a class action lawsuit over health care in CDCR facilities, on average, a California prisoner needlessly dies every six to seven days due to grossly deficient medical treatment [See: *PLN*, Mar. 2006, pp.1-9].

No guards did any time for these killings. No special commissions were convened. The respective governors at the time didn't concern themselves with dozens of prisoners' deaths. But when New Folsom (Level IV) prisoner Mathew Ormsby stripped a protective vest off a guard in March 2004 in an attempted stabbing that only resulted in "minor injuries," he was sentenced to 89-years-to-life. On November 30, 2004, a guard at New Folsom fatally shot prisoner Wade Shiflett in the back while Shiflett was stabbing another prisoner on "B" yard. And on August 27, 2004, California Men's Colony prisoner Anthony Brown stopped breathing two hours after being pepper-sprayed by a guard he had elbowed.

However, one thing is certain. The results of the investigations into Gonzalez's murder will be closely watched by his surviving family members. Their attorneys, John A. Ferrone and Michael Peacock, have already filed suit against CIM officials and CDCR, alleging misconduct in failing to provide adequate safety for Gonzalez. During a post-murder search of Sycamore Hall, officials discovered 35 "stabbing and slashing instruments," some rusted with age and secreted in toilets and traps. Within days after Gonzalez's death, the 352 protective vests held in the CIM warehouse were quietly issued. They had been in storage for over 4 months.

## Reports Reveal Failed Leadership

Two initial investigative reports on Gonzalez's January 10, 2005 murder, which revealed failed leadership, resulted in CIM Warden Lori DiCarlo and two guards being placed on administrative leave by then-CDCR Secretary Hickman. Further disciplinary actions are expected.

Hickman's initial findings uncovered serious management deficiencies. First, the alleged killer, Jon Blaylock, was not placed in proper high level custody during his seven months at Chino. Blaylock's history of assaulting staff and others, while known to the prison's classification committee, was essentially ignored in their four reviews. Blaylock, in and out of prison since 1990 and recently re-incarcerated for the attempted murder of a Los Angeles peace officer, had a classification score of 376 points (only 52 points are needed to require maximum security [Level IV] placement). With documented mental health problems, Blaylock had over twenty citations for violence to staff and other prisoners, including possession and use of weapons.

Nonetheless he was placed in the general population, which put him in daily open contact with staff and prisoners. He stabbed a prisoner on July 31, 2004, but was returned to the general population on September 22 of that year.

CIM staff did not tighten security after a riot and series of stabbings between December 6, 2004 and January 9, 2005. In response to a December 28 stabbing, Blaylock, a reputed "shot caller" for black prisoners, told guards that prisoners blamed staff for permitting the attack and wanted to "get" the responsible guards. No warden-level review of this threat was ever conducted.

Further, the murdered guard, Manuel Gonzalez, routinely let Blaylock out of his cell to move on the tier unsupervised. On the day he was killed, Gonzalez violated procedures by releasing Blaylock from his cell while leaving the grill gate and front door open. That was when Blaylock attacked him. Such violations during Gonzalez's second watch period were reportedly common.

### The Inspector General Sums Things Up

A March 16, 2005 report by the State Inspector General revealed lax inventory controls that permitted prisoners easy access to tools with which to manufacture weapons. Daily Tool Inventory Records were obviously falsified as having been checked off during a 20-day period when the tools had earlier been seized as evidence. Check-boxes on Tool Inventory forms were suspiciously signed by the same pen, appearing to have been done after-the-fact by one person. Facility disrepair and poor building maintenance provided prisoners with a ready supply of raw materials for making weapons. The IG's inspection found "unsecured tools in a five gallon bucket, unsecured lockers containing welding rods and propane cylinders, and numerous unsecured bins containing non-inventoried replacement parts kept on hand for electrical and plumbing repairs." Broken windows permitted prisoners to pass contraband from cell to cell. Required daily cell searches were not performed.

The IG report noted that Blaylock was inappropriately housed in the general population and that Gonzalez and other guards regularly violated security protocols by letting such violent prisoners run loose. Following Gonzalez's murder, the prison's clinic was found to be ill-prepared to handle emergency medical needs, with key supplies such as defibrillators, oxygen and airway relief equipment kept in different locked closets in separate rooms. Indeed, the prison's emergency response was characterized as "disorganized" and "pandemonium," so much so that the crime scene was contaminated and destroyed, resulting in the loss of important forensic evidence linking the victim and assailant. Staff were described as "traumatized" and "inadequately prepared by academy and institutional training." Elementary chain-of-custody procedures were not followed; evidence bags were not secured. Even blood evidence from Blaylocks' hands was neither examined nor preserved. Incredibly, no incident log was ever made. Additionally it was noted that prison officials had failed to adequately address Blaylock's known mental health needs.

The March 2005 Board of Corrections report, augmented by input from New York DOC Commissioner Glenn S. Goord, concluded unremarkably that CIM was overcrowded, that vests should have been distributed earlier, and that Blaylock should have been put in administrative segregation when he was processed in.

More to the point, all of the above reports generally labeled CIM as being in "complete disarray" and sorely in need of immediate new leadership. Secretary Hickman ordered a thorough review of the remaining 32 California prisons and eight youth facilities. Under increasing pressure, he subsequently resigned on February 26, 2006.

Sources: *Sacramento Bee, Los Angeles Times, Associated Press, Workers Comp Insider, Voters for Corrections Reform, Office of the Inspector General, Special Review Into The Death of Correctional Officer Manuel Gonzalez, Jr., March 16, 2005.*




**Save on Prescription Eyeglasses & Shades**

Send for a **FREE** Catalog
Money Back Guarantee

**Prism Optical, Inc.**
**10992 NW 7th Ave**
**Dept. LN206**
**Miami, FL 33168**

Inquires from Friends
and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com



Since 1959

**JAMES A. SKIDMORE II**
**Attorney at Law**
**560 N Arrowhead Ave., #5B**
**San Bernardino, CA 92401**
**909-885-1075**

Appeals & Writs — Revocation/Extension Hearings
Lifer Hearings — Misdemeanor/Felony Trials

**California Cases Only**

# South Carolina Prison Industries Program Implements Some Audit Recommendations

*by Michael Rigby*

The South Carolina Department of Corrections (SCDC) has implemented 5 of 13 recommendations made in an October 2003 report that criticized its Prison Industries Program (PIP), according to a May 2006 follow-up report. In its original report the South Carolina General Assembly's Legislative Audit Council (LAC) chided the SCDC for generally poor oversight of the PIP and practices that provided collaborating companies a potentially unfair advantage in the marketplace. [See *PLN*, February 2005, for more on the 2003 report].

