# U.S. Businesses Lobby Government to Curb Federal Prosecutors

*by Matthew T. Clarke*

U.S. businesses and Wall Street investment companies have begun a campaign to get the Justice Department to reign in federal prosecutors in business crime cases. The effort by the U.S. Chamber of Commerce, Securities Industry Association and Bond Market Association focuses on prosecutors pressuring companies to waive attorney-client privilege and stop paying the attorney fees of employees under investigation.

In 2002, largely in response to the Enron and other U.S. corporate scandals, Congress passed the Sarbanes-Oxley Act stiffening penalties for business fraud. In 2003, then-Deputy Attorney General Larry Thompson issued a memorandum containing guidelines for prosecutors considering indicting a company. The guidelines grant leniency to companies that cooperate with prosecutors. In the memorandum, waiver of attorney-client privilege by a company is considered a sign of cooperation while protecting culpable employees by paying their legal bills is a sign of non-cooperation.

An indictment alone can bring down a company, as it did with Arthur Anderson LLP, an accounting firm associated with the Enron scandal which went from 85,000 employees to bankrupt following its indictment. The now-defunct company was eventually vindicated on appeal, but that did nothing to change the company's dissolution.

Some federal legislators have proposed amendments to Sarbanes-Oxley intended to tone it down.

"It is a mere four years since the capital markets lost trillions in value as investor confidence in business evaporated," said former Securities and Exchange Commission chief accountant Lynn Turner. "In good times, people have short memories, and it appears some members of Congress and the financial community are taking advantage of that."

The U.S. Chamber of Commerce sees it differently.

"We don't have to violate people's constitutional rights, and we don't have to set up cooked deals so it makes it easier for the government to extort a settlement or a guilty plea," according to Thomas Donohue, the chamber's president.

But violations of constitutional rights, planting of evidence, pressure to take plea bargains and financial ruin that makes it impossible to hire an attorney are problems faced by poor criminal defendants every day. Not surprisingly, no one is coming forth to lobby for them or propose new legislation to curb the awesome power brought to bear against them by government prosecutors.

It seems likely that the lobbyists will succeed. American Bar Association (ABA) President Michael Greco has written Attorney General Alberto Gonzales asking him to revise the attorney-client privilege waiver provision on behalf of the ABA's 600,000 members. In March 2006, Democratic and Republican members of the House Judiciary Committee criticized the attorney-client privilege waivers, labeling them prosecutorial overreaching and a probable violation of employees' constitutional rights. In a case against KPMG, the nation's fourth-largest accounting firm, federal district judge Lewis Kaplan called the pressure on KPMG not to pay employees' legal bills "shameful" and told the prosecutor KPMG had the right to pay the attorney fees "without your thumb on the scale." Presumably he was referring to the scales of Justice.

Source: *www.bloomberg.com*.

# Corruption in Arpaio's Office: AZ County Continues Paying Convicted Sheriff's Sgt.

*by Gary Hunter*

On August 2, 2005, Maricopa County Sheriff's Sgt. Leo Richard Driving Hawk, Sr. pleaded guilty in Federal District Court in connection with a $78 million swindle perpetrated by his father's bank.

For over three years Driving Hawk was a vice president at the United States Reservation Bank and Trust while he simultaneously was employed as a member of Sheriff Joe Arpaio's Internal Affairs Division. What has raised eyebrows is that for over four months after his guilty plea Driving Hawk remained on the sheriff's payroll, receiving a $60,000 annual salary with Arpaio's apparent blessing. According to the Maricopa Co. Sheriff's Department, Driving Hawk remained employed with the department until the end of December 2005.

The tough-on-crime sheriff has remained conspicuously silent on the subject, but one of his aides, Jack MacIntyre, defended the continuing paychecks as an attempt to avoid future liability. "We want to make sure we cross all the t's and dot all the i's so there's no lawsuit that costs even more," he insisted.

Samuel Walker, a criminal justice professor at the University of Nebraska at Omaha, has authored books and runs a website on police accountability. He contends that Driving Hawk's guilty plea was enough to warrant termination.

"Certainly, if he's admitted he's guilty, that would be sufficient. He probably should be terminated – and immediately," said Walker.

MacIntyre said Arpaio's office was waiting until the judge accepted the plea and an internal investigation was complete. Arpaio's investigation began in late August 2005, more than two weeks after Driving Hawk pled guilty. According to the *Sonoran News*, however, Driving Hawk was named as a defendant in multiple cases involving securities fraud as early as April 2002.

Bob Forry, compliance manager for the Arizona Peace Officer Standards and Training Board, pointed out that misconduct alone is grounds for termination. There is no legal requirement to await a conviction.

Critics claim that Arpaio was hesitant to sever ties with Driving Hawk because the convicted sergeant was part of the sheriff's "inner circle." They claim that Arpaio uses his cadre of deputies to retaliate against political enemies, and speculate that actions against union leaders, covert surveillance, and investigation and prosecution of political opponents are some of the things that Driving Hawk knows about Arpaio's operations.

MacIntyre denies that Driving Hawk was part of Arpaio's "inner circle," but personnel files, obtained under Arizona's open records law, describe Driving Hawk as having been "hand-selected by the sheriff and/or the chief deputy" for the Internal Affairs Division. Records also reveal that Driving Hawk and Arpaio regularly communicated "on sensitive investigations and other matters, including security issues," and that Driving Hawk

was "one of the few supervisors who routinely reports directly to the sheriff."

Leo's father, Edward James Driving Hawk, Sr., founded the United States Reservation Bank and Trust in 1992. In 2001 the bank initiated what the Security and Exchange Commission (SEC) called a Ponzi scheme. Investors were promised profits of 20%, and early investors were paid with money from the investors who followed.

Leo pleaded guilty to charges of failing to notify authorities of the fraud and lying to at least one investor. The charges further stated that Leo siphoned more than $2.5 million from the bank "for no apparent reason," personally received $216,258, and diverted other money to casino and racehorse operations owned by the family.

Edward Driving Hawk, Sr. entered a guilty plea on Sept. 7, 2006, and his sentencing hearing is set for November 13.

Leo Driving Hawk's involvement in the $78 million scam is suspected to extend back at least 32 years. Arpaio became aware of the allegations raised by the SEC in 2003, yet Driving Hawk continued to receive glowing commendations and promotions. In January 2005 he was given yet another pay raise, which he continued to enjoy for months after he pleaded guilty. Leo is scheduled to be sentenced on April 16, 2007; he faces up to three years in prison.

Given Arpaio's penchant for openly demeaning convicted felons, including those who reside in his infamous tent jail, his silence in this case is surprising if not suspicious. However it is typical in that only poor criminals warrant Arpaio's wrath while the wealthy and well connected, like former Arizona governor Fife Symington, get kid glove treatment. Arpaio's most recent antics included parading prisoners through the streets of Phoenix in pink underwear and pink handcuffs. But apparently it took over four months for "America's Toughest Sheriff" to find a pink slip for one of his own employees who had admitted to committing felony crimes.

Sources: *The Arizona Republic, Sonoran News*

**Law Office of Michael R. Levine**
Zealous advocacy at trial, sentencing, and post-conviction.
20 years experience as a federal defender in California, Oregon, Hawaii
Author of acclaimed publication: *138 Easy Mitigating Factors*
For latest monthly update, send $100 to:
Michael R. Levine
400 S.W. 6th Avenue, Suite 600
Portland, Oregon 97204

**TYPING SERVICES**
Computer - Typewriter
ALL KINDS OF TYPING

"Special Rates for Prisoners"
Black / Color Printing and Copying

SEND A **SASE** FOR A **"FREE"** PRICE
LIST AND MORE INFORMATION TO:

LET MY FINGERS DO YOUR TYPING
Sandra Z. Thomas
P O Box 4178
Winter Park, Florida 32793-4178
Phone: 407-579-5563

# PLN Matching Grant Fundraiser 2006

**A generous PLN supporter has agreed to DOUBLE all prisoner donations, and match DOLLAR for DOLLAR all non-prisoner donations to Prison Legal News from October 15, 2006 until January 31, 2007—Up to a total of $25,000 !!**

A prisoner's donation of $5 is the equivalent of donating $15!
A non-prisoner's donation of $25 is the equivalent of donating $50!

You can mail a check or money order to:
**Prison Legal News, 2400 NW 80th St #148, Seattle, WA 98117**
Or call **206-246-1022** and use your Visa or MasterCard
Or visit PLN's website at **www.prisonlegalnews.org**, and donate with your Visa or MasterCard
Remember! PLN is a 503(c) non-profit corporation, so donations are tax deductible

| October 2006 | 0 | 5,000 | 10,000 | 15,000 | 20,000 | 25,000 | Goal |

# Georgia Prison Guards Plead to Misdemeanors in Prisoner Beatings

*by Michael Rigby*

In mid-April 2006, seven Georgia prison guards were indicted by a Tantall County jury in connection with beatings of prisoners at the Rogers State Prison in Reidsville.

