# Prison Legal News' Book Store

Fill in the boxes by each book you want to order indicating the Quantity and Amount. Enter the Total of the books on the Order Form. FREE SHIPPING on all book and PLN index orders OVER $25 (effective Nov. 1, 2003 until further notice). A $5 mailing charge on all other orders.

**SUBSCRIBE TO PLN FOR 4-YEARS AND CHOOSE ONE BONUS!**
1. TWELVE (12) FREE ISSUES FOR 60 TOTAL! ($18 TO $60 VALUE!)
2. WRITING TO WIN: THE LEGAL WRITER ($20.95 VALUE!)
3. THE CELLING OF AMERICA ($24.95 VALUE!)
4. EVERYDAY LETTERS FOR BUSY PEOPLE ($20.99 VALUE!)

**Writing to Win: The Legal Writer**, Steven D. Stark. Broadway Books, 283 pages. $15.95. Explains the writing of effective complaints, responses, briefs, motions and other legal papers. 1035

**The Celling of America: An Inside Look at the U.S. Prison Industry**, edited by Daniel Burton Rose, Dan Pens and Paul Wright; Common Courage Press, 264 Pages. $19.95. *Prison Legal News* anthology that in 49 essays presents a detailed "inside" look at the workings of the American criminal justice system. 1001

**Everyday Letters For Busy People**, by Debra Hart May, 287 pages. $15.99. Hundreds of sample letters that can be adapted for most any purpose, including letters to government agencies and officials. Lots of tips for writing effective letters 1048

**The Criminal Law Handbook: Know Your Rights, Survive the System**, Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. $34.99. Explains what happens in a criminal case from being arrested to sentencing, & what your rights are at each stage of the process. Uses an easy to understand question & answer format. 1038

**Represent Yourself in Court: How to Prepare & Try a Winning Case**, Attorneys Paul Bergman & Sara J. Berman-Barrett; Nolo Press, 528 pages. $34.99. Breaks down the trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say, in court, how to say it, where to stand, etc. (written specifically for civil cases—but it has much material applicable to criminal cases). 1037

**Law Dictionary**, Random House, 525 pages. $17.95. Up-to-date law dictionary includes over 8,500 legal terms covering all types of law. Explains words with many cross-references. 1036

**The Blue Book of Grammar and Punctuation**, Jane Straus, 68 pages, 8-1/2 x 11. $11.95. Self-teaching guide on all aspects of grammar and punctuation by an educator with experience teaching English skills to prisoners. Is both a reference and a workbook with exercises and answers provided. 1046

**Legal Research: How to Find and Understand the Law**, 12th ed., by Stephen Elias and Susan Levinkind; Nolo Press, 568 pages. $39.99. Excellent for anyone searching for information in a real or virtual law library (including paralegals, law students, legal assistants, journalists and pro se litigants), *Legal Research* outlines a systematic method to find answers and get results. 1059

**Spanish-English/English-Spanish Dictionary**, 60,000+ entries, Random House, $5.99 Two sections, Spanish-English and English-Spanish. All entries listed from A to Z. Hundreds of new words. Includes Western Hemisphere usage. 1034

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. & Canada**, by Jon Marc Taylor, 341 pages. $24.95. Includes contact info & outlines courses offered by over 250 education providers. Info on high school, vocational, paralegal, law, college and graduate courses. One of a kind prisoner resource. 1047

**The Citebook**, 21st ed., by Tony Darwin, Starlite, 306 pages, $41.95. This plain language legal manual lists positive cases (cases that give you a right, not take one away) and gives a short synopsis detailing each. 1057

**Deposition Handbook**, by Paul Bergman and Albert Moore, 2nd Rev Ed., 352 pages, $29.99. How-to handbook for anyone who will conduct a deposition or be deposed. Valuable info, tips & instructions. 1054

**SUBSCRIBE TO PLN FOR 3-YEARS AND CHOOSE ONE BONUS!**
1. EIGHT (8) FREE ISSUES FOR 44 TOTAL! ($12 TO $40 VALUE!)
2. ACTUAL INNOCENCE ($14.99 VALUE)
3. ROGET'S THESAURUS AND ENGLISH DICTIONARY (16.98 VALUE!)
   (SPANISH-ENGLISH/ENGLISH-SPANISH DICTIONARY CAN BE SUBSTITUTED)

**Actual Innocence: When Justice Goes Wrong and How To Make It Right, updated pb.**, by Barry Scheck, Peter Neufeld and Jim Dwyer, 432 pages. $9.99. Two of O.J.'s attorney's explain how defendants are wrongly convicted on a regular basis. Detailed explanation of DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct and the system that ensures those abuses continue. 1030

**Roget's Thesaurus**, 717 pages. $5.99. Over 11,000 words listed alphabetically linked to over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words. 1045

**Webster's English Dictionary**, Newly revised and updated. 75,000+ entries. $5.99. Includes tips on writing and word usage, and has updated geographical and biographical entries. Includes latest business and computer terms. 1033

**Capital Crimes**, by George Winslow, 360 pages. $19.00. Explains how economic policies create and foster crime and how corporate and government crime is rarely pursued or punished. 1024

**Lockdown America: Police and Prisons in the Age of Crisis**, by Christian Parenti, Verso, 290 pages. $17.00. Documented and has first hand reporting on law enforcement's war on the poor. Covers paramilitary policing and SWAT teams, the INS and prisons. 1002

**The Perpetual Prisoner Machine: How America Profits from Crime**, by Joel Dyer, 318 pages. $19.00. Exposes how private prisons, banks, investors and small companies profit from the prison industrial complex, and prison growth adds to revenue & profits. 1025

**Crime and Punishment In America**, by Elliott Currie, 230 pages. $12.95. Refutes arguments in favor of prison building as a crime solution. Demonstrates crime is driven by poverty and discusses proven, effective means of crime prevention. 1019

**Worse Than Slavery: Parchman Farm & the Ordeal of Jim Crow Justice**, by David Oshinsky, 306 pgs. $14.00. Analysis of prison labors roots in slavery. Focuses on prison plantations and self sustaining prisons. Must reading to understand prison slave labor today. 1007

**States of Confinement: Policing, Detention and Prison, revised and updated edition**, by Joy James; St Martins Press, 368 pages. $19.95. Activists, lawyers and journalists expose the criminal justice system's deeply repressive nature. 1032

**Seize the Day! 7 Steps to Achieving the Extraordinary in an Ordinary World**, by Danny Cox & John Hoover, 256 pages, $14.99. Provides 7 common sense steps to changing your expectations in life and envisioning yourself as being a successful and respected person. 1052

**BOP Occupational Training Programs Directory**, 124 pgs. $10.00. Directory listing vocational and education programs available to prisoners in every federal prison. Includes contact info for BOP national, regional and CCM offices, and BOP facilities. Invaluable if considering a training or education transfer. 1053

**Criminal Injustice: Confronting the Prison Crisis**, by Elihu Rosenblatt; South End Press, 374 pages. $18.00. A radical critique of the prison industrial complex. 1009

**Marijuana Law: A Comprehensive Legal Manual**, by Richard Boire, Ronin, 271 pages. $17.95. Examines how to reduce the probability of arrest and successful prosecution for people accused of the use, sale or possession of marijuana. Invaluable information on legal defenses, search and seizures, surveillance, asset forfeiture and drug testing. 1008

**ALL BOOKS ARE SOFTCOVER EXCEPT *PRISON MADNESS***

**Hepatitis and Liver Disease: What you Need to Know, 2004 Rev Ed**, by Melissa Palmer, MD, 470 pages. **$16.95**. Describes symptoms & treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow and exercises to perform.  1031

**All Things Censored: Mumia Abu-Jamal**, ed. by Noelle Hanrahan, 303 pgs. **$14.95**. Includes 75 articles by Abu-Jamal. Attacks capital punishment & critiques the dehumanizing prison system.  1040

**Prison Writing in 20th Century America**, by H. Bruce Franklin, Penguin, 1998, 368 Pages. **$13.95**. From Jack London to George Jackson, this anthology provides a selection of some of the best writing describing life behind bars in America.  1022

**Soledad Brother: The Prison Letters of George Jackson**, by George Jackson; Lawrence Hill Books, 368 pages. **$16.95**. Lucid explanation of the politics of prison by a well-known prison activist. More relevant now than when it first appeared 30 years ago.  1016

