# From the Editor

## *by Paul Wright*

Welcome to the first issue of *PLN* for 2007. With this issue, *PLN* now enters it's 17th year of publishing. We have several important goals for the coming year so we can better serve our readers. Among them are expanding the size of the magazine to bring readers still more news and information. In the past we have expanded based on increasing the amount of advertising in *PLN* and we hope to do this in the future, maintaining our commitment to having no more than 25% of our content being advertising.

If you know of any businesses who might be interested in advertising in *PLN* or which cater to prisoners please send their contact information to *PLN* so we can follow up on it. By the same token, if you patronize any of *PLN's* advertisers, please tell them that you saw their ad in *PLN* as it encourages them to continue advertising with us.

Our other goals are updating our mailing list program and further improving our website and increasing our outreach activities to build our readership. *PLN* currently has over 5,000 subscribers and we hope to significantly increase it in the coming year.

By now all readers should have received our annual fundraiser mailing. I hope you will have taken the time to respond to it and send a donation. Our goal is to raise $40,000 to upgrade PLN's technical needs. We have two matching grant donors who will match, dollar for dollar, all donations up to $25,000 from non-prisoners and who will give $2 for every dollar donated by or on behalf of a prisoner! But we must receive these donations by January 31st to meet the matching grant. So far, as this issue goes to press, we have only raised $14,305 of what we need. If you can make a donation please do so now!

One of our other goals for the year is to expand the selection of books that PLN distributes. We get a lot of letters from prisoners asking for more books beyond the ones we already distribute. Some of the problems in expanding our list are logistical (we only have so much room to store books in our office, as we prefer to have on hand copies of all the books we sell), the other is getting a better idea of what readers are interested in. We may wind up with a simple numbers system to determine the latter and drop any title that doesn't sell more than

say a dozen copies in a year.

One of the titles we will definitely be distributing by the end of the year is *Prison Profiteers: The Political Economy of Mass Imprisonment* which will be published by the New Press and which is being edited by PLN board member Tara Herivel and myself. Among the articles in this book, which is a comprehensive overview of the players who profit financially from having 2.3 million Americans imprisoned, is this issue's cover story on the prison phone industry by Steve Jackson. We have a great line up of many of the best criminal justice writers in the United States. Some of the articles in the book have previously appeared here in the pages of *PLN*, others are exclusive for the book. We will announce when it

is published and ready for shipping.

Please continue sending us your story ideas, news tips, verdict and settlement wins and other items of interest to *PLN* readers. I apologize for the fact that we cannot respond individually to every piece of mail that we receive. But we do read it and reply as needed. Please do not send us your legal pleadings or documents, if we need more details we will ask, and note that we lack the resources to provide legal advice or assistance. Publishing *PLN* and bringing readers information to help themselves and to build a prisoner rights movement is all we have the resources to do at this time.

If you believe in an independent penal press I hope you will take the time to send a donation to our matching grant campaign. ◼

# Maryland Sentence Reduction Rule Violates Ex Post Facto Clause

The Maryland Court of Appeals has struck down an administrative regulation amending another regulation to deny previously authorized sentence reduction credits for certain categories of prisoners.

In January of 2002, Quinton Demby, Jesse Baltimore, Kenneth Woodall, Daniel Falcone, and Earl Cox were all serving time in Maryland state prisons. Each was participating in a "double celling" program (cells with 2 occupants rather than one). Under the former Code of Maryland Regulations (COMAR) 12.02.06.05N(2), which was in effect when they committed their crimes, they were receiving special sentence reduction credits for participating in the double celling program.

On January 1, 2002, the Secretary of the Maryland Public Safety and Correctional Services (Secretary) enacted COMAR 12.02. 06.04F(1), which prohibited sentence reduction credits for participating in the double celling program to prisoners convicted of certain violent crimes. Since the above prisoners each had prior convictions for one or more of the newly enumerated disqualifying crimes, each was informed that he was no longer eligible for those sentence reduction credits. Maryland trial courts upheld that retrospective application of the amended policy to them, and they all appealed.

The Maryland Court of Special Appeals reversed the trial courts. It held that the regulatory amendments retrospectively lengthened the prisoners' sentences in violation of both the state and federal ex post facto clauses and reversed the trial courts. The state appealed.

On this appeal, the Court of Appeals of Maryland (the state's highest court) found that since the COMAR sections at issue were enacted by direction of the legislature through Md. Code, Corr. Serv. sec. 3-707, they were laws for purposes of ex post facto analysis. Further, since the amended section deprived them of the double celling sentence reduction credits available to them when they were sentenced, it lengthened their sentences in violation of both the Maryland state and the federal ex post facto clauses. It therefore affirmed the Court of Special Appeals' reversal of the trial courts. See: *Secretary, Dept. of Public Safety & Correctional. Services v. Demby*, 390 Md. 580; 890 A.2d 310 (2006). ◼

### Actual Innocence

Explains how the innocent are convicted by faulty eyewitness testimony, police perjury, expert witnesses, prosecutorial misconduct, etc., and how DNA testing is used to free the innocent.

**$9.99 from PLN's Book Store!**
See Page 45 for more information

# Your Right to
# *Pregnancy-Related Health Care*
## in Prison or Jail

**FACT:** *If you are pregnant, being in prison or jail does not mean you lose your right to decide whether to continue your pregnancy or have an abortion.*

### Your constitutional rights are being violated if you are told that:

1. You must have an abortion you do not want.
2. You are not allowed to have an abortion that you do want.
3. You must get a court order before getting an abortion.
4. You must pay for prenatal care or an abortion with your own money, regardless of your financial situation.
5. You must pay for the costs of the jail transporting you to a clinic or hospital to get prenatal care or to have an abortion.

### If any of these things listed above happens to you, you should:

1. Ask yourself if it is just one particular nurse or guard who's giving you a hard time. If it is, then ask other medical staff or officials to help you.
2. Document everything that happens. Put your request for an abortion or other medical care in writing and keep a copy. Also, keep a list of the people you've spoken to or contacted. Be sure to write down what they've told you and the dates and times you've spoken to them.
3. In addition to your request for medical care, you should also file a grievance (an official complaint). If your grievance is denied or rejected, you must file an appeal. **It is very important that you file all appeals that are allowed in your jail or prison's grievance system. It is also very important that you follow all the rules and deadlines of the grievance system.** These rules and deadlines are usually written in the inmate handbook. If officials will not give you the grievance forms you need, will not let you file or appeal a grievance, or are interfering with your use of the grievance system in any way, you should immediately contact your lawyer or the ACLU Reproductive Freedom Project.

If you are still told that you must have an abortion even though you don't want to, or you are unable to get an abortion or prenatal care you want, you should contact your lawyer or the ACLU Reproductive Freedom Project (212-549-2633). Collect calls will be accepted Monday through Friday, between the hours of 9:30 a.m. and 5:00 p.m. eastern time.

Whether you decide to continue the pregnancy or have an abortion, it is important to act quickly. Early prenatal care is very important for you to have a healthy pregnancy and a healthy baby. If you decide to have an abortion, it is also important to act quickly. While abortions are extremely safe, the costs and risks increase with time. The longer you wait, the harder it may be to find a doctor in your area able to provide the service.



Contact: American Civil Liberties Union
Reproductive Freedom Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2633 • e-mail: rfp@aclu.org

# Violence from Racial Tension and Overcrowding Pervades California Jails, Spreads to Prisons

*by Marvin Mentor*

Los Angeles (L.A.) County jail prisoners have been locked in interracial gang-controlled violence for the past year, and the unrest has spread to other jails and into California state prisons as prisoners pursue their simmering racially-charged disputes. Future stability seems doubtful. If California's prison system "desegregates," as projected pursuant to *Johnson v. California*, 125 S.Ct. 1141 (2005) [*PLN*, April 2006, p.20], the disturbing events described below portend a perpetuation of heated violence extending into an endless "long, hot summer."

## November 2005 - L.A. Jail Murder

On November 16, 2005, 35-year-old mentally ill prisoner Chadwick Cochran was brutally beaten for 30 minutes, assaulted with metal trays and finally stomped to death at the L.A. Central Jail in an unsupervised room with 30 other prisoners. Cochran had unwittingly made the mistake of "ethnically out of order" cutting the line for dinner. Sheriff's deputies later acknowledged that it was improper to have placed Cochran in with the hardened prisoners. "He was a fish out of water ... in the shark tank," Sheriff Lee Baca admitted, noting that the prisoners who killed Cochran were young gang-bangers awaiting trial on various assault and murder charges. Cochran was the eighth prisoner murdered at the L.A. County Jail in two years.

Baca could not explain how Cochran, a nonviolent offender who suffered from paranoia and delusions, had been transferred from the Twin Towers mental health facility to the Central Jail's general population. The sheriff opined that Cochran was not murdered because he was mentally ill or had disrespectfully cut the dinner line, or due to racial reasons, but rather was an opportunistic victim of sadistic murderers who took advantage of being in an unsupervised room with a weak victim. The two suspects in the killing, Christian Perez, 18, and Heriberto Rodriguez, 24, may face the death penalty.

Meanwhile, L.A. County faces civil lawsuits. Sheriff Baca's repeated failure to stem the string of murders and beatings in his jails has already resulted in settlements of $1.7 million with the families of two of the eight murder victims mentioned above (including $900,000 to the family of informant Raul Tinajero; see: *PLN*, Mar. 2006, p.10). The other six wrongful death suits are pending. Baca complains that he doesn't have the staff to watch everyone all the time, but County Supervisor Zev Yaroslavsky retorted, "It's not good enough ... to say 'stuff happens' and ... 'people are going to get murdered in our jails.' We're talking about human beings, whether they are criminals or suspects being held." Fourteen prisoners have been murdered in L.A. County lockups since 2000.

