safety concerns did not even rank.

Men represented 79% of the nation's guards, down 3% since 1992. Also, since 1992, the number of white male guards has fallen from 72% to 65% in 2001.

Nationwide, gender percentages slid disproportionately. In Mississippi 60% of the guards are women compared to only 8% in New Mexico.

Ethnicity is proportionate and an accurate reflection of the ethnic variance of the region. For example, 98% of Montana's workforce is non-Hispanic whites; the District of Columbia is 85% black. Black guards account for over half of the southern workforce in South Carolina, Alabama and Arkansas. Hispanics in New Mexico make up 56% of the door slammers there. In Hawaii, Pacific Islanders and Asians tip the scale their way with 65%.

A review of the ACA's compilation of gender and ethnic composition of composition of detention data and salary levels in adult facilities shows that in 2000 females and minorities experienced discriminatory discrepancies with respect to pay. For example, Maine, which employs 88% white guards and 8% black, starts employees off at $35,699 annually. Mississippi prisons hire 83% black guards (and 60% female) and only 17% white offers a starting pay of $17,073, barely above the U.S. poverty level.

Contrary to Hollywood stereotypes, not all guards are dummies. The educational level of federal guards, in 1999, show that 47% had at least a high school diploma. This correlation continues up the scale with Technical school (3%), some college (33%), college degrees (15%) and graduate school (2%).

So what is looming in the imminent envisagement of the prison and jail industry? This study predicted that by 2010 the prisoner population will fall back to 1.85 million. Much of the reason for this prediction is speculative and given the exponential growth of the prison and jail population, most likely wrong.

More lenient sentencing and parole guidelines is predicted. The use of rehabs for drug offenders and quicker parole for non-violent, non-sex felons is also forecast. Conservative executive and legislative arms of government are also tightening their fists around fiscal dollars and enacting moratoriums on prison building. However, none of that has come to pass.

Other experts predict, based on historical data, a rise in prison population to between 2.1 and 2.4 million. Certainly, an unpredicted poster criminal (McVeigh or McDuff) or event (Twin Towers or Texas-7) could again engender enough public outcry to eclipse either prediction. Given the rise of sentences and sanctions against sex and violent defendants and no change in US drug laws, it is highly unlikely that detention populations will decline any time soon.

The Bureau of Labor Statistics (BLS) estimates that 19,999 guards will be needed yearly between 2002-2012 to meet the growth and replacement needs of the prison industry. The ACA puts this figure at 30,000 citing the BLS' failure to factor probationer attrition rates.

Filling the void for qualified staff will remain a problem since guards will necessarily come from the same pool of workers that provide policemen, deputies, and a variety of homeland security positions.

Neither of these reports factors in the "soldier effect." National defense consumes much of the manpower that could otherwise fill the detention void. Additionally, many guards are also members of the National Guard and Reserve units. This quickly takes a toll during times of war.

Conclusions drawn from this data predict both financial and personnel problems. Recruitment, training and overtime pay are certainly going to be factors. Staff shortages, burnout and inexperience all bring their own consequences to the table.

Of little concern for either study was the diminished security and safety, inside of the prisons, that would result from these other problems. As with most expert prison opinions the prison problems seldom focus on prisoner's problems. The study is available on the website of the National Institute of Corrections.



**INMATE CONNECTIONS**
www.inmate-connections.com

**PEN PAL HOOKUPS for PRISONERS**
- ✓ 24/7 Internet Exposure
- ✓ Free Email Forwarding
- ✓ Free Photo Cropping & Enhancement
- ✓ Front Page Exposure Available
- ✓ Multiple Page Exposure Available
- ✓ Helpful How-To Brochure Available
- ✓ High Response Rate
- ✓ Fast Publication
- ✓ Referral Program & Incentives
- ✓ Stamps Accepted

*"INMATE CONNECTIONS is great! I've recommended your service to several inmates and they've all reached the same conclusion. It's unanimous! Personally, I've had the pleasure of meeting dozens of interesting women from all over the United States. There has even been a few from over seas. Your response rate is remarkable. I've received mail through your service on a regular basis. By the way, thanks for providing e-mail forwarding for us fellas! INMATE CONNECTIONS has certainly brought a great deal of joy to my life over the past year and I'm confident that 2006 will be just as rewarding. Please, continue the good work. Thank you!"*
- *Patrick Streater, California inmate*

Write for a free brochure/application:
**Inmate Connections**
465 NE 181st, #308 - Dept. PLN
Portland, Oregon 97230-6660
(Please include a business-sized self-addressed stamped envelope or .39-cent stamp if possible)
In business since 2001



**PRISONER RIGHTS ATTORNEY**
**CHARLES CARBONE, ESQ.**

**REPRESENTING CALIFORNIA PRISONERS**
- ● MEDICAL NEGLECT
- ● CRIMINAL APPEALS
- ● PAROLE ISSUES
- ● GUARD ABUSE
- ● CIVIL RIGHTS
- ● SHU

Charles Carbone, Esq.
PMB 212 - 3128 16th St.
San Francisco, CA 94103
415-531-1980
(Please write for approval to call collect)
www.charlescarbone.com or www.prisonerattorney.com

# Washington Prisoners Must Pre-Pay for Record Inspection

The Washington Court of Appeals has affirmed a lower court's refusal to require the Washington Department of Corrections (WDOC) to allow prisoners to inspect records without pre-payment of copy and postage expenses.

WDOC Policy No. 280.510 grants prisoners "a right of access on demand only to documents in their own file." Any other "[d]ocuments approved for disclosure are copied and mailed" only after "a 20 cent per page copying charge" and postage expenses are received.

WDOC prisoner Brandt Sappenfield "made several written requests to inspect certain Corrections records (not his own file)..." under RCW 42.17, Washington's public disclosure act (PDA). Citing Policy No. 280.510, the prison's "public disclosure coordinator compiled 187 pages of documents requested by ... Sappenfield and told him that these would be mailed upon receipt of $46.62."

"Sappenfield treated this response as a denial of his PDA requests," and "filed an administrative appeal challenging the validity of the Corrections policy." Sappenfield "alleged the policy was contrary to RCW 42.17.270 through .290 and was invalid on its face and as applied to his request."

WDOC's "central PDA administrator denied the appeal because the requested records were not part of ... Sappenfield's file and were therefore subject to its policy" regarding pre-payment of costs.

"Later ... Sappenfield asked to inspect two additional sets of records. Corrections again responded that there would be a 20 cents per page charge plus postage. The charges would total $208.48 and $16.93 respectively.... Sappenfield again replied that he wished only to inspect the documents, not to receive copies, and that he was unwilling to pay any fees. He asked to inspect the records himself. He did not suggest that a non-prisoner representative be allowed to inspect them for him. ... Sappenfield also wrote the state attorney general and asked for a review of Corrections' denial of his request for personal inspection of the records. He again did not mention the idea of a representative. An assistant attorney general explained that Corrections' response was not a refusal to disclose the records."

"Sappenfield then sued for an order for Corrections to show cause why the records should not be made available for personal inspection." The trial court dismissed the action, finding "that Corrections complied with the PDA by making copies available by mail at a reasonable charge."

The State Court of Appeals affirmed the trial court's dismissal order, finding that "[t]he trial court ... correctly concluded that the Corrections' policy is reasonable. [Prisoners] have access without charge to their own personal records. Access to additional public records can be obtained by means of copies mailed upon payment of a reasonable fee." The appellate court concluded that WDOC's "procedures appropriately balance public disclosure act mandates with its duty to manage" prisoners. See: *Sappenfield v. Department of Corrections*, 127 Wash.App. 83, 110 P.3d 808 (Wash.App. Div. 3, 2005), *petition for review denied*, 156 Wash.2d 1013, 132 P.3d 146 (Wash. 2006).

# Illinois Parole Violators Enforce Revocation Due Process Rights with Consent Decree

*by John E. Dannenberg*

The class of all Cook County, Illinois parole violators was granted a preliminary injunction by the U.S. District Court, Northern District, Eastern Division, ordering the Illinois Department of Corrections (IDOC) to conduct preliminary parole revocation hearings within ten days after arrest, at or near the site of the alleged violation. The injunction halted IDOC's practice of taking newly-arrested violators first to the Cook County Jail, then to Stateville prison and finally to the prison from which they were paroled – all before giving them their legally-required preliminary revocation hearing.

The effect of IDOC's practice had been to unconstitutionally delay due process as well as to simply deny it by removing violators from the area where potentially-helpful witnesses were located. A consent decree in the case has since been preliminarily approved.

