# Exhibit C
# Deposition of Gary Lindsey

1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                     DALLAS DIVISION

3   PRISON LEGAL NEWS,              )
         Plaintiff,                 )
4                                   )
    VS.                             )   CIVIL ACTION NO.
5                                   )   3:07-CV-0367-P
    GARY LINDSEY, et al.            )
6        Defendants.                )

7                                   CERTIFIED COPY

8

9

10

11

12

13

14

15                       DEPOSITION OF

16                     GARY M. LINDSEY

17                     DALLAS, TEXAS

18                     AUGUST 2, 2007

19

20

21

    ATKINSON-BAKER, INC.
22  COURT REPORTERS
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:  DAWN A. TOOKE, CSR NO. 7319

25  FILE NO.:  A105FA2

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3    PRISON LEGAL NEWS,              )
         Plaintiff,                  )
4                                    )
     VS.                             )    CIVIL ACTION NO.
5                                    )    3:07-CV-0367-P
     GARY LINDSEY, et al.            )
6        Defendants.                 )

7

8

9

10

11

12

13

14

15        Deposition of GARY M. LINDSEY, taken on behalf of

16    Plaintiff, at the Office of the District Attorney, 133

17    North Industrial Boulevard, 11th Floor, Dallas, Texas,

18    commencing at 1:08 p.m., Thursday, August 2, 2007, before

19    Dawn A. Tooke, CSR No. 7319.

20

21

22

23

24

25

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3        Mr. Scott Medlock
         TEXAS CIVIL RIGHTS PROJECT
4        1405 Montopolis Drive
         Austin, Texas  78741-3438
5        (512) 474-5073

6    FOR THE DEFENDANTS:

7        Ms. Dolena T. Westergard
         OFFICE OF THE DISTRICT ATTORNEY
8        Federal Section
         133 North Industrial Boulevard
9        LB 19
         Dallas, Texas  75207-4399
10       (214) 653-3692

11   ALSO PRESENT:

12       Mr. Ian Pisarcik

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A.    They were acting -- I'm not sure that they could

2    act on behalf of Dallas County.  They were acting on

3    behalf of the sheriff because that's who they were

4    actually working for, so I'm not sure that they could be

5    acting on behalf of Dallas County, per se, but they were

6    acting on behalf of the sheriff.

7    Q.    But they were enforcing a policy of Dallas

8    County?

9    A.    Well --

10   Q.    Of the sheriff's office?

11   A.    Of the sheriff's department of Dallas County,

12   yes.

13   Q.    And we're not sure how, say, the staff in the

14   mailroom were informed of the new policy, correct?

15   A.    No, I'm not.

16   Q.    Okay.  But from this e-mail marked as -- I

17   believe as Exhibit 2, we know that the policy came into

18   force on March the 17th, 2006, correct?

19   A.    I believe that's what the e-mail says, if that's

20   what it says.

21   Q.    You have no reason to believe that it started

22   being enforced earlier or later than that date?

23   A.    No, I do not.

24   Q.    Okay.  Now, the memo that's marked as Exhibit 4

25   discusses the reasons why the policy was issued, correct?

1    that goal by banning publications?

2        A.    No.    I think that you're looking at two

3    different issues here.    What was communicated to us and

4    one of the issues they had -- specifically what they were

5    talking about was fire-loading material because we don't

6    allow smoking.    They don't have lighters.    The issue they

7    had was the amount of paper, newspapers that were allowed

8    to accumulate in there that they felt constituted a fire

9    hazard in the cells.

10        Q.    But the communication there doesn't specifically

11    mention newspapers or publications, correct?

12        A.    No, it does not.

13        Q.    Okay.    And there are other ways to control fire

14    hazards, correct?    You mentioned that inmates aren't

15    allowed to smoke or have lighters.

16        A.    Yes.

17        Q.    And, like, for example, Dallas County could have

18    controlled the amount of publications that an inmate had.

19    They could limit him to, say, five magazines, correct?

20        A.    Well, they could.    I think you run into staffing

21    issues and other issues that you would have to try to

22    limit that.    We did not feel that that was the appropriate

23    solution because it still -- regardless -- because there

24    was no way to contain those things.    You still had a fire

25    hazard.

1     Q.    But if there was -- Dallas County does limit the

2    amount of material that inmates can have in their cell,

3    correct?

4     A.    We do now, yes.

5     Q.    And at the time when the 2006 policy was issued,

6    the -- there was a policy requiring inmates to keep their

7    cells clean and tidy, correct?

8     A.    Yes.

9     Q.    And there was a rule that prevented inmates from

10    placing paper over cell bars, doors, light fixtures and

11    air vents, correct?

12     A.    Yes.

13     Q.    And enforcing those policies would have

14    prevented fire hazards, correct?

15     A.    Yes.

16     Q.    And inmates were allowed to have other flammable

17    materials in their cells like a Bible, correct?

18     A.    Yes.

19     Q.    And they could have soft-back books, correct?

20     A.    Yes.

21     Q.    And they could have writing paper, correct?

22     A.    Yes.

23     Q.    And they could have toilet paper?

24     A.    Uh-huh.

25     Q.    And all of these materials we've just discussed

1        A.     (Witness complies.)   Okay.

2        Q.     You don't find anything in there objectionable

3   on security grounds at the jail, do you?

