UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PRISON LEGAL NEWS, n/k/a HUMAN RIGHTS DEFENSE CENTER, Plaintiff, | § | CIVIL ACTION NO. |
| v. | § | 3:07-CV-367-X |
| GARY LINDSEY, individually and in his official capacity as the Chief Deputy, Office of Detention Services for Dallas County, SHERIFF LUPE VALDEZ, individually and in her official capacity as the Sheriff of Dallas County, and DALLAS COUNTY, Defendants. | § | **Oral Argument Before the Presiding Judge Requested** |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO REOPEN CASE, MOTION TO ENFORCE CONSENT DECREE, MOTION TO SHOW CAUSE, MOTION TO MODIFY THE CONSENT DECREE, AND BRIEF IN SUPPORT**

JOHN CREUZOT
CRIMINAL DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

Jason G. Schuette
Assistant District Attorney
Texas State Bar No. 17827020
jason.schuette@dallascounty.org

Barbara S. Nicholas
Assistant District Attorney
Texas State Bar No. 24032785
barbara.nicholas@dallascounty.org

Civil Division
Dallas County Records Building
500 Elm Street, Suite 6300
Dallas, Texas 75202
Telephone: 214.653.7358
Telecopier: 214.653.6134

ATTORNEYS FOR DEFENDANTS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

I. BACKGROUND .......... 1

II. SUMMARY OF RESPONSE TO THE MOTION TO SHOW CAUSE .......... 4

III. ARGUMENT AND AUTHORITIES – SHOW CAUSE MOTION .......... 5

A. Legal standards for finding a violation of a consent decree .......... 5

B. Defendants did not violate the Consent Decree for a failure to notify HRDC regarding a rejection of HRDC items based upon content. .......... 6

C. Defendants notified HRDC in the manner specified by the Consent Decree for rejections of HRDC's materials for reasons other than content. .......... 7

D. The DCSO's mail procedures are necessary to serve important penological safety and security interests. .......... 9

E. Defendants did not intentionally violate the Consent Decree. .......... 10

IV. MOTION TO MODIFY THE CONSENT DECREE .......... 11

A. Introduction .......... 11

B. Consent Decree modifications sought .......... 12

C. Legal standards for modification of a consent decree .......... 13

1. The first *Turner* factor: a valid rational connection to a legitimate governmental interest .......... 20

2. The second *Turner* factor: whether alternative means are open to communicate HRDC's messages .......... 20

3. The third *Turner* factor: what impact an accommodation of the right would have on guards and inmates and prison resources .......... 22

4. The fourth *Turner* factor: whether there are "ready alternatives" to the proposed changes to the Consent Decree .......... 22

V. CONCLUSION .......... 24

CERTIFICATE OF CONFERENCE .......... 26

CERTIFICATE OF SERVICE .......... 26

# TABLE OF AUTHORITIES

## Cases

*Baddock v. Villard* (*In re Baum*),
606 F.2d 592 (5th Cir. 1979) .......... 5

*Beard v. Banks*,
548 U.S. 521 (2006) .......... 21

*Bell v. Wolfish*,
441 U.S. 520 (1979) .......... 9

*Cooper v. Noble*,
33 F.3d 540 (5th Cir. 1994) .......... 14

*Cooper v. Noble*,
41 F.3d 212 (5th Cir. 1994) .......... 14

*F.D.I.C. v. LeGrand*,
43 F.3d 163 (5th Cir. 1995) .......... 5

*Florence v. Bd. of Chosen Freeholders*,
566 U.S. 318 (2012) .......... 9

*Human Rights Def. Ctr. v. Baxter Cnty., Arkansas*,
999 F.3d 1160 (8th Cir. 2021) .......... 19, 21

*Jackson v. Whitman*,
642 F. Supp. 816 (W.D. La. 1986) .......... 5

*Jones v. Salt Lake Cnty.*,
503 F.3d 1147 (10th Cir. 2007) .......... 9, 10

*League of Latin Am. Citizens Dist. 19 v. City of Boerne*,
659 F.3d 421 (5th Cir. 2011) .......... 14, 18

*Lewis v. Sec'y of Pub. Safety & Corr.*,
870 F.3d 365 (5th Cir. 2017) .......... 9

*Martin v. Trinity Industries, Inc.*,
959 F.2d 45 (5th Cir. 1992) .......... 5

*McCreary v. Richardson*,
738 F.3d 651 (5th Cir. 2013) .......... 9

*NLRB v. Trailways, Inc.*,
729 F.2d 1013 (5th Cir. 1984) .......... 5

*Overton v. Bazzetta*,
539 U.S. 126 (2003) ... 19, 20, 21

*Pell v. Procunier*,
417 U.S. 817 (1974) ... 21

*Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*,
177 F.3d 380 (5th Cir. 1999) ... 5, 8

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ... 13, 14, 18

*Thornburgh v. Abbott*,
490 U.S. 401 (1989) ... 19

*Turner v. Safley*,
482 U.S. 78 (1987) ... 9, 19

*United States v. Alcoa, Inc.*,
533 F.3d 278 (5th Cir. 2008) ... 5

*United States v. Chromalloy Am. Corp.*,
158 F.3d 345 (5th Cir. 1998) ... 5

*United States v. Swift & Co.*,
286 U.S. 106 (1932) ... 13

**Statutes**

Tex. Admin. Code § 251.1 ... 3

TO THE HONORABLE COURT:

Defendants, Dallas County, Shane Sowell, in his official capacity as Chief Deputy, Office of Detention Services for Dallas County, and Sheriff Marian Brown, in her official capacity as the Sheriff of Dallas County, tender their response to *Plaintiff's Motion to Re-Open the Case, Enforce the Consent Decree, and Obtain an Order to Show Cause* (ECF No. 39) (the "*Motion*"). Defendants join Plaintiff's motion to re-open the case, but deny that they have intentionally or materially violated the Consent Decree, and deny that Plaintiff is entitled to relief. Further, Defendants move the Court to modify the terms of the Consent Decree.[1]

Defendants incorporate by reference *Defendants' Combined Appendix to Their Response to Plaintiff's Motion to Show Cause and to Modify the Consent Decree* ("Appx.").

## I. BACKGROUND

Plaintiff, Prison Legal News ("PLN"), now the Human Rights Defense Center ("HRDC"), filed suit against the original Defendants, Dallas County, former Dallas County Sheriff Lupe Valdez ("Sheriff Valdez"),[2] and former Dallas County Sheriff's Office ("DCSO") Chief Deputies Edgar McMillan ("Chief McMillan") and Gary Lindsey ("Chief Lindsey").[3] PLN alleged that it published for subscription a monthly 48-page (now 70 page) "legal information magazine" that dealt with the rights of incarcerated individuals. *See Plaintiff's Amended Complaint* (ECF No. 29) (the "Complaint" or "Compl.") para. 10. PLN further alleged that, in March 2006, Chief McMillan devised a policy that prohibited DCSO jail inmates from possessing magazines and newspapers,

[1] For convenience and judicial economy, Defendants brief together their response to the Motion and Defendants' own motion to modify the Consent Decree.