The PIP employs more than 1,900 prisoners, mostly through arrangements with private companies. The SCDC supplies the prisoners and the buildings, and the companies use the subsidized labor to manufacture their products. The companies then compensate the SCDC, which in turn pays the prisoner's hourly wages of between 35 cents and $6.50 per hour.

One area of concern addressed in the 2003 report was the PIP's failure to collect appropriate victim restitution from prisoner wages. The report advised the SCDC to review sentencing records to ensure that these deductions are properly made. During the follow-up review auditors found that in 2005 the SCDC had documented victim restitution deductions--apparently enough of an improvement to consider the recommendation implemented.

Billing was another problem area. The original audit noted that the SCDC sometimes saved companies money by either not billing them or under billing them for prisoner labor. In the update, no instances of improper billing were uncovered, the auditors said.

Along with providing sweet billing arrangements, the SCDC was also paying up to half of the prisoners' training wages for months at a time. Even the U.S. Justice Department took notice of this practice and, in a May 2003 letter, chastised the SCDC for providing these companies with a benefit unavailable to other companies in the community. During the follow-up review the SCDC stated that the practice had been discontinued and that the companies "currently pay the entire amount of inmate training wages."

The 2003 report also observed that the SCDC had not consulted with the Employment Security Commission (ESC) when establishing the training period for prisoner workers. In February 2006, however, auditors found the SCDC and the ESC had agreed that the web-based national Occupational Information Network would be an appropriate instrument to evaluate training criteria.

Finally, the original report recommended establishing "goals and performance measures ... that accurately reflect the degree to which the [PIP] is assisting the department in meeting its mission" and to report this information. (The "mission," ostensibly, is to provide prisoners with educational and vocational training, engage them in productive work, and prepare them for re-entry into their communities.) In the update auditors reported that the SCDC published performance measures in its fiscal year 2004-5 annual accountability report, though no specifics were given. The follow-up also noted that the SCDC has "published broad goals that pertain to its mission."

Despite the progress, the SCDC has yet to take action on the other recommendations, including working with the ESC to ensure that low-paid prisoners do not leech jobs from the community, listing perks given to private companies such as nominal rent and discounted utilities; subjecting contracts to use prisoner labor to a bidding process; and ensuring that all required deductions--including child support--are made from prisoner wages. Both the original report and the follow-up can be viewed online at www.state.sc.us/sclac.

# California County Jail Settles Overdue Prisoner Hospital Bills For $1.5 Million

*by John E. Dannenberg*

Settling a long-simmering dispute in billing rates for medical treatment of jail prisoners, San Diego County has agreed to pay $1.5 million to multiple hospitals for bills dating back over three years. The health care providers had sued the county in 2004 to recover unpaid bills incurred by its Sheriff's Department. The agreement does not cover some emergency room doctors who have sued separately.

State law requires sheriffs to pay for medical care for their jail prisoners. To this end, the San Diego County Sheriff contracted to pay specified rates for prisoner care, but in 2003 unilaterally notified the hospitals that he would now only pay a lesser scale. The hospitals responded by submitting "full-billed charges," which the sheriff proceeded to underpay. The "full-billed charges" came to $5 million. The settlement now calls for the county to pay $1,457,717 to the involved hospitals, on top of the $700,000 paid earlier.

The agreement permits the county to appeal one remaining question, namely whether the sheriff is responsible for medical costs of "pre-arraignment detainees." The San Diego Superior Court ruled in October 2005 that the county is so o ligated. [Note: Reversal of this holdi would have the anomalous result of ins lating the sheriff from liability for injur wrought upon a detainee during his arr -- a distasteful prospect in stark tensi with the presumption of innocenc Billings for such detainees in the last t years approach $4 million. The county agreed that if it loses its appeal, it will 55% of these full-billed charges.

Separately, a dispute with Tri-City h pital emergency room doctors for unp prisoner bills is set for trial in August, 2 They filed a second suit on April 18, 2 for bills from a different time frame.

A new law on health care prov reimbursements by county sheriffs was acted October 4, 2005 (Senate Bill 159) provides, inter alia, that hospitals provi emergency medical care, but who do have a contract with the sheriff, may ch only "a rate equal to 110% of the hosp actual costs." San Diego's sheriff curr has only one contracted provider, the versity of California Medical Center.

Source: *North County Times*.

# Illinois Cook County Jail Embroiled in Shootings, Scandals and Escapes

*by Gary Hunter*

Shootings, stabbings, suicides, a death and multiple escapes have turned the Cook County Jail in Chicago on its proverbial ear over the past year, in addition to misconduct by guards, a change in the jail's leadership and a lawsuit alleging brutal beatings.

## Guns in Jails

On February 1, 2006, prisoners Lorenzo Evans, Terry Martin and Gregory Sherman each sustained bullet wounds from a .32-caliber revolver that had been smuggled into Cook County's Division 11 maximum security jail.

Randi White, 21, was arrested after investigators unraveled her part in the gun-smuggling scheme. Prosecutor Brian Holmes described a scenario where, on January 26, 2006, White visited Sherman, her boyfriend's brother, at the jail. During that visit White allegedly "unscrewed the visiting cage mouthpiece ... and proceeded to hand the revolver to Mr. Sherman."

Sheriff's Dept. spokeswoman Sally Daly offered a different explanation. "We believe they unscrewed a plate where the phone was on the wall and passed the contraband through the opening," she said.

White was originally arrested and held on $500,000 bond. On June 2, 2006 she pleaded guilty and was sentenced to 3 years in prison. Evans and Martin likewise accepted guilty pleas and received 3-year sentences for their part in the scheme.

White's boyfriend, Isiah Sherman, and another man, neither of whom were placed at the scene of the gun smuggling, each received 2-year suspended sentences.

None of the gunshot injuries sustained by the prisoners was serious. Authorities suspect that the three men were plotting to file a lawsuit against the jail after shooting themselves.

In an unrelated incident, a guard was implicated in smuggling a weapon into the jail. Former Cook County guard Kenyatta Sanders was sentenced to 15 years in prison on February 21, 2006. She was convicted on a variety of charges including attempting to smuggle a loaded revolver and cell phone to prisoner Daniel Jimerson.

Sanders never admitted to a relationship between herself and Jimerson or to smuggling the gun, but an investigation turned up letters she had written to her incarcerated lover.

"I want you inside and out, but I need your help ... I have never been in love with a man in the system," wrote Sanders. Another excerpt stated, "Nobody can love you like me because [our] love is not a result of sex, money or material things, but is from two people connecting from the soul. We are soulmates until death do us part."

On January 20, 2003, Sanders had wriggled through a 9-inch opening to avoid a metal detector, but was confronted by other jail staff when she tried to gain unauthorized entry to a tier where Jimerson was housed. A search turned up the gun, a cell phone and a knife with a 4-inch serrated blade.