As previously reported [see *PLN*, April 2006, p.1], Rogers is a cesspool of violence and corruption. Handcuffed prisoners at the facility are routinely beaten with the explicit knowledge of supervisors, according to Tommy Cardell, a former guard at the prison. Cardell revealed the abuse to the *Atlanta Journal-Constitution* in May 2005 after officials in the Georgia Department of Corrections (GDOC) ignored his complaints.

Cardell said prisoners were punched and kicked in ways that wouldn't leave big cuts or bruises, and stated his supervisors gave him padded black leather gloves to administer the beatings. Prison officials as high up as the warden were sometimes present at the beatings and even encouraged them, said Cardell. He also accused prison medical personnel of helping to cover up the beatings.

After Cardell complained to the newspaper, the Georgia Bureau of Investigations launched an investigation in July 2005. Seven guards were fired and indicted, and Warden Glenn Rich and Assistant Warden P.P. Collins were suspended. Rich retired in August 2005 while Collins was later reinstated.

The indicted GDOC guards included Stewart John Wood, for one count of assault under color of office and one count of making false statements; Michael Byrd, four counts of assault and one count of false statements; Keisha Hopkins, two counts of assault and one count of false statements; Hansford Hunter III, one count each of assault and false statements; Jason Burns, six counts of false statements; Clinton Howard, two counts of assault and one count of false statements; and Tommy Osborne, two counts of assault and one count of false statements.

The false statement charges – which apply to anyone who lies, covers up facts, or falsifies documents in "any matter within the jurisdiction or agency of state government or of the government of any county, city, or other political subdivision" of the state – carry up to 5 years in prison and a $1,000 fine. The misdemeanor assault under color of office charges apply to state officers who assault individuals without legal justification.

The beatings at the Rogers facility have spurred a number of federal lawsuits against the GDOC. McNeil Stokes, an Atlanta attorney representing 16 former and current Rogers prisoners, said the assaults were a game to the guards. "It became a bloodsport at Rogers to be enjoyed two or three times a week," said Stokes.

As so often happens in such cases, the indictments proved largely ineffective. On June 5, 2006, prosecutors dropped the felony charges against six of the guards in exchange for their pleading no contest to the misdemeanor assault counts. Each was sentenced to one year in jail and fined $500. However, as part of the deal, the sentences were suspended on the condition they testify in a "companion case," presumably against the seventh guard, Tommy Osborne. The charges against Osborne were then dropped because he hadn't been given an opportunity to appear at the grand jury proceedings.

Stokes said he was disappointed that the felony charges were dismissed. "What if an inmate beat a guard like that?" he noted. "They'd be indicted and sentenced forever. It's unfortunate. As long as they got off easy, it's going to continue." Meanwhile, with the charges against him dismissed, Osborne returned to work at another Georgia prison on June 8, 2006. It's unknown if he'll be issued a new pair of black leather gloves or will simply use his old ones.

Source: *Atlanta Journal-Constitution*

# Unique Texas Sexual Predator Civil Commitment Has Successes/Failures

*by Matthew T. Clarke*

Texas has a unique form of civil commitment for sexual predators which allows outpatient treatment and requires most of the civilly committed to live at a halfway house. A committed man's recent "escape" from a Dallas halfway house brought the Texas model into question.

Seventeen states have laws that allow for civil commitment of sexual predators after they complete their prison sentences. Sixteen of them lock up the committed people with little or no treatment. Texas took another route.

The concept of civil commitment of sexual predators originated in Washington State in 1990. As of December, 2004, 3,493 people had been civilly committed as sexual predators nationwide. 66 of them came from Texas. 427 civilly committed sexual predators (CCSPs) have been released from civil commitment nationwide. None of them were from Texas. 30 of the Texas CCSPs have been returned to prison for violations of the strict civil commitment rules. Violation of civil commitment rules is a third-degree felony in Texas. No Texas CCSP has committed a sex offense after being civilly committed.

Texas began its civil commitment program in 2001. It provides sex offender therapy for CCSPs and requires that they be closely monitored. The monitoring includes tracking devices worn on the ankle and, for all but two of the CCSPs, living at a halfway house like the Wayback House, which is located just west of downtown Dallas.

Restrictions at the Wayback House are strict and conditions harsh. The men sleep seven to a room in an old converted hotel in an industrial part of Dallas. They are not allowed to leave the halfway house without permission and are required to take drug screenings, sex offender treatment, lie detector tests and sexual arousal tests in which a device is attached to their penises while they are shown photos or videos of simulated sex offenses. Simple liberties such as working, drinking a beer, riding a bus or watching cable TV are typically forbidden. They may not even be allowed to visit or receive visits from friends and relatives, even if the potential visitor is sick and/or elderly. They may be prosecuted as violating civil commitment—a third-degree felony—for "violations" such as writing a state prisoner without authorization or leaving an angry phone message.

Early on May 2, 2006, CCSP Mark

Petersimes cut off his ankle monitor and left the Wayback House. He was last spotted hitching a ride before dawn. He was the third CCSP to "escape." Jose Morales, the first CCSP to leave, is still at large after three years. The second "escapee" was caught soon after he fled the halfway house.

Petersimes had been sentenced to 2 years in prison for a 1981 North Carolina attempted sexual assault and 12 years in prison for molesting his girlfriend's 5- and 7- year-old daughters in Texas in 1991. In 2003; he walked away from an Austin halfway house to which he had been civilly committed. He received a 28-month prison sentence for that "escape" and was civilly committed to the Wayback house upon his release from that sentence.

Petersimes's departure prompted criticism of the Texas model of treating CCSPs on an out-patient basis rather than locking them up in prison-like facilities as the other sixteen states do. Supporters of the Texas model point out that it is cost effective and safe. Texas spends about a half million dollars a year on CCSPs; Florida spends $22.6 million a year for its CCSPs; California spends $45.5 million a year.

"The Texas program is safe," said executive director of the Texas Council on Sex Offender Treatment (TCSOT). "Other states now think we have taken a rational approach in dealing with sexually violent predators." TCSOT administers the Texas program.

A second criticism is that not enough of the 44,000 Texas registered sex offenders have been civilly committed. Florida also began its civil commitment program in 2001, but has committed over 450 people whom it imprisons at about ten times the per-committed person cost as Texas. However, Huntsville attorney David O'Neil, who has represented five CCSPs praises the civil commitment rate saying it shows that Texas is really only committing the "worst group of offenders" which is exactly what the civil commitment statute was intended to do. O'Neil is critical of violations of civil commitment restrictions being prosecuted as a felonies.

"The idea that when someone violates conditions that they're subject to a third-degree felony is beyond the pale," O'Neil said. "The conditions are so onerous ... I don't believe most of us would be able to comply."

The Texas state prosecutors who handle civil commitments in Texas say they would commit more people were additional funding available. Thus far, over 400 sex offenders have been flagged for civil commitment upon discharging their sentence. Some of the 66 CCSPs accepted civil commitment without a trial. Of those who took it to a jury trial, all but one have been civilly committed.

Source: *Dallas Morning News*.

## L.A. County Sheriff Settles Two Jail Excessive Force Suits For $135,000

Los Angeles (L.A.) County settled two civil rights complaints arising from alleged excessive use of force on prisoners in the L.A. County Jail. In January 2005, Jerry Moreno, a prisoner at the Pitchess Detention Facility (North) was brandishing two long metal frame pieces taken from a lighting fixture in his cell. He had to be forcefully extracted from his cell by the sheriff's Emergency Response Team. After firing two pepper balls at Moreno, sheriff's deputies Tasered him, allowing them to grab him off the upper bunk. The still struggling Moreno struck his head on the bunk. He was Tasered again, pending the paramedics' arrival. In the ambulance ride to the hospital, Moreno apparently repositioned himself on his stomach causing him to go into cardiac arrest from which he died. Estimating a potential $650,000 exposure, L.A. County settled with his family for $75,000. See: *Moreno v. County of Los Angeles*, USDC CDCA, Case No. CV-06787.

Separately, in December 2004, Desmond Pryer was in the North County jail on drug charges. Pryer refused to get up for chow, and deputies suspected a medical problem. When they escorted him to a dayroom, he started an altercation with deputies. One deputy struck Pryer with his flashlight four times in the upper leg, fracturing the femur bone. Pryer continues to have pain and a permanently impaired gait from his injuries. To avoid a projected $250,000 exposure on Pryer's excessive force claim, the County settled for $60,000. See: *Pryer v. County of Los Angeles*, Los Angeles Superior Court, Case No. BC 338035.