**The Politics of Heroin: CIA Complicity in the Global Drug Trade**, April 2003 Rev Ed, by Alfred McCoy; Lawerence Hill Books, 734 pages. **$32.95**. Latest Edition of the scholarly classic documenting U.S. government involvement in drug trafficking.  1014

**No Equal Justice: Race and Class in the American Criminal Justice System**, David Cole; The New Press, 218 pages. **$15.95**. Shows how the criminal justice system perpetuates race and class inequality, creating a two tiered system of justice.  1028

**Ten Men Dead: the story of the 1981 Irish hunger strike**, by David Beresford, 334 pages. **$13.50**. Relies on secret IRA documents and letters smuggled out from the IRA political prisoners during their 1981 hunger strike at Belfast's infamous Long Kesh prison.  1006

**Prison Nation: The Warehousing of America's Poor**, edited by Tara Herivel and Paul Wright, 332 pages. **$21.95**. Exposes the dark side of America's 'lock-em-up' political and legal climate.  1041

**NOTE!** All books ordered AT THE SAME TIME as a 3 or 4 yr sub will be mailed at no charge to the same address as the sub bonus book.

| Subscription Rates | 1 year | 2 years | 3 years | 4 years |
|---|---|---|---|---|
| **Prisoners** | $18 | $36 | $54 | $72 |
| **Individuals** | $25 | $50 | $75 | $100 |
| **Professionals** (Lawyers, agencies, libraries) | $60 | $120 | $180 | $240 |

**Finding the Right Lawyer**, by Jay Foonberg; American Bar Assoc., 256 pages. **$19.95**. Provides guidance for hiring a lawyer, including how to determine your legal needs, fee payments, how to evaluate a lawyer's qualifications, and much more.  1015

**10 Insider Secrets to a Winning Job Search**, by Todd Bermont, 216 pages. **$14.99**. Roadmap on how to get a job even under adverse circumstances - like being an ex-con. Includes how to develop a winning attitude, write attention grabbing resumes, prepare for interviews and answering questions.  1056

**Prison Madness: The Mental Health Crisis Behind Bars**, by Terry Kupers, 245 pages. **HARDBACK ONLY. $25.00**. Psychiatrist writes about the mental health crisis in American prisons and jails. Covers all aspects of mental illness, rape, racism, negative effects of long term isolation in control units and much more.  1003

**Capitalist Punishment: Prison Privatization & Human Rights**, edited by Andrew Coyle, Allison Campbell & Rodney Neufeld, 235 pages. **$19.95**. Analyzes and describes all the pitfalls of private prisons and privatized prison medical care.  1058

PLN Article Indexes provide detailed information about all PLN articles including title, author, issue, page number, topics covered, case names, and citations, the state or region covered and if it is state, BOP or jail specific. Can be searched on over 500 subjects, such as medical neglect and sexual assault.

1990-1995 Cumulative Index, $22.50     2002 Index, $10.00
1996-1998 Cumulative Index, $22.50     2003 Index, $10.00
1999-2001 Cumulative Index, $22.50     2004 Index, $10.00
2002-2004 Cumulative Index, $22.50

**FREE SHIPPING ON ALL BOOK AND INDEX ORDERS OVER $25!**
$5 mailing charge only applies to orders of $25 or less!
(Free shipping policy effective November 1, 2003 until further notice)

**Subscription Bonuses**
2 years  4 bonus issues for 28 total
3 years  8 bonus issues (44 total) OR a bonus book offer listed on pg 45
4 years  12 bonus issues (60 total) OR a bonus book offer listed on pg 45
All subscription bonuses are provided in addition to the normal 12 yearly issues. (All subscription rates and bonus offers are valid through 6-30-05)

**Mail payment and order to:**
Prison Legal News
2400 NW 80th St. #148
Seattle, WA 98117

Purchase with a Visa or MasterCard by phone
**206-246-1022**
Or buy books and subscriptions online at
**www.prisonlegalnews.org**

Please **Change my Address** to what is entered below  ☐
Please send **Info** about PLN to the person below  ☐

**Mail Order To:**

Name: _____
DOC #: _____
Suite/Cell: _____
Agency/Inst: _____
Address: _____
City/State/Zip: _____
Extra line: _____

All purchases must be pre-paid. Payments by prisoners with new stamps and pre-stamped envelopes accepted.

**Subscribe to Prison Legal News**                    $ Amount
6 month Subscription (Prisoners only) $9           _____
1 yr Subscription (12 issues)                              _____
2 yr Subscription (4 bonus issues for 28 total!)    _____
3 yr Sub (*Write below which FREE book you want!*)
    or 8 bonus issues for 44 total!                        _____
4 yr Sub (*Write below which FREE book you want!*)
    or 12 bonus issues for 60 total!                      _____
Sample Issue of PLN ($2)                                   _____

**Books or Index Orders** (No S/H on 3 & 4
yr sub special books OR book orders OVER $25!)    Qty.

_____   _____
_____   _____
_____   _____
_____   _____
_____   _____

Add $5.00 S/H To Book Orders **UNDER $25**         _____
WA Residents ONLY Add 8.8% To Book Cost           _____
**Total Amount Enclosed**                                  _____



## "Can I challenge my conviction or sentence and win?"

## "What are my rights as a prisoner and how can I protect them?"

**THE PRISONER'S GUIDE TO SURVIVAL** helps answer these two most important questions facing every man and woman imprisoned in the United States.

No matter what your legal or educational background, *The Prisoner's Guide to Survival* will help you learn how to research the law, study your rights, determine your legal options, and take the necessary steps to protect your rights or challenge an illegal conviction or sentence.

Complex issues are explained in plain language so that even if you don't have an attorney you can make an informed decision regarding your legal choices. The Supreme Court decision in *Apprendi v. New Jersey* and its potential for sentence reduction for thousands of defendants is also discussed.

**The SURVIVAL GUIDE includes:**
- Current legislation and court decisions affecting prisoners.
- Actual size example forms for Appeals, Habeas Corpus actions, Motions, Constitutional rights complaints for state & federal prisoners, and more.
- Over 3,000 shepardized case law decisions covering criminal conviction, sentencing and prisoner civil rights.
- An extensive prisoner assistance resource directory.
- A guide to the Freedom of Information Act and Privacy Act.

### The Prisoner's Guide to Survival:
*The most comprehensive and current legal assistance manual available to prisoners, covering post-conviction relief and prisoners' civil rights.*

### Our readers are impressed:
"WOW!" – H.B.S., FCI OTISVILLE, NY

"From the eye-catching, metaphorical endless maze cover, to its easy organization, to the breadth of subject matter – the book is more appealing than any of the many others that attempt to cover post-conviction matters. In short, I'm impressed."   – J.R., FCI PEKIN, ILL

"I think it's a great book which will be extremely useful to prisoners... Washington currently plans to eliminate its prison law libraries, which means books like this one will be increasingly important to prisoners' assertion of our legal rights."   – P.W., MICC STEILACOOM, WA

### TO ORDER YOUR COPY OF THE PRISONER'S GUIDE to SURVIVAL:
Complete order form below and send with your payment to:

**PSI PUBLISHING, INC.**
413-B 19th Street, #168
Lynden, WA 98264
1-800-557-8868

---

**PLEASE SEND _____ COPIES OF "THE PRISONER'S GUIDE to SURVIVAL"**

PRICE:
PRISONERS............................... $49.95
NON-PRISONERS ....................... $64.95

plus $5.00 shipping & handling.
Please allow 3-4 weeks for delivery.

NAME _____  REG. # _____
FACILITY _____
ADDRESS _____
CITY _____ STATE _____ ZIP _____
○ CHECK OR MONEY ORDER ENCLOSED, PAYABLE TO: PSI PUBLISHING INC.   ○ VISA   ○ MASTERCARD
CREDIT CARD# _____
EXP. DATE _____ SIGNATURE _____

Mail to: PSI PUBLISHING, INC., 413-B 19th Street, #168 Lynden, WA 98264 • 1-800-557-8868

# Pen Pal & Legal Ads
## Prisoners On--Line Since 1999!

 

With an amazing **87% Response Rate** and more exclusive web site features and benefits than **ANY** other prisoner pen pal company *(too many to list in this ad!)*, FBTW is in a class of its own! 1-Year Full-Page, Full-Color Regular Web Site Ads $39.95; 1-Year Ad Renewals $19.95!