## January 2006 - Prison Murders and Unrest

Jesse Sosa, 26, was found murdered in his cell at Pelican Bay State Prison (PBSP) on New Year's Day, 2006. His cellmate, Michael Olivo, 25, was the prime suspect in the strangulation death. Sosa's death was the second in-cell murder at PBSP in four months, following the September 6, 2005 killing of 36-year-old Lloyd Avery. Both Sosa and Olivo were associated with L.A. street gangs.

Dying at PBSP is apparently a significant hazard. Since the facility opened in 1989, 18 prisoners have been murdered, five shot by staff, two killed accidentally, 21 died as a result of suicide, and 22 succumbed to "natural causes" (including inadequate healthcare, which is another major problem in California prisons).

Two days after Sosa's untimely death, 37-year-old rapist Allen Benti was allegedly murdered in his Salinas Valley State Prison cell by Richard Mingus, a murderer serving life without parole. And on January 9, 2006, life-prisoner Heng Bong Kang was killed at the Correctional Training Facility (CTF) at Soledad, but California Department of Corrections and Rehabilitation (CDCR) officials did not release details.

January 13, a Friday, lived up to its bad-luck reputation at San Quentin State Prison, when 23 prisoners and two guards were injured during a 7 p.m. riot in the Badger Section dining hall, occupied at the time by 260 Reception Center prisoners. The guards suffered punches and a sprained knee. One prisoner was taken to an outside hospital with a broken jaw; six others were slashed. A search of the area turned up nine plastic weapons with sharp points or imbedded razor blades, according to CDCR spokesman Sgt. Eric Messick. An investigation determined that Hispanic perpetrators had attacked black, white and other Hispanic prisoners over an unspecified "act of disrespect."

On January 25, 2006, San Quentin Death Row prisoner Richard Penunuri, 27, slashed the arm of a guard who was uncuffing him. The deep gash, "nearly down to the bone," took 30 stitches to close. The planned attack was reportedly in retaliation for earlier actions taken by guards against members of the Cole Street Gang. CDCR was concerned how Penunuri could have obtained such a weapon while housed in the maximum-security Adjustment Center (AC) part of Death Row. The answer became more apparent after the AC was searched and other weapons were discovered, as well as a stash of dope in a bag of potato chips in one of the guard's lockers. The guard was escorted out of the facility.

The California State Prison (Los Angeles) at Lancaster had its second in-cell murder of 2006 on January 24. Richard Ponton, a 36-year-old white prisoner serving life without parole in the protective custody tier of unit C-4, was found stuffed under his bunk, his throat slashed. This was the same area where on January 2, arsonist Robert Painter, 59, was found beaten to death and wrapped in a sheet by his cellmate, Michael Andrews. A support group headed by Cayenne Bird, mother of a previously-murdered prisoner, blamed the killings on overcrowding. "They're carelessly double-celling the mentally ill with regular inmates," she said. But Lancaster officials have no plans to change their screening process for double-celling, stated prison spokesman Ken Lewis.

## February 2006 – Escalating Violence

After only a three-week lull, ethnic rioting broke out again at San Quentin on February 2, when 83 black and Hispanic prisoners attacked each other in the Reception Center dining hall. Twenty-seven were injured; six black prisoners had puncture or slash wounds. Prison officials confiscated 36 homemade weapons, including a 6" ice-pick, indicating the violence was planned.

Spokesman Messick recounted an earlier brawl on August 8, 2005 where 39 of 70 rioting white and Hispanic prisoners were injured. "I think that whatever the original issue was, it's long gone, and one problem begets another," he opined.

On February 4, 2006, a black-Hispanic melee in the maximum security Castaic North County (L.A.) jail resulted in one death and more than 100 prisoners injured (with 20 hospitalized, nine in critical condition). The four-hour-long fight involved 2,000 prisoners in two dorms – approximately 200 of whom were "seriously involved." Wayne Tiznor, a black 45-year-old prisoner jailed for failing to register as a sex offender, died from blunt head injuries. Two days earlier a Hispanic had been stabbed by a black prisoner at the Main Jail in a continuing South Central L.A. gang feud; Sheriff Baca suspected the new melee was in retaliation for that attack. Castaic's population is about 60% Hispanic and 30% black.

Two hundred sheriff's deputies plus highway patrol officers responded to the race riot with tear gas, pepper ball guns and flash-bang grenades. Later, a note sent by an anonymous prisoner requested that the men be segregated by race, which Sheriff Baca obliged. "Me and the ACLU can sit down and have a long talk," he said, adding, "Human life is more important than appearance."

Later, Ramona Ripston of the ACLU agreed that in the short term, "under these conditions people need to be kept separate." Deterrent techniques used for one day at Castaic included suspension of all privileges, and stripping 100 prisoners naked with only a blanket to cover them-

selves and no mattress to lie on.

Rather than quelling the simmering feud, the next day violence re-erupted at Pitchess Detention Center North, involving 35 blacks and 170 Hispanics who fought along racial lines. With only 77 deputies to guard 4,000 prisoners at North County, Sheriff Baca claimed $150 million in budget cuts for the 18,000-prisoner county jail system was the root cause of the unrest due to the resultant overcrowding. It took 18 hours to segregate the combatants by tier. Warring prisoners then took the day off and watched the Super Bowl. But the following day a third brawl broke out involving 90 prisoners that resulted in one injury.

Marc Klugman, the Sheriff's Dept.'s Correctional Services Chief, announced that they were working on a computerized plan to identify and isolate the most dangerous jail prisoners in the newer Twin Towers jail. However, he admitted that the plan would not avert all violence, because the jail's atmosphere is "a carry-over from an all-out war that's going on in the streets." Indeed, deputies are aware that some of the inside riots have been directed by gang members on the outside. It is estimated that around 25% of L.A jail prisoners are gang-affiliated. Sociologists tie the strife ultimately to a demographic shift whereby the increasing Hispanic population in Los Angeles is displacing a declining resident black community, with the two groups struggling over turf. "They have been clashing in schools, on the streets, in the workplace and in hospitals," said radio talk-show host Earl Hutchinson.

On February 8, 2006, two more

fights broke out at Castaic, involving 300 prisoners and injuring 22. And again, on February 9, more prisoners rioted after 70 members of the clergy and news media came in to talk to them and hopefully ameliorate the tension. But the riot orders had come from Mexican Mafia gang leaders, sheriff's deputies claimed, who were not interested in "talking." Najee Ali, of Project Islamic Hope, said that black prisoners were asking for help and wanted to be segregated and protected.

County officials weren't too hopeful about the future. L.A. County Supervisor Gloria Molina stated, "[The violence] is gang on gang. Black gangs and Latino gangs. It will absolutely spill out. I hope that's not the case. It will be very dangerous for L.A." Sheriff Baca added, "Their goal is intimidation. Their goal is to carry into our jails a message that the Latinos are in greater numbers than the African-Americans and you can't stop us from attacking you. ... This comes from two South Central gangs that are at war out in the streets and also the Mexican Mafia taking advantage of Latinos who are going to state prison." L.A. County Supervisor Yvonne Burke opined, "If this violence escalates to a greater level, it will be just horrible. It has the potential to bring the whole community down." County health officials told the grand jury that they fear violence will spread to hospital wards where prisoners are mixed without regard to security level.

### The Violence Spreads

On February 8, hundreds of black, white and Hispanic prisoners rioted at the

## New England Innocence Project

The New England Innocence Project ("NEIP") provides pro bono legal assistance to inmates in New England who are challenging their wrongful convictions. Our mission is to identify, investigate, and exonerate wrongfully convicted individuals through the use of DNA evidence. The NEIP considers cases from Massachusetts, New Hampshire, Maine, Vermont, Connecticut and Rhode Island in which actual innocence is claimed.

If you believe that biological evidence from your case exists and you would like NEIP to consider representing you, please **write** to us at the address below. Unfortunately, we are unable to respond to requests for representation that are received by phone or email.

Please contact us:    Intake Coordinator, New England Innocence Project, Goodwin | Procter LLP, Exchange Place, 53 State Street, Boston, MA 02109
Phone 617.305.6505

## Racial Tension, Overcrowding (cont.)

Correctional Training Facility (Soledad) state prison. Four prisoners were hurt in the North Facility B-Yard brawl.

Two days later in neighboring San Bernardino County, 14 jail prisoners were injured in a fight that broke out on a bus taking them to court. The fight began when numerous prisoners pulled out razor blades and began slashing. Another prisoner was cut in a courthouse holding cell. Although the fights were between blacks and Hispanics, Sheriff's Lt. Mike Stansell stated he had no intention of isolating the prisoners based on ethnicity. Stansell indicated he believed the violence was a carryover from the L.A. County jail violence. On February 14, similar fights broke out on two more of the court-bound prisoner buses.

Despite a continuing lockdown of all L.A. County jail prisoners, 86 black and Hispanic prisoners rioted again on February 10 at the Castaic facility, the third fight in three days. Eight went to the hospital. A majority of L.A. County jail beds are in 100-man dorms, so "lockdown" status does little to stem the violence.