Charles King and seven other named defendants filed suit under 42 U.S.C. § 1983 seeking future injunctive relief for themselves and all other similarly situated accused parole violators who were spirited away from the Cook County Jail within ten days of their arrests and sent to remote prisons, where their preliminary parole revocation hearings were often not held for many months. Because they sought only future injunctive relief and not release from custody, § 1983 and not habeas corpus was the instrument of choice. (See, e.g., *Wilkinson v. Dotson*, 125 S.Ct. 1242 (2005); *PLN*, July 2005, p.28). [§ 1983 is the proper vehicle when challenging the procedure, but not the fact, of incarceration].

Plaintiffs' attorneys, Thomas and Kevin Peters, sought relief for the class of all similarly-affected Cook County parolees. It is estimated that over 500 parole violators' rights had been thus abused by IDOC over the previous two years. The class was defined as future Cook County parole violators who are (a) taken into custody at the Cook County Jail, (b) transported from the jail within 10 days without having had a preliminary parole revocation hearing, (c) transferred to IDOC, and (d) held without a preliminary parole revocation hearing for more than 60 days.

In opposing the complaint, IDOC argued that the principles of *Gerstein v. Pugh*, 420 U.S. 103 (1975) should prevail over those of *Morrissey v. Brewer*, 408 U.S. 471 (1972), which were cited by the plaintiff parole violators. *Gerstein* dealt with Fourth Amendment rights to a "prompt" probable cause hearing after a warrantless arrest, whereas *Morrissey* dealt with Fourteenth Amendment due process rights to protect the liberty interest in parole. *Morrissey* established parole violators' rights to a preliminary hearing located reasonably near the place of the alleged violation and as promptly as convenient after arrest.

The district court, in ruling on the plaintiffs' motion for a preliminary injunction, distinguished *Gerstein* and *Morrissey* hearings. *Morrissey* hearings require greater due process protections, including the opportunity to call witnesses, cross examine adverse witnesses and present evidence, in addition to the right to counsel and the right to personally appear. Moreover, *Gerstein* and *Morrissey* hearings are distinguishable on their putative results: Whereas a finding of probable cause to detain in *Gerstein* does

not prevent release on bail, such a finding in a *Morrissey* hearing "extinguishes a parolee's right to ... bail."

In sum, the district court was persuaded that IDOC's policy of not providing timely preliminary parole revocation hearings within ten days while the arrestees were still at the Cook County Jail violated their Fourteenth Amendment due process rights under *Morrissey*. Further, the court noted that "parolees have a limited constitutional right to confront and cross examine persons who have provided testimony or evidence which could be used to revoke parole."

Rather than take the case to trial, IDOC agreed to enter into a consent decree. The consent decree includes the following provisions: 1) Accused parole violators shall be transferred to the IDOC's Northern Reception and Classification Center at Stateville within five calendar days after a parole violation warrant is issued, and a preliminary parole revocation hearing shall be held within 10 business days of imprisonment. If such transfers to the IDOC are not possible, a preliminary revocation hearing shall be held at the applicable Cook County facility within 10 business days of imprisonment. 2) All such revocation hearings shall include due process protections as set forth under the *Morrissey* standard, including an investigation of the police report and an interview with the arresting officer (a "King Investigation"). The results of the King Investigation shall be disclosed at the revocation hearing, and the accused parole violator has the right to cross examine the investigator, the right to present written evidence and the right to counsel. 3) Accused parole violators will be notified of the written findings of the hearing officer within 24 hours. If a finding of probable cause is made, the parole violator may be transferred to any IDOC facility.

Additionally, the John Howard Association (JHA) was appointed to monitor the consent decree for a period of one year, with the monitoring fees to be paid by IDOC ($150/hour for JHA Executive Director Malcolm C. Young, $125/hour for JHA Director Charles A. Fasano, and $100/hour for other JHA staff members). The consent decree also specified that IDOC would pay plaintiffs' counsel attorney fees in the amount of $25,987.50, calculated at $135/hour; any final attorney fees in excess of those specified in the decree will be billed at the end of the monitoring period.

The proposed consent decree was preliminarily approved by the district court on November 2, 2006, and notification of the class members was ordered. A fairness hearing is scheduled for January 19, 2007. See: *King v. Walker*, USDC ND Ill., Eastern Div., Case No. 1:06-CV-00204.

**CALIFORNIA HABEAS HANDBOOK**
**5th Edition Now Shipping!**

A PRACTICAL GUIDE TO STATE AND FEDERAL HABEAS UNDER AEDPA

By Kent Russell, PLN Columnist ("Habeas Hints")
• Completely Revised: Autumn, 2006
• All-New Habeas Grounds Table
• Appx. w/ Actual Russell Documents

Cost = $39.99 for prisoners (others add $10).
Send check or money order to:
Kent Russell (C.H.H.)
2299 Sutter Street
San Francisco, CA 94115

Website: RUSSELLHABEAS.COM

## PrisonCallsOnline

**TIRED OF EXPENSIVE COLLECT CALLS AND OUTRAGEOUS PHONE BILLS?**

**We can help** with Prepaid Collect Prison Calls!
**We service** most local, state and federal facilities nationwide.
**We can send** your collect calls to your CELL PHONE, your blocked home number or even overseas.
**We offer** fast activations and 24/7 Internet account access
**Ask us** how you may save by sharing a line with a relative.

**SAVE UP TO 60% ON COLLECT PRISON CALLS**

**1-888-925-1400**
www.prisoncallsonline.com

"I wanted to thank you for providing a service that has saved me over $2,300."
~ W. Howerton, MA

"Thank you for the great service you provide. I truly appreciate your help in keeping our communication line open."
~ J. Manzer, CO

"I'm thrilled with the savings... now I can talk more to my son"
~ N. Rigby, MA

"PrisonCalls is an exceptional company, not only in the service it provides, but also in the personnel. Finding the answers to any of my questions or concerns has only been a phone call away. Since the time we signed up with them we have saved roughly $300 a month on telephone bills."
~ J. Sax, KS

"I wouldn't hesitate for one minute to give your name and number to anyone I know who might be in need of your wonderful service."
~ C. Cooper, MA

When you want to save on your inmate's calls, call the leader in discounted inmate calls: **PrisonCallsOnline!**

# California Lifer Hearing Backlog Increases Despite Court Order To Catch Up

*by Marvin Mentor*

The Marin County Superior Court, which had directed the California Board of Parole Hearings (Board) to take the necessary steps to cut its lifer hearing backlog in 2001 when it was 2,058 hearings behind (and would take 21 months to abate), was distressed to learn in February 2006 that the backlog had increased 55% to 3,200 overdue hearings. The Honorable Verna Adams further ordered the Board not to "remedy" lifer hearing untimeliness by arbitrarily issuing multi-year parole denials.

Judge Adams accepted the untimely-hearing plight of California's lifers as a state-wide habeas corpus class action in *In Re Rutherford*. Originally, in 2001, this writer had assisted Jerry Rutherford in his habeas petition protesting that his overdue hearing was long past the statutory limit of two years. After giving him a belated hearing (parole denied), the Board was again way late for his subsequent hearing. Upon Rutherford's renewed complaint, Judge Adams re-opened the case and appointed the Prison Law Office (PLO) as class counsel.

On February 15, 2006, the court defined the class as "all prisoners serving indeterminate terms of life with the possibility of parole, and who have approached or exceeded their MEPDs [minimum eligible parole date] without receiving their parole hearings within the time required by Penal Code §§ 3041 and 3041.5." Reviewing the evidence, "the court found] inescapable the conclusion that Respondents are failing to furnish timely parole eligibility hearings ... and that the backlog is increasing at an alarming rate." Retaining jurisdiction, the court ordered the parties to enter into a stipulation to resolve the problem, and awarded the PLO attorney fees.

On March 23, 2006, the court approved stipulated procedures outlined in a Remedial Plan which included 90-day reports on reduction of the hearing backlog. This process would continue until the backlog was less than five percent and remained so continuously for twelve months -- to be achieved within 18 months.

On May 5, 2006, not satisfied with progress and disturbed by new reports of a rash of multi-year denials, the court ordered, inter alia, that "[respondents] may not deny further parole consideration for more than one year in the case of prisoners who have formerly been denied for one year, in the absence of a significant change in circumstances, which must be stated on the record." The court also ordered the Board to stop coercing lifers into off-the-record "deals" to forgo hearings (i.e., waive their rights) to gain the "benefit" of a shorter denial, rather than assuredly be given a longer denial if they entered the hearing room. Judge Adams bluntly called this Board practice "illegal and certainly immoral."