4        A.     Not on first glance, no.

5        Q.     And you don't have any reason to believe that

6   there's anything objectionable in there?

7        A.     No, I don't.

8        Q.     And, to your knowledge, the publication -- my

9   client's publication has never caused any sort of problem

10  at the jail?

11       A.     I'm not aware of any, no.

12       Q.     Okay.  But during the implementation of the

13  March 2006 policy, inmates couldn't access my client's

14  publication, correct?

15       A.     I'm not sure I can really answer that question.

16  I'm not sure whether it was cut off in May or March of

17  2006 or not.

18       Q.     Assuming that the policy was enforced beginning

19  on March 17, 2006, would inmates in the jail have been

20  able to access my client's publication while the policy

21  was in force?

22       A.     If that was being enforced at that time.  You

23  know, the policy went in -- to go back and specifically

24  say that that publication was excluded, I can't answer

25  that.  I don't know.

1   publisher's attorneys were notified or not, I do not know,

2   but I think there were issues that were raised about,

3   specifically, the "Prison Legal News" that made us look at

4   that policy again, plus putting in property boxes inside

5   the cells where we could limit the amount of material that

6   an inmate was allowed to accumulate.

7        Q.    When were the property boxes put in?

8        A.    It would have been some time in the spring.    I

9   don't have an exact date.

10       Q.    Spring of this year?

11       A.    Yes.

12       Q.    Do you know if it was -- if that limitation was

13  put in before or after this lawsuit was filed?

14       A.    I'm not sure of the file date on the lawsuit.    I

15  think the property boxes were probably put in prior to the

16  filing of the lawsuit.

17       Q.    Okay.  And the -- just to be clear, the property

18  boxes limit the amount of stuff that an inmate can keep in

19  their cell?

20       A.    Yes.

21       Q.    So the inmate could keep however much stuff they

22  wanted as long as it just fit in that property box?

23       A.    Yes.

24       Q.    So they could fill the entire thing up with

25  "Prison Legal News" or they could fill it all up with

42

Appendix p. 21

1    whatever other material they're allowed to have?

2        A.    Yes.

3        Q.    Okay.  Do you believe the policy was changed

4    because of this litigation?

5        A.    No.

6        Q.    No.  Why was the policy changed, to your

7    understanding?

8        A.    Well, I think -- to be more specific as to

9    exactly which policy we're talking about, if we're talking

10   about back in March or May, no, it was done as a result of

11   the Department of Justice.  We changed some of the policy,

12   too, because of the insulation in the property boxes.  We

13   had another alternative to control some of the fire

14   material up in the jails.

15       Q.    Okay.  And the policy could change back,

16   correct?

17       A.    The policy could change back if the Department

18   of Justice or the jail commission came through and said,

19   This is not satisfactory on what you're doing, we could be

20   forced to change the policy again, yes.

21       Q.    Now, you said the Department of Justice forced

22   you to change the policy.

23       A.    No.  I didn't say that they --

24       Q.    They could force.

25       A.    They could force the changes.

1          MR. MEDLOCK:  Okay.  Okay.

2      Q.    Real quick, just a few more questions.  As a

3  jailer, you know that it's important to keep prisoners

4  occupied while they're in the jail, correct?

5      A.    Yes.

6      Q.    And reading is a good way to keep prisoners

7  occupied, correct?

8      A.    Yes.

9      Q.    And sometimes reading can even help rehabilitate

10  an inmate, correct?

11      A.    Well, assuming whatever it is they're reading,

12  yes.

13      Q.    Assuming they're reading -- assuming they're not

14  reading pornography, for example, that would be --

15      A.    It could, yes.

16          MR. MEDLOCK:  Okay.  Thank you, Chief.  I'm

17  going to pass the witness at this point.

18          MS. WESTERGARD:  I have no questions, but I

19  would like to make a few statements about what we'd get

20  for you today based upon -- the Chief made reference to a

21  correspondence plan approved by the jail commission.  I

22  don't think -- we will provide you that, for what it's

23  worth.  He's going to look for the dates of -- some kind

24  of indication of when the property boxes were received.

25          MR. MEDLOCK:  Okay.

REPORTER'S CERTIFICATE

I, DAWN A. TOOKE, CSR No. 7319, Certified
Shorthand Reporter, certify;

That the foregoing proceedings were taken
before me at the time and place therein set forth, at
which time the witness was put under oath by me;

That the testimony of the witness, the
questions propounded, and all objections and
statements made at the time of the examination were
recorded stenographically by me and was thereafter
transcribed;

That the foregoing is a true and correct
transcript of my shorthand notes so taken.

I further certify that I am not a relative or
employee of any attorney of the parties, nor
financially interested in the action.

I declare under penalty of perjury under the
laws of Texas that the foregoing is true and correct.

Dated this _____ day of _____,

2007.

Signature Reserved

_____
DAWN A. TOOKE, CSR NO. 7319
Expiration Date: 12/31/2008
Atkinson-Baker, Inc. Court Reporters
500 N. Brand Blvd., Third Floor
Firm Reg # 32
12/31/2007
Glendale, CA 91203; Tel. # (800) 288-3376

Appendix p. 24