[2] PLN sued Sheriff Valdez in both her individual and official capacities. The current Dallas County Sheriff is Marian Brown. As with Chief Shane Sowell, who is also to be substituted in place of his former counterpart, Gary Lindsey, Sheriff Brown's appearance here is obviously solely in her official capacity, not in any individual capacity.

[3] Chief McMillan was the Chief Deputy in the DCSO's Detention Bureau. He preceded Chief Gary Lindsey in that role. PLN sued Chief McMillan and Chief Lindsey in their individual capacities. Chief Shane Sowell is presently the Chief Deputy for the Dallas County Sheriff's Department's Detentions Bureau, essentially the same role as performed

including PLN's monthly publication. *See id.* para. 11. PLN alleges that Chief McMillan circulated that policy to jail staff, including Chief Lindsey, *id.* para. 12, and that, as a direct result of the no-newspapers policy, jail inmates were prevented from receiving PLN's publications, and that PLN's publications were instead destroyed. *See id.* paras. 13-17. PLN alleged that the new policy gave PLN no alternative means of exercising its rights of free speech and free expression to disseminate constitutionally-protected materials, in violation of the First and Fourteenth Amendments. *See id.* paras. 20-22. Finally, PLN alleged that reasonable alternatives to DCSO's policy existed, which would both meet the DCSO's legitimate and significant governmental interests without hindering PLN's and inmates' constitutional rights. *See id.* para. 23. PLN sought declaratory and injunctive relief, and statutory attorney's fees. The dispute was concluded by entry of a Consent Decree (ECF No. 37), and an accompanying Judgment (ECF No. 38).

In recent years, the DCSO and Dallas County Jail (the "Jail") officials have wrestled with increasing problems related directly to inmates' personal possession of physical paper materials, including specifically books, magazines/pamphlets/periodicals, and correspondence. The primary concerns surround (1) use of physical paper reading materials as a medium to transport contraband, principally, dangerous drugs such as K2;[4] (2) inmates' use of paper to jam or defeat cell door locking mechanisms; and (3) fire hazards, including inmates' intentional use of paper as fuel. *See* Declaration of Paul Lehmann ("Lehmann Decl.") paras. 5-6 (Appx. 2-3); Declaration of Shane Sowell ("Sowell Decl.") paras. 4-6, 16 (Appx. 8-9, 11).

These concerns were not merely theoretical. The Texas Commission on Jail Standards

---

[4] K2 is one of the many trade names or brand names for synthetic designer drugs that are specifically intended and designed to mimic tetrahydrocannabinol, or "THC," the main psychoactive ingredient of marijuana. These designer synthetic drugs are from the synthetic cannabinoid class of drugs that are often marketed and sold under the guise of "herbal incense" or "potpourri." *See* https://www.dea.gov/factsheets/spice-k2-synthetic-marijuana. *See also* Lehmann Decl. paras. 4-5 (Appx. 2) (describing how K2 is delivered as contraband to jail inmates via physical paper).

("TCJS") is responsible for establishing and enforcing minimum standards for Texas county and municipal jails.[5] Compliance with TCJS rules is mandatory, and the TCJS conducts inspections and provides guidance to facilities. On 23 February 2022, the TCJS issued a written notification to Sheriff Marian Brown and Dallas County Judge Clay Jenkins, advising that the Jail failed to comply with Texas Minimum Jail Standards in areas directly implicating inmates' personal access to, and possession of, physical paper materials.[6] *See* Lehmann Decl. para. 8 (Appx. 3) and TCJS letter dated 23 February 2022 (Appx. 14). The TCJS's notification letter attached a copy of the Texas Commission on Jail Standards Inspection Requirements Review for an on-site inspection of the Jail conducted on 14-18 February 2022, which specifically noted approximately 40 inoperable Jail cell doors, as well as the "consistent" smell of a "burning aroma at the North Tower facility" associated with K2. *See* Lehmann Decl. paras. 8-11 (Appx. 3-4); TCJS Inspection Report February 14-18, 2022 (Appx. 16-17). Further, TCJS inspectors personally witnessed inmates "manipulating a cell door with contraband causing the door to become inoperable." *See id.* (Appx. 16). The contraband used was paper material possessed by the inmates. Lehmann Decl. para. 9 (Appx. 3); TCJS Inspection Report February 14-18, 2022 (Appx. 16).

Infiltration of drug contraband had become an increasingly prevalent and serious concern. Paper products were being used to smuggle drugs to inmates by impregnating the paper with soluble drugs, such as K2, from which inmates recover the drugs by burning the paper and inhaling the synthetic cannabinoid that was dissolved into the paper fibers. *See* Lehman Decl. para. 5 (Appx. 2). As the TCJS Inspection Report states, the K2 issue "affects the inmate population as

---

[5] Title 37, Part 9 of the Texas Administrative Code governs the Texas Commission on Jail Standards, outlining rules for jail construction, inmate management, health services, and operational procedures. *See* Tex. Admin. Code § 251.1.

[6] *See* letter dated 23 February 2022 from Brandon S. Wood, Executive Director of the Texas Commission on Jail Standards to Sheriff Marian Brown and the Honorable Clay Jenkins, notifying those officials that the Dallas County jail failed to comply with the minimum standards established under Texas Local Government Code Chapter 351 and the Commission's rules. *See* TCJS letter dated 23 February 2022 (Appx. 14).

well as the jail staff who have to constantly inhale these fumes." TCJS Inspection Report February 14-18, 2022 (Appx. 16). The TCJS inspectors specifically remarked that "[t]he jail must find ways to address this issue so that this does not become common behavior from those inmates who are not adhering to jail rules and regulations." *Id.*

To respond to these indisputably serious jail security concerns, the DCSO joined other jail and prison facilities, large and small, to implement "paperless" systems with respect to inmates' in-cell possession of written materials. *See* Lehmann Decl. para. 7 (Appx. 3). Jail inmates now largely receive personal mail electronically, the exception being attorney-client correspondence, discussed below. Lehmann Decl. paras. 15-16 (Appx. 5-6). Non-privileged inmate mail is scanned remotely and is delivered to inmates electronically. Inmates view their correspondence via electronic tablet devices.[7] With the exception of inmates' attorney-client correspondence, inmates' in-cell possession of physical books, pamphlets, correspondence, and the similar items is prohibited. Lehmann Decl. paras. 15-16 (Appx. 5-6).

## II. SUMMARY OF RESPONSE TO THE MOTION TO SHOW CAUSE

Defendants have not materially violated the Consent Decree. *First*, the County has not "censored" HRDC's materials. HRDC fails to show that any HRDC publication or communication has been blocked, refused, or otherwise disfavorably treated based upon the content of HRDC's communication or because of its origin, HRDC. *Second*, HRDC fails to show that the County violated the Consent Decree by not providing a written explanation of "why the content [of HRDC's communications] is non-compliant with Dallas County regulations." *Third*, despite

[7] Inmates' regular mail is forwarded to the County's third party vendor, Smart Communications ("Smart"). Smart electronically scans the mail, and the digitized version is stored on Smart's servers. The individual inmate-recipient, can view the correspondence via electronic tablet devices provided by the Dallas County Jail. *See* Lehmann Decl. para. 15 (Appx. 5). "Legal mail" sent by inmates' legal counsel is photocopied in the inmates' presence, and the copy is physically tendered to the inmate, who is permitted to retain it. The original is destroyed to maintain confidentiality. In this way, drugs cannot be introduced into the Jail via attorney correspondence. *See id.* para. 16 (Appx. 5-6).