Earlier this year a gun was smuggled into another Illinois county jail, too, although by different means. Victoria Lundy managed to smuggle a .25 caliber pistol into the Ross County Jail on January 29, 2006. The gun was discovered after it accidentally discharged inside a holding cell.

Lundy was originally questioned about an incident of shots being fired, then was arrested for driving without a license. Another woman in the cell with Lundy said Lundy had gone to the bathroom several times before the gun went off.

A close inspection of the weapon revealed an "off white colored liquid substance on the gun with red specks [that] appeared to be consistent with vaginal fluid."

Lundy later admitted to the original shooting. Her charges include improperly discharging a weapon, illegal conveyance of a weapon and carrying a [very well] concealed weapon.

## Escapes and security failures

Cook County jail prisoner Randy Rencher escaped from the facility on June 27, 2005. Rencher faced a variety of charges and is suspected of at least two bank robberies that occurred after his escape. Both banks were robbed by a man wearing a jail guard's uniform. Of major concern was a statement allegedly made by Rencher that he had bribed a guard to help him escape. Rencher, who later turned himself in on November 2, 2005, was the first prisoner to escape from Cook County Jail in a decade. But he wasn't the last.

The Division 11 maximum security jail was embarrassed again on February 10, 2006 when Warren C. Mathis made a clean getaway in a truck carrying dirty

SOMEONE KNOWS!

Who killed Kenneth Trentadue? Tortured at Federal Transfer Center in Oklahoma City 8/20/95. Can you help solve this horrific mystery? This is not law enforcement. This is for Kenny and other prisoners. We'll follow every lead. $$$ Reward. P.O. Box 25067, LA, CA 90025. All leads Confidential

HARVEY R. COX, MS
Corrections Consultant
(Both Federal and State Inmates)
32 years Correctional Employment, including Federal, State, & Private Prisons
(Warden at 3 Institutions)

Reasonable Rates for Assistance in:

PSI Review Prior to Sentencing (Impacts on Prison Designation and Programs)

Prison Transfers

Parole Representation (Not Texas State Inmates)

Prison Grievances (Administrative Remedies)

Expert Witness

PO Box 1551
Weatherford, TX 76086
(817) 596-8457
Fax: (817) 594-7172
E-mail: hrcox@yahoo.com
www.prisonconsultant.com

## Cook County Jail (cont.)

laundry.

"At some point, it is believed Mathis slipped away from the officer who was supervising the work detail and hid in a truck that was picking up inmate laundry," said Sheriff Michael F. Sheahan's press office. Mathis was facing three armed robbery charges when he arranged his unauthorized early release. He was captured a day later.

On February 11, 2006, six prisoners overpowered a guard in their escape from the Cook County jail, Division 10.

The well-planned ruse was based on intimate knowledge of jail routines and security weaknesses. Using homemade knives, Eric Bernard, David Earnest, Tyrone Everhart, Arnold Joyner, Michael McIntosh and Francisco Romero subdued guard Darin Gater after a seventh prisoner, Patrell Doss, first blinded Gater with a hot-water concoction.

"We had planned and plotted it for more than seven to eight months," Earnest told an NBC5 reporter after he was captured. "It was disinfectant and soap in his eyes. By the time he could see, when he opened his eyes, he had about three knives and two inmates standing in front of him."

The escape began when Gater arrived on duty alone. Staffing shortages resulted in only Gater being assigned to what is normally a two-guard position. At some point Gater unlocked Doss and escorted him to the showers. That's when Doss dashed Gater with the soapy water, blinding him long enough for the other prisoners to arrive.

Gater was handcuffed and Doss donned the guard's uniform and took his keys. Using a fire as a diversion, Doss was able to secure the other prisoners' escape but was himself trapped in the process. The remaining six managed to get outside the building, where they scaled a barbed-wire fence and ran away.

Joyner, Earnest and Everhart were captured the next day without incident. Bernard, McIntosh and Romero were caught on Feb. 13 after a home invasion and a standoff with over three dozen police.

Outside accomplices Michelle Reyes, Jose Romero and Anna Romero were charged with aiding in the escape of McIntosh and Romero after they spent the day driving the fugitives around the city. Each was given a $200,000 bond.

The case took a bizarre twist when Gater admitted under interrogation that he was part of the escape plot. Prosecutors say the guard confessed to giving the prisoners his keys and uniform and then handcuffing himself. Gater's alleged motive was to embarrass outgoing Sheriff Michael Sheahan and to help his former supervisor, Richard Remus, a candidate for Sheriff, get elected.

Gater did not deny making the comments but his attorney, Tommy Brewer, said his client was coerced. "Anything to stop the questioning," said Brewer. "They denied him sleep, [he was] not allowed to eat, they wouldn't let him make phone calls." Brewer claimed that Gater was being made into a "fall guy."

Sheriff Sheahan disagreed, stating, "It's [Gater's] words that he's talked about the political motivation and he talked about what went down and he admitted everything that he did." Gater was charged on February 14, 2006 and posted a $500,000 bond.

Other security lapses were discovered in connection with the escape. Cook County jail Sgt. Ivan Hernandez was told by his supervisor, Capt. Michael Wright, that a prisoner had a knife and was planning to escape but no cell search was ever conducted.

That tip came at about 3:30 p.m. on the day of the escape. Hernandez and Wright consistently tried to shift the blame to each other. Hernandez said he was waiting on Wright to call back and authorize the cell search. Wright stated that no authorization was required and that Hernandez should have searched the cell on his own authority.

Jail monitor Charles Fasano faulted both men. He noted that Sgt. Hernandez should have performed the search. But he also said of Capt. Wright, "You'd want to call back and say what did you find? Did you find a knife?"

Hernandez and five other guards were eventually suspended. Four of those guards have alleged that they also were held and questioned for over 24 hours without an attorney. All of the guards and supervisors agreed that the jail was short-staffed that night, One guard even admitted to being told about a knife but insisted that no one had said anything about an escape plot.

When asked if any guards helped them escape, Earnest said, "No. Not at all. Everything we needed was there. We had seen it." It was like a "walk in the park," he added.

One week after the mass escape from the jail, on Friday, February 17, 2006, Cook County prisoner Lawanda Warren, 40, walked out of a hospital where she was being treated after the guard watching her went to answer a phone.

Warren was being held on drug charges. Police tracked her down through her family members, who eventually convinced her to surrender. Cook County Sheriff Sheahan took Warren back into custody himself.