Both Pryer's and Moreno's claims were settled in May 2006.

**Roget's Thesaurus**
Can't think of the right word? Let Roget's help you! Over 11,000 words listed alphabetically.
**$5.99**
**Available From PLN's Book Store!**
See Page 45 for more information.

CHI-EY INC photo department "Personally Customized" - greeting cards calendars, postcards and reprints in different sizes/combinations

Introducing our new and exciting services *for the inmate *for background *for clothing color *for combining photos

All photo(s) cut before shipped. Turn around time only "48" hours. Prices include postage & handling. For brochure and information please send $2.00 for order please send institution check or money order to:
CHI-EY INC- PO BOX 829,
Hillsboro, OR 97123

**PRISONER RIGHTS ATTORNEY**
**CHARLES CARBONE, ESQ.**

**REPRESENTING CALIFORNIA PRISONERS**
• **MEDICAL NEGLECT**
• **CRIMINAL APPEALS**
• **PAROLE ISSUES**
• **GUARD ABUSE**
• **CIVIL RIGHTS**
• **SHU**

Charles Carbone, Esq.
PMB 212 - 3128 16th St.
San Francisco, CA 94103
415-531-1980
(Please write for approval to call collect)
www.charlescarbone.com or www.prisonerattorney.com

# Supreme Court: No Exclusionary Rule for Vienna Convention Violations

*by Matthew T. Clarke*

On June 28, 2006, the Supreme Court held that violations of the Vienna Convention on Consular Notification (Convention) do not require exclusion of evidence from a criminal trial and are subject to procedural default rules.

Moises Sanchez-Llamas, an Oregon state prisoner and a citizen of Mexico, was arrested following a shootout with police. During police questioning, he made incriminating statements. Mario Bustillo, a Virginia state prisoner and a citizen of Honduras, was arrested and charged with murder. Neither was notified of his Convention rights, including the right to have his country's consulate notified of his arrest and detention.

Sanchez-Llamas filed a pretrial motion to suppress his statements. The motion was denied. He was convicted and lost his state appeals. The Oregon Supreme Court held that the Convention did not create rights enforceable by an individual. He then appealed to the Supreme Court.

Bustillo was convicted of murder. He then filed a state petition for a writ of habeas corpus arguing for the first time that his Convention rights had been violated. The state court dismissed the petition as procedurally barred because he failed to raise the claim at trial or in direct appeal. The Virginia Supreme Court found no reversible error.

The Supreme Court granted certiorari in both cases and decided them jointly. In Sanchez-Llamas's case, the court held that exclusion of evidence was not required for violations of the Convention. Assuming without deciding that the Convention created judicially-enforceable rights, the court reasoned that the situations which called for exclusion of evidence pursuant to the exclusionary rule were those in which violations of constitutional rights could lead to unreliable evidence or the police gained an advantage by the constitutional violation. Examples of this include coercion of confessions and warrantless search and seizure. However the police gain no tactical advantage by violating the Convention. Convention violations do not lead to unreliable confessions or unlawful searches. Therefore, exclusion of evidence would be too harsh a remedy for the treaty violation.

The Supreme Court also noted that diplomatic avenues were the primary means of enforcement of international treaties and were available for Convention violations. It intimated that it might be possible to sue over violations of the Convention, possibly under 42 U.S.C. § 1983.

The Supreme Court rejected Bustillo's argument that recent International Court of Justice (World Court) rulings meant that procedural bars could not be used against claims of violations of the Convention. The court held that, whereas World Court opinions deserved "respectful consideration" of an international agreement being interpreted by an international court, they were not binding on the Supreme Court. It also noted that the U.S. withdrew from the Optional Protocol to the Vienna Convention (which gave the World Court the authority to settle disputes between nations over the Convention). Furthermore, violations of the United States Constitution were subject to procedural default and the court did not see any reason to value Convention rights higher than constitutional rights. Therefore, the court held that Convention rights violations were subjected to procedural default. The Supreme Court affirmed the judgments of both state supreme courts. See: *Sanchez-Llamas v. Oregon*, 126 S.Ct. 2669 (2006).

Additional Source: *Legal Times*.

# Settlement Agreement Evicts Room and Board Fees From Georgia Jail

*by Michael Rigby*

The Sheriff of Clinch County, Georgia, has agreed to end a decades-long practice of charging pretrial detainees for "room and board" and to return $27,000 to those who paid the fees over a 4-year period. Also pursuant to the agreement, signed by U.S. District Court Judge Hugh Lawson on April 14, 2006, the County's insurer will pay an additional $30,000 to cover plaintiffs' attorney fees and court costs.

In November 2004 the nonprofit Southern Center for Human Rights and the King and Spalding law firm--both based in Atlanta--sued the County on behalf of two men, Willie Williams Jr. and Mickel Jackson. Williams, who spent eight months in the jail, was charged $4,608. He posted bond in June 2004 but was prevented from leaving the jail until he signed a promissory note agreeing to pay $20 a week toward the debt or be reimprisoned. Williams said he paid $140 before the case was settled.

Jackson was charged $1,415 for three months in jail. He was released on bond in April 2004 and ordered to pay $100 per month toward his "jail bill." Southern Center attorney Sarah Geraghty told *PLN* that Jackson paid more than $700 toward the bill, even though the charges against him were dropped.

The class action 42 U.S.C. § 1983 lawsuit, filed in the Southern District of Georgia, claimed the practice of charging pretrial detainees $18 a day was illegal. Specifically, the lawsuit claimed the practice violated both the U.S. and Georgia constitutions. "It's the court's job to impose appropriate punishment after conviction," said Geraghty. "It's not the sheriff's job to impose punishment on detainees at the jail." According to the lawsuit, the County has been collecting the fees for 30 years, long before the current sheriff, Winston Stephens, took office.

The case was settled during mediation before U.S. Magistrate Judge Mallon Faircloth. Under the settlement, the County agreed to reimburse all detainees who paid jail fees between November 21, 2000 and November 21, 2004. The reimbursement checks will be made available until April or May 2007.

Williams, against whom charges were also eventually dropped, was to receive $100 under the agreement. Jackson was to receive $718. Their attorney, Sarah Geraghty, was pleased with the outcome. "I'm really looking forward to delivering the checks," she said. See: *Williams v. Clinch County*, USDC SD GA, Case No. 7:04-CV-124-HL.

Additional sources: *Atlanta Journal-Constitution, AP*

# Ex-Con Denied Admission To AZ Bar

The Arizona Supreme Court has upheld the State Committee on Character and Fitness' (Committee) denial of a convicted murderer's application for admission to the State Bar.

James Hamm served over 17 years in the Arizona prison system for a first degree murder he committed near Tucson in 1974. By the time he was released in 1992, he'd earned a bachelor's degree in applied sociology, summa cum laude, from Northern Arizona University. While on parole Hamm graduated from the Arizona State University School of Law, and in 1999, he passed the Arizona bar exam. In 2004 he filed his Character and Fitness Report with the Committee and requested admission to the Arizona Bar.

Under Arizona Supreme Court Rule 36(g), the Committee must deny an application if it is not convinced of the applicant's good moral character. The applicant may then petition the State Supreme Court for review.

The Committee denied Hamm's application, citing: (1) the extreme violence associated with his murder conviction; (2) his failure to disclose the fact that he'd been questioned by police about an argument with his wife in 1996; (3) his failure to pay child support for his son; and (4) his possible emotional instability. Hamm petitioned the Supreme Court for review.

On review, the Supreme Court recognized that the more serious a past crime is, the more difficult it will be to show current good character. It also found no instance in which a person convicted of first degree murder had been admitted to the bar in Arizona. The court found, Hamm's post-conviction accomplishments notwithstanding, that he had not overcome the presumption of bad character created by his 1974 murder conviction. The court also found that his failure to disclose the fact that police had questioned him about the argument with his wife and his failure to pay child support weighed against him.

On that basis the Supreme Court concluded that the Committee did not violate Rule 36(g) or the due process clause by denying Hamm's application. The Committee's decision was therefore affirmed and Hamm's petition dismissed. This case illustrates the often illusory nature claimed by government officials that want to see prisoners "rehabilitated" and "succeed", as long as they don't succeed too much. See: *In the Matter of James Joseph Hamm*, 211 Ariz. 458; 123 P.3d 652 (AZ 2005).