**Rated BEST** by our clients, we provide you with our **Quarterly Newsletter** to keep you connected, and **FREE** Ad Tips & Suggestions to provide you with the tools to produce the only thing you're looking for... **RESULTS!!**

**Professional Web Site Ads** created by talented New York Web Designers who are also family members and friends of prisoners! We're connected and know the importance outside friendships and relationships hold for you.

Our staff are **Photoshop & Design EXPERTS!** Our web site ads and customer photos are unrivaled in their quality and appeal to the outside public. Have your family and friends compare us to the others... we're confident you'll want to work with us if you know the difference!

### ... Just a Few of the EXTRAORDINARY Benefits our Clients Enjoy ...

- Outstanding Customer Service Staff - Our promise to you ... if you write, we WILL respond *(simply enclose SASE for response!)*
- Exclusive 'Search Express Instant Friend Locator' makes finding your ad easy for web site visitors *(you are never buried in long lists!)*
- Exclusive 'On-Line Letter Response Center' provides '4' convenient responding options for web site visitors to answer your ad!
- We GUARANTEE your ad will be seen by the outside public! *(FREE Hit Counter provided to track the number of visits to your ad)*
- FBTW is listed on the FRONT page of Major Search Engines such as *(GOOGLE, Yahoo, AOL, etc.)* for web site visitors searching for 'prison pen pals' *(if a web site does not appear on the first page of search results, the chances of your ad being seen is minimal!)*
- The Friends Gazette, our **FREE** Quarterly Newsletter, keeps our customers connected to the company they trust to represent their ads, and also hooks you up with other resources *(Gifts, Photos, Greeting Cards, Books, etc.)* We'll even refer our customers to other 'quality' prisoner pen pal web sites because our ONLY goal is to help you receive mail!

Send SASE for complete membership details!   *Pricing listed above expires 12-31-2007*

## Friends Beyond The Wall, Inc.
Attn: Pen Pals - PLN   ❖   2600 South Rd   ❖   Suite 44-244   ❖   Poughkeepsie, NY 12601-7004
Web Site: www.FriendsBeyondTheWall.com          Email: Info@FriendsBeyondTheWall.com

---

### Subscription Renewal
Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2006, then the subscription expires after the February 2006 issues is mailed. Please renew at least 2 months before the expiration date. IF THE LABEL SAYS **EXPIRES:11/2006** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

### Change of Address
If you move or are transfered, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!



**Prison Legal News**
2400 NW 80th Street #148
Seattle, WA 98117

Change Service Requested

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

50

# PRISON Legal News

VOL. 18 No. 1
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

January 2007

## Ex-Communication: Competition and Collusion in the U.S. Prison Telephone Industry

*by Steven J. Jackson*

The prison communication industries occupy a large and significant blind spot within the literature of critical communication scholarship and the social sciences more generally. Professional arguments around crime, punishment and the American prison system have dealt with communication issues as a footnote, if at all.

For their part, communication scholars have largely ignored the question of prisons, neglecting almost entirely their unique communicative forms, institutions, and industrial structures. But as historians and social theorists have come to appreciate, prisons often mirror, in uncanny and revealing ways, the societies that produce them. So too in the more specific institutional world of correctional communications, whose distinctive characteristics speak to pressing issues in the field of communication writ large: the dangers and abuse of monopoly power; the attendant need (and frequent failure) of regulation; the sometimes dubious marriage of state and corporate interest; and ultimately the role of social movement and citizen mobilization in moderating the worst abuses of state and corporate power.

This article tells a small but important part of the larger prison communication story: the rise in the 1990s of a deeply inequitable pricing scheme that has seen the cost of prisoner phone calls skyrocket, even as rates available to businesses and consumers on the outside world have fallen dramatically. The story takes place under the unsettling shadow of two of the more consequential social movements of the past twenty-five years: the unparalleled explosion in national incarceration rates, and the apparent triumph of de-regulatory philosophies in the national telecommunication arena. Driven by a combination of social, economic, and ultimately political factors, the national prison "market" has grown faster than at any time in its history.

Enticed by a separate combination of institutional, fiscal, and political opportunities, the prices charged prisoner telephone calls vis-à-vis those available in the outside world have risen no less dramatically. Since the late 1980s, county, state, federal and private detention facility officials have exploited their monopoly sourcing power to enter into what amount to profit-sharing arrangements with the major telephone companies, offering exclusive service rights in exchange for exorbitant commissions, calculated as a percentage on revenue or profit, paid back to the state. By the mid-1990s, the price of a single fifteen-minute in-state call had topped $20 in some jurisdictions, with out-of-state fees spiking to as high as two dollars per minute ("When Johnny Calls Home," 1999; Wunder, 1995). The net result is a sharp rise in the cost of maintaining family and community connections across prison walls – a cost borne most immediately by the individuals directly affected, but ultimately by society as a whole. This article traces the origins of this uniquely pathological outcome, and details the protests and challenges that have begun to be mounted against it.

### Growing the Market

Present trends in the prison phone industry must be placed against the backdrop of a broader and longer history of American penology, the most salient feature of which has been a massive socially- and racially-unbalanced expansion over the past thirty years. The roots of the national revolution in crime and punishment can be traced in part to responses to the economic crises, social unrest and urban disturbances of the 1960s and 70s. The perceived failure of law enforcement efforts vis-à-vis the anti-war, civil rights and black power movements of the time prompted major investments and a major rethinking of

### Inside

| | |
|---|---|
| From the Editor | 12 |
| Los Angeles Jail Problems | 14 |
| Wisconsin DOC Medical Suit | 20 |
| Prison Struggle in Brazil | 22 |
| Washington Health Care Problems | 25 |
| Illinois Parole Settlement | 28 |
| Vienna Convention Suits | 30 |
| Indigent Defense Settlement | 32 |
| New Mexico Strip Searches | 34 |
| Mississippi Beating Verdict | 37 |
| BOP Property Suit Allowed | 40 |
| News in Brief | 42 |
| Colorado Ad Seg Suit | 44 |

# www.prisonlegalnews.org

## Prison Legal News Online! 

➤ PLN's website offers all issues of PLN in both a searchable database and PDF format. Issues are indexed and posted as soon as they go to press!

➤ Full text decisions of thousands of court cases, published and unpublished!

➤ Most complete collection of prison and jail related verdicts and settlements anywhere!

➤ Brief bank with a wide assortment of winning motions, briefs, complaints and settlements!

➤ Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search. Visitors can search the site's content for free, pay only if we have what you are looking for!

➤ Our Publications section has downloadable versions of numerous government reports, audits and investigations from around the country!

➤ All content is easy to print for downloading and mailing to prisoners!

➤ Order books, print subscriptions and make donations on line!

➤ Website chat room and forum allow for discussion and questions and answers by those interested in prison and jail issues!

➤ Links to thousands of other prison, jail, criminal justice and legal websites around the world!

➤ This is the highest quality and most comprehensive prison litigation news and research site in the world!

## New content added almost daily!

If you need to know about prisons and jails or are litigating a detention facility case you can't afford not to subscribe to our website!

Online subscribers get unlimited, 24 hour a day access to the website and its content!

Low, affordable subscription rates to meet your needs and budget:

➤ $9.95 per month
➤ $69.95 per year

*You can't afford not to subscribe!*

**www.prisonlegalnews.org**

*Sign up for PLN's FREE listserve to receive prison and jail news and court rulings by e-mail.*

**PUBLISHER**
Rollin Wright

**EDITOR**
Paul Wright

**ASSOCIATE EDITOR**
Alex Friedmann

**EXECUTIVE DIRECTOR**
Donald W. Miniken Jr.

**COLUMNISTS**
Mumia Abu Jamal, Denise Johnston, Daniel E. Manville, Kent Russell

**CONTRIBUTING WRITERS**
Matthew Clarke, John Dannenberg, Gary Hunter, David Reutter, Mike Rigby, Sam Rutherford, Roger Smith, Silja J.A. Talvi, Bob Williams & Mark Wilson

**LAYOUT**
Lance Scott/Catalytic Communications

*PLN* is a Monthly Publication

A one year subscription is $18 for prisoners, $25 for individuals, and $60 for lawyers and institutions. Prisoner donations of less than $18 will be pro-rated at $1.50/issue. Do not send less than $9.00 at a time. All foreign subscriptions are $60 sent via airmail. *PLN* accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. *PLN* is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News**
2400 NW 80th Street #148
Seattle WA 98117
(206) 246-1022
Fax (206) 248-6846
info@prisonlegalnews.org
www.prisonlegalnews.org

Please do not mail *PLN* paperwork for an ongoing case or request legal advice. *PLN* is not a legal service provider and cannot give legal advice. *PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - **The Editor** - at the above address. We cannot return submissions without a SASE. Check our website or send a SASE for writers guidelines.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index*.