Two days later, L.A. County jails recorded their second murder in two weeks. Sean Andrew Thompson, 38, a 6'4" 300 lb. black prisoner held on drug possession charges who was known to suffer from high blood pressure, collapsed and died after a fight defending another black detainee against four highly violent Hispanics at the Men's Central Jail. The fight was allegedly ordered by Mexican Mafia prison gang leaders. That same day, 90 more prisoners fought at the Castaic facility.

Gang violence is not isolated to southern California. Terry Jungel, past president of the National Sheriffs Association, said, "The explosions of violence we are seeing in Los Angeles are systemic statewide." Even the Merced County Jail, in Northern California, was placed on lockdown in May 2006 after repeated fights between rival gang members. Ultimately, Jungel stated, the problems can be traced to overcrowding in the jails and prisons, a widely-accepted belief.

Visiting outsiders from the African-American community, however, found that there was gross disparities in how the racial groups were treated. They found that Hispanics received cleaning supplies to keep their living areas clean, while blacks lived surrounded by spoiled food and garbage. Hispanics complained that their bags of carrots were outdated by three years. These issues served only to fuel the tinder-box of animosity between the racially-divided groups. Sheriff Baca noted that there are 500 gang-related murders committed every year on the streets of Los Angeles, many of which are "solved" by warring prisoners in the jails. The recent Castaic jail murders have resulted in 21 prisoners being charged with various crimes.

But the problem is also related to classification; i.e., mixing prisoners who have disparate levels of dangerousness. In overcrowded conditions, weaker non-gang affiliated detainees are placed in vulnerable situations when they are indiscriminately housed with known violent predators. L.A. County Correctional Services Chief Klugman acknowledged that they were working on preventing such mixing as a top priority. A proposed radio-tag prisoner tracking system for the jail is estimated to cost $20 million, Klugman told County supervisors.

On February 13, 2006, the behind-bars battleground moved to California's central valley, when 28 black and Hispanic prisoners were injured in a major riot at the 6,000-bed Sierra Conservation Center (SCC) state prison. The fight stemmed from a "disrespect issue" in the 1,100-man medium security Tuolomne Unit yard. Prisoner Primitivo Hernandez was stabbed and then set on fire after he fell on a smoke canister, used by guards to disburse the combatants.

Nonetheless, the segregation of prisoners by race at the Castaic jail was lifted two weeks after it had been imposed. "We will do this as tensions allow," said sheriff's spokesman Steve Whitmore. Some communities in the L.A. basin that had been hard hit with racial violence saw crime actually decrease after sweeps to arrest known troublemakers. "The problem in the jails may be partly due to knuckleheads who usually strike out on the streets and are now mostly in the jails," suggested Deputy Chief Earl Paysinger of the L.A. police's South Bureau.

Rather, it might be the opposite that occurs. Two unnamed Guatemalan immigrants suggested that fighting in the jails might spill out into local neighborhoods. "Latinos are becoming the biggest group, and I think many blacks resent that," said one. He noted that blacks were outnumbered by Hispanics in the jails, but not on the streets – a factor that could lead to freeworld reprisals.

Still, whereas in 1980 Hispanics composed 19% and blacks composed 7.7% of California's population, today the numbers are 33% and 6.7%, respectively, with greater disproportion in southern California due to its proximity to the Mexican border. Sheriff's Deputy Tim Brennan, with 20 years experience working the gang-infested Compton district, was surprised to recently find two members of warring black gangs – the Bloods and the Crips – riding in the same car while wearing their red and blue gang colors. "What are you doing," he asked, "Going to get the Mexicans?" At the Los Angeles Center for Enriched Studies, a top-rated school in L.A. County, black students skip school on Cinco de Mayo, under threats from Hispanic gangs that they will be shot if they attend classes that day.

As expected, the Castaic jail suffered six more injured prisoners when fighting between blacks and Hispanics broke out once again on February 17, 2006.

### Solutions Prove Elusive

While "overcrowding" is the oft-cited and generally-accepted mantra for jail violence, real solutions are hard to find. Sheriff Baca wants to hire 1,100 more deputies and has $70 million to meet that goal. But his jails are packed and no new ones are planned. L.A. County enjoys compensation from the CDCR for housing 1,200 state prisoners awaiting prison beds, and could relieve its jail overcrowding by moving those prisoners out. However, the $27 million-per-year state revenue stream is hard to give up. On the other hand, the cost of lawsuits resulting from deaths and injuries provides a financial incentive to build more jails. The most obvious solution: sentencing reform and bail reform, are politically unacceptable. One of the solutions currently being contemplated involves computerized classification of violent prisoners to properly isolate them from more vulnerable ones. But this begs the question of the underlying racial conflict that is growing demographically in the streets and festering in the lockups. And if Sheriff Baca is correct, the problem is really one of drugs and turf – for which policing and enforcement seems to be a losing battle across the nation.

Another potential contributing factor to the number of jail deaths, riots and injuries is the dearth of discipline meted out to guards whose negligence or incompetence caused such incidents. L.A.

County jail deputies cited for misconduct often receive little more than written reprimands or brief suspensions. When they appeal such punishment it is often reduced. For example, the guards who left Chadwick Cochran with dozens of violent prisoners in an unsupervised room, where he was beaten to death, were not subjected to any form of discipline.

Michael Gennaco, chief attorney for the Sheriff's Office of Independent Review (OIR), admitted that employee disciplinary actions were "sometimes watered down without justification," and Correctional Services Chief Klugman stated that sanctions are often reduced after jail employees "promise to learn from their mistakes." Unfortunately, prisoners like Cochran don't have the same luxury.

Further, on December 6, 2006, the Office of Independent Review issued a report stating that it took the L.A. County Sheriff's Department longer than a year on average, and sometimes several years, to review the deaths of jail prisoners as required by state law. According to OIR chief attorney Gennaco, some reviews have taken as long as 600 days to complete – long enough to let the statute of limitations lapse, which precludes disciplining or filing charges against jail staff who may have been at fault.

In the state prison system, CDCR has utilized "peacekeepers" in an attempt to reduce racial violence. The questionable practice involves the use of "shot-callers," prisoners who are given greater freedom to move among the population to negotiate solutions to problems non-violently on behalf of prison administrators. However, it was precisely this practice that led to the January 10, 2005 murder of a guard at Chino State Prison by a prisoner with "peacekeeper" status. Guard Manuel Gonzalez was stabbed to death by Jon

Christopher Blaylock, a Crips member who had been let out of his cell to assist with the peaceful re-integration of fellow prisoners following a race riot. [See: *PLN*, Nov. 2006, p.18].

### The Race War - A Myth?

Maria Luisa Tucker, a staff writer for Alternet, interviewed J.R., a savvy but saddened former gang member who has spent 12 of his 28 years behind bars. J.R. was in the L.A. County jail, but not as a prisoner. He was a motivational speaker for Homies Industries, a cornerstone of L.A.'s community gang intervention programs. His rehabilitation came not from "the system" but from a combination of parenthood, religion and the ultimate realization that gang life led inextricably to prison or death. Kids are more likely to listen to tattooed ex-cons than cops or teachers, and J.R. is hell-bent on getting out his message. Other organizations like Unity One, Unity T.H.R.E.E., Homies Unidos, Amer-I-Can and NO GUNS provide valuable intervention services such as negotiating gang ceasefires, tattoo removal, job training and life skills classes. The empirical experience of these mentors, gleaned from the trenches, gives them both cachet in the eyes of their students as well as credibility.

Father Greg Boyle, who founded Homies Industries, said he believes prison fights are not really about race but are about simple things of the moment like who decides which TV show to watch in

a dorm. Any minor affront behind bars is fraught with the possibility of violence. "It's a little bit like rape. Rape has nothing to do with sex. It has to do with power," Father Boyle observed. "What fuels the fights is the tension in the jails."

Bo Taylor, founder of Unity One, believes that society, not the sheriff, should be blamed. "We allowed this to happen," he said. Taylor makes the connection between violence and the low academic level of prisoners – most have only a 6th or 7th grade education. "They have no tools to figure things out. People can't use the same phones, or use the same toilets. Someone has implemented a system based on racism." A recent parolee added his comments on the state prison system's policy of racially-segregating prisoners for 60 days during reception: "It's hard to say if it would be better without segregation. It's been etched into prison life." Taylor believes it is appropriate now but contends that it has been used unfairly as a scapegoat. The real problem, and hence the solution, lies within each individual, he believes.

A large part of what gang intervention workers do is control false rumors to calm tensions and prevent retaliation. Quelling plans for vengeance is central to Taylor's jail violence prevention program. Still, reality eventually sets in, J.R. stated disgustedly. "California's answer to gangs is 25-to-life for teenagers. You can rape a woman or molest a kid and be out in a few years. That's messed up." As for jail riots, he lamented, "I don't see no color lines. I



**Inmate Classified**

www.inmate.com
Pen Pal Ads Service Since 1996.
**Still The Best!**
Send for a brochure today!
Box 3311, Granada Hills, CA 91394

---



\*\*\*CERTIFIED CRIMINAL LAW SPECIALIST\*\*\*
Successfully Defending Clients Throughout the State Since 1984

**STEVE M. DEFILIPPIS, Esq.**
**625 N. First Street**
**San Jose, CA 95112**
**408-292-0441**

Specializing In Serious Felonies, Murders & Life Crimes

\*Criminal Trials        \*Lifer Parole Consideration Hearings
\*Personal Injury        \* Habeas Corpus (Parole Challenges)

\*State & Federal Trials & Writs

## Racial Tension, Overcrowding (cont.)

see struggle and pain."