While the Board agreed to the long-term reduction of its hearing backlog, it rejected and appealed the order to not give out multi-year denials following either a previous grant of parole or a one-year denial, absent new cause. Lifers have lately reported suffering two-year denials following prior grants of parole, and even longer denials following one-year denials -- all absent new cause. Showing judicial restraint, Judge Adams termed this practice "baffling." The court cited a 1994 statute that required the Board to promulgate regulations setting forth criteria for such multi-year denials, lamenting, "They haven't done that and 12 years have elapsed." An appellate ruling favoring the class would seriously crunch the "breathing room" the Board has created by this illicit practice.

Class counsel Keith Wattley of the PLO asked the court in August 2006 to put a stop to the Board's plan to hire 17 forensic psychologists to conduct lifer psychological exams beginning October 1, 2006. When Wattley pointed out that this personnel switch would necessarily cause hearing postponements due to delays in preparing psychological reports, the court put a stop to it. Additionally, the court is considering a request to order a survey to find out how many prisoners have been impacted by the unlawful "take-a-deal" hearing postponement tactic. In August 2006, Wattley announced that he will be leaving the PLO to go into private practice, but that the PLO will continue to represent the class.

On a sad note, our brother Jerry Rutherford passed away recently from Hepatitis-C. The class action has been recaptioned *In re Lugo*, but retains the same case number. See: *In re Lugo*, Marin Superior Court No. SC135399A.

Other source: *Sacramento Bee*.

# Vienna Convention Creates Individually Enforceable Rights

*by Matthew T. Clarke*

In a ground-breaking decision the Court of Appeals for the Seventh Circuit held that the Vienna Convention on Consular Relations (Vienna Convention) created individual rights to consular notification that may be enforced in a civil action. Thus, the Seventh Circuit allowed a former state prisoner who had not been afforded his Vienna Convention right to consular notification to sue, in federal court, the state officials who denied him those rights.

Tejpaul S. Jogi, a citizen of India and former Illinois state prisoner, was charged with aggravated battery with a firearm in Champaign County, Illinois. He pleaded guilty and was sentenced to twelve years in prison, but was removed to India after having served six of the twelve years. During his incarceration, Jogi learned of his Vienna Convention right to consular notification. Because no state official had ever notified him of his Vienna Convention rights, he filed a lawsuit against various police and prosecution officials in federal court under the Alien Tort Statute (ATS), 28 U.S.C. § 1350. The ATS establishes jurisdiction for federal district court in cases where a tort is committed against an alien in violation of a treaty of the United States. The district court dismissed the suit, stating that Jogi had failed to plead a tort under the ATS. Jogi appealed to the Seventh Circuit.

This case was complex and involved several novel issues. The first issue the Seventh Circuit was required to decide was whether the district court had subject matter jurisdiction. It held that the Supreme Court's decision in *Sosa v. Alvarez-Machain*, 124 S.Ct. 2739 (2004), helped clarify that the district court did have subject matter jurisdiction over this case. However, the *Sosa* opinion also made it clear that only "torts in violation of the laws of nations" would have been enforceable through the ATS, opening the question of whether the Vienna Convention created an individual right enforceable by an individual as a violation of the laws of nations, or whether only relationships between the national governments themselves could be considered when contemplating whether there had been a violation of the laws of nations.

The defendants cited the preamble to the Vienna Convention, which states that the purpose of the establishment of consular relations between sovereign states "is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective states." The Seventh Circuit, however, ruled that regardless of the language used in the preamble, the specific language in Article 5 of the Vienna Convention indicates that the Convention was intended to help both individuals and nations. Furthermore, Article 36 states that an alien must be informed of the right to have the alien's consular officials notified of the arrest and the charges, and that the government making the arrest must promptly make that notification if requested by the alien. Article 36 also guarantees the individual right to private communications with consular officials. Thus, the appellate court found that Articles 5 and 36 create an individual right to consular notification.

The Seventh Circuit also held that the Vienna Convention was self-executing. Thus, it did not require any additional complementary acts of legislation to be enforceable in the federal courts. The Seventh Circuit noted that this was the position of the United States government when the convention was enacted, and was the position taken by the United States as amicus curiae in the Supreme Court case of *Medellin v. Dretke*, 125 S.Ct. 2088 (2005).

Because the United States ratified the Vienna Convention, it is considered the supreme law of the land, on full and equal parity with laws enacted by Congress. In *Breard v. Greene*, 523 U.S. 371, 118 S.Ct 1352, 140 L.Ed2d 529 (1998), the Supreme Court had stated that Article 36 "arguably confers on an individual the right to consular assistance following an arrest." The Seventh Circuit used this, in addition to cases from other circuits and two recent International Court of Justice (World Court) cases to find that the Vienna Convention creates individually enforceable rights.

Another unique issue in this case was whether the rights created by the Vienna Convention were enforceable in a civil action. Some federal circuit courts had previously held that Vienna Convention rights were not enforceable in a criminal case or that there was no remedy available in a criminal case for violation of Vienna Convention rights. The Seventh Circuit held that these rulings were irrelevant when determining whether the Vienna Convention rights were enforceable in a civil action. The Seventh Circuit then held that Vienna Convention rights were privately enforceable in a federal civil action. Because Jogi was relying on a specific statute, rather than the common law of nations, he was not required to show that the violation was "shocking egregious." Instead, treaty-based violations are analyzed in a manner similar to claims of a violation of a statute.

The Seventh Circuit further held that Jogi's claim was not barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364 (1994), because it could have no effect on his conviction or sentence, which he had already served in its entirety. The judgment of the district court was reversed and the case remanded for further proceedings. See: *Jogi v. Voges*, 425 F.3d 367 (7th Cir. 2005).

**Choose from 1000's of Great Gifts**
Buy quality gifts for friends & loved ones. Electronics, toys, magazines, fragrances, gourmet foods, handbags, flowers & more. Reliable delivery. Fast, fair, friendly gift service. Orders confirmed by request. Send name, address and $5.00 (or 13 - 39¢ stamps) for gift catalog and brochures along with complete ordering details. Quixtar affiliated independent business owner. Try us once and you'll be back.
**The Gift Wizard**
PO Box 567
Florence, AZ 85232



**INMATEMAILPALS.COM**

A new and unique Internet pen pal experience developed by a former inmate to offer those behind bars the following advantages...

♦ **Much** lower prices/More for your $
♦ Your ad is placed on the Internet within 24 hours
♦ Affiliation with numerous prisoner support/advocacy groups provides extra exposure
♦ Graphics for your ad are enhanced and attractive
♦ Color copy of your ad...free
♦ If requested, assistance writing the content of your ad...free

Let's face it: Prison life is very tough. I was incarcerated for over 10 years, so I know the critical importance of mail and outside contacts. A pen pal can change your life, regardless of your sentence.

I encourage you to compare prices and service. If you have questions, please write me. I will answer all letters personally. I want to give back to those who are still behind the walls. I look forward to serving you. Take care.

For an application and additional information write:

Brian Rooney
(Inmatemailpals.com)
PO Box 264
Fairfax, VA 22038-0264

1 photo, 300 words...$20/yr.
2 photos, 400 words...$30 /yr.
3 photos, 500 words...$40/yr.
Color copies of your photo $1 each
*Stamps are acceptable as payment

**INMATEMAILPALS.COM**

# Washington Prisoner Sues Over Bogus Disciplinary Actions; State Settles for $1,500

The Washington State Department of Corrections (DOC) has paid one of its prisoners $1,500 to dismiss a civil rights action he filed after disciplinary actions taken against him were vacated for being unlawful.

Lonnie Burton is a Washington state prisoner who, in April of 2001, was serving time at the Stafford Creek Correction Center in Aberdeen. An unidentified Stafford Creek guard who claimed Burton had been billing collect calls to third parties infracted him for soliciting services he couldn't pay for. He was found guilty and sanctioned to twenty days of cell confinement and twenty days loss of good time.

He was soon transferred to the Airway Heights Correction Center near Spokane. In August of 2001, an Airway Heights guard named Castillo found a crude outline of a cell key, a small container of urine, and material from adult book vendors during a search of Burton's cell. He was infracted and found guilty of possessing material likely to be used in an escape attempt and creating a risk of injury through careless behavior. His sanctions for these transgressions were six days of segregation and one-hundred-twenty days loss of good time.

After unsuccessfully appealing within the DOC, Burton challenged the infraction's validity in a Personal Restraint Petition in the state court of appeals. The Attorney General agreed that he'd been sanctioned in error and had the infractions expunged and his good time restored.

Burton then filed a civil rights action under 42 U.S.C. § 1983 in the federal district court at Tacoma. He claimed, among other things, that the DOC violated his right to due process of law in violation of the Fourteenth Amendment to the U.S. Constitution when it rescinded his good time credits through invalid disciplinary actions. He sought both injunctive and monetary relief.