HRDC's assertion that it does not intend to relitigate the Consent Decree, its motion attempts to do exactly that by raising arguments arising under the Constitution, rather than under the terms of Consent Decree. *Fourth*, to the extent that one or more of the Defendants violated the Consent Decree, the violation was not intentional.

## III. ARGUMENT AND AUTHORITIES – SHOW CAUSE MOTION

### A. Legal standards for finding a violation of a consent decree

It is firmly established that in a civil contempt proceeding, the party seeking an order of contempt must establish by clear and convincing evidence: (1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order. *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 382 (5th Cir. 1999) (citing *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995)) (citing in turn *Martin v. Trinity Industries, Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)). *See also NLRB v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir. 1984) ("Plaintiffs must prove the alleged contempt by clear and convincing evidence.") (citing *Jackson v. Whitman*, 642 F. Supp. 816, 817 (W.D. La. 1986)).

"The judicial contempt power is a potent weapon which should not be used if the court's order upon which the contempt was founded is vague or ambiguous." *Martin*, 959 F.2d at 47 (quoting *Baddock v. Villard* (*In re Baum*), 606 F.2d 592, 593 (5th Cir. 1979)). Therefore, the contempt power should only be invoked where a specific aspect of the injunction has been clearly violated. *Piggly Wiggly*, 177 F.3d at 382-83 (citing *Martin*, 959 F.2d at 47). "Courts should not impose their own terms within a consent decree and should read consent decree terms by their plain meaning." *United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008) (citing *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 350 (5th Cir. 1998)).

**B. Defendants did not violate the Consent Decree for a failure to notify HRDC regarding a rejection of HRDC items based upon content.**

HRDC appears to contend that Defendants violated the Consent Decree by not following the process for notifying HRDC of mail rejected for objectionable content. *See* Motion 2; Motion 6 sec. III-C (discussing Consent Decree procedures for screening incoming mail for objectionable content). Paragraph 4 of the Consent Decree specifically addresses content-based rejections:

> Nothing in this settlement agreement and release shall be construed to prevent or limit Defendants or their agents, employees and departments from continuing to review, reject, process and dispose of inmate mail *for reasons of prohibited content*. This reserves Dallas County's authority *to review content* for reasons such as security, safety, institutional discipline and to monitor criminal activity. When any mail is rejected *due to its specific content*, a violation notice will be provided to the sender within 15 days, as described below in paragraph 5. (Emphasis added).

HRDC presents no evidence that HRDC materials were rejected on the basis of content. To be sure, the Wright Declaration provides no evidence of a content-based rejection. *See* ECF No. 39-1. Moreover, DCSO Assistant Chief Deputy Paul Lehmann, who currently serves in the Support Services Bureau with the Office of General Services, specifically denies that any HRDC materials have been rejected on the basis of *content*. *See* Lehmann Decl. paras. 2, 12, 19 (Appx. 1, 4, 6).

Paragraph 5 of the Consent Decree addresses the notification procedures that apply when HRDC materials are rejected for content-based reasons:

> If the rejection is for content based reasons, [HRDC] will receive a written explanation for why *the content is non-compliant* with Dallas County regulations within 3 business days of the rejection. The explanation will clearly explain the reason for the censorship and the party to whom [HRDC] can direct an appeal of the censorship decision. The Dallas County jail mailroom will hold the item during the pendency of any administrative appeals and deliver the item to the addressee if the appeal is decided in favor of the publisher and/or the inmate addressee. (Emphasis added).

Obviously, the provisions of Consent Decree paragraph 5 do not apply to HRDC's non-compliance allegation, as there has been no content-based rejection of HRDC's materials. *See* Decl. of Paul Wright (ECF No. 39-1) ("Wright Decl.") Put differently, HRDC fails to direct the Court to a

content-based rejection of its materials. Therefore, the Court should not find Defendants to be in contempt of the Consent Decree based upon a content-based (censorship) rejection, nor for any supposed failure to notify HRDC pursuant to paragraph 5 of the Consent Decree.

### C. Defendants notified HRDC in the manner specified by the Consent Decree for rejections of HRDC's materials for reasons other than content.

HRDC contends that Defendants did not comply with the notice provisions for rejections of HRDC's mailings for reasons other than content. *See* Motion 2; Motion 7 sec. II-C (discussing Consent Decree procedures for providing notice of rejection). Paragraph 5 of the Consent Decree specifically addresses the requirements for notices of rejections for reasons other than content:

> [HRDC] is entitled to receive notice of every mail rejection or undelivered item sent by [HRDC] to an inmate at the jail, together with a statement *or indication* of the reason for the rejection or non-delivery, regardless of the postal class by which the rejected piece of mail was sent. If the rejection or non-delivery is for non-content reasons such as address error or insufficient address, return of the envelope with indication of the reason written or stamped on the envelope is adequate. (Emphasis added).

Here, HRDC admits that an explanation of the non-content reason for rejection was provided. Defendants provided such statements or indications, and HRDC concedes this. HRDC's Motion contains an image of a "return to sender" label affixed to HRDC mail addressed to jail inmate Francisco Martines, which label HRDC itself describes as a "statement." *See* Motion 2 ("HRDC became aware of Defendants' violations through a threadbare statement."). That label concisely but fully states the non-censorship reason for the rejection, that books, publications, and periodicals will no longer be accepted. *See id.*

Further, HRDC's evidence demonstrates that other jail inmates' mail was returned with the same notification. *See* ECF No. 39-1 paras. 37-38 (Wright Decl.), and ECF Nos. 39-2 and 39-4 (Exhibits A and C to Wright Decl.). Wright's Declaration is notable with respect to the statement that "[t]he notice came with no other detail, despite paragraph 5 of the Consent Decree requiring

Defendants to inform HRDC of the specific reasons why HRDC's mail was being rejected." Wright Decl. para. 38. The Consent Decree doesn't require the "specific reasons," it requires only "a statement or indication of the reason for rejection or non-delivery." *See* Consent Decree para. 5. The labels do exactly that. Defendants complied with the notification requirement, and thus should not be found in contempt. *See Piggly Wiggly*, 177 F.3d at 382-83 (stating that the contempt power should only be invoked where a specific aspect of the injunction has been *clearly* violated).

Finally, HRDC again attempts to tie the notification requirements for content-based mail rejections to the more onerous notification requirements non-content based rejections. *See* Motion 2 ("Defendants . . . also failed to comply with the provisions of the Consent Decree that afforded HRDC a proper explanation and an opportunity to appeal censorship decisions."); *see also* Wright Decl. paras. 45-46 (stating that Defendants "never provided a written explanation of the reason for the rejection, and that Defendants returned rejected materials "rather than holding the materials during the pendency of an administrative appeal"). As shown above, a written explanation was provided as to each piece of returned mail, and the administrative appeal process applies only to mail returned for *censorship decisions*. *See* Consent Decree para. 5.