### Beatings, Deaths and Suicides

Cook County jail guards are currently locked in a court battle against prisoners over an earlier riot that broke out in the jail in July 2000; also, two former guards are pursuing a separate lawsuit claiming they faced retaliation and were forced to resign after refusing to cover-up what happened during the 2000 incident.

Nathson Fields described how he and other prisoners were attacked by out-of-control guards who were intent on making a point during the 2000 beatings. Nathson said of one of the Cook County guards, "... he looked down at me." "He told me that, 'You no celebrity. You no role model.' He said I was going back to Death Row."

Fields had served 11 years on death row for a gang-related murder but was granted a new trial when his judge, Thomas Maloney, was convicted on bribery charges. Fields credited jail guard Corte[z] Brown with shielding him from othe[r] guards who were trying to beat him. "I was convinced I was about to die," sai[d] Fields.

But in separate testimony, Brow[n] denied that he ever helped Fields. He sai[d] it was another prisoner he was helpin[g] that day.

More recently, on March 12, 2006, [a] fight in the Division 10 jail left four prison-ers and one guard injured. In a melee th[at] involved 14 prisoners, two were stabbe[d] and two others suffered head injuri[es.] Three had to be hospitalized with serio[us] but non-life threatening wounds. Th[e] guard was injured when he tried to bre[ak] up the fight; witnesses say the incide[nt] began over the TV.

Another altercation occurred on Ap[ril] 15, 2006 when a prisoner allegedly tri[ed] to hit a guard. Jail officials claimed th[at] Demetrius Thomas refused an order to [go] to a recreation area after being search[ed]

and attempted to assault a sergeant. Four other prisoners and three guards joined in the ensuring scuffle; four prisoners were subsequently taken to outside hospitals.

A week later, on April 22, 2006, a third fight broke out which resulted in seven prisoners being hospitalized – five with stab wounds, including Jeffery Iniguez, who suffered serious injuries to the back of his head. Iniguez died four days later after being removed from life support at Mt. Sinai Hospital. His was the first stabbing death at the Cook County jail since Nov. 2004.

In an attempt to regain control over violence at the facility, on May 14, 2006, Sheriff Sheahan announced the appointment of Salvador "Tony" Godinez as the jail's new director. Godinez, formerly a warden at the Stateville Correctional Center in Joliet, assumed the $125,000 per year position in mid-June. Apparently, however, the county didn't get its money's worth.

On August 16, 2006, prisoner Maeceo Dickey, 39, attacked guard William Baker, punching him and repeatedly slamming his head against the floor. By the time help arrived, Dickey had already left the area and guards had to search for him. They ordered prisoners to lie down during the search, but claimed that some refused and "had to be forcibly taken down ...," according to Sheriff Dept. spokesman Bill Cunningham. The prisoners told a different story, however. They said the guards severely beat them in retaliation for the attack on Baker even though they weren't involved, and they suffered bruises, black eyes, chipped teeth and other injuries as a result.

Thirteen prisoners at the Cook County jail filed suit over the incident on September 12, 2006. "From the way my clients describe it, it was a jail-guard riot," stated attorney Richard Dvorak, who is representing the plaintiffs in the lawsuit. "They just started indiscriminately beating people: Kicking, punching, stomping. Several of these injuries occurred while these inmates were in handcuffs." The suit is pending.

Additionally, two suicides occurred at the jail in July 2006. Prisoner Michael McAndrews, 47, hanged himself with a sheet in his cell on July 27. Another prisoner, Keith Aldridge, 26, had committed suicide in the same manner just days earlier. Jail officials called the timing of the two deaths a coincidence.

### Other Incidents Outside the Jail

Some Cook County jail guards have experienced problems outside their place of employment, too.

In an embarrassing fatal incident on February 19, 2005, Cook County guard Arlin McClendon, 36, decided to play a prank on a fellow co-worker. While he was driving, McClendon flashed his lights and honked his horn at a friend's SUV; then, after the vehicle stopped at a red light, he jumped out and banged on the SUV's window. Unfortunately his friend's wife was driving the SUV. McClendon's friend, who was not named, pulled up in another vehicle and, believing his wife was being carjacked, shot McClendon multiple times. The shooter, another Cook County jail guard, apparently did not recognize McClendon even though they had both worked in the same department for years and were described as "lifelong friends." No charges were filed.

Also, on August 27, 2006, police were investigating the shooting of an unnamed off-duty Cook County Sheriff's Dept. jail guard, who was shot twice in the back at his home. Investigators were unsure whether the shooting was related to his position at the jail. The guard was expected to recover.

Trying to escape the madness at the jail, Cook County guard Michael T. Hogan, 24, was having a leisurely drink at a local bar on April 6, 2006 when Chicago Lawn District officers burst onto the scene. Hogan was arrested after he dropped a small bag of cocaine on the floor and stepped on it in attempt to hide it from the approaching police. He was charged with a felony count of possession of a controlled substance. Hogan, on probationary status as a jail guard, was subject to immediate termination. Apparently some Cook County guards belong in the jail – and not as employees.

Sources: *Associated Press, Chicago Sun Times, Chicago Tribune, UPI*

**Prisoners' Guerrilla Handbook to Correspondence Programs**
High-school, vocational, paralegal and college courses available to prisoners.
**$24.95**
***Available from PLN's Book Store!***
See page 45 for more information.

**Tightwad Magazines**
Our **New Catalog** is now available. We have lots of New Selections & 100's of Popular Magazines at **LOW PRICES & Special Package Deals.**
**Write for a FREE Catalog:**
Please send a SASE (self addressed stamped envelope) if possible, to speed delivery.
**Tightwad Magazines**
(PLN) PO Box 1941 Buford GA 30515

William L. Schmidt, Esq.
EXPERIENCED, AGGRESSIVE AND SUCCESSFUL PRISON LAWYER
CALIFORNIA CASES ONLY!
- Medical Malpractice
- Civil Rights Violation
- Administrative Issues
- Writs of Habeas Corpus
- Appeals
- Parole Hearings
- Revocations
- Transfers

Send a one-page case summary to:
791 Price St. #170
Pismo Beach, CA 93449
(805) 556-0844
(Please write for approval to call collect.)

# Colorado Expands Private Prisons While Fining CCA for Understaffin

*by Matthew T. Clarke*

On June 28, 2006, Colorado assessed $126,000 in fines against Corrections Corporation of America (CCA) for persistently understaffing two Colorado private prisons. The Colorado Department of Corrections (DOC) also awarded contracts for new private prisons and the expansion of current private prisons to CCA and other private prison companies.