---

**E-Z INDEX CITEBOOK**

Easy to use and AFFORDABLE Cite book, now AVAILABLE. The E-Z Index Citebook was designed with convicts in mind. It contains 1000s of citations related to over 300 legal topics confronted by pro se convict litigants. A must have if access to law library is denied. This book is 8½ x 11 with simple glued binding to ensure receipt at any correctional facility. First 25 orders get complementary Membership to Crosswords Litigation, your connection to court records, etc. Send for a FREE Brochure. E-Z Index Citebook is $29.00 Postage included. Or 5 books of new 39 cent unused postage stamps. CROSSROADS LITIGATION, P.O. Box 43, Campobello, SC 29322

---

**social research**

# PUNISHMENT: THE U.S. RECORD

A Social Research Conference
at The New School for Social Research
Thursday and Friday, November 30 - December 1, 2006



**A conference on who, what, why and how we punish.**

**Join us** as we examine the foundations of our ideas of punishment, explore the social effects of current practices and search for viable alternatives to our carceral state.

**FEATURING:**
Stephen B. Bright
David Garland
Elizabeth Gaynes
Nancy Gertner
Moshe Halbertal
Bernard E. Harcourt
Marc Mauer
Lorna A. Rhodes
Jeremy Travis
Bruce Western

**FOR INFORMATION AND TO REGISTER**
Social Research Conferences
65 Fifth Avenue, Room 375
New York, NY 10003
t: 212.229.5776 x3121
f: 212.229.5476
socres@newschool.edu
**www.socres.org/punishment**

**LOCATION**
John L. Tishman Auditorium
The New School
66 West 12th Street, NYC
between 5th and 6th Avenues

**THE NEW SCHOOL**
A UNIVERSITY

# $6,280,000 Settlement For Illegal California Juvenile Hall Strip Searches

*by John E. Dannenberg*

On July 10, 2006, the County of Sacramento, California agreed to pay $6,280,000 to the class of juvenile hall detainees who were illegally strip-searched between January 1, 1998 and October 1, 2004 at the Sacramento County Boys Ranch, Community Programs, Warren E. Thornton Youth Center, William K. Morgan Assessment Center, and the Juvenile Intake and Juvenile Hall facilities. Of this sum, up to $500,000 is reserved for claims administration and $1.5 million is to be paid to Sacramento class attorney Mark Merin for fees and costs. $280,000 is specifically allocated to pay for verified claims of the class action's six representative plaintiffs.

Emily Robinson and Kimberly Koslowski were principal named plaintiffs in two actions [later joined by the court] brought in U.S. District Court (E.D. Cal.) in 2004 seeking damages from unconstitutional strip searches in Sacramento County's various juvenile detention facilities. They alleged that regardless of their status as detainees, convicted misdemeanants or nonviolent felons, they were routinely subjected to unclothed body strip searches upon arrival at their unit and upon transfer to their units. In addition, they were strip searched in groups following visits and school classes. In no case was advance approval requested or given for such strip searches, in plain violation of California Penal Code (PC) § 4030 et seq. On September 29, 2004, Sacramento County suddenly instituted a comprehensive 14 page revised strip search policy conforming with the relevant statutes.

Discovery revealed that the illegal policy was operative between January 1, 1998 and October 1, 2004, affecting an estimated 29,000 juveniles. A class was certified consisting of all such detainees, with sub-classes specified (a) for those who were booked on misdemeanor, infraction, ordinance violations or other non-felony offenses, not involving violence, drugs or weapons [which are exceptions to the no-strip-search law], and (b) for those with felonies, but not involving these exceptions.

The settlement was designed on a "point" award basis, where more points were assigned for the least justified searches. Each Settlement Class Member (SCM) who submits a verified claim will receive 1 point for each booking (up to a maximum of three bookings), plus additional points as follows: 5 points if the claimant was only charged with a non-felony, non-violent crime, or 3 points if charged with a non-violent felony not involving drugs or weapons. When all claims have been received (180 day filing period), the $4 million non-class-representative claimant pot will be divided proportionate to the total points claimed and each claimant's pro-rata share. An exception is if the total points claimed are less than 100 of the estimated potential, in which case each claimant shall be paid a flat $500 per point. If SCMs are under 18, their claim forms must be cosigned by a parent or guardian. If minors' claims are not cosigned, their checks will be sent to the class attorney to hold in trust until their 18th birthdays. Any affected person wishing to sue separately may opt out of the class settlement and seek their own relief.

Potential SCMs will be sought by contacting all known prior juvenile detainees at their last known addresses, by posting notices in all Sacramento juvenile facilities, and by public advertising in newspapers and on the radio. Any SCM may write the class attorney and obtain claim forms. The claims administrator, to whom completed forms must be sent, is Gilardi and Co., LLC, P.O. Box 1110, Corte Madera, CA 94976-1110. The class attorney is Law Office of Mark Merin, 2001 P Street, Suite 100, Sacramento, CA 95814. See: *Robinson v. Sacramento County*, U.S.D.C. (E.D. Cal.), Case No. CIV-S-04-1617 FCD/PAN.

# New York Parole Rates Plunge Under Governor Pataki's Policy

*by John E. Dannenberg*

The administration of Governor George Pataki has dramatically cut parole release rates for violent felons, especially those with A-1 crimes (e.g., murder, attempted murder, kidnapping, arson). Where 23 percent of New York's parole eligible A-1 felons were released in 1992-93, only 3 percent were approved in 2004-05. The restriction is not the result of any change in statutes or regulations, but is due to the dramatic change in "exercise of discretion" by Pataki's increasingly carefully culled appointees to the parole board.

New York has the nation's highest percentage of prisoners sentenced to life-top terms (20 %), none of whom can be released unless and until the board says so. The Governor does not enjoy veto power over the board in New York, but his personal (read: political) views nonetheless carry the day via public reprovals and new appointments. For example, former political prisoner Kathy Boudin was convicted of second degree felony-murder after three deaths during a 1982 Brinks armored truck heist. When she was approved for parole in 2003, Pataki angrily replaced longtime Board Chairman Brion Travis in a matter of months. No controversial paroles have been granted since.

The grass-roots citizens' organization Coalition for Parole Restoration complains that the system has "no accountability and no real avenue of judicial review." If a prisoner challenges his parole denial, it takes two years to get through the appeals system. But also in two years, the prisoner will automatically have another parole hearing. George Oliveras (who was eventually released after serving 27 years on a 25-life term) made it to the appellate courthouse steps four days before his subsequent hearing, only to have the court moot his petition. [Note: Mootness should be challengeable here because the issue is "capable of repetition yet evading review."]

Career criminal Alfred Mancuso, 72, got 25-life in 1978. Yet, with a clean

prison record and claims of innocence, he has been denied parole every two years for the last 16 years. "The bottom line is, they are afraid of Governor Pataki. Every time they grant someone parole, [Gov. Pataki] comes out against it in the newspaper. I ... believe they are afraid of the repercussions," he said.

Albany Supreme Court Justice Edward Sheridan noted that the governor has repeatedly called for the elimination of paroles. The judge used this in his 2003 ruling wherein he found "an undeniable inference that the Board has 'gotten the message' and is implementing executive policy." Alfred O'Connor, counsel for the New York State Defenders Association, noted that the newer restrictions are being applied unfairly to those who plea-bargained earlier to get a more lenient term. Brian Jacques, who plea-bargained for 15-life for a murder in 1983 expected to be released in 15-17 years; indeed, the sentencing judge gave him the minimum sentence. Today, with a clean record and 23 years in, he is still in the dark as to when he might be released. He believes the board is following Pataki's agenda, "do not let these people out."

Most board members declined interviews or to answer phone calls on the subject. Chauncey Parker, Governor Pataki's director of criminal justice and who is over the board, does not deny that the board shares the governor's philosophy and follows his agenda to the extent legally permitted. The board can place any weight on any factors and does not have to explain itself to anyone. The current "agenda" is to simply lay the denial of parole to "the seriousness of the crime," an unchanging and subjective factor. "The governor's focus [is on] public safety," Parker said. But retrospectively imposing an arbitrary sentencing system is fundamentally unfair, O'Connor complained.

Yet Mr. Parker states that Governor Pataki favors going to the federal system, where life sentences mean life without the possibility of parole. He would then leave all other sentences to the discretion of the judge, to be rendered as determinate terms in effect eliminating the board. In New York, the 1995 Sentencing Reform Act eliminated parole for second felony offenders; Jenna's Law in 1998 abolished parole for all violent offenders and added a post-release supervision program.

Only non-violent, non-drug offenders receive an indeterminate (but non-life-top) sentence in New York now. Yet, the rate of parole of even those offenders has dropped from 5,196 to 386 in the last decade.

New York's legislature seems stumped on what to do. They have looked at sentencing reforms, but can't come to a consensus when political careers are in tension with concerns for the burgeoning prison budget. Meanwhile, triple murderer Gerald Balone, who is serving a 25-life sentence, has completed all the vocational and rehabilitation programs offered in his three decades in state prison. As to getting out, he is no less baffled than the legislature. "I am at a loss," he lamented. "I don't know what to do."