### Ex-Communication (cont.)

the nature of domestic policing efforts, blurring the line between international, federal and local jurisdictions, introducing both new players (the federal Law Enforcement Assistance Administration, the Drug Enforcement Administration) and new techniques (helicopter surveillance, SWAT teams, community policing, advanced command-and-control communications, the FBI's computer-based National Crime Information Center) to the landscape of domestic law enforcement. These macro-scale political motivations were joined at the local level by the real and frequently destructive consequences of crime and drugs on working class, inner city and impoverished neighborhoods, turning the effort to police, or 'reclaim,' urban neighborhoods into a political and moral project of considerable complexity.

Such revolutions in policing both reflected and supported contemporary legislative developments. The 1968 Omnibus Crime Control and Safe Streets Act marked the first serious federal foray into the previously local jurisdiction of law enforcement, introducing new lines of federal funding, training, and institutional support, and carrying among its provisions an erosion of the recently-won *Miranda* rights of suspects along with previous restrictions on domestic wiretapping and other surveillance activities. Incremental reforms throughout the early 1970s, along with new laws against drug abuse and organized crime, further loosened restrictions on the activities of law enforcement officials and federal prosecutors. Following a post-Watergate reprieve lasting through the later 1970s, the Comprehensive Crime Control and Sentencing Reform Acts of 1984 introduced new and wide-ranging provisions, with stricter sentencing laws (including mandatory minimums for many categories of drug- and gun-related offences) and new search, seizure and forfeiture powers.

In the late 1980s, additional federal legislation was passed, enshrining the basic legislative framework for the federal war on drugs, curtailing probation and suspended sentences, and introducing harsh mandatory minimums for the sale (and in some cases the mere possession) of illicit drugs. Federal legislative developments have been matched (and in some cases exceeded) by parallel 'tough-on-crime' legislation at the state level.

In 1973, New York introduced its Rockefeller Drug Laws, imposing severe mandatory minimums for minor sale and possession offences. In 1994, a popular ballot initiative brought in California's controversial "Three Strikes Law," requiring lengthy and mandatory prison terms for repeat offenders. So-called truth-in-sentencing laws have been introduced federally and in several states, stipulating that convicted felons serve a fixed minimum percentage of their sentence (typically 85 percent) before being eligible for parole. In many states during the 1980s and 90s prison alternatives and re-entry programs (including parole, probation, counseling, psychiatric care, mandatory treatment, rehabilitation, and early-release programs) were being de-funded, rolled back, outsourced, and in some cases, terminated.

These and other changes have fundamentally altered the traditional balance of prosecution, defense and judicial functions within the American legal system. The introduction of mandatory minimums and longer prison terms has moved the prosecutor's unchecked charging power to the center of the criminal justice process, controlling the schedule and process of prosecution-defense negotiation, and effectively setting the terms of imprisonment. At the same time, massively overworked and under-resourced public defenders and court-appointed attorneys have faced funding reductions and workload increases that make adequate investigation of cases and effective client counseling virtually impossible. Meanwhile, minimum sentencing laws and the expansion of the plea-bargaining mechanism have narrowed the traditional discretion accorded judges in tailoring punishment to fit the unique circumstances of each crime. As a result, "assembly-line justice facilitated by powerful prosecutors, helpless defense attorneys, and increasingly powerless judges now characterizes the system that determines whether a person will lose his liberty or even his life."

The most immediate consequence of these shifts has been a sharp and sustained explosion in the national rate of incarceration lasting through the 1980s and 90s. From a figure of less than 320,000 at the start of the prison boom in 1980, the number of persons serving time in state and federal custody had more than

**Ex-Communication (cont.)**

quadrupled to nearly 1.47 million by 2003. Adding in those awaiting trial or serving short-term sentences in county jails, the total incarcerated population nationwide grew from slightly more than 500,000 to well over 2 million, for a national incarceration rate of 702 per 100,000 (Bureau of Justice Statistics, 2005). Expanded to include individuals serving time on parole or probation, the total population under state supervision by 2003 had reached 6.9 million, or approximately 3.2% of the adult U.S. population (Bureau of Justice Statistics, 2005).

Moreover, these aggregate figures hide an even more insidious pattern of racial inequity. At the end of 2002, black males of all ages were more than five times more likely than white, and three times more likely than Hispanic males, to be serving time in a state or federal prison. Multiplied by inequities in law enforcement, arraignment, probation, parole, and prison policy, by the early 2000s, approximately two-thirds of all U.S. prisoners were members of racial or ethnic minorities (*Sourcebook of Criminal Justice Statistics*, 2002; The Sentencing Project, 2000). In addition to the long-term effects of incarceration on family members and communities, new legislative measures passed in the early 1990s have banned certain categories of offenders (principally felons and many classes of drug-related convictions) from eligibility for many basic rights and social services, including welfare benefits, loans for higher education, and voting.

This explosion in numbers has fed and been fed by an unprecedented boom in prison construction that, in scale and pattern, has significantly altered the geography of American crime and punishment. Between 1980 and 2000, more than $7 billion per year was spent on the construction of new prisons; between 1990-1995 alone, 213 institutions were added to the state and federal systems, among these a high proportion of oversized and high security "super-max" facilities (Bureau of Justice Statistics, 1995). This massive system expansion has followed the contours of a distinctive spatial logic, with new prisons targeting economically depressed and geographically remote areas whose local boosters have competed aggressively to attract the jobs and investment widely believed to come with the ceded construction and/or operation of a new facility. Through much of the ex-industrial and post-Cold War north and rural south, prison building emerged in the neo-liberal 1980s and 1990s as a form of backdoor Keynesianism, the next (and last) best thing to a regional industrial policy. This activity has further skewed the already unbalanced geography of the American prison system, as aging urban facilities are taken off-line and replaced by a new class of institutions located far from national population centers.[1] By 2003, the sentence-miles of the American penal system, measured as a combination of time and distance served, reached an all-time high. Punishment had been in-shored.

Geographic trends within the state and federal systems have been exacerbated by the concurrent return of the private prison industry, growing up around the edges and cracks of an increasingly overburdened public system.[2] Lifted by the same tide of mass incarceration, and boosted by a parallel ideological shift favoring the "natural" efficiency of the private sector, private prisons were embraced across much of the country as a promising (and profitable) solution to the problem of the corrections explosion. Beginning with tentative inroads at the margins of the correctional mainstream in the early 1980s (immigration detention centers, minimum security and treatment facilities), by the mid-1990s industry leaders such as Wackenhut and the Corrections Corporation of America were competing aggressively over local, state and federal contracts for facilities of every type and level. Between 1995 and 2000, the size of the private prison population grew by more than 450%, from 16,663 to 93,077 (Bureau of Justice Statistics, 2000). By 2000 more than 264 private facilities were operating under contract with the state and federal governments, and the percentage of privately-housed prisoners nation-wide stood at 6.1% (*Sourcebook of Criminal Justice Statistics*, 2002).[3] The privatization of prisons has furthered the above-noted trend towards in-shoring, with states now routinely sending prisoners of all offense categories to serve their time in out-of-state facilities. Industry-leader Corrections Corporation of America, for instance, maintains a geographic stronghold in Tennessee, housing prisoners from as far afield as Montana, Hawaii and Puerto Rico.

Driven by all these factors – the dramatic expansion in prison population, the increasing distance between places of crime, conviction and punishment (and thus a greater need for long-distance methods of outside contact), and a growing awareness of the previously staid prison sector as a site for dynamic and creative profit-making – the prison telephone industry emerged during the 1980s and 90s as an important and distinctive sub-market within the national telecommunication industry as a whole. By the 1990s, the prison telephone sector had grown into a billion dollar market. Companies – and states – wanted a piece of the action.