Prison and jail officials in California, and other states, have long used racial divisions as a means of ensuring a compliant and malleable prisoner population. Attempts at prisoner unity run asunder the rocks of state sanctioned racism.

## March 2006 - More Violence in Prisons and Jails

San Quentin State Prison (SQ) is California's showcase for prison rehabilitation programs. Located in the progressive San Francisco Bay Area, SQ has some 3,000 qualified "brown card" volunteers approved to work with prisoners, as opposed to perhaps 150 at the average California prison. There are religious-based programs, college classes, art groups, intramural baseball and basketball games, and a wide range of youth-intervention programs bringing throngs of troubled youth inside the walls to both see what prison is like and to work with seasoned prisoner mentors to help convince them to stay out.

Nonetheless, San Quentin is not immune from racial unrest. During an annual cultural event, Black History Month, when community members bring in musicians, dancers and art exhibits for the general population on the lower yard, some Northern Hispanic prisoners seized the moment to launch an attack on black prisoners crowded around the performers' grandstand. Four weapons were recovered and the prison was placed on lockdown. A small number of the Northern Hispanics remained on lockdown four months later. The brawl followed earlier black-Hispanic fights in dining halls the previous month, when 16 prisoners were injured among the 80 involved.

At about the same time, 94 prisoners at Castaic fought each other again, with 14 injuries. This followed a 40-man fight in two dorms between blacks and Hispanics in the new-detainee area the night before.

Even juvenile facilities are experiencing gang violence, with L.A. County reporting a 25% increase in such incidents over the past three years. In the last decade, violence has spawned four audits, three lawsuits and a federal investigation of the juvenile halls and camps that house over 4,000 youths in L.A. County. Increasingly, violent youths have caused a

sharp increase in the numbers of juveniles remanded to the state prison system. Skirmishes in camp bathrooms or kitchens have grown to riot scale in some cases.

In October 2005, black and Hispanic juveniles rampaged for an hour at Camp Glenn Rockey in the hills above San Dimas, ransacking dormitories and even the staff quarters. The probation officers' union filed two lawsuits alleging understaffing of youth facilities. A corollary concern is that the staff shortage results in mentally ill and suicidal youths being simply locked in restraints for days at a time, according to one documented six-week period. The Board of Supervisors agreed in May 2006 to provide funding for 240 new guards and mental health staff at L.A. County's Juvenile Hall.

## A Lack of Problem-Solving Leadership

From the state prison system to county jail management to community intervention programs, there is a lack of leadership in terms of meaningfully changing the status quo. Not that there hasn't been change, especially among high-level officials. In February 2006, state Secretary of Corrections Roderick Hickman resigned after admitting that he couldn't rein in the California Correctional Peace Officers Association (CCPOA), the powerful guards union. He also demonstrated that CDCR was unable to operate its healthcare system so as to meet Eighth Amendment standards, resulting in takeover of CDCR's medical care by the federal courts. [See: *PLN*, March 2006, p.1].

Two months later, on April 21, 2006, former CDCR Undersecretary Jeanne Woodford, who had been temporarily elevated to fill the Secretary position, similarly resigned to resume her previous duties pending her retirement in July. Many other high-level CDCR career executives have also announced their retirements, leaving the upper ranks of the state prison system in disarray. Governor Schwarzenegger filled the vacant Secretary position with James E. Tilton, a 13-year CDCR veteran employee who more recently had worked in the state's Department of Finance.

Meanwhile, the Legislature, knowing that voters would continue to reject prison bond construction measures, nonetheless proceeded hastily to enact "lease revenue" bonds to force two new prisons down the public's throat. The prison-building

plan was part of Gov. Schwarzenegger's hug-the-CCPOA policy, intended to curry favor with the union for the upcoming November gubernatorial campaign. Indeed, the CCPOA raised its dues $30 per month for three months to add to the lard they spread on favored political candidates. The CCPOA was also negotiating its new contract with the state; as of mid-November 2006, however, the union was still without a labor agreement.

The state hired consultant Dennis Batcheldor, to the unseemly tune of $100,000/year, as its contract negotiator. In 2005 the CCPOA successfully killed nascent CDCR rehabilitation programs for drug offenders, which had been enacted to reduce the prison population. The CCPOA also keeps the prison population up by funding victims rights groups to lobby indiscriminately against the parole of every eligible life-sentenced prisoner. As a carrot, the CCPOA has suggested relieving CDCR's chronic overcrowding by releasing non-violent prisoners 30 days early. But the union's parole agents would then just violate them and have them re-incarcerated (bed-vacancy-driven "recidivism").

In November 2006, likely to bring pressure on the state in connection with the union's contract negotiations, the CCPOA aired attack ads against Gov. Schwarzenegger, blaming him for increased prison violence and an ineffectual legislative session on prison reform.

As for jails, in March 2006 the L.A. County Supervisors decided to proceed with a $300 million initiative to improve the county's jails – $200 million of which would be used to reopen the shuttered Sybil Brand facility in Monterey Park to house female prisoners. Additionally, this would free up high-security beds at the Twin Towers jail, which would provide needed protection for vulnerable detainees. Rebuilding the aging Central Jail, however, is projected to be a $1 billion project, which is unlikely to gain support. The Central Jail has been described as a "dark, depressing box that is home to hundreds of violent inmates. The cells are sealed with old-fashioned, hand-crank operated steel gates [reminiscent of] Alcatraz. The escalators don't work. It's impossible for guards to see into all of the cells. Pepper spray drifts through the ventilation system and causes sore eyes and burning lungs throughout the building." And this doesn't even begin to describe the mental torment of being caged in such a soul-wrenching lockup.

L.A. County jails have released many prisoners after they serve as little as 10% of their sentences. An exception exists for prostitutes (mostly black) and certain gang members, who are forced to do 100% of their time, according to a recent complaint filed by the ACLU. In November 2006, Sheriff Baca and District Attorney Steve Cooley announced a new early release policy that requires all jail prisoners to serve a minimum 25% of their sentences; the policy is expected to be in effect by the end of the year. Another scourge related to overcrowding is tuberculosis. In early 2006, the sheriff in San Diego admitted that up to 1,500 prisoners recently released to the community had been exposed to an active case of TB at the jail.

On May 10, 2006, U.S. District Court Judge Dean D. Pregerson visited the Central Jail for three hours at the urging of the ACLU, which was seeking court-ordered limitations on overcrowding. He was appalled at the conditions he saw, which were "not consistent with basic human values." Upon observing six men in a three-man cell, he opined, "There is not enough room for all six inmates to stand up or take a place or two. That is not a situation that I think should be permitted to exist in the future."

On June 19, 2006, Judge Pregerson ordered the creation of a panel to oversee reforms at the jail; on October 27 he issued a temporary restraining order (TRO) that barring the L.A. County Sheriff's office from placing more than 20 prisoners in holding cells at the Inmate Reception Center. The TRO also prohibited keeping prisoners in such temporary cells for more than 24 hours before moving them to permanent housing.

"Inmates, particularly pretrial detainees who are imbued with presumption of innocence, deserve better than to be housed in a system which has defaulted to the lowest permissible standard of care," Pregerson noted. The judge "sent a message to the county and to the sheriff that they can't play a shell game with these detainees, that they can't improve conditions in one facility and create shocking, unthinkable conditions in another," stated ACLU senior counsel Melinda Bird. The TRO was renewed by Judge Pregerson on Dec. 10, 2006 after a heated debate between jail officials and ACLU staff attorneys. L.A. County Correctional Services Chief Klugman admitted that the ACLU's access to the jail had been restricted after the civil liberties group had allegedly made "inaccurate" statements

to the media.

Sheriff Baca has announced that he intends to relocate "less acute" mentally ill prisoners to Castaic, opening up high-security cells elsewhere in the jail system as part of his $143 million eight-phase housing and security plan to gain 984 high-security beds. His bed-space reallocation plan initially included ending the county's $27 million contract with CDCR to house 1,200 state prisoners in L.A. County jails. However, although the Board of Supervisors unanimously approved the removal of state prisoners, Baca had second thoughts and pleaded to keep the lucrative contract for financial reasons.

Meanwhile, it's business as usual. On March 2, 2006, Eric Wilson was apparently murdered in a dayroom by another prisoner at the California Men's Colony state prison. On May 3, 2006, several prisoners and deputies were injured in renewed rioting at the L.A. Central Jail. A July 13, 2006 riot at the Pitchess Detention Center's east facility involved 1,275 black and Hispanic prisoners, according to jail officials, and left 40 injured. Guards used tear gas, stingballs and pepperballs; still, it took 20 minutes to stop the fighting. Earlier that day, 339 prisoners had battled at the jail's north facility. Five were hospitalized with "moderate injuries."

Alex Paul Valdez, 43, housed at the Castaic jail, was beaten to death in a unit holding 64 Hispanic gang members on Dec. 4, 2006. Ironically, the prisoners had been segregated to forestall racially-motivated fights.

Prisoners aren't the only ones who are turning to violence. According to L.A. County Sheriff's Department reports, the use of significant force by jail staff rose 60% between 2000 and 2005; use-of-force incidents in which prisoners were hospital-

ized or injured by guards increased from 186 to 339 over the same time period.