On summary judgment, the court dismissed all of Burton's claims except the above due process claim. A prisoner cannot attack the length of his sentence in a § 1983 action. But once a prisoner has prevailed in an action that reduces the length of his sentence because of a constitutional error, as Burton had done by getting his good time restored through vacation of the disciplinary actions, he may sue for damages under § 1983. Thus, the court held that Burton must be allowed to proceed on this claim.

Faced with the prospect of taking a losing case to trial, DOC's Deputy Secretary, Eldon Vail, signed an agreement to pay Burton $1,500 to dismiss the suit on August 18, 2005. See: *Burton v. Waddington*, USDC WDWA, Case No. C03-501-FDB.

# Settlement Revamps Grant County, Washington Indigent Defense System; County Agrees to $1.1 Million in Attorney Fees

Grant County, Washington entered into a sweeping settlement to resolve a class-action lawsuit alleging that its indigent defense system was constitutionally deficient.

Prior to February 12, 2004, Grant County "maintained a contract system of providing for the defense of indigent" felony defendants. The County "contracted with one attorney or law firm to provide all indigent defense services," including "representation in connection with pre-charging activities, pre-trial hearings, plea negotiations, trial, post-trial motions, filing notices of appeal, probation revocation hearings, certain civil proceedings, and material witness proceedings."

Between January 1996 and December 31, 2000, the County contracted with the firm of Earl & Earl, P.S., to provide all indigent defense in felony cases. The firm was permitted to delegate cases to other attorneys, and commonly did so. Beginning in December 2000, the County entered into an exclusive five-year felony indigent defense contract with attorney Thomas Earl.

Under that contract, Earl was paid "a flat fee for representation of all indigent persons in connection with felony criminal matters... regardless of the number of cases, the complexity of the cases, or the actual costs incurred in the defense of the cases." The flat fee covered "attorney's fees, expert witness fees, private investigator fees and all other" defense costs.

One of the attorneys Earl delegated cases to was Guillermo Romero. In two cases against Earl and two cases against Romero, state and federal courts found that both attorneys provided seriously deficient counsel. The County was aware of these findings but took no action.

Fifteen days apart, in 2001, the Washington State Bar Association (WSBA) initiated disciplinary proceedings against both Earl and Romero, related to unethical conduct committed as Grant County public defenders. On November 15, 2002, the WSBA recommended that Romero be disbarred for committing multiple ethical violations. On June 17, 2003, the WSBA recommended that Earl be disbarred for multiple ethical violations including charging indigent clients money. The County was aware of the WSBA decisions, but took no action.

Despite the WSBA findings, Earl's contract was not terminated. On February 12, 2004, the Washington Supreme Court ordered Earl's immediate suspension but he continued to appear in court as Grant County Public Defender until February 17, 2004.

Despite knowing of Earl's disbarment for 2 and a half years, the County took no action to ensure that indigent defense services were not interrupted on the effective date of Earl's suspension. The indigent defense system was thrown into chaos. Judges "issued a plan to conscript attorneys – including trusts and estates attorneys, business attorneys, and others with no criminal defense experience – to represent indigent persons in felony matters. The only 'qualification' for this compulsory service" was "that the attorney's place of work not be located too far from the courthouse."

Until February 12, 2004, Earl handled more than 300 cases per year; double the WSBA's recommended cap of 150 cases per year. After Earl's suspension there were no limits and attorneys were frequently assigned 28 new cases per month (336 per year), or more.

Under the 2000-2005 contract, the indigent defense budget was fixed at

$500,000, to cover all defense costs. "For many years prior to February 2004, costs for expert witnesses, investigators and similar expenses were required to be paid out of the same limited funds.... This created a conflict of interest for attorneys, required to choose between their own income and retaining an expert or investigator for a client." Often indigent clients were deprived of essential services as a result of this arrangement.

In April 2004, the American Civil Liberties Union of Washington (ACLU), Columbia Legal Services and two private law firms brought suit in the Kittitas County Superior Court, alleging that the Grant County indigent defense system deprived indigent felony defendants of effective assistance of counsel, in violation of the Washington and United States Constitutions. On September 13, 2004, the court certified the case as a class action.

On October 14, 2005, the court denied the County's motion for summary judgment, and granted the plaintiff class partial summary judgment. On November 2, 2005, the parties entered into a comprehensive settlement agreement which brought sweeping changes to the indigent defense system. The County agreed to: a 150 case cap on attorney caseloads, the imposition increased funding for attorney fees, separate funding for investigators, expert witnesses and other defense costs. The Settlement also required the creation of a conflict of interest check system and a complaint system for indigent defendants.

The County paid the plaintiff class $500,000 as partial payment of attorneys' fees and costs. It agreed to additional payments of $100,000 per year, for up to six years. The litigation was stayed for six years, unless full compliance is found after five years (2010). See: *Best v. Granty County*, Kittitas County Superior Court No. 04-2-00189-0.

Similar problems with the Thurston County, Washington, misdemeanor indigent defense system have drawn the attention of the ACLU. But County officials are not moved. "I think they'll sue us," says Thurston County Prosecutor Ed Holm. "I don't think we'll settle." Commissioner Bob Macleod agreed, stating "I don't anticipate we would add to the assigned counsel at this time."

Additional sources: *The Seattle Times, The Olympian*

## $214,000 Award for Injuries Caused by Dilantin Deprivation to Michigan Jail Prisoner

A Michigan federal jury awarded a former prisoner $214,000 in damages for injuries caused by policies at the Grand Traverse County Jail that failed to assure she received her Dilantin.

The plaintiff in this case, Amy Lynn Ford, was on probation for a domestic assault conviction. The evening before reporting to her probation officer she consumed four to six beers, which registered on a breath test. Ford was arrested for a probation violation and taken to jail.

While being booked, she advised guards that she was a epileptic and she had not taken her Dilantin that day. This was reported on the booking questionnaire and placed in the nurse's inbox. Ford was then taken to a cell, where she refused to utilize the bottom bunk.

While sleeping on the top bunk she experienced a seizure, causing a fall that broke her hip and collarbone. Ford's lawsuit contended cruel and unusual punishment. The jury found the guards were not deliberately indifferent to her condition.

The jail's policy, however, of notifying the nurse by placing a notice in an inbox, was found to be deliberately indifferent. The nurse made her own hours on Sundays, the day of the incident. Guards had no idea if the nurse was coming or going and at what time she would receive the notice. They could have easily called her to alert to the medical concern, which would have resulted in Dilantin being provided.

The jury found the jail's policy related to providing the Dilantin was the cause of Ford's injuries, and awarded her $214,000 on May 5, 2006. She was represented by Fredrick E. Mackraz of Grand Rapids. "What I take away from the verdict is that the jury felt the policies and customs of the county were a moving force behind the constitutional violation," said Mackraz. See: *Ford v. Grand Traverse County*, USDC WD MI, Case No: 1:04-CV-00682-MOB.

---

**Dictionary of the Law - Random House**
Thousands of clear concise definitions
See page 45 for ordering information

---

Attention inmates: You need mail when you're in jail!!

Here is all the information you need to place your ad on
**www.inmate-connection.com**
First name, last name, inmate ID#, facility name,
COMPLETE Mailing Address, your sex, D.O.B., race.
Interested in men, women, friends or legal help (choose 1).
Convicted of, release date. All ads run for 1 year.

Send 200 word ad, photo and $25.00 check or money order to:
Inmate-Connection.com
P.O. Box 83897
Los Angeles, CA 90083

We will return your photo along with a copy of your web page.
Inmate-Connection.com is a legitimate service registered in
the State of California. Price doubled for all extras.
Send self-addressed stamped envelope for all inquiries.

# Illegal Strip Searches Cost MTC, New Mexico County $8.5 Million

*by Michael Rigby*

Management and Training Corporation (MTC) and Santa Fe County, New Mexico, will pay $8.5 million to settle with an estimated 13,000 former prisoners who were unconstitutionally strip searched at the Santa Fe County Detention Facility between January 2002 and June 2006. The Utah-based MTC, which operated the jail from October 2001 until April 2005 under a contract with the county, will be responsible for the bulk of the payout--$8 million--while the county will pay $500,000, according to the settlement agreement filed in federal court on July 6, 2006.

The jail's blanket strip search policy was first brought to light in September 2004 when a local newspaper ran a story on Lisa Leyba, 36, a cocktail waitress and bartender who was strip searched following her arrest for serving alcohol to a minor. She believed the doorman had checked IDs, she said. Leyba, like seven of the other named plaintiffs, had never been arrested in her life prior to the alleged offense that led to her being strip searched. The charges against Leyba were later dropped, according to her attorney in the criminal case, Dan Marlowe.