Despite HRDC's concession on page 2 of its Motion that the "return to sender" labels are indeed statements; HRDC later argues that the "return to sender" labels violate paragraph 5 of the Consent Decree. *See* Motion 8 ("The notice came with no other detail, which itself violates paragraph 5 of the Consent Decree."). As explained above, the labels are *statements*, and they do provide an *indication* of the reason for the rejection or non-delivery, which is all that is required when mail is rejected for reasons other than content. *See* Consent Decree paragraph 5.

Thus, HRDC fails to show that Defendants failed to notify HRDC of the rejection of its materials for reasons other than content in the manner specified by the Consent Decree. The Court

therefore should not find Defendants in contempt on the basis of failure to provide the notice.

**D. The DCSO's mail procedures are necessary to serve important penological safety and security interests.**

"Controlling the flow of contraband and ensuring institutional security are legitimate penological objectives." *Lewis v. Sec'y of Pub. Safety & Corr.*, 870 F.3d 365, 368 (5th Cir. 2017) (citing *Bell v. Wolfish*, 441 U.S. 520, 559-62 (1979)); *see also McCreary v. Richardson*, 738 F.3d 651, 656 (5th Cir. 2013) (per curiam) ("Prison practices that impinge on prisoners' constitutional rights are valid as long as they are 'reasonably related to legitimate penological interests.'") (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987))). It is self-evident that steps taken to prevent the smuggling of dangerous designer drugs such as K2,[8] and steps taken to prevent inmates from defeating cell door locks, are "reasonably related to legitimate penological interests" of inmate health and institutional security . Indeed, they are not merely reasonably related to those interests; they are *directly* related to those core interests. Likewise, it is self-evident that maintaining secure inmate cells is of paramount importance for maintaining institutional security, and the Court ought defer to the professional judgment of DCSO officials. *See McCreary*, 738 F.3d at 657 ("We 'defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security.'") (quoting *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 322-23 (2012)).

It is noteworthy that jail bans on inmates possessing softcover books received from outside sources are constitutional. In *Jones v. Salt Lake County*, 503 F.3d 1147 (10th Cir. 2007), an inmate, Jones, challenged as unconstitutional under the First Amendment the county jail's prohibition

[8] *See*, *e.g.*, Drug Fact Sheet: K2/Spice (https://www.dea.gov/sites/default/files/2020-06/K2-spice-2020.pdf) "Severe adverse effects have been attributed to the abuse of synthetic cannabinoids, including agitation, anxiety, seizures, stroke, coma, and death by heart attack or organ failure. Acute kidney injury requiring hospitalization and dialysis in several patients reportedly having smoked synthetic cannabinoids has also been reported by the Centers for Disease Control and Prevention."

against possessing paperback books ordered from sources outside the jail. Instead, inmates could obtain paperback books through the jail library. *Id.* at 1156-57. The *Jones* court held that the categorial ban was "rationally related to the legitimate governmental objective of prison security," because the outside sources ban "prevents contraband from being smuggled into the jail and lessens the administrative burden on jail personnel who must inspect each book." *Id.* at 1158.

**E. Defendants did not intentionally violate the Consent Decree.**

To the extent that the Court finds that any of Defendants violated the Consent Decree by instituting the DCSO's 14 March 2022 procedures, where the Jail ceased accepting *any* physical books, publications, and periodicals for delivery to inmates, Defendants did not do so in defiance of the Consent Decree's terms. Chief Lehmann, who as Assistant Chief Deputy participated in the decision to move the Jail to a "paperless environment" with respect to inmates' possession of actual paper materials, was not subjectively aware of the existence of the Consent Decree, nor was he made aware of its existence. *See* Lehmann Decl. para. 12 (Appx. 4).

In candor to the Court, the error was the result of the passage of time and changes in DCSO personnel. The Sheriff holding office in 2007, at the time the Consent Decree was entered, was Guadalupe Valdez, who served as the Sheriff until 6 December 2017. Valdez was succeeded by the current Sheriff, Marian Brown, who assumed elected office on 1 January 2018, eleven years after the Consent Decree. Furthermore, Defendants' attorney who handled this lawsuit from its inception in 2007 to the entry of the Consent Decree was Dolena Westargard, who passed away on 25 August 2017, several months before Sheriff Brown took office. In addition, there were other key personnel changes at the DCSO. The DCSO's Legal Advisor[9] in 2007 was Leslie Sweet, who

[9] The DCSO has its own legal advisor, who is not a member of the Dallas County District Attorney's Office. However, the original Defendants' attorney in the litigation was Dolena Westergard, an Assistant Dallas County District Attorney who was assigned to the Federal Litigation Division (now absorbed into the Civil Division) of the Dallas County District Attorney's Office.

served from 22 December 1998 through 10 April 2009. Sweet was succeeded by Elizabeth Lutton, who served as the Sheriff's Legal Advisor from 4 May 2009 through 13 January 2026. Thus, Lutton did not participate in the prior litigation involving PLN's lawsuit and the entry of the Consent Decree.

In short, those who participated in the entry of the Consent Decree had either left office, left DCSO/County employment, or had passed away, leaving no institutional memory of the prior litigation or of the entry of the Consent Decree. Unfortunately, this confluence of events resulted in the unawareness of the Consent Decree. Thus, Defendants did not intentionally disregard the Consent Decree; they were subjectively unaware of its existence. For these reasons, the Court should not find Defendants in contempt.

## IV. MOTION TO MODIFY THE CONSENT DECREE

### A. Introduction

As the County has explained in its response to HRDC's Motion, the changes made to the DCSO's practices and procedures for handling inmate mail and allowances for inmates' physical possession of paper materials were necessitated by changing conditions in the Jail. The widespread use of paper as a transport medium for introducing drug contraband into the Jail, inmates' use of paper materials to tamper with cell door security, inmates' use of paper materials to clog plumbing fixtures and lavatories, and directives issued by the TCJS to take immediate steps to remedy those problems, required adoption of new restrictions to address those penological imperatives. Current conditions have rendered the existing Consent Decree unworkable, and continued enforcement of the Consent Decree would be decidedly detrimental to the public interest and the penological interest of maintaining jail security, including the safety of the jail detention service officers. For example, a jammed door can result in an inmate getting out and possibly attacking jail staff or other detainees. Defendants' proposed modifications to the Consent Decree are suitably tailored

to the changed circumstances, and should be allowed for the continued safety of Jail inmates, staff, and the general public.

**B. Consent Decree modifications sought**

Defendants seek the following modifications of the Consent Decree:

1. **HRDC Publications and Correspondence.** HRDC may transmit *Prison Legal News*, renewal notices, book catalogs, newsletters, and similar materials intended for individual inmates confined in Dallas County correctional facilities. Such materials shall be submitted in an electronic format, provided that HRDC possesses and grants the rights necessary for DSO and its designated service providers to reproduce and electronically distribute the materials as provided in Paragraph # below. HRDC shall provide the material in a format reasonably compatible with the electronic system then utilized or designated by DCSO for distribution of inmate communications or publications. DCSO shall make electronically submitted materials available to the identified inmate recipient or subscriber through the electronic delivery system then in use, subject to reasonable technical, security, and operational requirements applicable to electronic materials generally.