The fines were prompted by a state auditor's report which blasted the private prison companies and recommended fines. [*PLN*, Apr. 2006, p. 18]. CCA's Kit Carson County Correctional Facility (KCCCF) in Burlington was fined $103,743 for short shifting 701 times during the ten-week period ending January 10, 2006. This meant that the prison was short about ten employees per day every day spread out among three shifts. The supervisor was missing for five shifts while the assistant supervisor was absent for 44 shifts. In October 2005, the DOC waived $46,000 in fines for KCCCF because it said it was unfair to strictly enforce a contract that was only a month old at the time.

CCA's Crowley County Correctional Facility (CCCF) in Olney Springs was fined close to $23,000 for short shifting 157 times during the ten weeks. CCCF had been previously granted a waiver for $18,000 in fines.

Alison Morgan, the DOC's supervisor of private prisons, said that staffing had improved at the private prisons since the fines were assessed. According to the state auditor, private prisons have a large turnover in staff because the guards are paid only about two-thirds the amount that state prison guards are paid. And have little in the way of benefits. Interestingly, the DOC did not state how much money CCA made by short staffing its facilities. In similar cases around the country, private prison companies have determined they can short staff their facilities, absorb the fines and still make a handsome profit off the difference.

Around the same time it was assessing the fines against CCA, the DOC announced that it was awarding several contracts to build new and expand existing private prisons. The DOC awarded Houston-based Cornell Companies a contract with a potential value of $16 million annually to build and operate an 832-bed women's prison in Hudson. This beat a competing bid from GRW Corporation to expand a 282-bed private women's prison it operates in Bush. GRW may have lost the contract due to a scandal involving employees having sex with prisoners at Brush. [*PLN*, Oct. 2005, pp. 18-20].

The DOC also awarded Boca Raton, Florida-based GEO Group a contract to build and operate a 1,504-bed prison in Alut potentially worth $28 million a year. CCA was awarded a contract to expand KCCCF and its men's prison in Bent County by 720 beds each.

The expansion projects and new prisons are expected to be completed by the middle of 2008.

Colorado currently pays private prison companies $51.91 per prisoner per day to incarcerate state prisoners.

According to DOC spokeswoman Katherine Sanguinetti, Colorado's prison population is growing by 100 prisoners per month and will exceed existing capacity the end of 2006.

"We are almost out of state beds, we are desperately in need of places to these inmates to keep them safe and sec and house them in a humane way," s Sanguinetti. "The private prisons allov to do that without incurring the constr tion costs to the state."

Colorado's private prisons h been plagued with short staffing, ri and guards bringing in drugs and ercing prisoners to have sex with th [*PLN*, Jan. 2005, pp. 26-32; Oct. 20 pp. 18-20; April 2006, p. 18]. What's s secure and humane about that? Sente ing reform, releasing lifers held long p their parole dates and similar measu are not within the bounds of polit consideration.

Sources: *Rocky Mountain News, Gre Tribune, Fort Worth Star-Telegram.*

# $1,156,149 Awarded to Former Federal Prison for Failure to Diagnose and Treat Throat Canc

The U.S. District Court for the Eastern District of New York on September 6, 2005, awarded $1,156,149 to former Bureau of Prisons (BOP) prisoner Hernando Lopez for failure to diagnose and treat throat cancer over a two-year period. The Court held that BOP medical personnel in Pennsylvania were the direct and proximate cause of Lopez's injuries, where such cancer should have been initially diagnosed and treated but for the deliberate indifference and negligence of such medical personnel. The Court reduced Lopez's initial $6 Million claim, based upon a determination that Lopez would live for another 16 years, that there would be no future reoccurrence of this cancer, and to bring the award in line with other factually similar cases.

In June 2000, Lopez had complained to BOP medical personnel in Loretto, Pennsylvania of nasal and breathing problems, which he attributed to an assault he sustained by another prisoner in 1998 and to a subsequent surgery to correct nasal blockage. BOP medical personnel had prescribed various antibiotics and throat gargles to Lopez for symptoms of sore throat and hoarseness, despite his repeated requests to be examined by an Ear, N and Throat (ENT) specialist which w consistently denied. Lopez's sore th and hoarseness persisted and worse as he was moved from Pennsylvani a BOP transfer facility in Oklahom June of 2001, then to Oakdale, Louisi approximately three weeks later in of 2001.

Between July 18, 2001, and Octo 24, 2001, Lopez was examined by B medical personnel in Oakdale, inclu two physician assistants and two s physicians, who noted in his medica cords a persistent and worsening ho voice, sore throat, continuing probl of breathing and voice changes. On tember 18, 2001, BOP Staff Physi Blocker wrote in Lopez's medical rec "consider ENT evaluation for comp of nasal problems and voice chan citing reasons therefore "history of septoplasty (surgery for deviated sep and difficulty breathing." On Septe 28, 2001, Dr. Joel Alexander exam Lopez at Oakdale and noted his histo nasal congestion and that he suffered a "possible vocal cord dysfunction October 15, 2001, Lopez was exam

by a BOP physician assistant because he was complaining that his throat hurt, and it was noted again that he suffered from a "possible vocal chord dysfunction."

In October of 2001, over 14 months after his initial request to be seen by an ENT specialist, Lopez was examined by Dr. Leslie Warshaw, Jr., a private ENT specialist in Oakdale, Louisiana. When Dr. Warshaw attempted to examine Lopez's throat with a mirror (after determining that a flexible laryngoscope was broken), he was unable to do so because of Lopez's gag reflex.

On December 13, 2001, Lopez had a CT Scan of his sinuses, which was negative. On January 22, 2002, Dr. Warshaw examined Lopez by passing a flexible scope down his nose and observed a lesion on his larynx, which he noted as "possible Tl, T2 squamous cell carcinoma of the larynx,""recommending a biopsy to properly diagnose the lesion. During such biopsy on February 6, 2002, Dr. Warshaw discovered a "large mass lesion in the anterior two-thirds of the right rue vocal cord extending into the ventricle ...," which he removed as much as possible with forceps and a carbon dioxide laser to remove remaining visual evidence of the tumor. Dr. Warshaw's post-operative diagnosis was Squamous Cell Carcinoma (SCCA) of the larynx.

A month after Lopez's March 2002 release, he had a portion of his right voice box removed, with a tube permanently inserted into his throat below his voice box so that he could breathe. Lopez subsequently participated in a regimen of chemotherapy and other procedures, resulting in no further cancer reoccurrence.

Lopez had timely exhausted his administrative remedies while imprisoned and subsequently filed a complaint against BOP personnel under the Federal Tort Claims Act (FTCA) on April 9, 2002, alleging Eighth Amendment *Bivens* claims for failure to diagnose and treat his throat cancer, and deliberate indifference and negligence of BOP medical personnel in such failure to diagnose and treat his cancer in a timely manner. Lopez's complaint was tried before the Court from March 28 through April 16, 2005.