Source: *New York Law Journal*

## PrisonCallsOnline

**TIRED OF EXPENSIVE COLLECT CALLS AND OUTRAGEOUS PHONE BILLS?**

**We can help** with Prepaid Collect Prison Calls!

**We service** most local, state and federal facilities nationwide.

**We can send** your collect calls to your CELL PHONE, your blocked home number or even overseas.

**We offer** fast activations and 24/7 Internet account access

**Ask us** how you may save by sharing a line with a relative.

### SAVE UP TO 60% ON COLLECT PRISON CALLS

**1-888-925-1400**

**www.prisoncallsonline.com**

"I wanted to thank you for providing a service that has saved me over $2,300."
~ W. Howerton, MA

"Thank you for the great service you provide. I truly appreciate your help in keeping our communication line open."
~ J. Manzer, CO

"I'm thrilled with the savings... now I can talk more to my son"
~ N. Rigby, MA

"PrisonCalls is an exceptional company, not only in the service it provides, but also in the personnel. Finding the answers to any of my questions or concerns has only been a phone call away. Since the time we signed up with them we have saved roughly $300 a month on telephone bills."
~ J. Sax, KS

"I wouldn't hesitate for one minute to give your name and number to anyone I know who might be in need of your wonderful service."
~ C. Cooper, MA

When you want to save on your inmate's calls, call the leader in discounted inmate calls: **PrisonCallsOnline!**

# Idaho Population Cap Upheld; $155,858.68 in Fees and Cost Awarded; 300+ Prisoners Shipped to Minn. CCA Facility

A federal court in Idaho has refused to lift a 1987 population cap on four housing units at the Idaho State Correctional Institution (ISCI). More than 200 beds were removed and more than 300 prisoners were transferred to a Minnesota private prison as a result of the ruling. Many were later moved to private prisons in Texas.

In 1987, the federal district court issued injunctive relief in a class action lawsuit, capping the population of four ISCI units due to overcrowding. See: *Balla v. Idaho State Board of Correction*, 656 F.Supp 1108 (D. Id. 1987).

Pursuant to 18 U.S.C. § 3626(b)(1) and (2) of the Prison Litigation Reform Act (PLRA), in 2005 prison officials moved to terminate the 1987 population caps. The ISCI population had grown from approximately 750 in 1987 to 1,416 prisoners in 2005. The court noted that seventeen "years after the injunctive orders ... Defendants return to court, requesting relief under conditions that are worse ... than when the original injunctive orders were put in place."

The court first determined that the 1987 injunctions satisfied "the narrow tailoring standard of § 3626(b)(2)," and the "findings required by the PLRA are implicit in the court's judgment in *Balla*." It then adopted *Balla*'s extensive findings supporting the population cap.

"Over the past several years, Idaho's incarceration rate has generally been in the top ten in the country, often in the top five. Seldom have resources maintained pace with the inmate population increases.... Projected growth in the inmate population over the next four years anticipates an additional 1,300 inmates system wide. No funds have been allocated to mitigate the anticipated growth in the ... population," stated the court.

Finding that "the record clearly shows current and ongoing constitutional violations," the district court adopted *Balla*'s conclusions of law and injunctive orders. It then "determined that the prospective relief ordered in *Balla* ... remains necessary to correct the current and ongoing Eighth Amendment violations at ISCI."

The court then issued a tentative ruling granting the plaintiffs' motion for attorney fees and costs, noting that in *Dannenberg v. Valadez*, 338 F.3d 1070, 1075 (9th Cir. 2003), the Ninth Circuit held that the full amount of attorney fees incurred to obtain injunctive relief may be awarded. The court indicated, however, that it would suspend its ruling if oral argument was requested.

On December 9, 2005, the district court denied the defendants' motion for partial reconsideration, finding that the defendants were reasserting arguments that had been previously presented, considered and rejected. The court also adopted its earlier tentative ruling on attorney fees and costs, awarding plaintiffs attorney fees of $150,054.15 and costs of $5,804.53. See: *Balla v. Idaho Bd. of Corrections*, 2005 WL 3412806.

In response to the decision, Idaho prison officials transferred more than 300 prisoners to a Corrections Corporation of America (CCA) prison in Appleton, Minnesota, at a cost of $1.1 million – not including transportation and recordkeeping expenses.

Shipping prisoners out-of-state was the only option to ease overcrowding, claimed Idaho Department of Corrections Director Tom Beauclair. Apparently sentencing reform, releasing prisoners past their parole dates and similar measures are beyond the pale. "Idaho's prisons and jails can no longer manage inmate growth and our ability to stretch the system is over," said Beauclair. In addition to the CCA prison, Idaho houses 588 prisoners in county jails, but that is viewed as a short-term remedy because local jails are growing increasingly crowded.

Prison officials plan to ask the state legislature for $160 million to construct three new prisons, and for an additional $7.9 million to cover the cost of housing overflow prisoners both out-of-state and in county jail cells.

Additional Sources: *Casper Star Tribune, Spokesman Review, wcco.com*

# New York Jail Employee Charged With Sexual Abuse Commits Suicide

On March 27, 2006, a health care worker charged with multiple counts of sexually abusing female prisoners at the Suffolk County Jail apparently committed suicide by stepping into the path of an oncoming Long Island Railroad Train. He was pronounced dead at the scene just before midnight.

Physician's Assistant Gary Feinberg, 48, had been arrested on February 8, 2006, and charged with 16 counts of second-degree sexual abuse and 5 counts of misconduct, said Sheriff's Department Chief of Staff Alan Otto. Additional charges were pending. Feinberg, who had pleaded not guilty to the charges, was free on $2,500 bail and had returned to his job at the jail, though his contact with prisoners was supposedly prohibited.

Feinberg's suicide coincided with the filing of a $10 million lawsuit by one of the victims. Rochelle Ramos claimed in her lawsuit--filed the day of Feinberg's death--that Feinberg rubbed up against her and fondled her roughly during a routine exam on December 28, 2005. Though Ramos is no longer in jail she still suffers from the assault. "I have to struggle with the feeling," Ramos, 40, said during a news conference at her attorney's office. "I feel so gross. I feel so violated."

Police said Feinberg inappropriately touched at least five women. Ramos's attorney, Leonard Leeds, said dozens more have come forward since. Leeds, who called the suicide a tragedy, noted the county may still be liable if officials were aware of Feinberg's behavior and did nothing to stop him. "If there were so many complaints and allegations, why didn't Suffolk County do anything?" Leeds said.

Source: *Newsday*

---

> **New Revised Edition Now Available!**
> **Hepatitis & Liver Disease**
> By Dr. Melissa Palmer
> See page 46 for ordering information

# Federal Prisoner Awarded $150.00 For Food Poisoning

*by Michael Rigby*

On February 17, 2006, the U.S. District Court for the Middle district of Florida awarded $150.00 to a federal prisoner who contracted food poisoning while imprisoned at FCC Coleman-Low.

On April 23, 2002, prisoners eating breakfast in the chow hall were served ham that had been stored overnight in a malfunctioning cooler. Several of the prisoners, including plaintiff Guillermo Gil, became ill and were treated in the prison medical department. Gil, who experienced diarrhea, chills, nausea, vomiting, headache, and dizziness, was given phenergan for the vomiting and immodium for diarrhea. After returning to his housing unit Gil testified he was unable to eat and did not feel better for three days.

Gil further claimed he became fearful of eating chow hall food, developed a taste aversion to ham, and lost 15 pounds as a result of being unable to eat certain foods.

Gil sued under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 et seq., claiming the United States was liable for damages relating to the food poisoning. The United States admitted liability and a non-jury trial was held on February 13, 2006, to assess damages.

Initially the Court noted that as a federal prisoner Gil's recovery under the FTCA was limited in that "no [prisoner] may bring a civil action against the United States ... for mental or emotional injury suffered while in custody without a prior showing of physical injury."

Based on the evidence presented, the Court found that Gil suffered the effects of acute gastroenteritis for three days. However, the Court further determined that the evidence was insufficient to establish that Gil continued to suffer physical effects from the food poisoning beyond that time. Moreover, the Court observed that Gil provided no objective evidence showing that he suffered mental injury from the incident or that his aversion to ham "extends to other foods such that he is unable to sustain himself."

Consequently, the Court concluded Gil was not entitled to damages for his asserted mental injury, but he was entitled to intangible damages of $150 for pain and suffering, inconvenience, and loss of capacity for enjoyment of life. Gil was represented by Jose H. Cortes, Jr. of the Ocala, Florida firm Blanchard, Merriam, Adel, & Kirkland. Cases such as this affecting large number of prisoners with relatively minor injury are probably better brought as class actions. See: *Gil v. United States Of America*, USDC MD FL, Case No. 5:03-CV-198-0C-10GPJ.