**Building the Industry**

The history of prison telephone access in the U.S. is itself of relatively recent vintage. Until the early 1970s, prisoners of the state and federal prison systems were limited to one collect call every three months, granted at the discretion of prison officials in response to a formal petition process. In 1973, the federal Bureau of Prisons called for an expanded telephone access program that would "permit constructive, wholesome community contact" while addressing security concerns through rudimentary call monitoring capabilities (Department of Justice, 1999). Citing contemporary recidivism studies showing a strong correlation between weakened family and community bonds and the likelihood of re-offense, federal prison officials argued that a more liberalized regime of telephone access could help to maintain prisoner-community connections that were valuable to the rehabilitation process. State prison departments throughout the country generally followed suit over the course of the 1970s, installing widespread access to commercial payphone service as a regular feature of American prison life.

Until 1984, the fledgling prisoner telephone market remained the exclusive purview of AT&T, and rates for operator-assisted collect calling – the only form of service available to prisoners – kept pace with those for similar services in the outside world. As with other segments of the American telecommunications market, the 1984 Consent Decree authorizing the break-up of AT&T threw this long-standing equilibrium up for grabs, setting off a succession of market entries and FCC rules-makings that substantially altered the architecture of American telecommunications. Changes in the prison phone sector were quickly caught within

the deregulatory wind blowing through the industry as a whole, with piecemeal and interim steps away from the AT&T monopoly enacted throughout the latter half of the 1980s. A more focused Prisoner Services Order issued by the Federal Communication Commission in the early 1990s sought to eliminate a variety of vestigial barriers to competition in the prison phone market, establishing a nominally pro-competitive regulatory framework governing the relation between new entrants and incumbent local exchange carriers – the Regional Bell Operating Companies formed in the wake of the AT&T break-up – upon whose larger network would-be competitors continued to rely.

First into the newly-liberalized market were AT&T rivals MCI and Sprint, followed closely by a series of dedicated start-ups. In 1989, MCI introduced its 'Maximum Security' service, part of a larger and concerted push into the government and institutional services market. By 1995, the company held monopoly or near-monopoly contracts for prison service in California, Ohio, Connecticut, Virginia, Wisconsin, Missouri and Kentucky. The reorganized AT&T's Prisoner Services Division managed to hold on to detention markets in New Jersey, Pennsylvania, Michigan, New Mexico, Mississippi and Washington, followed by tier-two players GTE (Washington DC, Hawaii, Indiana, parts of the Michigan contract), Sprint (sharing Michigan, also Nevada) and US West (New Mexico, Idaho, Oregon, South Dakota, and Nebraska). In most instances, local and long-distance contracts were awarded separately, with long-distance provisions split between the majors and the former regional bell operating companies holding the majority of local contracts: Bell Atlantic in Maryland, Delaware, and West Virginia; NyNex in Massachusetts; Southern Bell in North and South Carolina; and South Central Bell in Alabama and Mississippi.

In addition to these familiar names, several niche players have sought to establish a foothold in the lucrative prison market. North Carolina-based Pay-Tel Communications moved aggressively into the market in the late 1980s, winning service deals in North and South Carolina in 1989, and subsequently adding contracts in Tennessee, Georgia, Virginia and Florida. Other post-divestiture competitors have sprung up in the specialized prison equipment market, selling technologies, services and security features designed to correctional specifications.[4] Several of these companies attempted to make the leap from equipment supplier to stand-alone service provider. Long-time equipment supplier T-NETIX, for instance, won exclusive service rights to the Indiana system in 2001, adding to its previous contracts in New Mexico and Pennsylvania. Competitor Global Tel*Link was awarded the contract for prison facilities in Louisiana. Like the traditional majors, newcomers like Pay-Tel have sought to compete by offering service packages that "best take advantage of pending regulatory changes to enhance revenues and increase our clients' commissions" (http://www.paytel.com/backgrd.html). By 2000, competition in the prison phone industry had shrunk appreciably, with MCI solidifying control in the crucial California and New York markets, and adding contracts in Florida, Illinois, and Georgia. Sprint had strengthened its hand considerably, landing a major long distance contract with the Federal Bureau of Prisons, along with contracts in the important state markets of Georgia, Florida,




### Ex-Communication (cont.)

Michigan and South Carolina.

Whatever their merits in the larger telecom world, incentives to competition within the prison telephone industry have proven fundamentally perverse. Armed with a uniquely effective monopoly sourcing power, county, state and federal officials have entered into what amount to profit-sharing agreements with telephone service providers, exchanging exclusive service rights for large commissions paid back into state funds.[5] Under such conditions, the incentives of price competition have worked in precisely the opposite direction, with companies offering the highest bids (in terms of rates and commissions) routinely awarded contracts, the costs of which are passed on to the (literally) captive market. The net result of deregulation and competition in the prison phone industry, then, has been a dramatic rise in prices – even as consumer rates available elsewhere in the American telecommunications landscape have plummeted.

By the mid 1990s, this perverse competition had driven prison phone commissions and rates to new heights. According to an American Corrections Association survey published in 1995, nearly 90% of detention systems nation-wide received a percentage of the profits derived from prisoner-placed collect calls, ranging from 10-55% of gross revenues. For states struggling to keep up with the costs of the incarceration explosion described above, phone revenues represented a welcome and multi-million dollar source of income. According to the results of the 1995 ACA survey, based on state self-reporting, Ohio was making $21 million annually in prison phone commissions, while New York brought in $15 million, California $9 million, Florida $8.2 million, and Michigan $7.5 million. Nationwide, the 32 state departments of correction and 24 city and county jails surveyed – a far from complete count of the national total – reported phone commission revenues in 1994 exceeding $100 million. Such windfall profits for the states (along with the undisclosed profits of the telephone companies themselves) have been accompanied and enabled by a dramatic rise in the price of prison collect calling. As of 1994, respondents to the ACA survey reported initial connection fees running between one and three dollars, followed by per minute charges ranging as high as ninety cents for local calls, and $2.25 for long distance. Fifteen minute phone calls (the institutionally-allowed maximum) billed at $20 or more were routine, while monthly phone bills for family members receiving prisoner collect calls climbed into the several hundred (and in some cases, thousand) dollar range.

This situation has met so far with a general absence of regulatory oversight. In 1996, Congress instructed the FCC, under Section 176 of the revamped Telecommunications Act of 1996 (TCA), to revise the rule and policies governing the national payphone industry in support of the TCA's stated goal of ensuring a "pro-competitive deregulatory national framework." In its September 20, 1996 Report and Order, the Commission observed that low cost and technology barriers to entry made the payphone sector well-suited to competition, and noted that, "a large number of firms, both large and small, have entered the industry since it was initially opened to competition in 1984, and those firms have provided competition in at least some segments of the payphone market" (FCC, 1996, para. 12). The Report did, however, hold open the possibility of three scenarios in which the benefits of competition might not be realized: the potential conflict of interest experienced by local exchange carriers offering their own payphone services at the same time as providing the underlying service for payphone competitors; cases of inadequate disclosure, in which consumers are unaware of rates for coin-operated or operator-assisted service prior to placing calls; and finally, the existence of "certain locations where, because of the size of the location or the caller's lack of time to identify potential substitute payphones, no 'off premises' payphone serves as an adequate substitute for an 'on premises' payphone" (FCC, 1996, para. 14).

The report goes on to note that:

"In such locations, the location provider can contract exclusively with one PSP [payphone service provider] to establish that PSP as the monopoly provider of payphone service. Absent any regulation, this could allow the PSP to charge supra-competitive prices. The location provider would share in the resulting 'locational rents' through commissions paid by the PSPs. To the extent that market forces cannot ensure competitive prices at such locations, continued regulation may be necessary (FCC, 1996, para. 16)."

Despite this acknowledgement of the market dynamics driving the prison phone escalation, the Commission failed to address or act to remedy the large and growing prisoner charges already well in evidence. Where it touched the matter at all, it argued that compensation rates in the prisoner payphone industry should be left to the discretion of detention officials, along with contractual arrangements between location owners and service providers.

A second potential regulatory opening came with 1998 FCC investigations into the issue of "billed party preference," i.e. the question of whether recipients of collect calls from payphones should be able to select from a competitive range of service providers, or whether that right could be 'sold' by location owners to a single monopoly provider. In this case, as anticipated in the 1996 Report and Order, the price benefits of competition celebrated under the 1984 AT&T divestiture and 1996 Telecommunications Act once again cut the other way. A separate statement by Commissioner Gloria Tristani attached to the ruling acknowledged:

"Unfortunately, operator services from payphones are a rare example of competition leading to higher prices for consumers. When more OSPs [Operator Service Providers] compete for the right to serve a particular location, they must pay higher commissions to the location's owner. OSPs often recover those higher commissions from consumers in the form of higher calling charges (FCC, 1998, addendum)."