As of December 6, 2006, there have been three murders, 37 major disturbances and 75 minor disturbances involving prisoners at L.A. County's eight jail facilities since the beginning of the year. Sheriff Baca was defensive about the level of violence. "The problems in the jails, in my opinion, are 100% bred by the prisoners," he remarked. "We'll never be singled out for the murders we have prevented." In the absence of any meaningful oversight or accountability, Baca has little reason to fear being "singled out" for anything in a position to bring about a solution.

That is, perhaps, because it is more practical to take note of the killings, riots, injuries, racial strife, chronic overcrowding and abysmal conditions of confinement, which are too obvious to ignore.

Sources: *Los Angeles Times, Sacramento Bee, Monterey Herald, San Francisco Chronicle, Valley Press, Merced Sun-Star, The Signal, Press Telegram, Inland Valley Daily Bulletin, LA Daily News, aol.com, sfgate.com, alternet.com, The Californian, San Jose Mercury News, New York Times, Fresno Bee, San Diego Union-Tribune*



**Save on Prescription Eyeglasses & Shades**

Send for a **FREE** Catalog
Money Back Guarantee

**Prism Optical, Inc.**
**10992 NW 7th Ave**
**Dept. LN107**
**Miami, FL 33168**

Inquires from Friends
and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com



Since 1959

**T Y P I N G**
**S E R V I C E S**
Computer - Typewriter
ALL KINDS OF TYPING

"Special Rates for Prisoners"
Black / Color Printing and Copying

SEND A SASE FOR A "FREE" PRICE
LIST AND MORE INFORMATION TO:

LET MY FINGERS DO YOUR TYPING
Sandra Z. Thomas
P O Box 4178
Winter Park, Florida 32793-4178
Phone: 407-579-5563

# Lawsuit Filed Over Health Care at Wisconsin Women's Prison, More Possible

## by Michael Rigby

The medical, dental, and mental health care provided to female prisoners at the Taycheedah Correctional Institution in Fon du Lac, Wisconsin, is so "grossly deficient" that it constitutes cruel and unusual punishment, according to a federal class-action lawsuit filed by the American Civil Liberties Union (ACLU) on May 1, 2006. The suit--brought in the U.S. District Court for the Eastern District of Wisconsin under 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132; and § 504 of the Rehabilitation Act, 29 U.S.C. § 794--lists numerous examples of human suffering due to spurious health care and inadequate staffing. It also contends that women receive mental health care that is far inferior to that afforded male prisoners. The findings of a Department of Justice (DOJ) report released the same day makes similar accusations regarding conditions and treatment for mentally ill women.

Health care at Taycheedah has long been dysfunctional. The issue was spotlighted in February 2000 following the death of Michelle Greer, 29. Guards had twice gone to the prison's infirmary seeking help for Greer after she told them she couldn't breathe and her asthma inhaler wasn't helping. Without examining her, nurses determined there was no emergency because she could still talk. Greer died on the floor of the prison chow hall after she collapsed, still clutching her inhaler. Several months after Greer's death union officials representing Wisconsin Department of Corrections (WDOC) medical personnel characterized health care at Taycheedah as being in a "state of crisis." Two subsequent investigations, one by the Legislative Audit Bureau completed in May 2001 and another by the National Commission on Correctional Health Care released in December 2002, found that WDOC health services were poorly organized and managed and expressed concern over chronic understaffing and the delivery of controlled medications by guards. The suit contends that "little has changed since then."

Horror stories concerning inadequate care at Taycheedah are legion. Kristine Flynn, one of the four named plaintiffs,

for example, has a history of uterine cancer and suffers from bipolar mood disorder and social anxiety syndrome. In June 2005, Flynn, 48, noticed a lump in her thigh and filed numerous sick-calls regarding the lump. But medical personnel told her it was "just fatty tissue." It wasn't until June 2006 that the lump was diagnosed as a benign tumor and removed. By then it was golf-ball sized and removing it caused irreparable nerve and tissue damage. Disturbingly, this was not Flynn's first experience with Taycheedah's inept health care. In June 2002 she attempted suicide after the prison's psychiatric staff abruptly discontinued the eight psychotropic medications she was taking.

Other examples of endemic mistreatment and neglect at Taycheedah include Tammy Young and Debbie Ann Ramos. Young developed painful sores on her head in November 2003. For the next two years she awoke most mornings with her hair encrusted with blood and pus. The sores were finally cultured in September 2005 and the culprit revealed: methicillin-resistant staphylococcus aureus, or MRSA--a highly contagious and potentially fatal form of staph infection. Not surprisingly, the incidence of MRSA infection at Taycheedah has soared in the past several years, according to the suit. Ramos, 43, another of the named plaintiffs, went years without seeing a gynecologist despite a diagnosis of chronic endometriosis. She was ultimately forced to undergo a hysterectomy that could have been avoided with proper care. "These situations are not isolated mistakes," said Larry Dupuis, the ACLU of Wisconsin's legal director. "They are manifestations of a system that has been in crisis for years and the state has made no meaningful effort to address its underlying problems."

The lawsuit, filed by Dupuis and attorneys David C. Fathi and Gouri Bhat of the ACLU's National Prison Project, further alleges that the WDOC employs only one part-time dentist to treat all 700 Taycheedah prisoners. As a result, "prisoners with painful dental problems sometimes remain on the 'urgent wait list' for weeks before they are seen ...."

As bad as medical and dental care

are at Taycheedah, the prison's mental health system may be responsible for even more misery. Named plaintiff Vanessa Parker, who is sometimes suicidal, was found by a court to be in need of in-patient psychiatric treatment. However, she has never left the prison for psychiatric care since her imprisonment in 1994 and rarely sees onsite mental health staff. The DOJ report noted further examples of egregious neglect, including Angela Enoch, 18, who committed suicide in June 2005. Though supposedly in observation at Monarch--Taycheedah's mental health unit--she managed to strangle herself with seams ripped from her pillow. Before her death she "had been pleading for psychiatric help." The DOJ report called the prison's treatment of mentally ill prisoners "unacceptable" and threatened additional lawsuits if the situation is not remedied.

The report also criticized the use of solitary confinement as an alternative to mental health treatment. In July 2005, as part of the yearlong investigation, DOJ investigators found that 44 of the 59 women in segregation at Taycheedah had "serious mental illnesses and were observed to be in significant distress." One prisoner they observed was clearly psychotic and had a long history of mental illness that included pushing her urine and eating her feces. She had been segregated for disciplinary problems, including "disrespect." Another mentally ill prisoner, a 15-year-old girl, was also in long-term lockdown for disciplinary problems. She was receiving no medication or treatment. "Placing an unmedicated, mentally ill teenager in segregation, with little or no stimulation, and no education services causes psychological damage that may be irreversible," the report said. "The waiting time for her release from segregation would feel like a lifetime to a girl of this age."

The report also expressed concern over "grossly inadequate" psychiatric staffing; medicating mentally ill women without monitoring "the consequences effectiveness, or potential side effects" failure to "provide a minimal array of mental health programming, crisis services, and specialized treatment for inmates with acute mental illness"; and placing

women who threaten to kill themselves in segregation with no treatment other than medication. What's more, taxpayers may actually be paying for non-existent mental health services. "Although Taycheedah's Annual Report for Fiscal Year 2005 describes an elaborate array of programming, we found that very little actually exists," investigators said.

Confronted with the nightmare at Taycheedah, some in the Wisconsin legislature are now calling for reform. "It is an embarrassment for our state," said Representative Sheldon Wasserman (D-Milwaukee), who is also a physician. "This is an absolute horror. What we are doing is something from the dark ages. Why does it take the threat of a federal lawsuit to get Wisconsin to do something about it? This is going to cost millions of dollars to fix." Ironically, the $7.50 Wisconsin prisoners are charged for a health services visit--the highest co pay in the nation--has done little to alleviate the problem. The WDOC currently has the highest suicide rate in the nation. See Flynn v. Doyle, USDC ED WI, Case No. 06-C-537-RTR, and the DOJ report Re: Investigation of the Taycheedah Correctional Institution (May 1, 2006) for more.

Additional sources: jsonline.com, AP, ACLU News Release

# Vermont DOC Agrees To Stop Punishing Self-Harming Prisoners

## by Michael Rigby

On May 18, 2006, the Vermont Department of Corrections (VDOC) settled a class-action lawsuit by agreeing to stop punishing prisoners who harm themselves. The VDOC further agreed to implement training, retain consultants, and document the mental health assessments of self-harming prisoners. Additionally, the VDOC will pay the litigation costs incurred, by Vermont Protection and Advocacy (VPA), a federally funded law office established under the Protection and Advocacy of Mentally Ill Individuals Act of 1986 (PAMII) to represent disabled prisoners.

The VPA's lawsuit, filed pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983, alleged the VDOC maintained an offensive and inhumane policy of punishing self-harming prisoners by segregating them, using unnecessary force, and taking away privileges. "There are numerous instances of [these prisoners] being pepper sprayed, assaulted, isolated, restrained, held naked or barely clothed, and losing various privileges, including liberty, visitation and programming, based on self-harming behavior related to their disabilities for which they did not receive adequate treatment," the lawsuit says.

One prisoner cited in the suit was confined in punitive segregation after slashing her throat in the prison shower. She was upset because her grievances regarding inadequate mental health care had been ignored. Another prisoner was reportedly "shackled to a bed for more than a week without adequate mental health treatment or supervision apparently because of his self-harming behavior."