The lawsuit alleged jailers strip searched every person processed into the jail regardless of any reasonable suspicion they harbored contraband or weapons and despite clearly established law. Filed in the U.S. District Court for the District of New Mexico on January 12, 2005, the lawsuit alleged claims under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act. MTC abandoned the policy three months after the lawsuit was filed.

The 11 named plaintiffs will each receive $42,750 under the agreement. Payments ranging from $1,000 to $3,500 will be awarded to the individual class members depending on when the strip searches occurred and other factors, such as whether their breasts or genitals were touched and whether they were a victim of prior sexual abuse. Also, the Santa Fe law firm Rothstein, Donatelli, Hughes, Dahlstrom and Schoenburg, which represented the plaintiffs, will receive $2 million in fees and expenses.

Leyba and another named plaintiff, Kristi Seibold, 51, said the money is not as important as making sure others will not be subjected to the same humiliation they were. "It's bad enough to get arrested knowing you're innocent, without having to then get humiliated and degraded afterward," Leyba said. "You carry it with you."

Seibold, a mother of two teenage boys, was strip searched twice at the jail in 2006: The first time following her arrest for an unpaid ticket that had in fact been paid, and again after she was arrested on a charge, later dismissed, of failing to surrender her dog to an animal control officer. "It was absolutely humiliating and shocking," Seibold said of being strip searched.

The plaintiffs were represented by attorneys John Bienvenu, Mark Donatelli, and Robert R. Rothstein. See: *Leyba v. Santa Fe County Board of Commissioners*, USDC D NM, Case No. CIV-05-0036-BD/ACT.

Additional sources: *Journal, The New Mexican*

# PLRA's Mental and Emotional Damage Award Ban Unconstitutional in $219,000 First Amendment Claim

A Michigan federal district court has held that the Prison Litigation Reform Act's (PLRA) prohibition of mental or emotional damages without physical injury is unconstitutional as applied to First Amendment Violation Claims.

A jury awarded Michigan prisoner Darrell Siggers-El $4,000 in economic damages, $15,000 in mental or emotional damages, and $200,000 in punitive damages. The award came in Siggers-El's retaliation claim, which alleged he was given a retaliatory transfer for making informal complaints to prison officials about a guard's refusal to issue disbursements to Siggers-El's black attorney from his prison account. *PLN* previously reported the decision to deny the guard qualified immunity. See: *Siggers-El v. Barlow*, 412 F.3d 693 (6th Cir. 2005).

After trial, the guard sought a new trial or remitter. First, he argued the PLRA prohibits damages for mental or emotional injury unless there exists more than de minimus physical injury. The Court held that "to bar mental or emotional damages would effectively immunize officials from liability for severe constitutional violations, so long as no physical injury is established."

The Court then quoted a persuasive hypothetical situation. In one case, a sadistic guard holds an unloaded gun to a prisoner's head, pulling the trigger, or stages a mock execution in an adjacent cell. While "The emotional harm could be catastrophic," it "would be non-compensable." Yet, if a guard pushed a prisoner without cause and that prisoner broke his finger," all emotional damages proximately cause by the incident would be permitted."

The Court held that since First Amendment violations rarely, if ever, result in physical injuries, construction of the PLRA against recovery of damages would defeat congressional intent and render constitutional protections meaningless. "Congress did not intend to allow 'prison officials to violate inmate First Amendment rights with impunity, resolute with the knowledge' that First Amendment violations will almost never result in physical injuries," the Court said. It, therefore, refused to grant a new trial or remitter on the mental or emotional damage award.

The punitive damage award was also not found to be excessive because the guard's act was found to be reprehensible, retaliatory, and malicious. The guard knew the prisoner's transfer would cost him one of the best jobs in the prison, prevent him from seeing his lawyer, paying his lawyer, and from seeing his emotionally disabled daughter.

Finally, the Court awarded Siggers-El $90,875.95 in attorney fees and $1,964.07 in costs. His representation was mainly handled by students of the University of Michigan's law school Clinical Law Program. Because "the Jury found the defendant lied about the reasons for the Plaintiff's transfer," the Court required Siggers-El to pay only $1 of his judgment for attorney fees. See: *Siggers-El v. Barlow*, 433 F.Supp.2d 811 (E.D. Mich 2006).

# Michigan Prisoner Assaulted By Jailers Awarded $2,000

*by Michael Rigby*

On June 9, 2006, the U.S. District Court for the Eastern District of Michigan awarded $2,000 to a prisoner who was beaten by jailers in the Macomb County Jail.

While imprisoned at the jail on October 27, 2004, plaintiff William F. Diaz claimed he was beaten by jailer Anthony Romita. Romita had instituted a lockdown during which he aggressively and profanely ordered the prisoners to their cells. Afterward Diaz told his cellmate that he would "kick Romita's ass" if they weren't in jail, and Romita apparently overheard him.

Romita, accompanied by another jailer, Bryan Sywak, entered Diaz's cell and asked, "Which one of you motherfuckers said you would kick my ass?" He then grabbed Diaz by the neck while Sywak escorted Diaz's cellmate to another area. Upon Sywak's return, Romita released his grip on Diaz's neck and began repeatedly punching him in the kidneys, according to the lawsuit. Romita followed up the punches by kneeing Diaz in his left side and hitting him in the back of the head. When Diaz crumpled under the blows, Sywak and Romita forced him onto his bunk, hitting his head in the process. They then smashed his face into the mattress and held it like they were trying to smother him. Sywak and Romita then left the cell and never documented the use of force.

Diaz subsequently filed suit in federal court alleging, among other things, assault and battery, conspiracy, and violation of his constitutional right to be free from cruel and unusual punishment. He named as defendants Romita, Sywak, and jailer Eric Oke, who was working in the control picket during the incident and allowed the assailants access to Diaz's cell.

At trial Diaz presented testimony from fellow prisoners, sheriff's investigators, and others. The jury absolved Sywak and Oke of any wrongdoing but found that Romita had committed battery and used excessive force. They consequently awarded Diaz $2,000 in compensatory damages against Romita but declined to award punitives. Diaz was returned to the Michigan Department of Corrections' Mound Road Correctional Facility in Detroit after the verdict.

All three guards were disciplined following and internal investigation-- Oke for improperly opening a doorway, and Sywak and Romita for removing a television during the lockdown without documenting it--though no criminal charges were filed and they all kept their jobs. Diaz was represented by attorney Fred Gibson of Clinton Township, Michigan. See: *Diaz v. Romita*, USDC ED MI, Case No. 05-70928.

Additional source: *macombdaily.com*



**William L. Schmidt, Esq.**
EXPERIENCED, AGGRESSIVE AND
SUCCESSFUL PRISON LAWYER
CALIFORNIA CASES ONLY!

- Medical Malpractice
- Civil Rights Violation
- Administrative Issues
- Writs of Habeas Corpus
- Appeals
- Parole Hearings
- Revocations
- Transfers

Send a one-page case summary to:
791 Price St. #170
Pismo Beach, CA 93449
(805) 556-0844
(Please write for approval to call collect.)

# Florida DOC's Policy Prohibiting Release of Sex Offenders Without Address Unconstitutional

*by David M. Reutter*

In October, 2005, a Florida Circuit Court has held that a Florida Department of Corrections (FDOC) policy that requires a sex offender to provide a physical address or face indefinite imprisonment is unconstitutional.

Christopher A. Daughtry was convicted on June 23, 2000, of lewd or lascivious assault upon a child. He was sentenced to a split sentence of seven years imprisonment to be followed by five years of sex offender probation. Daughtry reached the end of his term of imprisonment on August 6, 2005. Before he was physically released, the FDOC performed a warrantless arrest for a purported violation of probation. The stated basis for the arrest was Daughtry's failure to provide an address where he would reside when released to probation.

Under Florida law, sex offenders with a victim under eighteen years of age are prohibited from "living within 1,000 feet of a school, day care center, park, playground, or other place" where children regularly congregate. Florida law also requires FDOC to report information concerning sex offenders, including an offender's intended residence if known, to the Florida Department of Law Enforcement (FDLE) when release occurs. FDOC contended it had an inescapable duty to report a satisfactory address to the FDLE.

FDOC recognized that the Court could find Daughtry not guilty of a violation and order his release. FDOC, however, said it would re-arrest Daughtry each time he was released if he could not provide a suitable address. The Court set several status conferences hoping Daughtry would locate an acceptable address.