   Nothing in this Agreement requires DCSO to utilize any particular vendor, device, software platform, file format, or method of electronic delivery, and DCSO may modify or replace its electronic delivery systems and procedures as operational needs and technology change, provided that DSO maintains a reasonable means for delivering compliant HRDC materials to their intended inmate recipients.

2. Distribution of digitized copies of subscription/product solicitations electronically (via tablet) only, to all inmates not otherwise under a restriction (*e.g.*, suicide watch, medical unit/ infirmary). HRDC shall provide a digital copy to the DCSO for these distributions, as provided for in paragraph #.

3. HRDC shall remain an approved distributor or vendor of softcover, glue-bound books for purposes of this Agreement. HRDC may send books intended for individual Dallas County Jail inmates to DCSO in accordance with DCSO's procedures for receipt of publications. Books received from HRDC for an individual inmate will be maintained in the Jail law library or another secure library location designated by DCSO and will not be maintained in the inmate's cell or other individual housing area.

   An inmate may have up to three (3) books held for the inmate at one time. The books shall remain available for the inmate's use through the Jail's library procedures during the inmate's confinement, subject to reasonable restrictions based on security, classification, housing status, facility operations, and library access. Books held for an individual inmate remain the property of that inmate and shall be returned to the inmate upon the inmate's release from, or transfer out of, the Dallas County Jail, unless the inmate voluntarily relinquishes ownership or otherwise authorizes their disposition.

4. **Security, Safety, and Institutional Operations.** Nothing in this Agreement limits

DCSO's authority to adopt and enforce reasonable policies and procedures necessary to maintain jail security, safety, sanitation, institutional discipline, prevent or investigate criminal activity, control contraband, or protect inmates, employees, and visitors. This authority includes reasonable restrictions concerning the physical form, method of delivery, storage, possession, and location of books, publications, correspondence, and other materials within DSO facilities.

DCSO may also review and reject particular materials based upon prohibited content consistent with applicable law. DCSO shall not restrict HRDC materials solely because of HRDC's identity, viewpoint, criticism of correctional institutions, or other constitutionally protected expression.

5. **Rejection and Non-Delivery.** If DCSO rejects electronically submitted HRDC material because of its content, DCSO shall provide HRDC written or electronic notice identifying the material rejected, the reason for the rejection, and the procedure for requesting administrative review. If material cannot be delivered for a non-content reason, including release or transfer of the intended inmate, an incorrect or insufficient inmate identifier, technical incompatibility, technical failure, or another administrative or operational reason, DSO or its designated service provider may provide notice through the ordinary notification process then in use.

6. **Duration, Periodic Review, and Termination.** The parties acknowledge that correctional practices, security threats, technology, methods of inmate communication, and systems for distributing publications may change over time. Accordingly, the parties shall review the operation of this Agreement at least once every three (3) years to determine whether its provisions remain appropriate in light of then-existing technology, correctional practices, security conditions, and applicable law.

**C. Legal standards for modification of a consent decree**

Federal Rule of Civil Procedure Rule 60(b) provides district courts with the authority to modify a consent decree. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992). Like any other judgment, a consent decree is not written in stone, and is subject to revision when material circumstances that underlie the decree change. Rejecting the "grievous wrong" standard embodied in *United States v. Swift & Co.*, 286 U.S. 106 (1932), in *Rufo* the Supreme Court recognized that, where a judgment has prospective application, as it does in this case, Rule 60(b) permits courts to apply "a less stringent, more flexible standard." *Rufo*, 502 U.S. at 380. "Because [consent] decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased. *Id.*

Applying *Rufo*, in *Cooper v. Noble* the Fifth Circuit explained that, "[w]hen significant changes in factual conditions make a consent judgment unworkable, make compliance substantially more onerous, or make enforcement detrimental to the public interest, a court has the discretion to modify the judgment." 33 F.3d 540, 544 (5th Cir. 1994), *supplemented*, 41 F.3d 212 (5th Cir. 1994) (internal citation and quotations omitted). Similarly, in *League of Latin American Citizens District 19 v. City of Boerne*, 659 F.3d 421 (5th Cir. 2011) ("*LULAC*"), the Fifth Circuit explained that "[d]istrict courts must take a flexible approach to motions to modify consent decrees and to motions to modify or vacate institutional reform decrees." *LULAC*, 659 F.3d at 437 (citing *Rufo*, 502 U.S. at 379-380). *LULAC* explains *Rufo's* two-step test for consent decree modification:

> First, the party seeking modification must show that "a significant change either in factual conditions or in law" that "make compliance with the decree substantially more onerous or workable because of unforeseen obstacles [or] … unworkable because of unforeseen obstacles[,] … or when enforcement of the decree without modification would be detrimental to the public interest. Second, the court must then "consider whether the proposed modification is suitably tailored to the changed circumstance."

*LULAC*, 659 F.3d at 437 (quoting *Rufo*, 502 U.S. at 383, 384) (internal citations omitted).

For the first part of the *Rufo* test, the party seeking modification must show that the changes in circumstances are "significant" and not just merely inconvenient. *LULAC*, 659 F.3d at 437. In this regard, "courts should apply a flexible approach when deciding modification requests." *Id.* (citing *Rufo*, 502 U.S. at 379).

Here, Defendants have demonstrated significant changes in circumstances, which are tied directly to the overarching legitimate penological interest in institutional security and physical safety of inmates, staff, and visitors, and which render the existing Consent Decree unworkable. These facts are indisputable:

- The Dallas County Jail's capacity exceeds 7,000 inmates. A central responsibility of DCSO is maintaining a safe and secure jail for inmates, employees, contractors, and visitors. Lehmann Decl. para. 4 (Appx. 2); Sowell Decl. para. 4 (Appx. 9).

- Contraband, particularly illicit drugs, presents a serious and continuing obstacle to the DCSO's ability to meet that responsibility. Lehmann Decl. para. 4 (Appx. 2); Sowell Decl. paras. 4-5 (Appx. 9).

- Drug usage inside a jail can cause intoxication, medical emergencies, unpredictable or violent behavior, trafficking and coercion among inmates, and increased risks to detention personnel who must respond to those incidents. Lehmann Decl. para. 4 (Appx. 2); Sowell Decl. para. 4 (Appx. 9).

- Paper presents a particular contraband concern because illicit substances, including synthetic cannabinoids commonly referred to as "K2," can be introduced into a correctional facility through paper. Lehmann Decl. para. 5 (Appx. 2); Sowell Decl. para. 5 (Appx. 9).

- K2 or similar substances may be dissolved into a liquid and sprayed onto or absorbed into paper. After the paper dries, treated paper may resemble ordinary untreated paper, making detection through ordinary visual inspection difficult. Treated paper may then be divided into smaller pieces, concealed, transferred, sold or traded among inmates, and consumed, including by burning the treated material and inhaling the resulting smoke or fumes. Lehmann Decl. para. 5 (Appx. 2); Sowell Decl. para. 5 (Appx. 9).