The Court found credible the plaintiff's pathology expert's opinion that Lopez's cancer was present in September through October 2000 while he was in Pennsylvania. This supported Lopez's argument that the BOP medical personnel were deliberately indifferent and negligent in not properly diagnosing and treating the cancer, which exhibited a gross deviation from the standard of medical care. The Court rejected the defendants' pathology expert as not credible, since the theoretical basis of her opinion was not regularly accepted in the medical community.

The Court ruled that in this case, there was a conflict in the underlying substantive law relating to damages, such that the laws of Pennsylvania, Oklahoma, and Louisiana (where Lopez was located during his symptoms associated with cancer), were significantly different regarding the award of such damages. After a choice of law analysis, the Court reasoned that "Pennsylvania is where Lopez's cancer should have been diagnosed, and if diagnosed, prevented."

The Court's total award of $1,156,149 was based on $18,149 in past medical expenses, $228,000 for future medical expenses, $400,000 for past pain and suffering, and $450,000 for future pain and suffering. The Court further ordered a 3.88 percent interest rate until paid plus recovery of Lopez' costs of this action. See: *Lopez v. United States*, USDC ED NY, Case No. 03-Civ-1729.





**WriteAPrisoner.com**

**Take your first step toward making new friends...**

**Are you tired of never hearing your name at mail call? Have you given up hope of meeting new people while incarcerated? We can help. We list personal and legal ads for inmates on our website, along with your photo and address.**

- We receive an astounding 10,000 plus visitors from around the globe daily!
- We have been making headlines since we opened our doors over five years ago - featured on *20/20, E! True Hollywood, Women's Entertainment, The Ricki Lake Show, Court T.V., CNN, Fox News, ABC News, CBS News* and many more!
- Your ad can be found in numerous directories - alphabetically, by state, newest members, birthdays, etc.
- Our website provides information and resources in 51 languages and we are geared for international search engines.
- Comprehensive search allows viewers to search for your ad by age, race, religion, astrological sign, key words, location, etc.
- We advertise non-stop on every major search engine and have thousands of websites linking back to us.
- Affordably priced at $40 for the first year, $30 for renewing year.
- Free email forwarding service increases the volume of your incoming mail.
- Free online résumé posting for members being released within the year
- Our website is user-friendly and includes a supportive chat community
- Free brochure available by sending a SASE to the address below
- Contact us today and start looking forward to mail call!

*"I wanted to thank you for your GREAT services! I have a beautiful fiancée because of my ad. Thank you! PLEASE remove my ad because I no longer have a need for it!" - Richard Jimenez,*
South Walpole Prison, Massachusetts




*Proud member of the Volusia County Chamber of Commerce*

**For A Free Brochure, Send S.A.S.E. To:**
**WriteAPrisoner.com**
**P.O. Box 10**
**Edgewater, FL 32132 USA**




*Proud member of the Better Business Bureau of Central Florida*



# Record $3.2 Million Settlement for Wrongfully Imprisoned Massachusetts Man

*by Michael Rigby*

The City of Boston, Massachusetts, has agreed to pay $3.2 million to a man who spent 10 ½ years in prison for a rape he did not commit. The March 2006 settlement is believed to be the largest of its kind in state history.

Neil Miller's nightmare began on November 15, 1989, when he was arrested for the brutal rape and robbery of a 19-year-old college student six weeks earlier. Miller was quickly convicted and sentenced to 10-25 years in prison. After his direct appeals were denied Miller contacted the Innocence Project, which successfully petitioned for post-conviction DNA testing of semen found on the victim's body and bed. The test proved Miller could not have been the perpetrator, and on May 10, 2000, he was freed. Following Miller's exoneration, the DNA was checked against a database of convicted sex offenders. The check implicated another man, Larry Taylor, who in 2005 pled guilty to three rapes, including the one for which Miller was convicted.

In a March 9, 2006, statement, Miller's attorneys, Howard Friedman and Innocence Project co-director Peter Neufeld, said testimony in their 2003 lawsuit showed that Boston police manipulated evidence in order to convict Miller. For instance, then-detective Margot Hill (now a deputy superintendent) ignored clearly exculpatory evidence, say the attorneys. What's more, criminologist David Brody--who retired as the crime lab's director after 32 years--lied about the DNA evidence to make it appear more likely that Miller committed the crime.

Miller's attorneys are now calling for a reexamination of every case Brody participated in. "These were not mistakes," Neufeld said. "[Brody] was the head of the laboratory who testified more than 1,000 times who is caught in perjury. You have a duty to question all other cases." By the end of 2005 at least ten convictions in Suffolk County had been overturned, most through DNA testing.

Neufeld and Friedman had intended to argue at trial that the filing of false testimony and affidavits was rampant in the Boston Police Department. They also planned to show that the department's policies and procedures fostered the misconduct. Expert testimony would have been provided by Professor Gary Wells (identification), Dr. Edward Blake (serology), Steve Rothlein (police practices), and Dr. Jerome Rogoff (forensic psychiatry).

The $3.2 million settlement agreement was reached a week before the trial was set to begin in the U.S. District Court for the District of Massachusetts. Miller was previously awarded $500,000 in a lawsuit against the state--the maximum under a 2004 Massachusetts law designed to compensate the wrongfully convicted.

Despite the victories, the nightmare continues for Miller. "It's still not over," he said. "There are still other guys who are sitting up there because of this forensic guy. Until they're cleared, everything isn't fine with me. It's not over." Miller, who has had trouble finding a job since his release, said he plans to give away most of the money. "It'll do some good for a while," he said.

Attorney Neufeld is based in New York with the firm Cochran, Neufeld Scheck, LLP. Friedman, of the Friedman Law Offices, is based in Boston. See: *Miller v. City of Boston*, USDC D MA, Case No. 03-10805-JLT.

Additional sources: *Boston Globe, eyewitnessnewstv.com*

# Florida County Sued Over Refusing Sex Offender Home Weather Stripping

A Florida sex offender has sued Brevard Bounty for refusing to weatherize his home. The suit alleges the County has enacted a prerequisite that excludes persons with criminal convictions from receiving federal funds to perform energy savings and installation of energy saving measure on low-income homes. That prerequisite is illegal because it is more restrictive than federal law, the suit contends.

Raymond Houston, 45, was convicted in 1994 of lewd and lascivious acts on a child younger than 16. He was sentenced to 4½ years probation, which he successfully completed. "There was a house party. She was underage, and I was stupid," said Houston.

Under the federal Energy Conservation and Production Act (Act), Houston sought to have his doors weather stripped and a hot water heater replaced. Brevard County, who has a contract with Florida's Department of Community Affairs (DCA) to distribute money under the Act, rejected Houston's application because he was an "ineligible applicant" under criteria set by the Brevard county Commission's "Weatherization Policy".