**Actual Innocence**
Explains how the innocent are convicted by faulty eyewitness testimony, police perjury, expert witnesses, prosecutorial misconduct, etc., and how DNA testing is used to free the innocent.
**$9.99 from PLN's Book Store!**
See Page 45 for more information



ORDER YOUR COPY NOW! $15/$9 for prisoners
Certain Days c/o QPIRG Concordia
1455 de Maisonneuve Blvd. O.
Montreal, QC H3G 1M8, CANADA
Please make cheques payable to **QPIRG Concordia**

# Minnesota Court Invalidates "Some Evidence" Standard in Disciplinary Hearings for Fact-Finding

*by David M. Reutter*

The Minnesota Supreme Court has held that a Minnesota Department of Corrections disciplinary hearing fact-finder must find by a preponderance of the evidence that a prisoner has violated a disciplinary rule before the Commissioner of Corrections can extend the prisoner's date of supervised release for the rule violation. In so holding, the court held the "some evidence" standard of proof is inappropriate at the fact-finding level.

Before the Court was an appeal of a writ of habeas denial by the Washington County District Court, which was brought by Richard Carillo, a prisoner at the Minnesota Correctional Facility at Faribault (MCFF). Carillo's petition alleged that on May 24, 2002, a fight broke out at MCFF while Carillo was on the prison baseball field with several other prisoners.

The fight caused guards to order prisoners to return to their living quarters. Lieutenant Susan Williams saw another prisoner fall in front of Carillo. She was about 50 yards away, and she radioed guards to intercept "the next white person [who] comes in ****, [and] grab his ID." Williams then wrote Carillo a charge for disorderly conduct and assault of a prisoner.

At the disciplinary hearing, Williams said she saw a white prisoner put his hands on another prisoner's shoulders and push him to the ground. She could not identify Carillo's face because he was 50 yards away, but she maintained constant eye contact with him until he reached the living quarters. She also identified Carillo by the clothing he was wearing, despite the fact that all other prisoners playing baseball were also wearing a white T-shirt, gray sweatpants and tennis shoes.

Robert Mendez testified that he was the prisoner who fell to the ground. He said he was not pushed but that he stumbled and fell on his own while jogging toward the building; no one shoved him. Another prisoner and Carillo testified that Mendez fell on his own and was not pushed. The hearing officer found that Williams' testimony constituted "some evidence" that a violation occurred and found Carillo guilty. The Commissioner of Corrections then delayed Carillo's supervised release date by seven days.

Carillo's petition argued that his term of imprisonment was extended without providing sufficient procedural due process. The court concluded it was inappropriate to analyze Carillo's liberty interest by looking solely to statutory language; rather it must examine the nature of the deprivation and the extent to which the deprivation departs from the basic conditions of Carillo's sentence.

Under Minnesota's statutory scheme, sentences presumptively consist of a specified minimum term of imprisonment equal to two thirds of the executed sentence and a specified maximum term of supervised release equal to one third of the executed sentence. Under this scheme, a prisoner's term of imprisonment may be extended by the Commissioner only if the prisoner commits a disciplinary offense. The Court held this scheme implicates due process protection, as any extension of a prisoner's period of imprisonment represents a significant departure from the basic conditions of the prisoner's sentence.

The Court held that the "some evidence" standard of *Superintendent, Massachusetts Correctional Institution at Walpole v. Hill*, 472 U.S. 445 (1985) addressed only a standard of appellate review, not a standard of proof. Whether a standard of proof satisfies due process requires a three-part test: 1) the private interests affected; 2) the risk of an erroneous deprivation of such an interest; and 3) the government's interest.

Carillo satisfied the first test. The Court said that the risk of an erroneous deprivation of an interest is high when the fact-finder uses the "some evidence" standard. As to the final factor, the government has an interest in promoting fair procedures. The "some evidence" standard sends the message to prisoners as well as society at large that once an individual is convicted of a crime, he is presumed guilty of every subsequent allegation.

The Court held that prison hearing officers must find by a preponderance of evidence that Carillo had committed a disciplinary offense before the Commissioner can extend the date of his supervised release. See: *Carillo v. Fabian*, 701 N.W.2d 763 (Minn. 2005).

# $50,000 Settlement for Neck Injury Resulting from Seattle Jail Guard's Excessive Force

Washington State's King County Jail has paid a former jail prisoner $50,000 to settle a civil rights action claiming guards used excessive force and injured the prisoner's neck.

Robert Ward Garrison was confined at the King County Department of Adult Detention and placed in an "unsanitary" cell that was "piss covered." He "begged," to no avail for guards to move him to another cell. On March 10, 1998, Garrison pulled apart a fire sprinkler, which ran for 45 minutes, flooding the wing.

A Sergeant ordered Garrison to be 4-pointed on a board, face down. His feet were shackled together, his right arm cuffed near his hip, and his left arm stretched out over his head. After several hours, Garrison's shoulder began to hurt.

Garrison managed to free his feet and sat up. Eventually, guards discovered this and rushed the cell. One guard grabbed Garrison by the hair, slamming his face into the board, causing "a very sharp burning pain." The guard then dropped his knee on Garrison's neck, which exploded in pain.

Garrison continued to experience neck pain, but it was not until January 1999 that an examination revealed he had sustained a herniated disc in his neck. Garrison then filed a civil rights action in April 2002.

In May 2006, Garrison agreed to settle the suit for $50,000 with King County. Garrison was represented by Carl Marquardt of the Seattle law firm Stokes Lawrence. See: *Garrison v. King County Department of Adult Detention*, USDC, WD WA, Case No. C02-0880.

## Sovereign Immunity No Bar to BOP Prisoners' Eighth Amendment Mandamus Suit

The Tenth Circuit Court of Appeals has held that a federal prisoner's mandamus action alleging an Eighth Amendment violation is not barred by the doctrine of sovereign immunity. This action was brought by Bureau of Prisons (BOP) prisoner Ron Simmat, who is incarcerated in the United States Penitentiary at Leavenworth, Kansas.

Simmat submitted a request to BOP staff in August 1999, seeking treatment by a dentist for a cavity. He filed a subsequent request in November 1999. On April 9, 2000, Simmat filed yet another request stating that "his lower chewing molar" had begun giving him "constant pain, which gets really bad when I lay down." Four days later, Simmat was ordered to report for an X-ray, which indicated that the tooth might need to be extracted. Simmat was asked to return for a follow-up in two months. He did not return and received no further dental care for his other dental problems, which included gum disease, several cavities and a root that protruded from his gums.

He filed his pro se complaint in Kansas federal district court, seeking injunctive relief for the denied dental care in violation of the Eighth Amendment. The defendants moved for dismissal on the ground that sovereign immunity deprived the court of subject matter jurisdiction. The district court held that because Simmat only sought injunctive relief, it had jurisdiction. Summary judgment, however, was granted the defendants for Simmat's failure to raise a genuine issue of fact regarding deliberate indifference to a serious medical condition.

The Tenth Circuit held that Simmat's claim met the basic requirements of federal question jurisdiction under 28 U.S.C. § 1331, for it sought recovery under the Constitution or federal law and was neither "immaterial" or "frivolous." But jurisdiction is not enough to bring suit; a plaintiff must also state a claim upon which relief may be granted, what used to be called a cause of action.

The real question before the Court was what type of action is allowed. It held a *Bivens* action against the defendants in their official capacity is not allowed. The appellate court held that a prisoner seeking injunctive relief to compel a government official to perform non—discretionary duties should bring a mandamus action under 28 U.S.C. § 1361.

The BOP argued that because Simmat's suit would "require affirmative action by [the] sovereign," namely the provision of dental care, it was prohibited by *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949). The Court held this interpretation "would leave prisoners without a remedy for federal prison officials' failure to carry out their constitutional duties, violating the basic principle that 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.'" Moreover, Congress passed legislation to waive sovereign immunity in most suits for non-monetary relief in 1976. See: 5 U.S.C. § 702.

While the Tenth Circuit held that sovereign immunity did not bar Simmat's Eighth Amendment claim seeking a mandatory injunction, or more precisely, relief and the nature of mandamus, his claim was ordered dismissed without prejudice for failure to exhaust administrative remedies. See: *Simmat v. United States Bureau of Prisons*, 413 F.3d 1225 (10th Cir. 2005).

## Wrongly Imprisoned Massachusetts Man Settles Suit Against City For $2,450,000

On October 14, 2005, the City of Chicopee, Massachusetts, paid $2,450,000 to settle with a man who was falsely convicted of rape and imprisoned for 14 years before DNA evidence exonerated him.

Eduardo Velazquez was convicted in 1987 of raping a college student at knife point and sentenced to prison. He remained there for 14 years until DNA testing revealed he was not the perpetrator.