Nevertheless, while the unique circumstances of prison calling were recognized in the preamble to the proceedings, the FCC's ultimate remedy to the problem

**Tightwad Magazines**

Our **New Catalog** is now available. We have lots of New Selections & 100's of Popular Magazines at LOW PRICES & Special Package Deals.

Write for a FREE Catalog:
Please send a SASE (self addressed stamped envelope) if possible, to speed delivery.

**Tightwad Magazines**
(PLN)  PO Box 1941 Buford GA 30515

– rate disclosure prior to connection – ignored the core issue of price, particularly in settings (like prisons) where this sort of "buyer beware" solution proved impractical. Moreover, the Commission pointedly *excluded* concerns of high prisoner phone tariffs from the general findings of the billed party preference decision, bending to the predictable arguments advanced by MCI, AT&T, Sprint and a variety of other industry players that expense, security and penological concerns unique to the detention setting overbalanced the potential benefits to be derived from competition or rate caps.

In the face of this studied regulatory indifference, commissions, prices and profits from the prison phone industry continued to rise through the latter half of the 1990s. By 2000, commissions on prisoner calling had reached new levels, with California at 44%, Georgia 46%, South Carolina 48%, Illinois, Ohio and Pennsylvania 50%, Indiana 53%, Florida 57%, and New York a national high of 60%. At least ten states were taking in $10 million or greater from prisoner calling, with California, New York, and the Federal Bureau of Prisons leading the way with more than $20 million in prison phone revenues each. Such patterns were broadly if unevenly replicated at the local level, with city and county jails – home to more than 700,000 prisoners, or about 35% of individuals incarcerated nationwide – entering into similar commission-based phone contracts. Escalating commissions have been recouped in escalating charges levied against the recipients of prison collect calls. In theory, price ceilings for in-state prisoner calling are established and regulated by state-level public utility or interstate commerce commissions; in practice, such ceilings have proven largely ineffective in reining in rate abuses in the prisoner telephone industry.[6]

In addition to the central issue of price, family members and advocates have raised a variety of other concerns regarding the prison phone system.[7] One common complaint is with excessive "branding", the legally mandated voice-over informing call recipients that they are speaking to an individual in state or federal custody. The brand plays at the beginning and periodically throughout every prison-originated call, during which time voice communication is impossible, thereby reducing the usable part of an already limited fifteen minute call. Quality of service complaints are frequent, with call interruptions and premature disconnections routine. Family members have expressed frustration and suspicion at the frequency with which prison-originated connections were lost mid-conversation, causing billed parties to re-incur connection fees as high as $3 twice or more within a single fifteen minute calling window. Similar frustrations have greeted carrier rate assignment practices, with family members noting instances of calls placed at off-peak hours being billed at peak rates. Some respondents cited phone bills purporting to show prison collect calls falling outside of institutionally allowed access times. Other family members pointed to calls billed at twenty minutes or more, in systems in which prison-originated calls are automatically terminated after fifteen minutes. In 1999, suspicions of abuse were successfully tested in administrative hearings by the San Diego-based Utilities Consumer Action Network, which filed a complaint against MCI before the California Public Utilities Commission over irregularities in the company's billing practices and quality of service for calls originating from California correctional facilities. In a 2001 settlement, MCI was ordered by state regulators to refund (in the form of an MCI-funded Prison Communication and Visitation Grant Program) more than $500,000 in illegal overcharges to California prison families. This followed a pattern of regulatory actions and settlements dating from the early 1990s that saw companies ranging from People's Telephone to MCI fined as much as $100,000 and forced to pay refunds on illegal prison billings running as high as $1.7 million (Florida House of Representatives, n.d.).

As interviews with advocates and family members reveal, the social costs of this pricing regime have been enormous. By 2000, low-income families with monthly phone bills running to several hundred, and in some cases, thousands of dollars, faced a series of hard financial decisions. Several family members reported foregoing medical operations or prescription drugs in order to meet payments on their MCI, AT&T or other phone bills. For some, telephone service surpassed rent as the largest household monthly bill. Many more had had their numbers blocked, suspended or permanently disconnected over unpaid prison bills, thus losing telephone service altogether. Some had seen their credit ratings permanently ruined.

Many more, however, had simply given up, and were forced to voluntarily restrict, and in some cases cut off, contacts with incarcerated relatives. And here the individualized costs cited above meet up with a set of larger social costs which reveal the present pricing regime to be not only inequitable, but also strikingly ill-considered on purely policy grounds. As these accounts suggest, the ultimate effect of profit-sharing and what amount to price-gouging arrangements in the prison phone sector has been a long-term trend towards ex-communication, making contact between prisoners and family members on the outside more costly, and therefore more difficult to maintain. But this goes directly against the findings of several decades of recidivism and community impact studies, some of which were used to justify the introduction of prison calling in the first place.

Such studies have found that a powerful predictor for re-offense is the failure to maintain family and community contact while under incarceration. As this body of work demonstrates, a reliable way of increasing the likelihood that prisoners *will* re-offend is to break all ties with the

**HARVEY R. COX, MS**
**Corrections Consultant**
(Both Federal and State Inmates)
32 years Correctional Employment,
including Federal, State, & Private Prisons
(Warden at 3 Institutions)

Reasonable Rates for
Assistance in:

PSI Review Prior to Sentencing
(Impacts on Prison Designation and Programs)

Prison Transfers

Parole Representation
(Not Texas State Inmates)

Prison Grievances
(Administrative Remedies)

Expert Witness

PO Box 1551
Weatherford, TX 76086
(817) 596-8457
Fax: (817) 594-7172
E-mail: hrcox@yahoo.com
www.prisonconsultant.com

**Ex-Communication (cont.)**

outside world and then place them back on the street years later, with little re-entry support, in a community to which they have become a stranger. Beyond such individual-level outcomes, numerous scholars have pointed to the wider social costs associated with the disruption of family and community contact, in the form of weakened parent-child relations and more general damage to community social networks and authority structures.

These costs are once again borne immediately and disproportionately by low-income and communities of colour – but in the long run by society as a whole, through downstream costs in policing, educational decline, and future costs passed through the juvenile and adult correctional systems. To support a policy and pricing regime that encourages precisely this outcome would seem to amount to a staggeringly short-sighted piece of public policy.

**Opposition, Challenges, Alternatives**

Since the late 1990s, pricing and other abuses in the prison telephone sector have attracted a growing chorus of critics and opponents. The past four years have seen a series of court-based challenges to the commissioned monopoly system, launched by prisoners, prison families and public interest law firms. In a series of class action suits, the New York-based Center for Constitutional Rights has attacked such arrangements on constitutional grounds, arguing that the present system constitutes a case of unlawful taxation, and moreover that the high prices resulting from monopoly service provision in state, county and private prison facilities violates First and Fourteenth amendment rights to free speech, association and equal protection of both prisoners and family members (*Arsberry v. Illinois*, 244 F.3d 558 (7th Cir., 2001); *Bullard v. New York*, 307 A.D.2d 676 (New York SC, App. Div., 3rd Dep, 2003) *Wright v. Corrections Corporation of America*, C.A. No. 00-293 (GK) (D.D.C.

```
┌─────────────────────────────────────┐
│          Roget's Thesaurus          │
│  Can't think of the right word? Let │
│  Roget's help you! Over 11,000 words│
│         listed alphabetically.      │
│                $5.99                │
│   Available From PLN's Book Store!  │
│    See Page 45 for more information.│
└─────────────────────────────────────┘
```

Aug 22, 2001). These challenges have met with limited success to date. Courts at the district and circuit level have remanded some cases to relevant state regulators and the Federal Communication Commission under the filed-rate and primary-jurisdiction doctrines, declining to rule on constitutional issues until the rate questions have undergone appropriate administrative review. Other cases have been dismissed on grounds long familiar to plaintiffs of prison-related suits: the requirement for prior exhaustion of lengthy, obscure and frequently futile internal appeal procedures to the full satisfaction of the court; the court's traditional deference to the discretion of prison administrators, and the concomitant low levels of judicial scrutiny applied to security-inspired abrogations of the constitutional rights of prisoners; and the perennial imbalance in resources available to legal aid and public interest lawyers versus those of corporate and government legal departments.