The VPA claims the VDOC has been aware of its substandard mental health care since it began filing formal grievances on behalf of the prisoners in February 2002. In March 2004 the Governor's office published the findings of its investigation into the suspicious deaths of seven prisoners over the prior 18 months. That report criticized Dr. Paul Cotton, LLC., for failing to live up to his contractual obligations in the areas of quality assurance, staff training, and staffing levels. Cotton took over the VDOC's mental health contract in October 2003 after the former provider, Matrix, chose to bow out. Another report, this one released in April 2004 by the State Auditor of Accounts, echoed many of the findings of the Governor's investigative team and additionally found that state contractors likely owed the State more than $140,000 based on "false and inaccurate billing procedures." Finally, on June 4, 2004, the VPA provided the VDOC with a report by psychiatrist Craig Van Tuinen, who cited "systemic and serious instances of substandard and harmful provision, or lack of provision, of mental health services." Specifically, Van Tuinen found the practice of punishing mentally ill prisoners for self-harming behavior "unacceptable, counter-therapeutic, and inconsistent with community standards of care."

Rather than proceed to trial, the VDOC decided to settle. Under the agreement prisoners must never be placed in punitive segregation for self-harming behavior. Those confined in administrative segregation for self-harming will receive an initial assessment by a qualified mental health professional and will retain the same property and privileges as other prisoners in segregation unless contraindicated and approved by mental health staff. In addition, mental health professionals must conduct documented daily and weekly visits of self-harming prisoners in segregation, evaluate prisoners who remain in restraints beyond an initial emergency, and consider alternative options if the restraints have failed to stabilize the prisoner after eight hours. VPA attorney Edward Paquin represented the prisoners. See: Vermont Protection and Advocacy v. Hofmann, USDC D VT, Civil Action No. 2:04-CV-245.

**Law Office of Michael R. Levine**

Zealous advocacy at trial, sentencing, and post-conviction.

20 years experience as a federal defender in California, Oregon, Hawaii.

Author of acclaimed publication: 138 Easy Mitigating Factors

For latest monthly update, send $1.00 to:

Michael R. Levine
400 S.W. 6th Avenue, Suite 600
Portland, Oregon 97204

**E-Z INDEX CITEBOOK**

Easy to use and AFFORDABLE Cite book, now AVAILABLE. The E-Z Index Citebook was designed with convicts in mind. It contains 1000s of citations related to over 300 legal topics confronted by pro se convict litigants. A must have if access to law library is denied. This book is 8½ x 11 with simple glued binding to ensure receipt at any correctional facility. First 25 orders get complementary Membership to Crossroads Litigation, your connection to court records, etc. Send for a FREE Brochure. E-Z Index Citebook is $29.00 Postage included. Or 5 books of new 39 cent unused postage stamps. CROSSROADS LITIGATION, P.O. Box 43, Campobello, SC 29322

# 200 Dead in Brazil Prison Uprisings, Street Violence

### *by Gary Hunter*

In May 2006, approximately 200 people were killed in Sao Paulo, Brazil as gang members of the Primerio Comando da Capital – the First Capital Command, known by its Portuguese initials, PCC – clashed with police in the streets and rioted in prisons.

The violence began after prison officials learned of a plot by the PCC to take control of several prison units on Mother's Day. When 765 gang members were slated for transfers to more secure facilities in an effort to thwart the planned takeover, PCC leaders activated their members both inside and outside the prisons.

On May 12, 2006, prisoners took about 200 hostages, including visiting family members and guards. Communicating by cell phone, PCC leaders inside the prison then mobilized members on the outside, who launched attacks on the police. Gang members used machine-guns, grenades and homemade bombs to attack police stations and police cars. Policemen were also killed in bars and at their homes. By the end of the day over 55 attacks had left 19 police dead.

"They have struck at the spinal cord of our security," said Sao Paulo State Security Secretary Saulo de Castro Abreu Filho.

Fighting escalated on May 13 as PCC members began targeting banks, shopping malls and busses. Eleven banks were bombed and over 80 transit busses torched after the passengers were removed. The violence spread out of Sao Paulo proper and into the suburbs of Carapicuiba, Guaruihos and Osasco, in addition to the costal cities of Cubatao and Gauruga.

Ten prisons rioted in the neighboring states of Mato Grosso do Sul and Parana in sympathetic response to the Sao Paulo uprising. More than 20 policemen were killed in the second day of violence.

Inside the prisons, the mass hostage-taking added anxiety and chaos to the already grossly-overcrowded prison system. Brazil's prisons and jails are designed to hold about 250,000 prisoners. They currently house over 360,000 – the fourth largest prison population in the world.

At some facilities prisoners are housed in bunks stacked four-high, or sleep on mattresses on the floor among rats and insects. They rely on food brought in by visitors to supplement the meager prison meals, which have been described as "starvation rations."

Prosecutor Fernando Capez acknowledged the prisons' problems. "Our facilities are really human warehouses, universities for crime, factories for revolt," he stated.

Paulo Mesquita of Sao Paulo's Human Rights Watch agrees. "The policy here is strongly oriented toward putting people in prison. Even if that is a good policy, the judiciary and the penitentiary system have to keep up. Police have a goal of putting people in prisons that are not prepared to handle them."

Julita Lemgruber, a criminologist from Rio de Janeiro, stated that Sao Paulo's prison problems go deeper than just overcrowding. She attributes the violence to a combination of government corruption and a fatalistic outlook of prisoners. "These guys know they are going to die. They are going to die at the hands of their enemies or at the hands of police."

In spite of the obvious need for prison expansion to relieve chronic overcrowding, Brazil's President, Luiz Inacio "Lula" da Silva, cut the annual prison budget by fifty percent in 2005. Sentencing reform is not even an issue because a majority of Brazilian prisoners have not yet been convicted of a crime and are awaiting trial.

PCC was organized in 1993 by eight prisoners as a politicized gang that advocated for prison reform. A riot at the Carandiru prison in 1992 had left 111 prisoners dead at the hands of the military police. The massacre quickly enlarged the ranks of the PCC, which now has an estimated 80,000 members and is the predominant gang at about 80% of Sao Paulo prisons and jails.

According to Rev. Valdir Joao Silveira of the Prison Pastoral group, an organization of the Roman Catholic Church, the PCC has achieved positive prison reforms. While the gang controls the drug trade in prison, it has banned crack cocaine. The PCC has no tolerance for prison rapists, who are often beaten or killed, and allegations of guard brutality have decreased during the gang's reign.

In 2001, PCC prisoners under the direction of Idemir Carlos Ambrosio (aka "the Shadow") took control of 29 Sao Paulo prisons and seized 2,500 hostages in riots that left 16 dead. The May 2006 "mega rebellion" was intended to be a repeat of the 2001 uprising on a larger scale.

Authorities believe that several leaders run the PCC from inside the prison system. But the consensus is that Marcos Willians Herba Camacho (aka "Marcola") is the mastermind of the latest violence. Camacho is serving 44 years for bank robbery and was one of the prisoners slated for transfer when the bloodletting began.

Human rights expert Renato Simones calls the prison crisis "a power struggle," stating "the PCC feels emboldened because it senses the government is weak."

Many citizens sense the same thing. Lucia Sousa da Silva had to shut down her grocery store early because of the violence, which lasted four days. "The police are totally outgunned," she said. "They try to protect us, but really they're unprepared."

"It's a civil war," remarked newsstand worker Manuela Nascimento. "Now I leave my house scared and go to work scared."

Although the federal government offered 4,000 troops to help restore order, the offer was rejected by Sao Paulo state Governor Cláudio Lembo, who said he had control of the situation. Many saw it as a ploy by Lembo to save face politically.

Police claim the PCC is responsible for a wide variety of crimes including arms trafficking, bank robberies, drug dealing and prison breaks. But official reports indicate that police were responsible for the deaths of at least 79 gang members during and after the May violence, plus an unknown number of civilian fatalities.

"I don't believe there are death squads today that are formally organized," said Gov. Lembo. But he conceded that an investigation could reveal police brutality. "It's incredible that a city this size can maintain social discipline," he acknowledged. Brazil is the home of the Latin American death squad which were first formed after a military coup in 1964, with CIA assistance, to crush leftist dissidents. While Brazil is nominally a democracy the death squads have remained and instead of political dissidents now target criminals, the homeless, street children and homosexuals.

Lembo insisted that the riots were the result of an "absence of discipline" in the prison system. Julita Lemgruber disagrees. "To say that what is needed is a rigid disciplinary code within the pris-

ons is hypocritical ... federal legislation already exists on how prisons should be run," she said.

"The lack of services provided by the state gives room to criminal gangs to impose terror," says Lemgruber, who ran the Rio de Janeiro prison system from 1991 to 1994.

Both Simones and Lemgruber point to pervasive corruption within the Sao Paulo prison system. It is estimated that the PCC operates with the assistance of about 1,000 corrupt guards and wardens who turn a blind eye to the gang's activities. Lemgruber notes that PCC leaders learned of the planned prison transfers, which touched off the May rebellion, from their contacts working in the congressional building.

"What's happening in Sao Paulo's prison system and the rise of gang culture there is a reflection of the long-term failure of the whole criminal justice system," stated Amnesty International researcher Tim Cahill.

The government's containment of the May prison riots was brutal. At one penitentiary in Araraquara, 1,400 prisoners were forced into outdoor yards designed to hold only a few hundred; guards welded the gates shut and cut off the electricity.

Food was lowered from guard towers and prisoners had to sleep in the open air.