Unfortunately, Daughtry was unable to accomplish the daunting task of finding a post-release home from prison with no money, no job, and no family or friends to assist him. Daughtry's only asset or resource was his ability to work and earn money. Of course, prison, jail and parole officials offered no assistance in finding him a place to live. The Court found that Volusia County Department Of Corrections put the final nail in the coffin built by FDOC when it placed Daughtry in "lockdown," which prohibited him from making phone calls, "for his own protection" from other prisoners who knew he was a sex offender.

The Court found the FDOC's action overrode the decision state policymakers made many years ago to employ imprisonment, probation and a discretionary combination of the two as appropriate sentences. The FDOC, moreover, had no entitlement to set into place a standard that was impossible to perform, and then elevate to a criminal act the failure to perform to that standard. FDOC cannot rewrite the law by creative construction, nor overrule decisions of judicial bodies by its acts, the Court held.

The Court ordered FDOC to cease its practice of violating sex offenders who do not provide an acceptable address upon release; to monitor Daughtry by GPS monitoring and daily personal contact with a probation officer; to assist Daughtry in obtaining suitable housing utilizing available state funds; and to allow him to describe a residence a person of average intelligence could locate, which could include residing under a bridge.

The State has filed an appeal. "Our understanding of the law is that homelessness is not an option for a sex offender in the 5th District [Court of Appeals]," said prosecutor Phil Havens. *PLN* will report future developments. See: *Florida v. Daughtry*, Seventh Judicial Circuit Court, Volusia County, Case No: 99-34205.

# Wisconsin "Boondoggled" Into Buying Broken Down New Private Prison

After buying a private prison for $87.1 million, the Wisconsin Legislature is crying foul upon discovering the Stanley prison violates electrical, plumbing, and safety codes that will cost $5 million to repair. It's turning out that the entire situation, from the building of the prison to its purchase by taxpayers, was influenced by political lobbyists who had legislators on the take.

The Stanley prison, which confines 1,511 prisoners, was built by Dominion Asset Services in Edmond, Oklahoma. To build a prison in Wisconsin, the Legislature and Governor must agree with what is needed and the Building Commission must formally approve the plan. That process was circumvented to build the Stanley prison.

After the prison was built Attorney General, now Governor, Jim Doyle advised legislators that no prisoners could be housed at the prison unless the state leased or bought it. Dominion went into action after that opinion was issued in 2001.

Dominion hired lobbyists to push the Legislature to buy the prison. To help grease that wheel, Dominion gave $125,000 to Independent Citizens for Democracy, a campaign group illegally controlled by Senate Majority Leader Chuck Chvala (D-Madison). That changed Chvala's position on the state purchasing the prison. Then-Governor Scott McCallum agreed to purchase the prison. Dominion employees donated $4,000 to his re-election campaign.

The state purchased the prison in 2002 for $87.1 million, which allowed Dominion to make "a nice profit," said Sen. Fred Risser. A subsequent inspection has revealed code violations in the heating and cooling systems. Also, the prison requires installation of smoke controls in housing units, grounding of electrical wires, rebuild electric conductors, and move metal stairs. The cost is at least $5 million.

"We're wasting $5 million on this," said Sen. Carol Ruessler, "This company totally did not follow (code) requirements," While that may be true, the bigger question is how did state inspectors approve the building with so many violations of the code requirements?

State officials are now trying to determine if they can sue Dominion. "This was a serious mistake, and a boondoggle of the nth degree," said Sen. Fred Risser. Perhaps, the bigger mistake is allowing private companies to enter the public arena to build and run prisons in the first place.

Source: *Journal Sentinel*

# New York Prison Worker Not Kidnapped/Raped Long Enough For Compensation

*by Gary Hunter*

On December 28, 2004, a 52-year old female employee at New York's Camp Cass juvenile facility was accosted by 16-year old Michael Elston who choked her, banged her head against a wall and raped her at knife-point. Elston then forced his hostage into her car and drove around for six hours before she managed to escape.

The victim said she and her captor traveled "for 50 miles, both inside and outside this facility, at times within several feet of the youth detention aides and other residents and nobody came to my aid."

But being beaten, raped, strangled and held at knife point for six hours was not enough to garner the detention facility worker union insurance compensation. Union insurer JLT Services has a captive clause that only covers workers who are kidnapped for eight hours or more.

The victim's doctor sent a letter in September 2005 to the Civil Service Employees Association (CSEA) stating that the victim would never be physically or emotionally able to return to work. CSEA Capital Region President Kathy Garrison personally requested JLT Services, the union's insurer, to waive the eight-hour limit for the captive clause of its policy. A waiver, if granted, would compensate the victim between $40,000 and $100,000.

"I believe it is in the best interest of our organization and our member to do this," Garrison said in her letter.

On Monday March 6, 2006 JLT Services formally denied the request. The victim received workers compensation and $10,000 cash.

"I feel like I'm being raped all over again," she said. Over 200 local residents have petitioned town, county and state officials to shut down the rural facility near Rensselaerville, New York. A Department of Labor review concluded that Camp Cass employees receive insufficient training and are often exposed to dangerous situations they are not prepared to handle.

Elston was sentenced to 27 years in prison.

Sources: *New York Times Union*

# Mississippi Beating Suit Nets $348,960 — Upheld on Appeal

The Fifth Circuit Court of Appeals has upheld a Mississippi district court's award of damages after a bench trial. The civil rights action was brought by Mississippi prisoner Stephen Michael Combs against Norris W. Kennedy, an employee at Combs' prison. Following the trial, Kennedy appealed the judgment.

On appeal, the Fifth Circuit found "no reversible error as to the factual findings and liability holding against Norris Kennedy for his conduct in this incident." That conduct was not disclosed in the Court's opinion, but it did state that Combs suffered disfigurement, pain and suffering, and emotional damage.

The Fifth Circuit also found the district court's award was not duplicative. That award consisted of "(1) $25,000 for past and present personal injuries; (2) $30,000 for past and present pain and suffering; (3) $55,000 for past and present emotional damages; and (4) $165,000 for permanent injury and future suffering, and emotional damage." As such, the Fifth Circuit affirmed the judgment. See: *Combs v. Holman*, 134 F.Appx. 669 (5th Cir. 2005) (unpublished).

After mandate issued, the parties agreed to the Court entering an order allowing Combs to recover his $275,000 judgment. That October 27, 2005, order also awarded Combs $60,942.50 in attorney fees and costs of $13,018.30 for an additional total of $73,960.80. The Court's order requires the Mississippi Attorney General to recommend the Mississippi Legislature pay the total judgment of $358,960.80 by July 31, 2006 with interest of .0128% from the date of judgment. See: *Combs v. Holman*, USDC SD MS, Case No. 3:00-cv-36-L-N.

## MARILEE MARSHALL* & ASSOCIATES, INC.
### ATTORNEYS AT LAW
### CERTIFIED CRIMINAL LAW SPECIALIST
### 523 WEST SIXTH STREET, SUITE 1109
### LOS ANGELES, CA 90014

### APPEALS, HABEAS CORPUS,
### LIFER PAROLE HEARINGS AND RELATED WRITS
### CALL OR WRITE FOR FREE CONSULTATION
### 213-489-7715

# 5th Circuit Reverses Texas Prisoner's Disciplinary Conviction For "Non-Existent" Offense

*by Michael Rigby*

The U.S. Fifth Circuit Court of Appeals held there was no evidence to sustain a Texas prisoner's disciplinary conviction for assaulting a guard and that the district court erroneously construed the prison's disciplinary code.

Texas state prisoner George Cleron Morgan allegedly assaulted prison sergeant M. Hunt on January 28, 2003 after Hunt had stopped him to inspect an envelope he was carrying. Following a strip search Morgan demanded that Hunt return the envelope. When the envelope was not forthcoming, Morgan charged Hunt, hitting Hunt's left shoulder with his own.

Hunt proceeded with a disciplinary report charging Morgan with a Level 1, Code 3.3 offense, which the September 2003 edition of the prison disciplinary handbook defined as "assaulting an officer, or any other person who is not an offender, without a weapon, which results in a non-serious injury." Morgan was found guilty and received punishment consisting of 45 days commissary and recreation restriction, 42 hours of extra duty, 15 days of solitary confinement, reduction in time earning status from Line 1 to Line 3, and the loss of 180 days of earned good time credits.

After unsuccessfully challenging the disciplinary conviction through the prison grievance process, Morgan filed a 28 U.S.C. § 2254 habeas corpus petition in the U.S. District Court for the Southern District of Texas. On cross motions for summary judgment the district court dismissed Morgan's petition and refused to issue a certificate of appealability (COA). Morgan appealed to the Fifth Circuit, which issued a COA on two issues: "(1) whether the evidence was sufficient to sustain Morgan's disciplinary conviction and (2) whether the district court erroneously construed the disciplinary code." The Court found for Morgan on both issues.