- Beginning around 2015, and increasingly in the following years, introduction of paper-borne K2 into state prison and jail systems became epidemic, with severe adverse health consequences to inmates and facility staff.[10]

- Inmates' possession of physical paper also presents security concerns independent of drugs, because paper from correspondence, magazines, newsletters, pamphlets, periodicals, and books can be torn, folded, compressed, layered, rolled, or inserted into fixtures and mechanisms. Lehmann Decl. para. 6 (Appx. 2); Sowell Decl. para. 5 (Appx. 9).

- In a jail environment, paper can be repurposed to interfere with security equipment, including cell-door locking mechanisms, and can be accumulated or placed into toilets and drains, creating plumbing problems, flooding, unsanitary conditions, and additional demands on detention and maintenance personnel. Lehmann Decl. para. 6 (Appx. 2-3); Sowell Decl. paras. 6, 13 (Appx. 9, 11).

- Texas Commission on Jail Standards (TCJS) conducted a comprehensive inspection of

---

[10] *See*, *e.g.*, https://www.youtube.com/watch?v=I8MEaBCzFQ4&t=8s ("Correction officers say K2 is to blame for rise in overdose calls in Somers prison" NBC Connecticut, July 2, 2025); https://www.tpr.org/2017-07-11/texas-prisons-struggle-to-keep-k2-under-control ("Texas Prisons Struggle to Keep K2 Under Control" Texas Public Radio, July 11, 2017); https://908devices.com/blog/why-k2-spice-is-keeping-corrections-staff-up-at-night/ (The Paper Problem: Why K2/Spice Is Keeping Corrections Staff Up at Night" 908devices, August 26, 2026); https://journalrecord.com/2017/07/12/prisons-dealing-with-smuggled-synthetic-marijuana-k2/ ("Prisons dealing with smuggled synthetic marijuana, K2" AP, July 12, 2017); https://prisonjournalismproject.org/2025/04/01/the-rapid-rise-of-k2-and-suboxone-in-a-michigan-prison/ ("The Rapid Rise of K2 and Suboxone in a Michigan Prison" Prison Journalism Project, April 1, 2026).

the Dallas County Jail from February 14 through February 18, 2022. Lehmann Decl. para. 8 (Appx. 3); Sowell Decl. para. 8 (Appx. 9-10).

- The TCJS inspection documented a drug-related condition in the Jail's North Tower. TCJS stated that, during the inspection team's week at the Dallas County Jail, inspectors consistently smelled a burning aroma at the North Tower facility. Lehmann Decl. para. 10 (Appx. 3-4); Sowell Decl. para. 9 (Appx. 10); TCJS Inspection Report February 14-18, 2002 (Appx. 16).

- TCJS reported that, after speaking with numerous staff members, the smell was associated with K2 and the burning or smoking of coffee grounds. TCJS further documented that staff described the problem as having been ongoing for several months and as affecting inmates as well as jail employees who had to inhale the fumes. TCJS Inspection Report February 14-18, 2002 (Appx. 16).

- Operable and secure cell doors are fundamental to maintaining custody and control within a jail. Lehmann Decl. para. 9 (Appx. 3).

- The February 2022 TCJS inspection identified significant physical-security problems in the North Tower. TCJS reported that approximately forty housing-unit doors were inoperable. TCJS further reported that, while inspectors were onsite attempting to verify repairs, inspectors witnessed inmates manipulating a cell door with contraband, causing the door to become inoperable. Lehmann Decl. para. 9 (Appx. 3); Sowell Decl. para. 8 (Appx. 9-10).

- The February 2022 TCJS inspection findings reinforced concerns the DCSO was already confronting about contraband, drug use, burning activity, and the various ways materials available to inmates could be misused. Lehmann Decl. para. 11 (Appx. 4).

- A glue-bound paperback book remains composed principally of physical paper. Pages can be torn or otherwise removed from the binding. Once removed, those pages can be divided, concealed, transferred, altered, burned, placed into plumbing or fixtures, or otherwise repurposed. From a correctional-security perspective, eliminating staples addresses only one possible physical hazard. It does not address the risks associated with the paper itself. Lehmann Decl. paras. 17-18 (Appx. 5-6); Sowell Decl. paras. 12-13 (Appx. 10-11).

- Effective March 14, 2022, the DCSO ceased accepting physical books, publications, and periodicals for delivery to inmates as part of the broader effort to reduce physical paper in the Jail. Lehmann Decl. para. 13 (Appx. 4).

- The change was a direct response to the February 2022 TCJS inspection that documented serious security and drug-related conditions, and the DCSO responded by taking measures intended to address those conditions. Lehmann Decl. para. 13 (Appx. 4).

- The TCJS conducted a comprehensive re-inspection from May 31 through June 2,

> 2022. TCJS inspectors specifically noted that they found "no trace of the consistent burning aroma at the North Tower facility." DCSO also continued its efforts to correct the other deficiencies identified during the February inspection. Lehmann Decl. para. 14 (Appx. 4); TCJS Inspection Report May 31 – June 2, 2002 (Appx. 18-27).

The foregoing changes in circumstances at the Dallas County jail were "significant," and not just merely inconvenient. The steady infiltration of K2 into penal facilities nationwide, documented by countless reliable sources, transformed into an epidemic scourge several years after the parties here entered into the 2007 Consent Decree. *See* footnote 10, *infra*. By early 2022, K2 infiltration into the Jail had become prevalent enough that it contributed to a failed TCJS inspection. Further, in addition to the direct (inmate) and indirect (staff and visitors) health risks, inmate possession of physical paper put cell security directly at risk, via inmates using paper to sabotage cell doors—a circumstance that directly impedes the DCSO's fundamental penological interest in maintaining custody and control within the Jail. These are not mere inconveniences.

There is also inmates' use of physical paper to disrupt plumbing and sanitation systems, by stuffing paper into cell toilets and drains. While superficially such vandalism may appear to be merely an "inconvenience," it causes flooding and leads to unsanitary conditions. Lehmann Decl. paras. 6, 23 (Appx. 2-3, 7); Sowell Decl. para. 6 (Appx. 9). The health risks presented by toilet backups are common knowledge,[11] and are particularly significant in an institutional setting, such as a large jail facility. Thus, Defendants have shown significant changes in circumstances arising from inmates' possession of physical magazines, periodicals, books, and the like.

Finally, it must be noted that the DCSO is not engaging in censorship of HRDC's materials. As Chief Lehmann's declaration makes clear,

[11] Raw sewage contains bacteria (*e.g.*, E. coli, Salmonella), viruses (*e.g.*, Hepatitis A, norovirus), and parasites (*e.g.*, Giardia, Cryptosporidium) that can cause gastrointestinal illness, respiratory infections, and other communicable diseases. These pathogens become health risks through direct skin contact, ingestion, or inhalation of fine water droplets or aerosolized particles.

> . . . DCSO's security concern is not unique to HRDC materials. The concern applies to physical paper generally, regardless of whether the material comes from HRDC, another publisher, a private correspondent, or another source. DCSO has not rejected HRDC's physical materials because of disagreement with HRDC's views, criticism of correctional institutions, or other content.

Lehmann Decl. para. 19 (Appx. 6).