That policy prohibits grant funds to any person convicted of a felony in any state or federal court or if listed as a sexual predator or sexual offender. It also excludes a household if any person living there is a convicted felon.

"We only have so much money to go around, maybe $10,000 or $20,000," said Brevard County Commission Chairman, Ron Pritchard. "The list of applicants far exceeds the amount of money, and I'm not about to use scarce resources on somebody who was convicted of such a heinous crime."

Attorneys for the American Civil Liberties Union (ACLU), who filed the suit on Houston's behalf, say the only criteria under U.S. Department of Energy regulations is based solely upon income. See: 10 C.F.R § 440.22. Even the DCM advised Brevard County they were violating federal law.

Brevard County officials are not concerned with federal law because there are "so many other deserving people" Pritchard said, "I guess we'll just have to iron this out in court."

The suit seeks declaratory and injunctive relief, requesting the requested repairs be made. It also seeks unspecified damages.

"This is just more posturing by Florida politicians to look tough on crime and on people with past felony convictions," said Howard Simon, Executive Director of the ACLU of Florida. "What does denying funds to low-income people to save on energy costs have to do with fighting crime?" See: *Houston v. Williams*, USDC Middle District Florida, Case No. 6:0[illegible] CV-110-ORL-28KRS.

Additional source: *Orlando Sentinel.*

# Private Geo Prison in Texas Rocked By Prisoner Abuse, Disturbance and Escape

*by Matthew T. Clarke*

Recently, the Newton County Correctional Center (NCCC), a private prison in Newton, Texas run by the Boca Raton, Florida-based Geo Group, has experienced several incidents involving the out-of-state Idaho prisoners housed there. These incidents included a non-violent protest involving 85 prisoners, an escape, and the resignation of a deputy warden. Additionally, allegations of prisoner abuse were substantiated; Idaho prisoners have since been removed from the facility.

Idaho incarcerates 449 of its prisoners in out-of-state private prisons. Of those, 30 are incarcerated at a CCA prison in Minnesota and 419 are held at NCCC, one of 53 prisons nationwide operated by Geo Group, formerly known as Wackenhut.

Initially, Idaho's out-of-state transfers were voluntary and had few problems. In October 2005, Idaho transferred 302 prisoner volunteers to Minnesota. However, overcrowding led Minnesota's prison system to exercise its primacy option on the bunk space in that state's private prisons. Thus, 270 of the 302 Idaho prisoners were transferred hundreds of miles away to NCCC in Texas, something they neither volunteered for nor desired.

When they arrived at NCCC, Idaho prisoners discovered hotter temperatures and an austere prison life without many of the luxuries and privileges they were accustomed to. According to Idaho Department of Corrections (IDOC) spokesperson Teresa Jones, these privileges included cable TV and personal televisions, the absence of which she referred to as "cultural differences" between how prisons were run in Idaho and Texas.

Another unaccustomed "cultural difference" was guard brutality. On April 7, 2006, six Idaho prisoners complained of abuse by guards. In a letter to his sister, one prisoner stated that he had been placed in isolation, handcuffed, beaten and pepper sprayed. The complaints resulted in disciplinary actions against three Geo guards – including one demotion, a suspension and the firing of a supervisor. It also prompted an "already scheduled" visit by IDOC officials to the for-profit prison site.

Another violent incident occurred on May 30, 2006, when an Idaho prisoner refused to leave his cell and cursed at a deputy warden. The deputy warden then punched him in the face; the prisoner was forced to the ground and pepper sprayed, and his pants were forcibly removed. An IDOC report regarding the incident found that it resulted from a lack of staff training and policy violations. The unidentified deputy warden resigned on June 4.

Less than a week later, on June 10, 2006, eighty-five Idaho prisoners participated in a non-violent protest on the recreation yard by refusing to return to their cells. The protest lasted more than seven hours and was prompted by demands for butter for rolls, more television channels and lower commissary prices, according to prison officials.

Two days later, a pair of Idaho prisoners escaped from NCCC by climbing the fence while guards were distracted by a disturbance elsewhere in the prison. Orlando Gonzalez-Leon, 27, serving up to 50 years for murder, was recaptured about 90 minutes later. The other escapee, Rudolfo Garcia-Lopez, 38, was serving up to 20 years for aggravated assault and attempted kidnapping. He was caught on the morning of June 15, 2006, about 12 miles from the prison.

It was later reported that an armed Geo guard in a watchtower had failed to shoot at the escapees despite having a clear shot. The guard, who was not named, stated, "My timing was slow and I felt highly-ass intimidated." Local law enforcement officials harshly criticized the guard, and Geo, for allowing the escape.

IDOC didn't view these problems as being serious. "There's always a little bit of a settling process" at a new prison, said Jones. Someone apparently reconsidered, however, as IDOC announced in July 2006 that it would move all of its prisoners out of NCCC and place them in two other Texas lock-ups run by Geo, the Bill Clayton Detention Center and the Dickens County Correction Center. IDOC Director Beauclair stated he was dissatisfied with Geo's inability to hire qualified staff at NCCC.

Apparently Wyoming prisoners are equally unhappy with the "cultural differences" of how prisons are run in Texas. A May 28, 2006 disturbance involved 39 of the 301 Wyoming prisoners housed at the Bill Clayton Detention Center; only minor injuries were reported. Wyoming incarcerates 536 of its prisoners in Texas.

Sources: *Houston Chronicle, www.localnews8.com, Associated Press,* www.billingsgazette.net.





www.inmate.com
Pen Pal Ads Service Since 1996.
Still The Best!
Send for a brochure today!
Box 3311, Granada Hills, CA 91394



"I know what a dump truck is, and I'm no dump truck! As an innocent man, I too have been to prison."

**FRANK PRANTIL**
**Attorney at Law**
**916 Second St, 2nd fl**
**Sacramento, CA 95814**
**(916) 446-4669**

***Over 36 years of criminal defense experience***
***Trial Attorney ■ Writs ■ Appeals***

400 felony jury trials and 20 murder trials. For a reasonable fee, I will review your case and tell you honestly what your chances for a writ of habeas corpus are.

**California Cases Only**

# Prisoner Dies in Custody of Washington Jailers

*by Gary Hunter*

Eight Spokane County Jail guards were placed on paid administrative leave while investigators probed the death of a prisoner under their care, but they weren't suspended for long. All were back at work within two weeks.

Benites Salmon Sichiro, 39, was booked into the jail on January 27, 2006 for three misdemeanor charges when he was kneed twice and shot multiple times with a Taser during three separate altercations with guards.

The fights began about 6:50 a.m. on January 29.