Velazquez sued the City of Chicopee and six police officers--James Pollard, Dennis Fontaine, Ron Landry, Mark Coelho, Michael Carroll, and Jeanne Norwalk--for improper procedures. Velazquez claimed the officers suppressed clearly exculpatory evidence, including a car-towing report and police call sheets that showed he was being questioned by cops in another matter while the rape was occurring several blocks away. Moreover, Velazquez claimed that after the victim reported the rape police officers coaxed her into identifying him as the assailant through "a grossly improper one-on-one show up" at her residence.

The City settled without admitting liability. Velazquez was 21 when he went to prison. He was 39 when the case settled.

Velazquez previously settled with the Commonwealth of Massachusetts for the statutory maximum of $500,000. He was represented by Mark H. Bluver of Springfield. U.S. District Court Judge Michael A. Ponsor presided. See: *Velazquez v. City of Chicopee*, USDC D MA, Case No. 3:03-CV-30249-MAP.

## L.A. County Settles With Abused Quadriplegic Prisoner For $46,000

In February 2004, prisoner Joseph Burriss became exasperated waiting to make a phone call from the Los Angeles County Jail. Burriss, a partial quadriplegic, maneuvered his wheelchair towards a deputy and made a disparaging racial remark. The deputy responded by wheeling Burriss to an isolation cell. When they arrived there, Burriss claims the deputy dumped him from the chair onto the floor. The deputy claimed that Burriss was flailing his arms in an attempt to hit or grab her. She then pepper sprayed Burriss in the face and put him in the cell.

Noting that a jury would not likely find that Burriss was a danger to the deputy, the County rationalized that an unreasonable-use-of-force liability existed. Although Burriss' injuries were not extensive, a settlement was reached in March 2006 for $46,000. See: *Burriss v. County of Los Angeles*, USDC. SD CA, Case No. CV-04-09967 RSWL.

# Oregon "Predatory Sex Offender" Designation Order Reversed; Notice and Hearing Required in All Cases

The Oregon Supreme Court held that every offender facing a "predatory sex offender" designation under Oregon's community notification law is entitled to minimal due process protections (i.e., notice and hearing).

In 1993, Oregon enacted a law requiring community notification when prisoners designated as predatory sex offenders are released on probation or parole. ORS 181.586(1)(a) authorizes the Board of Parole and Post-Prison Supervision (Board) "to determine which of the persons it releases on parole or post-prison supervision should be designated as predatory sex offenders."

"When the board first took on the task of identifying predatory sex offenders, it adopted a decisional process ... that did not allow for input from the potential designees." In *Noble v. Board of Parole*, 327 Or. 485, 964 P.2d 990 (1998), however, the Oregon Supreme Court held that this process deprived the designees of due process, which "require[s] the board to give a potential designee notice and an evidentiary hearing before the designation takes place." [*PLN*, Apr. 1999, p. 14].

In response to *Noble*, the board adopted a new, but similar, designation scheme. "Applying the risk assessment scales ... was a simple process" of simply checking items on the scale that pertained to the particular individual. Certain scores under this system required a predatory sex offender designation while other scores provided for discretion.

"The amount of process that a potential predatory sex offender designee received depended on the category in which the risk assessment score placed the potential designee." When the score required the sex offender designation the offender was entitled to receive notice of the risk assessment score and an opportunity to submit written objections, but was not entitled to a hearing. When the designation was not mandated by the risk assessment score, the offender was entitled "to a full evidentiary hearing prior to any predatory sex offender finding."

Applying this scheme, the Board determined that V.L.Y. was not entitled to a hearing. It then rejected his written objections and designated him as a predatory sex offender. The Oregon Court of Appeals, sitting en banc, agreed that V.L.Y. was not entitled to a hearing because the Board "lawfully could, and did, base its designation decision entirely on objective facts drawn from petitioner's criminal history." *V.L.Y. v. Board of Parole,* 188 Or. App. 617, 72 P.3d 993 (2003).

The Oregon Supreme Court reversed, holding that the board cannot "reasonably ... use this scale that relies solely on objective and easily ascertainable aspects of the offender's crime or crimes and excludes other evidence of the offender's current behavior and characteristics as the sole basis for determining that the offender *presently* 'exhibits characteristics showing a tendency to victimize or injure others.'" Therefore, "the board erred in using a procedure that permitted it to rely exclusively on the sex offender risk assessment scale in making its predatory sex offender designation."

Noting that "the import of [the] court's previous opinion in Noble does not appear to have been fully understood by the board," the Court re-emphasized that "any party facing such a designation, whatever the reason for that designation, must be accorded the basics of due process. Those basics, at a minimum, include notice and the opportunity to be heard as to all factual questions at a meaningful time and in a meaningful manner.... Because of the nature of the statutory inquiry assigned to it (to determine whether a potential designee 'exhibits characteristics showing a tendency to victimize or injure others') the board is not at liberty to substitute a purely documentary exercise for the hearing that any person faced with such a designation is entitled to receive." See: *V.L.Y. v. Board of Parole & Post-Prison Supervision,* 338 Or. 44, 106 P.3d 145 (Or. 2005).

# New Jersey Appeals Court Upholds Statute Disenfranchising Felons

The Superior Court of New Jersey, Appellate Division, held that a state law prohibiting felons from voting while on parole or probation did not violate equal protection despite its disparate effect on minority voting power.

Plaintiffs, the New Jersey National Association for the Advancement of Colored People (NAACP), the Latino Leadership Alliance, and others filed a claim seeking to invalidate N.J.S.A. 19:4-1(8), which disenfranchises defendants while on parole or probation for "indictable offenses."

The plaintiffs conceded the statute was authorized by Article II of the New Jersey Constitution, but argued that because "the criminal justice system in New Jersey discriminates against African-Americans and Hispanics, thereby disproportionately increasing their population among parolees and probationers," it unfairly diluted their voting power.

The Superior Court of New Jersey, Chancery Division, Union County, in Case No. UNN-C-4-04, held the statute did not violate the plaintiffs' right to equal protection under the law. The Appellate Division affirmed, holding that (a) the statute is specifically authorized by the New Jersey Constitution and (b) "[w]hen, as here, a statute is facially neutral, disparate impact is an insufficient basis for relief under [New Jersey's] equal protection doctrine." Similarly, the Appellate Division observed that the U.S. Supreme Court held in *Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) that "facially neutral state felon disenfranchisement statutes adopted without a discriminatory purpose" did not violate the equal protection clause of the Fourteenth Amendment.

The court noted that if the statute prohibited only African-Americans or Hispanics from voting, then it would have violated the State's equal protection doctrine. (Apparently it's okay to ban minorities from voting as long as it's based on a technicality.)

The plaintiffs were represented by attorneys Frank Askin and Laughlin McDonald (Rutgers Constitutional Litigation Clinic and Southern Regional Office of the American Civil Liberties Union). See: *New Jersey State Conference-NAACP v. Harvey,* 381 N.J.Super. 155, 885 A.2d 445 (N.J.Super.A.D., 2005), petition for appeal denied, 186 N.J. 363, 895 A.2d 450 (Table) (N.J. 2006).

## News in Brief:

**Arkansas:** On July 9, 2006, Rebecca Daniel, the former commissary manager at the Miller county jail was charged with sexually assaulting a male prisoner and giving him chewing tobacco. Prosecutors claim Daniel had sex with the prisoner in the back of the commissary and plied him with movies, food and tobacco.

**Belgium:** On September 24, 2006, an unidentified 25 year old prisoner died in jail custody. On the 26th at least 100 North African youths rioted to protest jail conditions and torched stores, police cars and a youth center. At least 30 protestors were arrested.

**Indiana:** On September 28, 200 state Department of Corrections officials announced they had fired two guards and were investigating how Wabash Valley Correctional Facility prisoner Anthony Stockelman, 39, wound up with the words "Katie's Revenge" tattooed on his forehead. Stockelman had been convicted of raping and murdering 10 year old Katln "Katie" Collman in 2005. Pictures of Stockelman and the tattoo have since made it online. He is now in protective custody.

**Louisiana:** On September 21, 2006, Union Parish jail guards James Webb, 23, and Nicholas Wilson, 21, were charged with smuggling an ounce of marijuana into the jail to give to prisoner Percy Franklin who is also charged with marijuana possession.

**Missouri:** On September 19, 2006, the Ste. Genevieve county jail reported that an unspecified number of prisoners had staph infections and had been quarantined and treated.

**New Jersey:** On July 26, 2006, Timberly Gamache, 35, a federal guard at the Federal Correctional Center in Ft. Dix was arrested and charged with providing tobacco and cell phones to Hassan Thomas, a prisoner convicted of drug crimes at the prison. Prison officials set up a sting using a prisoner informant to buy two pounds of tobacco from Gamache for $1,483.00. Gamache later charged the informant $2,800 for a pound of tobacco and a cellphone. Thomas and Gamache are both charged with conspiracy.