Other parties to the prison telephone debate have sought technical solutions to the problem of excessive pricing. New companies such as Outside Connection, Tele-Net, Prisoner Calling Solutions, and Private Lines Inc. have sprung up to offer reduced prison telephone services through remote call forwarding (RCF) techniques, allowing prisoners access to cheaper local service rates for contact with geographically distant family members.[8] While not technically illegal, and subject to the same security checks (e.g. monitoring, recording, number verification) as calls placed through the institutionally contracted long distance carriers, such third-party services have been vigorously opposed by prison industry officials and monopoly providers. Prisoners with RCF numbers on their call list have been threatened and punished with a variety of administrative sanctions, ranging from the suspension of privileges to periods of administrative segregation (i.e. solitary confinement) lasting as long as two weeks. In at least one instance, RCF calling has been punished as a category 2 infraction, typically reserved for violent offenses such as assaulting another prisoner. For their part, monopoly providers including MCI and Sprint have placed blocks and cancelled service on prisoner family phones who receive forwarded calls.

Such practices, together with the manifest reluctance of the courts to rule on prison telephone issues, has in recent years returned much of the action to the regulatory arena, in the form of key rulings pending before the Federal Communication Commission. In December 2002, RCF provider Outside Connection filed a petition requesting that the Commission intervene to prevent MCI's practice of blocking the numbers of forwarded prisoner call recipients, arguing that RCF services represented a viable and secure means of bringing competition and price relief to the prisoner telephone industry (Pae Tec Communications and Outside Connection, Dec. 11, 2002). In an April 16th response, MCI urged the FCC to dismiss the Outside Connection petition, arguing that the company's business model interfered with the security concerns and contractual freedoms of prison officials (WorldCom, Apr. 17, 2003). Soon thereafter, the first of the court-referred constitutional challenges, *Wright v. Corrections Corporation of America*, began making its way through the regulatory process. Filed in October 2003, the 388-page *Wright* petition called upon the Commission to redress the issue of excessive charges by requiring competition in prisoner telephone service provision, along with debit calling options as an alternative to more expensive collect calls. Citing the experience of the Federal Bureau of Prisons with debit-based calling systems,[9] together with affidavits from industry security experts attesting to the technical feasibility of a secure-yet-competitive prisoner calling market, the *Wright* petition asks the Commission to reverse its traditional position of deferential non-action to protect the public interest in non-exorbitant prisoner calling rates (*Wright*, et. al., November 3, 2003.) Not surprisingly, the petition has attracted the usual barrage of criticism from established players in the prison telephone industry, ranging from the major national service providers (e.g. Sprint, MCI, AT&T), to private prison corporations and state departments of correction. In fairly representative March 2004 filings, for instance, both MCI and AT&T responded to the *Wright* petition on ostensibly jurisdictional and security grounds, arguing that the FCC should maintain its traditional pattern of deference vis-à-vis the penological discretion and contractual freedoms of state departments of correction, and pointing to a recent pattern of occasional rate reduction as evidence that rate excesses

could be curbed short of FCC intervention (AT&T, Mar 10, 2004; WorldCom, Mar 10, 2004.) As with the RCF case noted above, the outcome of the *Wright* petition remains before the commission at the time of writing.

Developments in the legal and regulatory arenas have been paralleled by a wider movement to build legislative and public support for price reform. In January 2000, Citizens United for the Rehabilitation of Errants (CURE) launched a national Campaign to Promote Equitable Telephone Charges, seeking to eliminate excessive rates and improve access through legislative, administrative, and media pressure. Promoting alternatives such as debit calling and advocating legislative reform along with the reduction or outright elimination of state and county commissions, the CURE campaign has targeted lawmakers, detention authorities and media outlets in states where correctional phone contracts are up for renewal. Community groups such as Brooklyn's 5th Avenue Project and the Los Angeles Metropolitan Churches have pursued prison telephone reform efforts at the local and state-wide levels. In August 2000, advocates and church leaders called for a one-month boycott of MCI services in retaliation for its involvement in the prison phone industry.

These activist efforts, like the legal and regulatory actions noted above, have produced mixed results to date. CURE campaign organizers point to more than 150 articles and a dozen sympathetic editorials in the mainstream press, and report overwhelmingly favorable responses to the public lobbying campaign. These generally sympathetic media treatments and targeted lobbying efforts have resulted in occasional and partial victories in the form of regulatory, legislative, and policy reform. In 2002, a bill was introduced in the Texas legislature instructing the state Department of Criminal Justice to explore the feasibility of implementing a prisoner calling system. In 2002, California once again entered into exclusive contracts with MCI and Verizon, but agreed to a reduction in state commissions that would reduce the cost of prisoner calling by as much as 25%. During summer 2003, in apparent response to pressures emanating from the legislature, state PUC, and potential competition in the remote call forwarding market, MCI and the New York Department of Corrections announced that state prison facilities would be moving to a flat-rate pricing system, with all in-state calls, local or long-distance, priced at 16 cents a minute with a $3 connection fee – an increase over local fees under the previous system, but delivering substantial long-distance savings. Legislatures in Missouri and Kentucky have instructed state purchasing and prison officials to prioritize price over commission revenue in the awarding of new correctional phone contracts. Prison telephone practices and alternatives (including price reductions and debit calling options) have been scheduled for legislative review in seven states (www.curenational.org/~etc/, retrieved March 24, 2005).

Despite these partial and important successes, advocates acknowledge that changing phone policy and pricing structures is still an uphill battle. In addition to the legal hurdles noted above, opponents of current prison phone practices face the problem of organizing a socially disparate and largely economically disadvantaged class. As several respondents contacted during research for this article note, the people most adversely affected under the current telephone regime are also, not coincidentally, those with the fewest social resources available to contest it. In other cases, the felt vulnerability of prison families and incarcerated relatives is a barrier to advocacy: family members are reluctant to engage in overt activities on the outside for fear of provoking internal retribution against prisoners. Most materially, advocates of prison phone reform are confronted with the entrenched political economic interests of powerful corporate and state institutions. Reluctant to surrender their standing in a lucrative and rapidly expanding market, prison phone service providers have launched powerful and well-funded defenses against legal and/or regulatory actions before the courts, FCC, and state-level public utility commissions. Utility commissions in most states are staffed by former employees of the industries they purport to regulate. In the past four years, increasingly severe pressures on state budgets have made any proposal that would eliminate politically 'soft' sources of revenue, justified or not, an extremely hard sell for legislators.

## Conclusion

This article has offered a preliminary foray into the oddly parallel worlds of telecommunications reform and the American prison sector, both of which have experienced radical change over the past 25 years. The prison telephone controversy represents in some ways the most mundane, but also arguably the most deeply and destructively felt, point of their intersection. At the time of writing, the political and economic complexion of the prison telephone industry remains fundamentally up for grabs. On one hand, the efforts of a growing movement of family members and advocates to raise the issue to legal, legislative and public attention have created new political pressures and new political openings to curb the worst abuses of the commissioned monopoly system. In some cases, such efforts have produced important breakthroughs and concessions, leading to the partial rollback of price spikes experienced in the 1990s. On the other, prison telephone monopolies remain firmly in place and ineffectively regulated throughout large parts of the country, where price gouging and other abusive practices continue unabated. On the legal front the phone industry is batting 100% and has yet to lose a single case involving prison or jail telephone rates.

On the face of it, the case of the prison telephone industry would seem to suggest contradictory lessons vis-à-vis

**WANTED**
**YOUR EXTRA STAMPS**
**TRADE YOUR STAMPS 4 CASH**
For a limited time,
$   **FREE**   $
Swimsuit Calendar!
**Highest price paid for your postage stamps, paid directly to you. We pride ourselves for fast service, and honesty. We've served Federal, State, and County inmates since 1985.**

Send a S.A.S.E. for an application & details to:

**Nirvana Stamp Collection
P.O. Box 331327
Atlantic Beach, FL
32233**

### Ex-Communication (cont.)

current trends in the field of telecommunications policy. At first glance, the obvious abuses of monopoly power at work in the prison telephone industry might be taken as evidentiary support for the reform arguments of competition advocates (who have nevertheless remained uncharacteristically silent on this issue). Viewed more closely, inequities in prison telephone pricing constitute a clear case of market failure, starkly exemplifying the power of unregulated markets to produce outcomes that are both non-equilibrating (in the economist's sense) and deeply objectionable, on both ethical and social policy grounds. In this regard, the prison telephone industry provide compelling evidence, *contra* the deregulatory winds that continue to blow through Washington, of the responsibility of a robust regulatory presence to mitigate and correct the sometimes manifest errors and injustices of markets – a responsibility that the Federal Communications Commission and most state-level regulators and law-makers have to date failed to exercise.