However, despite crackdowns, the violence didn't dissipate. A month later, in June 2006, a series of eight prison riots occurred in which over 20 guards and prisoners were injured. On June 17 more than 250 people, mostly visitors, were taken hostage at the Viana prison in the Espiritu Santo state in a protest over prison conditions. Two prisoners were killed, including one who was decapitated. The hostages were released on June 20 and the other prison riots were quickly quelled by authorities.

Another surge of violence involving the PCC occurred the following month. On July 12, 2006, nearly 40 attacks took place in Sao Paulo, resulting in at least five deaths. Police stations, banks, stores and off-duty prison guards were targeted; notes left at some of the attack sites criticized "oppression" in the prison system.

On October 29, two prisoners and a police sergeant died during a riot at a jail in Volta Redonda. The sergeant was reportedly shot by prisoners after they took a guard's shotgun; the prisoners were burned to death.

Most recently, on November 9, 2006, 44 gang members at the Presidente Bernardes

prison, including PCC leader Marcos Willians Herba Camacho, staged a hunger strike and threatened to kill prison guards if their demands were not met. "There has been a total inversion of the power structure," said Joao Rinaldo Machado, head of the Sao Paulo state prison guards union. "The state is no longer in control of the prisons, and by threatening to unleash a prison rebellion, inmates can do pretty much what they want inside."

Sources: *Associated Press, BBC News, Christian Science Monitor, Chicago Tribune, Reuters, New York Times*

CHI-EY INC. photo department "Personally Customized" - greeting cards calendars, postcards, and reprints in different sizes & combinations

Introducing our new and exciting services *for the ability for background* *for clothing color for combining photos*

All photos sent before shipped. Turn around time only "48" hours. Prices include postage & handling. For brochure and information please send $2.99 for order please send institution check or money order to: CHI-EY INC- PO BOX 829, Hillsboro, OR 97123

## PLN Matching Grant Fundraiser 2006

**A generous PLN supporter has agreed to DOUBLE all prisoner donations, and match DOLLAR for DOLLAR all non-prisoner donations to Prison Legal News from October 15, 2006 until January 31, 2007—Up to a total of $25,000 !!**

A prisoner's donation of $5 is the equivalent of donating $15!
A non-prisoner's donation of $25 is the equivalent of donating $50!

You can mail a check or money order to:
**Prison Legal News, 2400 NW 80th St #148, Seattle, WA 98117**
**Or call 206-246-1022** and use your Visa or MasterCard
**Or visit PLN's website at www.prisonlegalnews.org,** and donate with your Visa or MasterCard
Remember! PLN is a 503(c) non-profit corporation, so donations are tax deductible

| October 2006 | 0 | 5,000 | 10,000 | 15,000 | 20,000 | 25,000 | Goal |
|---|---|---|---|---|---|---|---|

# California's "High-Risk" Sex Offender Parolees Ostracized; Parole Official Fired

### by John E. Dannenberg

California's 2,000 "high-risk" sex offenders (HRSOs) currently on parole are increasingly being ostracized following relentless publicity as to their whereabouts, forcing parole officials to continuously find new housing for them after concerned citizens run them out of town.

An abrupt eviction of twelve HRSOs from a motel in Vallejo caused unprepared parole agents to temporarily house the "dirty dozen" on the grounds of nearby San Quentin State Prison in Marin County. The resulting NIMBY ("not in my backyard") brouhaha raised by conservative Marin County legislator Joe Nation led Governor Schwarzenegger to sacrificially fire Jim L'Etoile, director of the state's parole division, on May 10, 2006.

California has over 80,000 released sex offenders, 7,500 of whom are currently on parole. The whereabouts of all these ex-offenders (those required to register) are publicly available on the Internet. HRSOs get special publicity and monitoring, particularly if they were civilly committed as Sexually Violent Predators (SVPs) following the expiration of their prison sentences. SVPs are incarcerated by the Department of Mental Health (DMH) until they either "graduate" from a multi-year treatment program or simply wait for a court to release them. [See: *PLN*, Dec. 2006, p20, *How to Exit California's Sexual Predator Program: Refuse Treatment*].

SVP "graduates" suffer the worst harassment of all, being relentlessly hounded by the media. The most recent "graduate," Timothy Boggs, was over-detained for a year by DMH because state parole authorities couldn't find any place in Sacramento County that would house him. In July 2006, frustrated Sacramento Superior Court Judge Ronald Tochterman ordered Boggs cut loose to find his own way in Sacramento. His cover at a local motel was blown the next day by the *Sacramento Bee*.

Housing for HRSOs has long proven problematic. In May 2006, 23 HRSOs who resided at hotels within 11 miles of Disneyland were evicted after state legislators said they were "displeased" with their otherwise legal location. In Solano County, displaced HRSOs were temporarily housed at a state parole office. Residential placement became much tougher on Jan. 1, 2006, when a new state law went into effect

that prevented HRSOs from living within a half-mile of schools. Frustrated Solano County officials are contemplating buying a trailer and a plot of land on which to isolate HRSOs, drawing comparisons to the leper colonies of long ago.

To further complicate matters, Proposition 83, a ballot initiative for "Jessica's Law," was approved by California voters on November 7, 2006. The law mandates lifetime Global Positioning Satellite (GPS) tracking for certain sex offenders and further restricts where sex offenders can reside, prohibiting them from living within 2,000 feet of schools and parks. The law was immediately challenged in federal court and has not yet been implemented. U.S. District Judge Susan Illston, upon approving a temporary restraining order to block the law, stated it was "punitive by design and effect" and probably unconstitutional. See: *Doe v. Schwarzenegger*, USDC CD CA, Case No. 3:06-cv-06968-JSW (2006).

Regardless, politicians fell all over themselves in support of Proposition 83 in an attempt to garner votes, and even proposed their own version of the law before the ballot initiative passed. The issue was also raised in the gubernatorial race, with Gov. Schwarzenegger and challenger Phil Angelides engaging in get-tough-on-sex-offenders one-upmanship. Just as President Bush won the crucial state of Ohio in his 2004 re-election by appealing to radicals to put anti-gay measures on conservative rural county ballots to ensure a high turnout of conservative Republicans, California politicians stoked the fires of prejudice against convicted sex offenders to advance their personal political agendas and ambitions.

State parole administrator Jerome Marsh noted that the state ends up paying for sex offenders' housing to avoid the worse situation of them being homeless with no registered address. This has resulted in price gouging by opportunistic motels, which charge $200 one week, $300 the next and $350 the following week.

To make matters worse, as HRSOs are identified and "outed" when they move into a new town, local communities enact emergency restrictive regulations. Riverside County took such measures upon the arrival of repeat rapist David Dokich in 2005 – the county passed a local ordinance barring HRSOs from living near schools, parks and

recreation centers, and requiring them to wear GPS tracking devices. The Sacramento-area city of Elk Grove passed preemptive emergency regulations in anticipation of Timothy Boggs' arrival in their community.

Shirley Poe, a concerned state parole administrator for Solano County, observed "while I don't want to paint these guys as angels, they're still human beings." And University of California (Irvine) Professor Joan Petersilia, a nationally renowned parole expert, dismissed HRSO residency restrictions as giving the public "a false sense of security. ... We take this cookie-cutter approach to all sex offenders rather than focusing on those who are truly dangerous."

But when politics and public opinion are involved, the cookie-cutter approach often prevails. The future outlook is for continued vigilantism and more oppressive restrictions for HRSOs. Even federal lawmakers made political hay of this issue by enacting a national sex offender registry. [See: *PLN*, Oct. 2006, p.10].

Meanwhile, problems continue. On November 28, 2006 the Inspector General's office for the Dept. of Corrections and Rehabilitation reported it had uncovered a scheme by parole officials that involved shuffling sex offenders among different hotels every four days. This circumvented a requirement for sex offenders to register their address within five days of moving to a new residence. During this shuffling process at least seven sex offenders were housed close to schools in violation of state law. A cover-up by one of the four unnamed parole employees involved in the scheme was also alleged; three of the officials involved were reassigned, while one retired.

"These are sworn peace officers, deliberately moving these parolees around and then engaging in a conspiracy to cover it up," fumed Todd Spitzer, Chairman of the state's High-Risk Sex Offender Task Force. The hotel shuffling scheme was apparently to buy time to locate suitable housing for hard-to-place paroled sex offenders. "The housing issue is the giant void in this whole public policy area, and at this point nobody has good answers," admitted Spitzer. "The bottom line is: Nobody wants to live next door to a sex offender."

Sources: *Los Angeles Times, San Francisco Chronicle, Sacramento Bee*

# Washington Women's Prison Healthcare Violations Continue

As we've reported extensively, health care at the Washington Corrections Center for Women (WCCW), has been woefully inadequate for decades. Reform efforts have been underway since 1993, but the more things change, the more they stay the same.

In addition to a 1993 class action federal lawsuit [*PLN*, Oct. 1994; April 1995], the Washington Department of Health (DOH) entered the fray in October 1998. DOH investigated for WCCW compliance with the 1994 Minimum Standards of Health Services Division for Operation and Maintenance of Health Care Services in Correctional Facilities. Investigators found egregious errors and violations, including nurses routinely recapping and reusing needles, a four-fold increase in medication errors during a 6 month period, and "errant infection control standards," among other violations. This led to annual DOH investigations at WCCW.

Despite more than a decade of litigation and 6 years of DOH oversight, the healthcare crisis at WCCW rages on. An annual DOH investigation conducted April 7-8, 2004 found no deficiencies related to the 2004 deaths of two WCCW prisoners. However, investigators found numerous deficient practices in other areas.