The Court first noted that Morgan's insufficient evidence claim amounted to a due process challenge. The Court next recognized that at the time of Morgan's alleged assault on Hunt, a "non-serious injury" was a required element of a Code 3.3 offense. Since both sides agreed that Hunt was not injured, the Court held that no evidence existed to support Morgan's disciplinary conviction. (The revised January 2005 edition of the disciplinary handbook now specifies as elements of a Code 3.3 offense "non-serious injury or no injury.")

Continuing, the Fifth Circuit addressed the district court's interpretation of the disciplinary statute in ruling on the summary judgment motions, the district court had opined that the "non-serious injury" requirement of the code was an "oversight" and that the prison had an unquestionable right to discipline a prisoner who assaults a guard, "even with no injury resulting." The Fifth Circuit held, however, that the disciplinary charge against Morgan--"assaulting an officer with no injury resulting"--was a "creation of the hearing officer and the district court," and had no basis in the disciplinary rules. Therefore, prison officials lacked authority to punish Morgan for a non-existent offense.

The district court's ruling was thus reversed and the case remanded with instructions for the district court to order prison officials to provide Morgan with a constitutionally adequate hearing within 90 days or to vacate the disciplinary conviction and reinstate Morgan's good time. See: *Morgan v. Dretke*, 433 F.3d 455 (5th Cir. 2005).

## Maryland Disciplinary Rules Violate APA

The Maryland Supreme Court invalidated prison disciplinary "directives" because they were not adopted in conformity with the State Administrative Procedure Act (APA).

Under the Maryland APA, all state agencies must follow certain procedures when adopting "regulations" as defined by the APA. The APA excludes statements concerning only internal management from the definition of "regulation."

The Department of Public Safety and Correctional Services (DPSCS) and Division of Corrections (DOC), adopted numerous regulations. "Most of the rules governing operation of the state correctional facilities, however, and especially those dealing with inmates, are in the form of 'directives' adopted ... without any pretense of compliance with" the APA, stated the Court.

On June 19, 2002, Maryland prisoner Richard Massey filed an administrative review request, alleging that he was being subjected to prison discipline pursuant to DPSCS D105-4 and 105-5, which violated the APA. The Inmate Grievance Office (IGO) determined that the challenged directives were not regulations as defined in the APA, and did not need to be adopted as such.

Massey then filed a petition for judicial review in state court. Following a hearing, the court affirmed the IGO decision but did not indicate why.

Massey appealed to the Court of Special Appeals, but before the case was argued the Maryland Supreme Court granted certiorari, sua sponte.

The State did "not contest that DPSCS D105-4 and 105-5 fall within the" APA's "definition of 'regulation.'" It argued, instead, that it was excused from complying with the APA because "the directives concern 'only internal management...' and therefore are excluded" from the APA's finding that both the nature and the history of the directives make it clear that they "are not merely guidelines pertaining to internal management, routine or otherwise."

The court held "that DPSCSD 105-4 and 105-5 constitute regulations" under the APA, that they "are not exempt from the APA requirements, and that to be legally effective, they must be adopted in conformance with those requirements." Since the rules at issue were not adopted in compliance with APA requirements, the court declared them ineffective. See: *Massey v. Secretary, Dept. of Public Safety and Correctional Services*, 389 Md. 496, 886 A.2d 585 (Md. 2005).

---

**New Revised Edition Now Available!**
**Hepatitis & Liver Disease**
By Dr. Melissa Palmer
See page 46 for ordering information

# Texas Supreme Court: Non-Suit Deprives Appeals Court of Jurisdiction

The Supreme Court of Texas held that a plaintiff's filing non-suit while an appeal was pending deprived the court of appeals of jurisdiction and any authority to enter an order, holding or opinion.

Darla Blackmon, a Texas state prisoner, died of pneumonia while being held at a substance abuse facility operated by the University of Texas Medical Branch at Galveston (UTMB). Her daughter, Sheila Shultz, filed suit against UTMB for wrongful death, alleging UTMB failed to diagnose and treat Blackmon's illness. Shultz claimed that the Texas Tort Claims Act waived the state's sovereign immunity because the case involved personal injury caused by a condition or use of tangible personal property. See: § 101.021(2), Texas Civil Practice and Remedies Code. UTMB filed a plea to the jurisdiction. The trial court denied the plea, and UTMB filed an interlocutory appeal in the court of appeals.

The court of appeals reversed the denial and rendered judgment in UTMB's favor. Shultz filed a motion for rehearing, which the court of appeals granted. Three weeks later Shultz filed non-suit (a voluntary dismissal of the underlying lawsuit), and moved to dismiss the appeal for want of jurisdiction. The court of appeals denied the motion and later issued a new opinion denying UTMB's plea to the jurisdiction.

UTMB filed a petition for review in the Texas Supreme Court. In response to the petition for review, Shultz maintained that the court of appeals was without jurisdiction to enter the opinion on rehearing as there was no longer a case or controversy following her filing of the non-suit.

The Texas Supreme Court held that, under the circumstances of the case, Texas Rule of Civil Procedure 162 applied to the suit while it was pending on appeal, and gave Shultz the right to file non-suit. Non-suit extinguishes the case or controversy from the moment it is filed or an oral motion is made in open court. The only exceptions are an adverse party's claim for affirmative relief, costs taxed by the clerk, and motions for sanctions, attorney's fees or other costs pending at the time of the dismissal. "A claim for affirmative relief must allege a viable cause of action, independent of the plaintiff's claim. ..." UTMB did not raise such a claim for affirmative relief but did request costs, attorney's fees and sanctions; thus, the trial court could still hold hearings on those issues even after non-suit was filed. However, the non-suit still rendered the merits of the suit moot.

UTMB argued that a plaintiff cannot file non-suit after a court has entered a judgment on the merits. But this was an interlocutory appeal and the court of appeals had withdrawn its judgment when it granted Shultz's motion for rehearing before the non-suit was filed. Thus, the only ruling in question was the trial court's order denying UTMB's plea to the jurisdiction. That ruling was in Shultz's favor; therefore, the court of appeals lacked jurisdiction to issue an order and opinion on rehearing. The Texas Supreme Court vacated the order of the court of appeals and dismissed the appeal for want of jurisdiction. See: *University of Texas Medical at Galveston v. Estate of Blackmon*, 195 S.W.3d 98 (Tex., 2006).



## LEARN TO PROTECT YOUR RIGHTS

**YOU HAVE A RIGHT TO**
- Adequate medical care
- Protection from assault
- Humane living conditions
- Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, **Protecting Your Health and Safety**, written specifically for inmates who are unable to receive help from a lawyer.

WRITTEN BY
ROBERT E. TOONE
A PROJECT OF THE
SOUTHERN POVERTY LAW CENTER

**COST** $10 (includes shipping/handling)

**ORDER A COPY**
Send a check or money order to
**Protecting Your Heath and Safety
Prison Legal News
2400 NW 80th Street #148
Seattle, WA 98117
(206) 246-1022**

Be sure to include your name, identification number (if any), and mailing address. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date. Upon request, prison law libraries will be sent a copy at no cost.

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2002.




## Not Just A Gift...
### The Complete Package

*When you can't be there ...*

*touch your loved ones in a special way!*

**Catering to Incarcerated People**

Affordable Gifts for Family & Friends
Exclusive Glass & Spa Items • Fine Jewelry
Unique Plush Animals • Specialty Candles
Fresh Cut Roses & Flowers
Balloon Gifts & More!

Send 5 new stamps in strips only (or equivalent funds) for **NEW 2007** Full-Color Catalog, now featuring nearly 70 gifts to:

*Jaden Moore of New York*

Catalog-PLN7 • 600 Violet Av, Ste.168 • Hyde Park, NY 12538
Web Site: www.JadenMooreofNewYork.com

# Virginia Guard Hazed By Coworkers Awarded $25,001

*by Michael Rigby*

On March 1, 2006, a jury in the U.S. District Court for the Western District of Virginia awarded $25,001 to a prison guard who was subjected to a humiliating hazing ritual by his coworkers.

Guard Terry Givens was promoted to sergeant on December 21, 2000, while working at the Wallens Ridge supermax prison in Western Virginia. Knowing the promotion meant Givens would be going to another shift, two of his coworkers--guards Mike Mullins and Joey O'Quinn--decided to give him an impromptu send off. Mullins and O'Quinn handcuffed Givens to a table and removed his pants. They then taped his genitals and took photographs. A third guard, Captain Charley Janeway, was reportedly aware of the attack and failed to intervene.