For the second part of the *Rufo* test, a court must "consider whether the proposed modification is suitably tailored to the changed circumstance." *LULAC*, 659 F.3d at 437 (citing *Rufo*, 502 U.S. at 383). To be "suitably tailored to the changed circumstance," the modification "must not create or perpetuate a constitutional violation," or "strive to rewrite a consent decree so that it conforms to the constitutional floor." *Rufo*, 502 U.S. at 391.

As for the first requirement, it is self-evident that an unconstitutional condition should not be imposed. *Id.* HRDC's *Motion* does not explain why the DCSO's new mail and literature procedures, referenced in page 3 of HRDC's *Motion* (Motion Exhibit B, the DCSO's 2025 Inmate Handbook at 16), are unconstitutional. HRDC merely states, without explanation, that the new DCSO policy is "an unconstitutional de facto ban on printed literature." *See Motion* 3. HRDC's contention fails to withstand scrutiny for two reasons. *First*, the DCSO does not "ban" all printed literature. Inmates may receive HRDC's solicitations in electronic format, via computer kiosks virtually throughout the Jail, or on electronic tablet devices. Defendants are unaware of any case authorities that require written materials to be made available in a particular format, that is, in paper form instead of electronic form. Here, inmates already have access to HRDC's hardcopy pamphlets/newsletter (*Prison Litigation News*) in the Jail's library.[12] Defendants now propose to limit individual inmates' subscriber access to an electronic format, in response to the substantial

---

[12] The DCSO has three (3) paid subscriptions to HRDC's in-house publication, *Prison Litigation News*. Those physical copies are available to inmates in the Jail library. *See* Sowell Decl. para. 17 (Appx. 12).

health and safety concerns described above.

*Second*, the DCSO's policy does not infringe on inmates' (or derivatively, HRDC's) First Amendment rights. "To determine whether a jail or prison policy infringes on the First Amendment rights of inmates, as well as those seeking to communicate with them, 'the relevant inquiry is whether the [policy is] 'reasonably related to legitimate penological interests.'" *Human Rights Def. Ctr. v. Baxter Cnty., Arkansas*, 999 F.3d 1160, 1164 (8th Cir. 2021) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989)) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Four factors are relevant to that inquiry:

- "whether the [policy] has a 'valid rational connection' to a legitimate governmental interest;"
- "whether alternative means are open to [those desiring to communicate with] inmates to exercise the asserted right;"
- "what impact an accommodation of the right would have on guards and inmates and prison resources;" and
- "whether there are 'ready alternatives' to the [policy]."

*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (quoting *Turner*, 482 U.S. at 89-91). However, in conducting this analysis, courts are to give "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132.

The Eighth Circuit's opinion in *Baxter County* deserves special attention for Judge Loken's concurrence in part. Judge Loken explains the *Turner* analysis is atypical of multi-factor tests:

> The majority ignores or overlooks Supreme Court decisions making clear that the four Turner factors are not a typical multi-factor test. HRDC's First Amendment right to access jail inmates is not "wholly derivative of the rights of inmates," [] but its right must give way to a *valid* jail or prison policy that prohibits inmates from receiving the communication in the interest of "maintaining institutional security and preserving internal order and discipline." Thus, when a jail policy satisfies the

> first Turner factor, the Supreme Court considers the other three factors to determine whether the policy is *reasonably* related to Baxter County's legitimate penological interests. If the second, third, and fourth factors are "logically related to the Policy itself, [they] add little, one way or another, to the first factor's basic logical rationale. ... The real task ... is not balancing these factors, but rather determining whether the [County] shows more than simply a logical relation, that is, whether [it] shows a *reasonable* relation."

*Baxter Cnty.*, 999 F.3d at 1171-72 (internal citations omitted) (emphasis original) (Loken, C.J., concurring in part, and dissenting in part). When viewed in this framework, Defendants easily demonstrate that this Court should modify the Consent Decree.

**1. The first *Turner* factor: a valid rational connection to a legitimate governmental interest**

The DCSO has abundantly established that the changes it requests to make in the Consent Decree have valid, rational connections to critical legitimate governmental interests: preventing the introduction of drug contraband into the Jail, preventing inmates from circumventing jail cell security, and preventing inmates from using paper to disrupting cell sanitation/plumbing systems. *See generally*, Lehmann Decl. (Appx. 1-6), Sowell Decl. (Appx. 8-13). The rational connections are obvious: no paper, no transport medium for K2 and similar contraband. No paper, no means of circumventing cell door mechanisms with paper torn from periodicals and books. No paper, no disrupting plumbing with paper from periodicals and books. No paper, no fires started with paper.[13]

**2. The second *Turner* factor: whether alternative means are open to communicate HRDC's messages**

The second *Turner v. Safley* factor is whether alternative means are open to exercise the right asserted, which in this instance is the right of inmates to access HRDC's materials. In *HRDC*

[13] Defendants duly recognize that a transition to a "paperless" jail will not eliminate entirely the substantial health and safety risks that a paperless environment is designed to address. However, Defendants have found no case authorities that require a corrections supervisor's solution to be 100 per cent effective. To the contrary, the test is merely whether the [policy] has a "valid rational connection' to a legitimate governmental interest, and whether there are "ready alternatives" to the policy. *Overton*, 539 U.S. at 132.

*v. Baxter County*, HRDC challenged Baxter County's policy that provided, "[w]ith the exception of privileged mail or legal mail, the only type of mail the jail staff are permitted to accept for the inmate is post cards. Other mail will be marked for return to sender." *Baxter Cnty.*, 999 F.3d at 1162-63. The HRDC publications included *Prison Legal News*, which is one of the publications directly at issue here. *Id.* at 1163.

As the Eighth Circuit noted in *Baxter County*, the Supreme Court has made it clear that, while alternative means of communication do not have to be "ideal," they do have to be "available." *Baxter Cnty.*, 999 F.3d at 1166 (citing *Overton*, 539 U.S. at 135); *see also Pell v. Procunier*, 417 U.S. 817 (1974). If the alternative means are illusory, impractical, or otherwise unavailable, this would weigh in favor of HRDC under the second *Turner* factor. A consideration in *Baxter County* was that, if HRDC could be required to use only postcards to solicit inmate subscribers, the postcard-only policy appeared to prohibit Jail inmates from receiving any of HRDC's publications, as subscribers or otherwise. Thus, HRDC asserted, the postcards-only policy was a *de facto* total ban on publishers communicating with inmates. *See Baxter Cnty.*, 999 F.3d at 1165 (noting that the Supreme Court has warned that "a *de facto* permanent ban" on inmate access to communications with outsiders would present a serious constitutional issue, and citing *Beard v. Banks*, 548 U.S. 521, 535 (2006)).

However, as Judge Loken explains in his concurring opinion, regarding the second factor, "[t]he absence of any alternative ... provides 'some evidence that the regulations [a]re unreasonable,' but is not 'conclusive' of the reasonableness of the Policy." *Baxter Cnty.*, 999 F.3d at 1172 (citing *Beard v. Banks*, 548 U.S. 521, 532 (2006) (plurality op.)) (quoting in turn *Overton*, 539 U.S. at 135).