A nurse noticed that Sichiro was going through alcohol withdrawal and wanted him moved to a cell closer to her office. Sichiro was belligerent as guards approached him. Two Taser shots were fired, but the projectiles bounced off books and magazines that Sichiro had stuffed in his jail coveralls. The stun-gun was then placed directly against his body and fired again, but even that did little to slow him down.

"He wasn't feeling the pain," one guard commented.

Guards eventually wrestled Sichiro into another cell and stuffed him under a bunk to allow them time to retreat. But when Sichiro stood on a desk and threatened to hurl himself head-first onto the concrete floor, the nurse then asked that he be placed in a restraint chair to keep him from hurting himself.

Guards used the Taser on Sichiro twice more before they could cuff him.

Sichiro continued to resist and bit one guard on the arm. The guard responded by kneeing Sichiro twice in the torso. Sichiro was then strapped into a restraint chair, lost consciousness and died. Attempts by the nurse to revive him were unsuccessful. An autopsy revealed that his death was caused by internal bleeding due to a lacerated liver.

According to Sheriff Mark K. Sterk, "based on Mr. Sichiro's behavior and the fact that he was fighting with them very, very violently," the amount of force used was appropriate. "The deputy used two knee strikes to distract the inmate long enough for him to get his arm out of Mr. Sichiro's mouth. We know that those knee strikes did occur during that altercation. We don't know that they were the cause of the injuries that caused his death."

Sheriff Sterk also noted that Sichiro was injured before he was taken into custody. Booking photos show Sichiro with a black eye, bruises, swelling and abrasions to his face, lip and neck. Abrasions were also found around his groin area.

Sichiro's nephew, Katamichey Rudolph, told police that his uncle had been in a fight on January 25, but other than scrapes and bruises he seemed fine. Rudolph said the fight was over some stolen belongings.

But police suspect that Sichiro may have been assaulted by someone connected to a sexual assault complaint alleging that he had had inappropriate behavior with a 12-year-old girl. "She looks older than me, but the investigator told us she's only 12," said Sisi Rudolph, Katamichey's wife.

Sheriff Sterk stated, "We're concerned that if he was injured prior to being booked into jail we may have some kind of a homicide that we need to be looking at."

Perspective depends upon the position of the observer. From the vantage point of the victim it should be observed that Sichiro was arrested for criminal trespass, obstruction of justice and fourth degree assault. All of which are misdemeanors; none carry the death penalty. Yet he died after spending two days in jail.

So whether Sichiro was fatally injured prior to being booked or after he was in custody, some would argue that there is still "some kind of a homicide that we need to be looking at" – a distinction that Sheriff Sterk failed to make.

As of October 2006, prosecutors were still reviewing the circumstances surrounding Sichiro's death, despite having received a comprehensive report from investigators in April. No charges have been filed.

Sources: *Associated Press, KXLY.com, KREM.com*

# Georgia Sheriff Indicted on Corruption Charges, Pleads Guilty

*by Gary Hunter*

Coffee County Sheriff Rob Smith was indicted on March 20, 2006 on eight counts of abuse of office. Three counts charged Smith with using prisoner labor to construct campaign election signs. The charges also included two counts of violation of oath of office, two counts of malpractice and malfeasance, and one count of theft by conversion for using a state vehicle for personal gain.

The district attorney's office is also investigating allegations that Smith issued release passes to prisoners illegally; one prisoner who allegedly received a pass was a convicted felon sentenced to state prison.

It is unclear whether Smith exercised his right, under Georgia law, to appear before the grand jury and make a statement. Smith's attorney, Jerome Adams, declined to comment on the charges.

Scores of the sheriff's supporters gathered at the Coffee County Jail. Nearly 100 people attended the rally but received no response from county leaders, who were under a gag order issued by three Waycross Superior Court Judges.

Before Governor Perdue could decide whether or not to appoint a commission to conduct an inquiry into whether Smith could still effectively perform his duties as sheriff, on March 29, 2006, Smith announced his resignation effective April 15. At the same time, as part of a plea bargain, he pled guilty to one count of malpractice and malfeasance in office. The remaining charges were dismissed; Superior Court Judge Mike Boggs sentenced the former sheriff to one year in jail, which was suspended.

District Attorney Rick Currie stated that an investigation into other issues involving the sheriff's office – including the release of prisoners on unauthorized passes, failing to serve felony arrest warrants, and improperly handling bail bonds —would continue.

Sources: www.wsbtv.com, www.walb.com, *Douglas Daily News*

# Your Right to Pregnancy-Related Health Care in Prison or Jail

**FACT:** *If you are pregnant, being in prison or jail does not mean you lose your right to decide whether to continue your pregnancy or have an abortion.*

**Your constitutional rights are being violated if you are told that:**

1. You must have an abortion you do not want.
2. You are not allowed to have an abortion that you do want.
3. You must get a court order before getting an abortion.
4. You must pay for prenatal care or an abortion with your own money, regardless of your financial situation.
5. You must pay for the costs of the jail transporting you to a clinic or hospital to get prenatal care or to have an abortion.

**If any of these things listed above happens to you, you should:**

1. Ask yourself if it is just one particular nurse or guard who's giving you a hard time. If it is, then ask other medical staff or officials to help you.
2. Document everything that happens. Put your request for an abortion or other medical care in writing and keep a copy. Also, keep a list of the people you've spoken to or contacted. Be sure to write down what they've told you and the dates and times you've spoken to them.
3. In addition to your request for medical care, you should also file a grievance (an official complaint). If your grievance is denied or rejected, you must file an appeal. **It is very important that you file all appeals that are allowed in your jail or prison's grievance system. It is also very important that you follow all the rules and deadlines of the grievance system.** These rules and deadlines are usually written in the inmate handbook. If officials will not give you the grievance forms you need, will not let you file or appeal a grievance, or are interfering with your use of the grievance system in any way, you should immediately contact your lawyer or the ACLU Reproductive Freedom Project.

If you are still told that you must have an abortion even though you don't want to, or you are unable to get an abortion or prenatal care you want, you should contact your lawyer or the ACLU Reproductive Freedom Project (212-549-2633). Collect calls will be accepted Monday through Friday, between the hours of 9:30 a.m. and 5:00 p.m. eastern time.

Whether you decide to continue the pregnancy or have an abortion, it is important to act quickly. Early prenatal care is very important for you to have a healthy pregnancy and a healthy baby. If you decide to have an abortion, it is also important to act quickly. While abortions are extremely safe, the costs and risks increase with time. The longer you wait, the harder it may be to find a doctor in your area able to provide the service.




Contact: American Civil Liberties Union
Reproductive Freedom Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2633 • e-mail: rfp@aclu.org