**New York:** On July 9, 2006, Marlon Clay, 35, a prisoner at the Erie County Correctional Facility in Alden choked to death in the jail visiting room while attempting to swallow two bags of tobacco given to him by Lisa Howard, a visitor. Howard was arrested and charged with promoting prison contraband.

**New York:** On September 20, 2006, Donald Keegan, 36, a Long Island landscaper employed by Suffolk County, was charged in Suffolk county supreme court with planning to murder four convicted sex offenders living near his home by setting their home on fire. An undercover cop befriended Keegan who told him, on audio and video tape, that he was planning to murder the sex offenders. In his conversations with police Keegan also expressed his dislike for Blacks, Native Americans and welfare recipients. The sex offenders were also booted from their residence by police who claimed it was too close to a school.

**Oklahoma:** On July 25, 2006, the Cornell Corrections operated Great Plains Correctional Facility in Hinton was placed on lockdown after a fight between 25-30 prisoners left five prisoners injured.

**Oregon:** On September 20, 2006, state police arrested James Price, 34, a guard at the state women's prison in Wilsonville on charges of raping at least one woman prisoner at the facility.

**Virginia:** On July 25, 2006, former Department of Corrections Lieutenant Bobby Brown, 56, was sentenced to six months in jail after of having consensual sex with Sheron Montrey while she was a prisoner at the jail and impregnating her.

**Wisconsin:** On September 19, 2006, Eric Hunt, a guard at the Wisconsin Secure Program Facility in Boscobel was charged in Grant County with hitting and abusing prisoner Jorel Norwood while Norwood was handcuffed.

---

### FOUNDATION FOR INNOCENCE
New Address: P.O. Box 1033
Maui, Hawaii. 96790
email: innocencehawaii2002@yahoo.com

#### NOTICE

Are you innocent of the crime for which you were convicted?
Were you rendered ineffective assistance of counsel
that resulted in being convicted?
If you answer YES to either of the above questions,
write for an assessment form. SASE is requested.

If any person has not received their assessment form response
please notify us at new address.

---

### PRISON WIZARD, INC.

➢ **Comprehensive new prisoner services company run by former prisoners and their families. We offer great service at a reasonable price.**
➢ **Quality picture copying at unbelievably low prices.**
➢ **Fast typing and copying services.**
➢ **We will help sell your artwork on our website and on ebay.**
➢ **Internet and legal research services. We will help locate your friends too. We can print song lyrics or sports schedules for you.**
➢ **Gift and book buying services. Send us what you need for a quote.**
➢ **Our unique and effective PEN PAL PROGRAM is now available. You will see how our match based program is different. We will work hard to match you with the right person. Sign up now and get noticed.**

**TRY US. WE ARE DIFFERENT AND BETTER THAN THE REST. NO GAMES. NO SCAMS. GREAT SERVICE. WEBSITE:** www.prisonwizard.com

**Send SASE to: Prison Wizard, Inc., P.O. Box 421526, Indianapolis, IN 46242**

# Mentally Ill Arkansas Prisoners Removed From Supermax, CMS Contract Renewed

*by Michael Rigby*

On April 21, 2006, the Arkansas Board of Corrections approved a new policy designed to keep mentally ill prisoners out of sensory-deprived environments like the Varner Supermax Unit in Lincoln County. The Board also renewed the prison system's contract with Correctional Medical Services (CMS).

The new supermax policy was implemented about two months after an investigation by the *Arkansas Democrat-Gazette* revealed that mentally ill prisoners were housed at Varner in 7-foot by 11-foot cells nearly around the clock because the prison system lacked suitable beds elsewhere. In March "about eight" prisoners were removed from the supermax on the advice of a prison psychiatrist.

The new policy is certainly a step in the right direction, though the idea that these environments can cause a mentally ill prisoner's condition to deteriorate is not exactly groundbreaking. Mental health experts around the country have been saying this for years. What's more, federal courts have ruled consistently that housing mentally ill prisoners in supermaxes may constitute cruel and unusual punishment.

Under the new policy, housing assignments and other actions that could worsen a mentally ill prisoner's condition are prohibited, said Wendy Kelley, the Arkansas Department of Corrections' (ADOC) top mental health official. "Before it had been more on inmates taking responsibility for their behavior," said Kelley. "The focus now is on determining if an inmate is mentally ill. ... If he's mentally ill, the focus now is on recommendations that will change the behavior." Mental health officials will be charged with making the recommendations, which will include drug therapy, talk therapy, and other psychological treatments.

Also at the Board's April meeting, a one-year extension of CMS's $43 million contract was unanimously approved. The ADOC contracted with CMS in 2003 to provide medical care to 13,500 prisoners in the state's 18 prisons. The cost breakdown amounts to $237.59 per prisoner per month.

Despite the contract extension, the Board criticized CMS for its poor dental services and staff retention, inefficient data collection and analysis, and for not keeping up with prisoners' medications when they are transferred. But if that's the ADOC's only complaint they're doing good. As consistently reported in *PLN*, the St. Louis-based CMS has been condemned by prisoners, advocates, and detention facility officials nationwide for being more concerned about the bottom line than about prisoner health care. See, for example, *PLN*, December 2005, p.1. See PLN indexes or visit online at www.prisonlegalnews.org for more.

Source: *Arkansas Democrat-Gazette*

## PLN Classifieds

**Defense Investigation Grp, Inc.**
We help the wrongfully convicted. Habeas Investigations Save $ use us before you invest with an attorney.
CA PL lic #24807
11222 La Cienega Blvd Ste 410
Inglewood, CA 90304
PH 310 / 337-1482 or 213 / 280-1945

**HEAVENLY LETTERS** Can Help with All of Your Needs  Send a S.A.S.E. for a Catalog. PO Box 851182 Westland, MI 48185 or info@HeavenlyLetters.com

**Ex-Offender Resource Guide**
Providing Help and Hope on the Outside For Info Send a SASE to Ewords PO Box 813474 Smyrna, GA 30081 www.faax.org

**ATTENTION, PRISON CHEFS!** I'm compiling a prisoner cookbook. Send your entries and include the name of the recipe and ingredients used. Will pay $25 for each recipe used. Send to: Joyce, P.O. Box 1401, Douglas, GA 31534

## Other Resources

**ACLU National Prison Project**
Contact about state and federal conditions of confinement affecting large numbers of prisoners, and sexual assaults against prisoners. Write: ACLU National Prison Project, 915 15th St. N.W., 7th Floor, Washington, DC 20005.

**Amnesty International**
Compile information about prisoner torture, beatings, rape, etc., to include in reports about U.S. prisons distributed worldwide. Write: Amnesty International, 322 8th Ave., New York, NY 10001.

**Children of Incarcerated Parents**
Works to stop intergenerational crime. Good info in three areas: education, family reunification, and services for parents and children. Write: Center for Children of Incarcerated Parents, PO Box 41-286, Eagle Rock, CA 90041.

**CorrectHELP**
Provide information related to HIV. Contact if you can't access programs or are not receiving proper medication. Write: CorrectHELP; PO Box 46276; West Hollywood, CA 90046. HIV Hotline 323-822-3838 (Collect OK from prisoners).

**FAMM-gram**
Quarterly magazine of FAMM, that includes info about injustices resulting from mandatory sentencing laws. FAMM-gram, $10 yr prisoners. Write: FAMM, 1612 K Street NW #1400, Washington DC 20006.

**Florida Prison Legal Perspectives**
Bi-monthly newsletter that includes court rulings, administrative developments and news about the Florida DOC. $10 yr prisoners; $15 yr individuals, $30 yr professionals. Write: FPLP, PO Box 1511, Christmas, Florida 32709.

**Justice Denied**
Only magazine dedicated to exposing wrongful convictions, and how and why they happen. 6 issues: $10 prisoners; $20 all others. $3 for sample issue, 37¢ for info (stamps OK). Write: Justice Denied, PO Box 68911, Seattle, WA 98168.

**November Coalition**
Newspaper published 4-times a year reporting on information related to ending the drug war, releasing prisoners of the drug war and restoring civil rights. Yr sub: $6 prisoners; $25 all others. Members receive the Razor Wire. Write: November Coalition, 282 West Astor, Colville, WA 99114.

**Stop Prisoner Rape**
Seeks to end sexual violence against prisoners. Counseling resource guides for imprisoned and released rape survivors & activists available for almost every state. Specify state with request: Stop Prisoner Rape, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010. Donations welcome.

**Western Prison Project**
Justice Matters is 4-times a year magazine reporting on prisoner issues in OR, WA, ID, MT, UT, NV and WY. $7 yr. prisoners; $15 all others. Write: WPP, PO Box 40085, Portland, OR 97240. Write for info about reports related to imprisonment.