Beyond such immediate policy concerns, however, the prison telephone story points to both the logic and limits of telecommunications development under the anti-regulatory ethos of present day neo-liberalism. The prison telephone market may be something of a special case, set apart by the notably attenuated citizenship, legal, and other rights granted to prisoners and their families under prevailing legal, moral, and political orders. It nevertheless expresses a notable logic and power of segmentation that has emerged in recent decades as a primary force and engine of capitalist market development. This power, like the American prison system itself, grows in conjunction with a steadily finer capacity for discrimination: the heightened ability of powerful state and corporate institutions to sort, classify and order markets and populations in increasingly detailed, effective, and ultimately profitable ways. In this regard, the apparent specificity of the prison telephone industry might be regarded as an extreme but still recognizable moment within a broader political economic and cultural shift from the logic of publics to the logic of segments. This larger shift, built around increasingly precise procedures of distinction and exclusion, opens up new and challenging terrains for political economy and critical communication scholarship more generally. If contemporary logics of capitalist economy and liberal governmentality have indeed traded mass for segment as the principal organizing unit of production, market development, and social order – as observers of various theoretical and political stripes have in recent years argued – it is perhaps high time that critical communication scholarship begin its own long march through the niches. The prison is a good place to start. ◼

### Endnotes

1 A striking indicator of the scale of this spatial effect can be seen in the National Criminal Justice Commission's estimate that 5% of rural growth nation-wide between 1980 and 1990 can be attributed to the simple transfer of offenders from cities to their new rural prison settings (cited in Parenti, 1999, p. 213).

2 Private prisons were common in many parts of the country during the nineteenth and early twentieth centuries. Private contractors were key players in the convict lease programs of the post-Reconstruction South, whereby prisoners were "leased" to industrial and agricultural concerns, sustaining the labor (and racial) base of the Southern plantation economy well beyond its nominal demise during the Civil War. The storied abuses of this system led to its eventual demise under reformist pressures in the early twentieth century.

3 In 2000, Texas was the largest single exporter to the private prison sector, housing more than ten thousand, or 6.8%, of its prisoners, in private facilities. Smaller systems, such as New Mexico, Alaska, and Montana, contributed higher percentages, but lower raw totals, of state prisoners. In other states, including the large systems of California, New York, and Illinois, the power of (politically conservative) guard unions has prevented large-scale outsourcing to private facilities.

4 Founded in 1986, Dallas-based T-NETIX provides call processing, monitoring, prisoner management, and fraud control software to more than 1600 facilities in the U.S., maintaining significant supply and outsourcing relationships with AT&T, SBC, Qwest and Verizon. Alabama-based Global Tel*Link, owned since 1993 by energy transnational Schlumberger, provides call tracking and billing equipment to MCI's correctional services division. Other equipment competitors include EverCom, specializing in correctional call management, monitoring and billing and payment systems aimed at the institutional and consumer markets, and New Jersey-based Science Dynamics, offering call management equipment for institutional settings.

5 In some states (e.g. New York, Florida, Michigan) prisoner phone revenues are paid into the department of corrections, in some cases into prisoner benefit or welfare funds; in others (e.g. California, Connecticut, Massachusetts) phone revenues go straight into general funds.

6 While practices vary from state to state, PUC rate caps are frequently defined against the statutory rates filed by the dominant local exchange carrier (typically the regional Bell operating company). In many states, however, formal rate caps have been relaxed or gone unenforced. In any case, formal rate caps for operator-assisted collect calls – a largely obsolete calling option in the outside world – provide a poor guide for prison phone rate setting, where cheaper calling options do not exist.

7 Information for this section of the article was gathered from twelve telephone and face-to-face interviews conducted with prison advocates, prison and jail officials, and family members between June-November, 2003, along with numerous email exchanges and participation in online discussion groups dedicated to prison family issues.

8 RCF services assign prisoners a number within the local calling area which automatically forwards to a pre-assigned family number, circumventing high monopoly long-distance tariffs. Companies advertise savings as high as 60-70% over available institutional rates.

9 Federal Bureau of Prison facilities have recently moved to a debit-based calling system, in which prisoners and families are assigned pre-paid accounts, rather than billed on a call-by-call basis to call recipients. The system remains subject to monopoly provision and all the usual security features, but has resulted in most cases in substantial savings to prisoners and family members.

*Steven J. Jackson is an Assistant Professor in the School of Information at the University of Michigan. Correspondence to: School of Information, University of Michigan, 550 East University Avenue, Ann Arbor, MI USA 48109-1092. Tel: 734-647-8031; Email: jacksons@umich.edu. Research for this paper was conducted while a Ph.D. Candidate in the Department of Communication at the University of California, San Diego, and was previously presented at the 2004 Union for Democratic Communication Conference, in St. Louis, MO. The author wishes to thank Robert Horwitz, Gary Fields, and an anonymous reviewer for comments on an earlier draft of this paper.*



## NATIONAL ASSOCIATION FOR EQUAL JUSTICE
## 2008 EQUAL JUSTICE MARCH ON WASHINGTON DC

Board of Directors, Executive Officers an staff has declared the month of November as National Equal Justice Month and celebrate November 8th as National Prisoners' Rights Day. We are pleased to announce that we are planning a three-day march on Washington DC, during the 2008 Presidential Election and with over 2 million men, women and juveniles incarcerated in the U.S. prison system, we are expecting to have over five million family members, friends and associates of incarcerated individuals to join us in Washington DC during our three-day march.

We will start our journey to Washington DC on December 31, 2007, with a concert in Los Angeles with a major recording artist. Our journey will take us throughout the country, gathering signatures to support justice within our country. Our goals are to get signatures of registered voters and arriving in Washington DC in late September with over fifty-million (50,000,000) signatures of registered voters. We want to make sure that the next President of the United States and his or her executive staff take a look at the large number of U.S. citizens being housed in the U.S. prison system. The United States has waged war on its own citizens, and incarcerate more individuals than any civilized country in the world, and the private prison industries are making major donations to politicians to keep this unjust industry operating.

With over fifty-million (50,0000) supporters and voters, we will demand that the Department of Justice and local government look at better ways to spend the American citizens' tax dollar. During our march we will honor this country's fallen heroes, children of incarcerated parents and those that have been wrongly convicted. We will also hold several conferences and town hall meetings, and meet with all potential presidential candidates to address the issues of police brutality, racial profiling, private prison industry, prison overcrowding, sentence reform, three-strike laws, mandatory minimum sentencing, federal and state parole, U.S. schools, education, taxes and the war in Iraq.

The title of the march is National Association for Equal Justice 3008 Equal Justice March on Washington D.C. This march will be a historic event, and to make it a success, we will need to raise a large amount of finances, and will need the support of all inmates, their families, friends and associates, along with organizations, groups and citizens that demand changes within our schools, the criminal justice system and government.

If you would like to support the 2008 Equal Justice March, please send your donation to: **National Association for Equal Justice, 2008 Equal Justice March on Washington DC, 4370 La Jolla Village Drive, 4th Floor, La Jolla, CA 92122.** For any donation of $50.00 or more, our sponsor, ARCH Travel and Leisure will give you a three-day, two-night free hotel accomodation at one of America's top resort cities, such as Las Vegas, Reno, Atlantic City, Orlando Florida, etc. The free hotel package is valued at over $400.00. we will also launch our million dollar ($1,000,000) 2008 Equal Justice March Fundraiser Raffle in March 2007, with over twenty vehicles, cash and other prizes.

Join us today, by supporting the 2008 Equal Justice March on Washington DC, because we believe that two million Americans incarcerated are two million too many, and justice is not served until all people regardless of race creed, color or social economic status recieve equal justic.

Thank you for your support,

*M. Michael Adams Sr.*
*Chairman/Chief Executive Officer*