## Inadequate Staffing

WCCW "did not ensure that adequate resources were consistently available to meet the healthcare needs of" prisoners, putting them at risk of not receiving necessary health care. DOH investigators found that the number of prisoners increased but staffing levels did not increase to meet the demands of the growing prisoners population. Investigators also noted that the short-handed nursing staff was significantly overworked. "Dental staff were still scheduling three months out for routine care." WCCW failed to evaluate and treat emergency dental care problems in a timely manner.

## Inadequate Policies/Procedures

WCCW "did not ensure that all policies and procedures were current, updated and consistent in all the health care policy and procedure manuals." This created the risk that staff would not follow WCCW practice standards.

## First Aid/CPR Training

WCCW "did not ensure that the system for tracking cardiopulmonary resuscitation (CPR) and first aid training for healthcare staff was updated and current...or that all staff were updated with CPR and first aid training" and nine staff simply did not have current training.

## Expired Medications

WCCW "did not ensure that medication, and medical supplies were within expiration dates." This placed "patients at risk of inaccurate laboratory and tuberculosis screening test results and alteration in medication results." DOH investigators cited numerous examples of expired medications and medical supplies, including TB/PPD and nitroglycerin.

## Other Violations

DOH investigators cited numerous other violations at WCCW. Ice was stored in an unsanitary manner. Tap water and showers exceeded the 120 degrees Fahrenheit cap imposed by Department of Corrections Health Care standards, sometimes by nearly 30 degrees. In many instances, "the facility was not...maintained in a clean, safe, and sanitary condition, and in good repair." For example, wall heaters lacked shields, pillows were torn and unserviceable, showers and bathtubs had mold growing in them, several clothes washers and dryers were inoperable, and a children's slide exceeded the 30 degree safety standard, by 20 degrees. WCCW failed to utilize refrigerator and freezer thermometers to monitor medication temperatures. Finally, annual maintenance checks of sterilizers, including dental clinic cassette and ultrasonic sterilizers, were not performed.

Medical care in Washington prisons remains abysmal, but that did not stop the district court from terminating a 1995 consent decree. The court also refused to consider plaintiffs' motion to hold prison officials in contempt for past consent decree violations. [*PLN*, Sept. 1999].

The Ninth Circuit Court of Appeals upheld the lower court's termination of the consent decree, but found that the refusal to consider the merits of the contempt motion was an abuse of discretion. See: *Hallett v. Payne*, 296 F.3d 732 (9th Cir. 2002) [*PLN*, Jan., Feb., June 2003].

On remand, prison officials agreed to pay $500,000 to settle the contempt action. Approximately half that sum went to attorney's fees and costs, with the balance being used to hire an Independent Patient Advocate, to help prisoners address healthcare complaints at WCCW. [*PLN*, July 2005, p. 26]. Plaintiffs were represented by Columbia Legal Services and the Seattle law firm of McDonald, Hogue & Bayless.

### INMATE REPRESENTATIVES WANTED

National Association for Equal Justice is looking for inmate representatives. We need male, female and juveniles in Federal, State and Juvenile correctional facilities nationwide to represent our association. You must have a GED or high school diploma and interact with inmates of all races... three years left to serve on your sentence. Jail... to apply. NAEJ is a nationwide prisoner... gionally. We serve to and protect the... ders, their friends, families and asso...

#### BENEFIT PACKAGE
- $25 to 60 per month
- Bronze membership package (Va...
- Community Release Starter Pack...
- Company Stock Option (25 shares of... at $225)
- Employment opportunities upon r...
- Annual Bonus up to $300

To apply send... information about yourself to:

National Association for Equal Justice
Inmate Representative Personnel
Executive Office
4370 La Jolla...
La Jolla, Cali...

Toll Free: (80...
Fax (800) 95...
E-Mail: naej...
An Equal Opport...

# The Prison and Jail Industry—Who Will Run It

## by Gary Hunter

With the huge growth in American prisons between 1980 and 1990, the American Correctional. Association (ACA) went looking in the past to solve both foreseeable and current problems. It quickly found that the problems facing the new detention industries were unprecedented.

In 2000, the National Institute of Corrections published a study entitled *Recruitment/ Hiring, and Retention: Current Practices in U.S. Jails*. Although the report was limited to 17 jails, it gave a good spring board for a new, nationwide study.

In 2002, the ACA propositioned the Bureau of Justice Assistance (BJA) to create a specific strategy and plan that the detention industry could implement in the recruiting, training and keeping of quality prison staff.

The following year, the ACA received a grant from the BJA. The funds were slated to assess the challenges facing the industry detention industry. The project was named *Building a Strategic Workforce Plan for the Corrections Profession* and conducted by Workforce Associates in Indianapolis.

First, in this tri-phase project, was a "Discovery Phase." The objective was to collect statistics, nationwide, regarding the problems associated with the current workforce and recruitment.

Second, the "Create Phase" was to identify positive aspects regarding prison and jail problems and how they were addressed.

Third, the "Implementation Phase" was to develop new practices to enhance recruitment and retention.

Not surprisingly the study concluded that "yes" a problem exists. But even this conclusion created a problem. Solutions could not be generalized since principal problems varied from state to state. Over half the problems discovered could not be solved with money and the middle aged, 22-44 year old, white male guard population is dwindling rapidly and must be replaced soon.

Findings, on the convict side, revealed that the number of people in American prisons grew 300 % from 1982 to 2002. The count in 1982 was 650,000 and has ballooned to over 2 million. The number of parolees also rose from less than 250,000 in 1982, to more than 750,000 in 2002. Probationers almost quadrupled from 1.4 million to about 4 million. Juvenile justice figures, although a bit ambiguous, rose 75 %. A national report claimed 109,000 in "residential placement facilities," "kidprison" to the rest of us.

In sum, the criminal justice system in America jumped from supervising a total of 2.2 million prisoners, parolees and probationers in 1982 to a busting at the seams 6.7 million in 20 years not including the incarceration of our children.

On the criminal justice side, findings revealed that from 1982 to 1999 cops on the street grew 41 %; Shakespeare's friends, the lawyers, grew by over twice that, to 84%. Not bad numbers.

The numbers of those who manage after convictions, although impressive, fall short of utopia. Within the same time period, the number of detention employees rose from 300,000 to 750,000. This 140 % increase does not come close to the 300 % increase of those incarcerated or on supervised release.

The rate of prisoners per guard vary greatly from state to state. The variation in 2000 was 10.8-1 in Alabama to 2.6-1 in the District of Columbia, with a national average of 5.5-1.

The problem, the study found, is attrition, the turn-over rate of employees as a result of resignation, retirement or death. It also includes incomplete probationary periods or preliminary periods of employment for those who just can't hack it.

Attrition rates vary greatly across the country. In 2000, the turnover rate for New York was 3.8% compared to a high of 41% in Louisiana. The national average of 12.6% in 1995 has steadily ascended to 16.1% by 2000. Some disparity, in the reported rates, must be assumed due to variegated information gathering practices and inconsistencies from state to state.

One coefficient, however, suggests a correlation between the states' turnover rates and hiring rates. As turnover rates rise, so do hiring rates. Although several states fall outside the norm, the conclusion is that high turnover and high hiring percentages are linked.

Another interesting manifestation associated with high attrition is the reciprocal relation to the national unemployment rate. For every one percent drop in unemployment there was a 1.6% increase in the prison turnover rate. In short, if there is a better job to be had guards are ready with resume in hand.

The exodus of detention personnel has prodded their respective states to generate creative augmentation policies. However, states like New York and Massachusetts, which have low attrition and recruitment due to higher salaries and benefits, are also experiencing a rapid decrease in white, male guards from age 25-44 who tend to retire more quickly and at a higher rate. The study concludes that this phenomenon will eventually result in the New England states joining the ranks of the norm.

A survey of 47 states and the District of Columbia reported that 72 % claimed "some degree of difficulty in recruiting" guards. Only 1 % said it was "easy."

In "retaining" guards, 64 % also reported "Some degree of difficulty;" only 4 % said it was easy.

Problems in recruiting were identified as: 1) inadequate pay and benefits (38 %); 2) burdensome hours and shift work (37 %); 3) a shallow workforce pool (33 %); and 4) rural locations of facilities (29 %).

Ironically, only 6 % claim personal safety hazards. Competition for recruits, poor public image, and applicants not meeting the requirements rank moderately high as reasons for recruiting difficulty.

Pay is also a problem. Across the board, guards and jailers make less money than other criminal justice occupations. In 2003 guards made a median wage of $40,900 working for the Feds; $33,260 slamming doors for the state; and $31,380 booking-in at county lock-ups. Cops and deputies averaged $44,020; first line supervisors'for guards averaged $45,500. Chasing robbers and burglars who shoot back pays a little better than holding those same people in lockup.

Since the attacks of September 11, 2001 a myriad of new security positions have been created. For example, airport screeners take home between $23,600 to $56,400 annually with good benefits. Also, many hazardous security guard jobs pay as much as $100,000 annually. Mercenary jobs in Iraq and Afghanistan pay even more.

Clearly higher pay makes for lower turnover. But other problems exist apart from poor pay. A 2003 survey cited four substantial reasons for attrition: 1) demanding hours and shift work; 2) stress and burnout; 3) employees not suited for the job; and 4) violation of conduct rules. Again, persona