Givens sued the Virginia Department of Corrections (VDOC) claiming the guards' outrageous behavior and Janeway's failure to intervene violated his constitutional rights. The VDOC contended the defendants' actions were merely horseplay and noted that O'Quinn and Mullins were demoted following the incident. Nevertheless, a jury found in favor of Givens and awarded him punitive damages of $5,000 each against Mullins and O'Quinn and $15,000 against Captain Janeway. The jury initially awarded no compensatory damages. But after the judge informed them there could, by definition, be no punitive damages without compensatory damages, the jury reconsidered and awarded Givens $1 in compensatory damages. Thus, the total award was $25,001.

It should be noted that Wallens Ridge has long been known for prisoner abuse [see *PLN*, January 2000, p. 17 for more]. And it's no wonder. If guards treat each other this way, one can only imagine what they do to the prisoners. Judge James P. Jones presided. Givens was represented by Hilary K. Johnson of Abingdon, Virginia. See: *Givens v. Virginia DOC*, USDC WD VA, Case No. 2:02-214.

# Fourth Circuit Holds FTCA Applies to BOP Property Claims

The Fourth Circuit Court of Appeals joined the Sixth, Seventh and District of Columbia Circuits in holding that Bureau of Prisons (BOP) guards are not "law enforcement officers" for purposes of 28 U.S.C. § 2680(c). The Fifth, Eighth, Ninth, Tenth, Eleventh and Federal Circuits disagree.

BOP prisoner Anthony Andrews was temporarily transferred between prisons for a hearing. He left most of his legal materials at the original prison because he was going to be returning. Guards later packed up his property and shipped it out of the prison. The property was lost.

Andrews filed an administrative claim, seeking damages for the missing property. BOP denied the claim and Andrews brought suit against the United States under the Federal Tort Claims Act (FTCA), alleging BOP employees negligently lost his property.

The government moved to dismiss on sovereign immunity grounds. The district court granted the motion, concluding that BOP officials "were 'law enforcement officer[s]' for purposes of § 2680(c)'s exception to the waiver of sovereign immunity." It then found that the government "had not waived sovereign immunity for suits against BOP officers" on property claims, and dismissed for lack of subject-matter jurisdiction.

The Fourth Circuit noted that the case turned on the precise meaning of who a "law enforcement officer" is under § 2680(c). While BOP guards assuredly meet that definition in the abstract, the court applied the canons of statutory construction to "remove the phrase from the abstract and give it the meaning the context demands." This resulted in a much narrower definition than the phrase has in the abstract.

The court held that the phrase "should be limited to those officers acting in a tax and customs enforcement capacity." Since the BOP guard "was not performing such a function, he is not a 'law enforcement officer' for purposes of § 2680(c)." Therefore, the court reversed the dismissal, noting that while the quantity of Circuits favored the government's position, the quality of decisions favored Andrew's position. See: *Andrews v. United States*, 441 F.3d 220 (4th Cir. 2006).

# Eleventh Circuit Affirms Damage Award in Psychiatrist's Strangling Death

The Eleventh Circuit Court of Appeals has affirmed a jury's verdict awarding a psychiatrist's widow $1.3 million judgment against Florida's Collier County Sheriff. *PLN* previously reported this verdict, which was predicated upon the strangling death of Dr. David Hoyer.

Dr. Hoyer went to the Collier County Jail to evaluate the competency to stand trial of known dangerous prisoner Rodriguez Patten on January 3, 2001. Patten strangled Hoyer, who died three days later.

After the jury's verdict, the sheriff appealed. He argued that the district court erred in "permitting certain testimony of Mrs. Hoyer's expert witness, Randall Atlas." The Eleventh Circuit disagreed.

That Court noted that sheriff Hunter admitted at trial that he at least owed Dr. Hoyer a general duty of care. More importantly, the Court found the jury instructions cured any error. As such, the verdict was affirmed.

Mrs. Hoyer will soon receive $200,000 from the Florida Sheriff's Self Insurance Fund. This is the state cap on such claims against government entities. A bill has been pending in the Florida legislature to allow the entire verdict to be paid. It has been awaiting resolution of the appeal.

Despite pleading insanity, Patten received a life sentence on his kidnapping, carjacking, and robbery charges. See: *Hoyer v. Hunter*, 173 Fed. Appx. 790 (11th Cir. 2006).

Additional source: *Naple News*

## Missouri Prison Ordered to Provide Immediate Abortion

A federal court in Missouri granted an injunction to a female prisoner, requiring the Women's Diagnostic and Correctional Center (WERDCC) to transport her for an immediate abortion.

Prisoner Roe was approximately 16-17 weeks pregnant and had been requesting an abortion while confined at WERDCC. No such services were available there and prison officials refused to transport Roe to the community for an abortion.

Roe brought suit alleging that WERDCC's policy of refusing to allow abortions that are not medically necessary violated her constitutional rights. She moved for a preliminary injunction, requiring Defendants to transport her to a local health care provider for an abortion.

On October 13, 2005, the court granted the injunction, finding that all of the requisite factors tipped in Roe's favor. On October 14, 2005, Defendants moved to stay execution of the preliminary injunction. The court denied the motion, however, finding that it was "merely a recitation of the points in opposition made at the October 13, 2005 Preliminary Injunction Hearing." The Court then ordered that Roe be transported October 15, 2005 for the abortion.

The court indicated that an application to the Eighth Circuit Court of Appeals "for a stay of this Modified Order does not authorize Defendants to refuse to carry out its terms. This Court will not tolerate further defiance of its orders." See: *Roe v. Crawford*, 396 F.Supp.2d 1041 (WD MO 2005).

## Fifth Circuit Reinstates Texas Prisoners' Challenge to Extended Lockdown

*by Michael Rigby*

The U.S. Fifth Circuit Court of Appeals reinstated a prisoner lawsuit challenging the Texas Department of Criminal Justice's practice of indefinite segregation without due process.

C. Joseph Salazar and Johnny Maldonado are Texas prisoners who have been confined in administrative segregation (ad seg) for more than 15 years based on alleged gang affiliation. The pair sued TDCJ, pro se, under 42 U.S.C. § 1983 claiming its review procedures violated their Fourteenth Amendment due process rights. Specifically, the prisoners contended the procedures were a "sham" and that the State Classification Committee (SCC) had no power to release them from segregation. In May 2005, the U.S. District Court for the Southern District of Texas dismissed their suit as frivolous and for failure to state a claim.

On appeal, the Fifth Circuit vacated and remanded to the district court for reconsideration in light of *Wilkinson v. Austin*, 125 S.Ct. 2384 (2005), which was decided in June 2005 following the dismissal.

In *Wilkinson*, a class of prisoners confined for indefinite periods in Ohio's supermax prison contended that inadequate review procedures violated their constitutional right to due process. The *Wilkinson* court concluded, first, that prisoners have a liberty interest in avoiding placement in supermax, and second, that Ohio's new review procedures (implemented on the eve of trial) met due process standards by providing for a review within 30 days of initial placement in supermax, and a three-tiered review process with authority vested at each level to overturn placement recommendations.

Salazar and Maldonado made similar claims. Like those in Ohio's supermax, Texas prisoners confined in ad seg are deprived of virtually all human contact and mental stimuli. They are housed alone and remain in their cells 23 hours a day; they have no access to educational, vocational or other rehabilitative programs and they are provided with only limited access to legal materials, visitation and other privileges.

What's more, Texas prisoners placed in ad seg for gang affiliation are reviewed just once a year, and, because they are deemed "confirmed" members of a security threat group, the SCC has only one option: to continue confinement in ad seg. Consequently, Salazar and Maldonado argued that the process is devoid of any meaning or substance because the SCC lacked authority to release them.

Salazar was recently readmitted to the general population through the TDCJ's gang renunciation program -- currently the only way to be released from ad seg. Maldonado remains in segregation. The prisoners plan to seek class action certification and ask any interested parties to visit their web site at www.brokenchains.us and click on the "Living on the Edge" link. See: *Salazar v. Dretke*, 184 Fed.Appx. 418 (5th Cir. 2006) (unpublished).



**CAGED TALENT**
www.cagedtalent.com

**ATTENTION ARTIST AND CRAFT MAKERS**

SHOWCASE YOUR TALENTS ON OUR NATIONAL WEBSITE
UNLIMITED POSTINGS FREE
YOU RECEIVE 75% OF EACH SALE

CONTACT:
CAGED TALENT LLC.
3157 North Rainbow Blvd. Suite 425
Las Vegas, Nevada 89108-4578
Please Do Not Send Items until You Are a Member.