The facts here and the modifications to the Consent Decree Defendants seek do not even

approach a "ban," *de facto* or otherwise. What Defendants (the DCSO) propose is far less. Jail inmates would receive copies of HRDC's publication *Prison Legal News* electronically, as well as HRDC's subscription solicitations, via tablets. Alternatively, inmates could go to the Jail's library, and partake of one of the DCSO's three paid hardcopy subscriptions. Inmates could purchase HRDC's other for-sale publications, such as softcover books, which would be made available to the purchasing inmate for reading *in the library*, the same as is done with any other physical paper book. In other words, there would be more than ample alternative avenues for inmates to receive HRDC's offerings. Thus, there are ample alternative means open to exercise the rights asserted.

**3. The third *Turner* factor: what impact an accommodation of the right would have on guards and inmates and prison resources**

Defendants have amply shown the adverse impact accommodating HRDC's rights under the current Consent Decree is having on guards and inmates. Dangerous drugs are entering the Jail via printed paper materials. Security systems are being circumvented, which can lead to inmates getting out and possibly attacking staff or other detainees. Sanitary plumbing is being turned into a vector for disease. Fire risk is being increased. The current Consent Decree thus imposes a highly adverse impact on both guards and inmates.

**4. The fourth *Turner* factor: whether there are "ready alternatives" to the proposed changes to the Consent Decree**

Courts are to give "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132. Here, the Court has before it the declarations of two highly experienced law enforcement professionals, DCSO Assistant Chief Deputy Paul Lehmann, and Chief Deputy Shane Sowell. Chief Lehmann's law enforcement and corrections career began in 1992, at the Texas Department of Criminal Justice. Lehmann Decl. para. 2 (Appx. 1). Chief Sowell has more than 28 years of

law enforcement experience, the majority of which is in jail administration. Sowell Decl. para. 2 (Appx. 8). Those senior administrators, along with others, bear significant responsibility for determining the most appropriate means to accomplish the DCSO's legitimate goals of "maintaining a safe and secure jail for inmates, employees, contractors, and visitors" to the jail. Lehmann Decl. para. 4 (Appx. 2); *see also* Sowell Decl. paras. 3, 4 (Appx. 8-9).

As Chief Lehmann explains, the DCSO's move to a "paperless environment" for inmates was an operational security decision directed at the physical medium itself—paper—and the risks associated with bringing substantial quantities of physical paper into inmate housing areas." Lehmann Decl. para. 12 (Appx. 4). It had nothing to do with the content of HRDC's publications. *Id.* paras. 12, 19 (Appx. 5, 6); *see also* Sowell Decl. paras. 12, 18, 20 (Appx. 10, 12). Chief Sowell expresses the same concerns, and also affirms that a move to a paperless environment has nothing to do with the content of HRDC's materials. *See* Sowell Decl. paras. 15-16 (Appx. 11-12). Rather, the changes are necessitated by a substantial changed circumstances. As Chief Sowell explains,

> The security conditions that informed DCSO's 2022 operational decisions were materially different from those that existed when the 2007 Consent Decree was entered. By early 2022, DCSO was addressing documented security-door failures, inmate manipulation of security equipment with contraband, an ongoing burning condition in the North Tower associated by staff with K2, and the broader contraband risks associated with paper inside a large detention facility.

Sowell Decl. para. 18 (Appx. 12).

Chief Lehmann is unambiguous about the consequences of returning to the former environment, where inmates possess substantial quantities of physical paper:

> 19. Based on my experience and my involvement in the 2022 decision, allowing unrestricted quantities of original paper publications back into inmate housing areas would reintroduce risks DCSO sought to reduce, including opportunities to introduce and circulate drug-treated paper, engage in burning or smoking activity, misuse paper against security equipment or infrastructure, and accumulate paper in inmate housing areas.

Lehmann Decl. para. 20 (Appx. 6). Chief Sowell shares Chief Lehmann's professional assessment:

> 19. From a jail-administration perspective, requiring DCSO to place unrestricted quantities of original paper publications into inmate housing areas would reintroduce categories of risk that DCSO sought to reduce: paper capable of being used to interfere with locking mechanisms or plumbing, paper that can be burned or smoked, paper capable of carrying contraband substances, and increased paper accumulation in housing areas, which poses an extremely high fire risk.

Sowell Decl. para. 19 (Appx. 12).

For these several substantial and compelling reasons, Defendants have demonstrated that unforeseen and material changes in the operational environment of the Dallas County jail have rendered the Consent Decree unworkable in its current form, and the requested changes to the Consent Decree meet the *Turner v. Safley* requirements.

## V. CONCLUSION

The Court should deny HRDC's motion to hold Defendants in civil contempt. Defendants have not materially violated the Consent Decree. There has been no content-based censorship of HRDC's materials, therefore the content-based provisions of the Consent Decree did not apply. Also, Defendants provided written explanations of the non-content-based reasons that HRDC's mailed items were returned, also in compliance with the terms of the Consent Decree. Finally, to the extent there was a violation of the Consent Decree, it was not done knowingly. Rather, it was in response to pressing needs to take affirmative steps to comply with TCJS requirements and for the protection of all persons in the Jail—inmates, staff, and visitors alike.

The Court should also grant Defendants' motion to modify the terms of the Consent Decree. Preventing the infiltration of drug contraband, controlling physical jail cell integrity, and limiting the spread of disease promote institutional security and are legitimate penological objectives. The transition to a "paperless" jail facility is reasonably related to those objectives, leaves open several alternative means for HRDC to communicate with Jail inmates, lessens the adverse impact on Jail guards and inmates, and there are no other ready alternatives that will accomplish the legitimate

goals as determined by experienced corrections officials. Therefore, the Court should grant Defendants' Rule 60 motion to amend the Consent Decree.

WHEREFORE, Defendants pray that the Court find that they are not in civil contempt of the Consent Decree. Further, Defendants pray that the Court grant their motion to modify the existing Consent Decree as requested herein. Finally, Defendants pray that the Court grant Defendants all relief to which they are entitled, consistent with this response and motion.

Respectfully submitted,

JOHN CREUZOT
CRIMINAL DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

*/s/ Jason G. Schuette*
Assistant District Attorney
Texas State Bar No. 17827020
jason.schuette@dallascounty.org

Barbara S. Nicholas
Assistant District Attorney
Texas State Bar No. 24032785
barbara.nicholas@dallascounty.org

Civil Division
Dallas County Records Building
500 Elm Street, Suite 6300
Dallas, Texas 75202
Telephone: 214.653.7358
Telecopier: 214.653.6134

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with counsel for Plaintiff regarding the merits of Defendants' motion to modify the terms of the Consent Decree that is the subject of this response and motion. Plaintiff *opposes* all of the relief that Defendants seek. Therefore, the matter is submitted to the Court for determination.

*/s/ J. G. Schuette*
Assistant District Attorney

## CERTIFICATE OF SERVICE

I certify that on 16 September 2026, I caused the foregoing document to be electronically filed with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court, as permitted by Federal Rule of Civil Procedure 5(b)(2)(E). The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who has consented in writing to accept this Notice as service of this document by electronic means. Therefore, the County has complied with Federal Rule of Civil Procedure 5(a)(1).

*/s/ J. G. Schuette*
Assistant District Attorney